**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION** | MDL 2895<br><br>C.A. No. 19-02895-LPS |
| *THIS DOCUMENT RELATES TO:*<br><br>*ALL INDIRECT PURCHASER ACTIONS* | **Public Redacted Version Filed September 20, 2019**<br><br>**JURY TRIAL DEMANDED** |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................... 5

III.    THE PARTIES............................................................................................................ 6

IV.     FACTUAL ALLEGATIONS ....................................................................................... 9

        A.    Amgen Develops and Launches Sensipar and Earns Billions of Dollars ................ 9

        B.    Amgen Acquires the '405 Patent ........................................................................ 9

        C.    Generic Manufacturers Seek FDA Approval for Generic Versions of
              Sensipar.......................................................................................................... 10

        D.    Amgen Sues the Generic ANDA Applicants for Infringement of the '405
              Patent............................................................................................................. 10

        E.    Teva and Other Non-Settling Generics Win Non-Infringement Judgment
              at Trial ........................................................................................................... 17

        F.    Teva Receives FDA Final Approval and Launches Its Generic Version of
              Sensipar.......................................................................................................... 18

        G.    Amgen and Teva Enter an Unlawful Market Division Agreement to
              Eliminate and Delay Generic Competition ......................................................... 20

V.      THE ANTICOMPETITIVE EFFECTS ON INTERSTATE AND
        INTRASTATE COMMERCE ..................................................................................... 26

VI.     MONOPOLY POWER AND MARKET DEFINITION................................................. 28

VII.    CLASS ACTION ALLEGATIONS ............................................................................ 33

VIII.   CLAIMS FOR RELIEF ............................................................................................ 36

        FIRST CLAIM FOR RELIEF Contract, Combination, and Conspiracy in
              Restraint of Trade under the Sherman Act § 1 (Against All Defendants).............. 36

        SECOND CLAIM FOR RELIEF Monopolization under the Sherman Act § 2
              (Against Amgen)............................................................................................. 39

        THIRD CLAIM FOR RELIEF Conspiracy and Combination in Restraint of
              Trade under State Law (Against All Defendants)................................................. 40

<u>FOURTH CLAIM FOR RELIEF</u> Monopolization and Monopolistic Scheme
under State Law (Against Amgen) ............................................................. 45

<u>FIFTH CLAIM FOR RELIEF</u> State Consumer Protection Violations (Against
All Defendants) ......................................................................................... 49

<u>SIXTH CLAIM FOR RELIEF</u> Unjust Enrichment (Against All Defendants) ................ 53

IX.    DEMAND FOR JUDGMENT .......................................................................... 75

X.    JURY DEMAND ............................................................................................ 75

Plaintiffs UFCW Local 1500 Welfare Fund, Teamsters Local 237 Welfare Fund, and Teamsters Local 237 Retirees' Benefit Fund on behalf of themselves and all others similarly situated, file this Complaint against Defendants Amgen Inc. ("Amgen"), Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., and Actavis Pharma, Inc. (collectively, "Teva"). Plaintiffs' claims arise from Defendants' anticompetitive scheme to restrain competition in the market for Sensipar® and its AB-rated generic equivalents sold in the United States. Plaintiffs' allegations are made on personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters.

## I.   NATURE OF THE ACTION

1.      Plaintiffs seek damages and equitable relief arising from Defendants' anticompetitive agreement, which eliminated generic competition in the United States for branded and generic versions of Sensipar (cinacalcet hydrochloride tablets). Sensipar is a drug used to treat certain conditions associated with chronic kidney disease and thyroid cancer.

2.      Amgen received approval from the Food and Drug Administration ("FDA") to market Sensipar in the United States in March 2004. After launch, Sensipar's sales grew rapidly. As of 2017, Amgen's U.S. sales of Sensipar exceeded $1.3 billion annually.

3.      Because Sensipar was a blockbuster drug, numerous generic drug manufacturers filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking the approval of generic versions of Sensipar. Teva was one such manufacturer. Other generic manufacturers filing ANDAs included Aurobindo Pharma, Hetero Labs, Sun Pharmaceutical Industries, Cipla Ltd., Mylan Pharmaceuticals, Amneal Pharmaceuticals, Dr. Reddy's Laboratories, Breckenridge Pharmaceutical, Micro Labs, Piramal Healthcare, Strides Pharma, Ajanta Pharma, and Zydus Pharmaceuticals.

4.      As part of their applications, these generic manufacturers were required to make certain certifications against the patents covering Sensipar. Among these patents were U.S. Patent Nos. 6,011,068 (the '068 patent") and 9,375,405 ("the '405 patent"), which expired on March 8, 2018 and September 22, 2016, respectively. While the ANDA applicants generally did not challenge the '068 patent, all filed "Paragraph IV" certifications against the '405 patent, stating that the patent was invalid, unenforceable, or not infringed by the proposed ANDA applicants' generic versions of Sensipar. However, under the Hatch-Waxman Act and FDA regulations, no generic manufacturer was entitled to first filer exclusivity.[1] Nor was Amgen entitled to a statutory 30-month stay on FDA's final approval any pending generic Sensipar ANDA.[2] Therefore, upon receipt of FDA final approval, any generic ANDA holder could launch its generic version of Sensipar.

5.      Amgen sued, in the United States District Court for the District of Delaware, each generic manufacturer that filed an ANDA for allegedly infringing the '405 patent. Beginning in or around September 2017, generic ANDA applicants began settling with Amgen. These settlements included ███████████████████████████████████████████████████ ████████████████████████████████████████████████████. Although ████████████████████ are cloaked in a pro-competitive guise, they actually inhibit competition. Specifically, in this case, they diluted the incentive of other, non-settling generic manufacturers of cinacalcet hydrochloride to challenge vigorously otherwise weak patents. ████████████ ██████████████████████████████████████████████

---

[1] *See* 21 U.S.C. §355(j). Under Hatch-Waxman, the first ANDA applicant to file a Paragraph IV certification is generally entitled to receive 180-days of marketing exclusivity as to all other ANDA generics.

[2] *See* 21 U.S.C. §355(c)(3)(C). Under Hatch-Waxman, if a brand manufacturer sues an ANDA applicant within 45 days of receiving the applicant's Paragraph IV notice, the FDA is not permitted to grant final approval for 30 months (with certain limited exceptions).

██████████████████████████████████████████████████████

████████████████████████ ·  ██████████████████████████

████████████████████████████████████████████████

██████████████████ generic versions of Sensipar could have entered the market at least as early as March 8, 2018, when the '068 patent expired.

6.      Yet, despite these settlements, a few generics—including Teva, Amneal, Piramal, and Zydus—continued litigating through a bench trial in March 2018. After the submission of post-trial briefs, in July 2018, the Court (Goldberg, J.) held that Teva, Amneal, and Piramal's generic versions of Sensipar did not infringe the '405 patent and Zydus's proposed generic product would infringe the '405 patent.[3] In September 2018, Amgen appealed the Court's non-infringement ruling to the Federal Circuit.[4]

7.      With Amgen's appeal pending, on December 27, 2018, the FDA approved Teva's ANDA for a generic version of Sensipar. The recipient of a non-infringement judgment, Teva immediately launched its generic product. During the one week that followed, Teva flooded the market with between ████████████████████ of product worth over ██████████ Teva set its wholesale price at █████ of Amgen's Sensipar price. Teva was able to realize approximately *$212 million* in net revenues,[5] while Amgen lost ***hundreds of millions of dollars*** in revenues, which it primarily attributed to at-risk generic launches.[6] With Teva competing in the market, Amgen had limited options: either apply to the trial or appellate court for a stay of the non-infringement order and an injunction against Teva—or engage in self-help.

---

[3] *Amgen Inc. v. Amneal Pharms. LLC,* 328 F. Supp. 3d 373 (D. Del. 2018), *appeal filed, Amgen Inc. v. Amneal Pharms. LLC*, No. 19-1086 (Fed. Cir.).

[4] *See Amgen Inc. v. Amneal Pharms. LLC, et al.*, No. 1:16-cv-00853 (D. Del.), Dkt. #406.

[5] *See* Second Declaration of Robert G. Cunard, at ¶¶6-7, *Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-cv-00044-LPS (D. Del. Mar. 21, 2019) (AM10804-0000006417-423) ("Second Cunard Decl.").

[6] Amgen Inc., SEC Form 10-Q at 7 (Mar. 31, 2019), http://investors.amgen.com/node/28321/html.

8.      Instead of applying for relief in court, Amgen chose self-help—and broke the law. On January 2, 2019, Teva and Amgen entered into a confidential agreement in which Teva agreed to stop selling its generic version of Sensipar in the United States (the "Amgen-Teva Agreement"). Under the Agreement, Teva admitted that its generic product infringed claims of the '405 patent—a stunning reversal of its position in the underlying patent litigation, particularly given that Teva won a non-infringement judgment after trial.[7] Teva also agreed not to re-enter the Sensipar market until the earlier of (1) ███████████ (2) ██████████████ █████████████████████████████████, and (3) ████████████████████ ████████████████████████████.[8] In exchange for Teva ceasing its sales and delaying its re-entry for two-and-one-half years, Teva was only required to pay Amgen, at most, $40 million, thereby allowing Teva to retain ████████████ in net revenues from its one-week at-risk launch.[9] In addition, Teva was ████████████████████████████ ██████████████████.[10]

9.      Amgen's quickly-reached deal with Teva re-established and maintained Amgen's brand monopoly. Moreover, the deal eliminated not only Teva as a competitor but other generics as well. Amgen's '405 patent action settlements include ██████████████████ ████████████████████████████████████████████. The structure of the deal between Amgen and Teva was designed to—and for a period of time in fact did—██████████████████████████████████████████ ████████████████.

---

[7] ████████████████████████████████
[8] █████████████████████
[9] █████████████████████
[10] ███████████████████████

10.     To further their anticompetitive scheme, following their settlement, Amgen and Teva jointly applied to Judge Goldberg for a ruling vacating his non-infringement order in favor of Teva—an extraordinary and unjustified remedy that the Court ultimately declined to grant.[11]

11.     Through these actions, Amgen and Teva effectively stopped other generics from entering the market and driving the price of Sensipar well below Teva's discounted price. And although two other generics—Cipla and Aurobindo—have launched generic versions of Sensipar, competition in the market remains impaired as a result of the Amgen-Teva Agreement because Teva is no longer selling generic Sensipar.

12.     Absent Defendants' unlawful conduct, Plaintiffs and the members of the Classes would have been able to purchase generic Sensipar tablets at significantly lower prices than Amgen has charged since then. Indeed, the injury to Plaintiffs and the Classes is ongoing, as competition remains stunted.

13.     Accordingly, to redress the economic injury Defendants have already caused— and continue to cause—Plaintiffs, on behalf of themselves and all others similarly situated, seeks injunctive and other equitable relief under the federal antitrust laws, as well as damages and other monetary relief under state antitrust, consumer protection, and common laws.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action seeks injunctive and equitable relief under the Clayton Act, 15 U.S.C. § 26. This Court also has jurisdiction under the Clayton Act § 12, 15 U.S.C. § 22.

15.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy for the proposed Damages Class exceeds

---

[11] *Amgen Inc. v. Amneal Pharms. LLC*, C.A. No. 16-853, D.I. 439 (D. Del. Mar. 26, 2019).

$5,000,000, and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants. This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

16.     Venue is appropriate in this District under 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §1391(b). Defendants reside, transact business, are found, or have agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District. Moreover, the effects of Defendants' conduct on interstate trade or commerce are ongoing.

17.     This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District.

## III.    THE PARTIES

18.     Plaintiff UFCW Local 1500 Welfare Fund ("**Local 1500**") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York 11590. Local 1500 provides nearly 23,000 plan participants with health and welfare benefits and, with 15,000 members, is the largest grocery union in New York. During the Class Period (as defined below), Local 1500 indirectly purchased, paid, or reimbursed for some or all of the purchase price for Sensipar and/or its AB-rated generic equivalents manufactured by Defendants. Local 1500 made such payments and/or reimbursements in New York. Local 1500 paid and

reimbursed more for these products than it would have absent Defendants' anticompetitive
conduct and, accordingly, suffered injury to its business and property.

19.     Plaintiffs Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees'
Benefit Fund (collectively "Local 237"), consist of two health and welfare benefit plans and is
headquartered and has a principal place of business in New, York, New York. Local 237
administers the assets of defined contribution plans formed to provide certain benefits including
prescription drug benefits. Local 237 provides health and welfare benefits to active and retired
members and participants who reside in numerous locations in the United States. During the
Class Period, Local 237 indirectly purchased, paid, or reimbursed for some or all of the purchase
price for Sensipar and/or its AB-rated generic equivalents manufactured by Defendants. Local
237 made such payments and/or reimbursements in several states, including New York, Florida,
Pennsylvania, and Tennessee. During the Class Period, Local 237 paid and reimbursed more for
these products than it would have absent Defendants' anticompetitive conduct and, accordingly,
suffered injury to their business or property.

20.     Defendant Amgen Inc. ("**Amgen**") is a Delaware corporation with its principal
place of business at One Amgen Center Drive, Thousand Oaks, California 91320. Amgen is the
holder of NDA 021688 and sells Sensipar throughout the United States.

21.     Defendant Teva Pharmaceuticals USA, Inc. ("**Teva Pharmaceuticals**") is a
Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales,
Pennsylvania 19454. Teva Pharmaceuticals launched generic Sensipar at the end of 2018 and
entered the agreement with Amgen, from which this action arises. The relation between Teva
Pharmaceuticals and the non-Amgen defendants is described below.

22.     Defendant Watson Laboratories, Inc. ("**Watson**") is a Nevada corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson is a subsidiary of Teva Pharmaceuticals. Watson is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva Agreement from which this action arises. Watson is the holder of ANDA 204377 for generic Sensipar tablets.

23.     Defendant Actavis Pharma, Inc. ("**Actavis Pharma**") is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Actavis Pharma is a subsidiary of Teva Pharmaceuticals. Actavis Pharma is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva Agreement from which this action arises. Actavis Pharma is the packager of Teva's generic Sensipar.

24.     Defendants Teva Pharmaceuticals, Watson, and Actavis Pharma are collectively referred to as "**Teva**." Between December 27, 2018 and January 2, 2019, Teva sold throughout the United States generic Sensipar under Watson's ANDA.

25.     Defendants Amgen and Teva are collectively referred to as "**Defendants**."

26.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

8

IV.    **FACTUAL ALLEGATIONS**

    A.    **Amgen Develops and Launches Sensipar and Earns Billions of Dollars**

27.    Development of Sensipar began with a collaboration between Brigham and Women's Hospital, Inc. (the "Hospital") and NPS Pharmaceuticals, Inc. ("NPS") and led to the application for, and subsequent allowance of, the '068 patent and certain other patents (collectively, the "NPS Patents"). The NPS Patents relate to the production and/or medicinal use of cinacalcet hydrochloride. The '068 patent was the primary substance patent and was set to expire on March 8, 2018.

28.    In March 1996, Amgen received a license to the NPS patents. Under its license, Amgen is responsible for all development and commercial activities involving Sensipar— Amgen's brand cinacalcet hydrochloride product—as well as enforcing applicable patent rights in the licensed territories.

29.    In March 2004, Amgen received FDA approval for New Drug Application 021688 for Sensipar tablets. Sensipar is indicated for the treatment of secondary hyperparathyroidism in patients with chronic kidney disease on dialysis and the treatment of hypercalcemia in patients with parathyroid carcinoma. Sensipar is marketed in three strengths: 30 mg, 60 mg, and 90 mg.

30.    Beginning in April 2004, Amgen marketed, distributed, and sold Sensipar tablets throughout the United States. Sales of Sensipar in the U.S. grew rapidly, ultimately reaching over $1.3 billion annually in 2017.

    B.    **Amgen Acquires the '405 Patent**

31.    The U.S. Patent and Trademark Office ("PTO") issued the '405 patent in 2016. The '405 patent purportedly describes "a pharmaceutical composition compromising a therapeutically effective amount of calcium receptor-active compound and at least one

9

pharmaceutically acceptable excipient, wherein the composition has a controlled dissolution profile."[12] The '405 patent was assigned to Amgen, and Amgen is the owner of the '405 patent. Amgen listed the patent in the Orange Book.

**C.    Generic Manufacturers Seek FDA Approval for Generic Versions of Sensipar**

32.    Pharmaceutical companies can seek FDA approval of generic versions of a brand drug by filing an ANDA. To have an ANDA approved, a company must demonstrate, among other things, that its proposed generic is therapeutically equivalent to the brand drug. Beginning at least as early as March 2008, over a dozen generic drug manufacturers filed ANDAs seeking approval of generic versions of Sensipar. These manufacturers included Teva, Aurobindo Pharma, Alkem Laboratories, Hetero Labs, Sun Pharmaceutical Industries, Lupin Pharmaceuticals, Cipla Ltd., Macleods Pharma, Mylan Pharmaceuticals, Amneal Pharmaceuticals, Dr. Reddy's Laboratories, Breckenridge Pharmaceutical, Piramal Healthcare, Strides Pharma, Ajanta Pharma, Torrent Pharma, Heritage-Emcure, and Zydus Pharmaceuticals.

33.    As part of their ANDAs, each manufacturer submitted a Paragraph IV certification against Amgen's '405 patent. In these Paragraph IV certifications, each ANDA applicant represented that the '405 patent was invalid, unenforceable, or not infringed by the generic's proposed ANDA product.

**D.    Amgen Sues the Generic ANDA Applicants for Infringement of the '405 Patent**

34.    Each ANDA applicant provided notice of its respective Paragraph IV certifications to Amgen. Because filing a Paragraph IV certification constitutes an act of

---

[12] Abstract, United States Patent No. 9,375,405.

infringement,[13] upon receipt of these notices, Amgen sued each generic ANDA filer for patent infringement. However, under Hatch-Waxman and applicable FDA regulations, no generic was entitled to 180-days of marketing exclusivity, and Amgen was not entitled to a statutory 30-month stay on the FDA's approval of any generic Sensipar ANDA. Therefore, upon receiving FDA final approval for its ANDA, any generic manufacturer could launch its generic version of Sensipar.

35.    As the patent litigations continued, certain generic manufacturers settled with Amgen and their cases dismissed:

| Generic Company | Date of Settlement | Date of Dismissal |
|---|---|---|
| Breckenridge Pharmaceutical | September 15, 2017 | September 21, 2017 |
| Sun Pharmaceutical | October 24, 2017 | November 2, 2017 |
| Hetero Labs | October 24, 2017 | November 2, 2017 |
| Ajanta Pharma | November 1, 2017 | November 9, 2017 |
| Cipla Ltd. | February 26, 2018 | March 5, 2018 |
| Mylan Pharmaceuticals | February 27, 2018 | March 5, 2018 |
| Dr. Reddy's Laboratories | March 2, 2018 | March 5, 2018 |
| Strides Pharma | March 2, 2018 | March 5, 2018 |
| Aurobindo Pharma | March 19, 2018 | March 23, 2018 |
| Macleods Pharma | March 27, 2018 | April 10, 2018 |
| Lupin Pharmaceuticals | April 18, 2018 | April 23, 2018 |
| Alkem Laboratories | April 30, 2018 | May 9, 2018 |

---

[13] 35 U.S.C. § 271(e).

| Generic Company | Date of Settlement | Date of Dismissal |
|---|---|---|
| **Torrent Pharma** | May 23, 2018 | June 12, 2018 |
| **Heritage-Emcure** | December 4, 2018 | December 7, 2018 |

36.    These settlement agreements provided ███████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ██ ███

████████████████████████████████████████████████████████

███████████████████████████████████ █ ██████████████

████████████████████████████████████████████████████

████████████████ ████████ ██████████████████████████████

████████████████████████ ███████████

37.    The generic manufacturers, as part of their settlements with Amgen, received

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████





38.     While the exact language of these ███████████████ they have largely similar structures. This was by design. As most brands do in settling patent litigation, ██████ ███████████████████████████████████████ ███████████████ █████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ In support, Alkem argued that (a) "the brand controls the drafting of the settlement agreement"; (b) "the brand offers the template up in the negotiations and carries it through . . . with each [generic] defendant"; and that, as a result, (c) "they're all going to contain substantially the same language."[18] While the request was ultimately denied, given the common features in each settlement's ███████████—which are described in more detail below—Alkem's statements create a plausible inference that Amgen inserted ███████████ and "carri[ed] it through . . . with each [generic] defendant."

39.     ████████████████████████████ ████████████████████████ ███   █████████████████████ █████████████████████████████████ ██████████ █████████████████████████████ ████████████████████████████████

---

[18] *See* July 9, 2019 Hr'g Tr. at 10-12, *Amgen, Inc., et al. v. Amneal Pharms., et al.,* C.A. 16-853 (D. Del.).

[19] ███████████████████████████



40.

41.

████████████████████████████████████████████████████████

███████████████████████████████

42.     Amgen's scheme to delay full generic competition and secure monopoly profits to which it was not lawfully entitled depended on its ability to convince at least some (and as many as possible) of the generic ANDA filers to accept a delayed entry date. To induce generics to settle, Amgen offered ████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

43.     Of course, without being assured that other generics would agree to similar terms, it was not in the economic self-interest of any of one generic manufacturer to delay its market entry. Under normal circumstances, generic manufacturers are generally incentivized to seek the earliest launch date possible, whether through litigation or settlement. But these incentives are diluted ██████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████ For the settling generics, ██████

███████████████████████████, therefore, of substantial value and constitute compensation that they could not have otherwise obtained if they had litigated and won their patent cases.

44.     Nor would a brand manufacturer willingly offer ████████████████████

█████████████████████████████████████████████

████████████████████████████████ Industry experience shows that the presence of ██████████████████████████████████████

████████████████████████████████████████████████████████████ In fact, the then-current CEO of generic drug manufacturer Apotex twice testified before Congress that because they "eliminate any incentive for a subsequent filer to continue to litigate for earlier market entry," acceleration clauses (which he referred to as "poison pill" provisions), represent "the primary anticompetitive aspects of settlements."[21] These clauses both induce prospective generic competitors to accept later entry dates and deter others from challenging weak patents:

> [N]o subsequent filer is going to take up the patent fight knowing it will get nothing if it wins. Consumers are the biggest losers under this system. If subsequent filers do not have the incentive to take on the cost of multimillion patent challenges these challenges will not occur. Weak patents that should be knocked out will remain in place, unduly blocking consumer access to generics. The challenges to brand patents by generic companies that Hatch-Waxman was designed to generate will decrease. And settlements that delay consumer access to the generic will, in turn, increase.[22]

45.    While Apotex's CEO was addressing acceleration clauses in the context of a first ANDA filing generic company retaining the 180-day exclusivity, his reasoning applies with equal force in this case, where no company has such exclusivity. In this case, the more generic companies Amgen enticed to accept a settlement with a delayed entry and ████████████████ the less likely it would be that non-settling generics would continue their efforts at challenging the patents or commencing full generic competition.

46.    If Amgen's scheme had not unlawfully enticed its would-be generic competitors to work together, generics would have entered the market sooner than they actually did. In fact,

---

[21] *Protecting Consumer Access to Generic Drugs Act of 2007: Hearing on H.R. 1902 Before the Subcomm. On Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 110th Cong., at 65, 67 (2007) (statement of Bernard Sherman, CEO, Apotex, Inc.), https://archive.org/stream/gov.gpo.fdsys.CHRG-110hhrg38992/CHRG-110hhrg38992_djvu.txt.

[22] *Protecting Consumer Access to Generic Drugs Act of 2009: Hearing on H.R. 1706 Before the Subcomm. On Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 111th Cong., at 218 (2009) (statement of Bernard Sherman, CEO, Apotex, Inc.), http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg67822/pdf/CHRG-111hhrg67822.pdf.

two settling generics—Cipla and Aurobindo—received FDA final approval on March 8, 2018, the date the '068 patent expired. This meant that absent their settlements, they could have launched their generic versions of Sensipar at least as early as March 8, 2018. Strides Pharma, Sun Pharmaceutical, and Mylan Pharmaceuticals also received FDA final approval between April 2018 and October 2018, meaning that absent their settlements, they too, could have launched generic versions of Sensipar. As a result, consumers would have been able to purchase generic versions of Sensipar earlier, and those purchases all would have been made at lower prices than they did once those generics came to market.

47.    In the absence of Amgen's scheme, reasonable, law-abiding generic companies in the position of those here each would have demanded, and received, an entry date dependent upon its own individual assessment of the strength or weakness of its own circumstances. Instead, they agreed to delay in exchange for Amgen's promise that ████████████████ ████████████████████████████

### E.    Teva and Other Non-Settling Generics Win Non-Infringement Judgment at Trial

48.    While many generic manufacturers settled with Amgen, others—Teva, Amneal, Piramal, and Zydus—continued litigating through a four-day bench trial, held in March 2018. In July 2018, Judge Goldberg found that Teva, Amneal, and Piramal did *not* infringe the '405 patent.[23] In September 2018, Amgen appealed the Court's ruling of non-infringement in favor of Teva, Amneal, and Piramal to the Federal Circuit. That appeal is pending.

---

[23] The Court also found that Zydus had infringed the '405 Patent, but Zydus is currently appealing that ruling.

### F.     Teva Receives FDA Final Approval and Launches Its Generic Version of Sensipar

49.     Because Teva, Amneal, and Piramal had received non-infringement rulings, these manufacturers needed only to obtain FDA final approval of their ANDAs to launch their generic versions of Sensipar, regardless of the pendency of Amgen's appeal. On December 27, 2018, the FDA granted final approval to Teva's ANDA for generic Sensipar. Upon receiving approval, Teva immediately launched its generic version the drug.

50.     Over a one-week period, Teva sold between an approximately ████████████ ████████████ of generic Sensipar, valued at over ███████.[24] Teva, which set its wholesale acquisition cost ("WAC") at approximately ████ of Amgen's WAC,[25] realized ***over $212 million*** in net revenues during this short period of sales.

51.     Teva's launch caused Amgen to lose ***hundreds of millions of dollars*** in Sensipar revenues. In its Q1 2019 SEC Form 10-Q, Amgen reported that its Q1 2019 Sensipar revenues decreased by ***$274 million*** over Q1 2018 Sensipar revenues, which Amgen stated "***was driven primarily by the impact of at-risk launches by generic competitors***."[26]

52.     Had Teva continued selling generic Sensipar, rather than enter into the agreement with Teva, Teva's entry would have ████████████████████████████████████████ ████████████████████████ Had the other settling generics entered, the price for generic versions of Sensipar would have dropped significantly below that offered by Teva, as is typical

---

[24] *See* Second Cunard Decl. at ¶¶6-7: ████████████████████
[25] ████████████████████████████████████
[26] Amgen Inc., SEC Form 10-Q, at 33 (Mar. 31, 2019), http://investors.amgen.com/node/28321/html.

when multiple generics compete.[27] And as more generics entered the market to compete,

Amgen's share of branded and generic Sensipar tablet sales would have eroded by 90%.[28]

53.     Amgen's own executives and experts submitted declarations in a related litigation



.[29] Specifically,

.[30]

54.     And even if Amgen was ultimately successful in arresting generic Sensipar sales

at some later date,

[31]

---

[27] FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions (Jan. 2010), at 8, https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff ("Publicly available information about recent generic launches suggests that a generic market typically matures about one year after the first entrant comes on the market. The generic penetration rate at that point is about 90% on average . . .").

[28] *Id.*

[29]

[30]

[31]

██████████[32] In other words, Amgen's customers would continue to reap the economic benefits of the very competition Amgen was seeking to eliminate.

55.     Amgen had to move quickly once Teva launched—both to stop sales by Teva and ███████████████████████████████████████████████. And it did just that.

### G.     Amgen and Teva Enter an Unlawful Market Division Agreement to Eliminate and Delay Generic Competition

56.     Having lost against Teva at trial, in order to stop Teva's sales of its competing generic product, Amgen had to either persuade the district court or the Federal Circuit to stay the non-infringement ruling and to enjoin Teva's sales—or engage in self-help. Amgen chose the latter and quickly negotiated an agreement to end Teva's competitive threat and keep Teva—██ ████████████—off the market for an extended period of time.

57.     On January 2, 2019, Amgen and Teva executed an agreement that ended competition from Teva's generic product and prohibited Teva from re-entering the market until ████████████████████████████.[33] Significantly, in the Agreement, Teva admitted that its generic Sensipar product infringed valid and enforceable claims of the '405 patent, ***directly contradicting*** its then-existing litigation position and Judge Goldberg's non-infringement judgment in Teva's favor.[34]

58.     In exchange for ceasing its generic Sensipar sales, Teva agreed to pay up to $40 million to Amgen—an amount that would ██████ if other generics entered the market.[35] But Teva's $40 million "payback" is barely ████ of Teva's gross revenues realized after its one-week

---



launch (and is not even ███ of the estimated total net revenues). Moreover, because (1) the

Amgen-Teva Agreement effectively ████████████████████████████████

████ and (2) ████████████████████████████████████

████████ the Agreement ensured that Teva would retain nearly the full value of its at risk

launch.[36]

59.     Former Aurobindo CEO, Robert Cunard, who was retained as an expert by Cipla

in a related litigation to evaluate the Amgen-Teva Agreement, similarly summarized the effect of

Defendants' Agreement:

████████████████████████████
██████████████████████████████
█████████████████████████████
█████████████████████████████
███████████████████████████████
██████████████████████████████
███████████████████████████████
█████████████████████████████
███████████████████████████████
███████████████████████████████
██████████████████████████████
███████████████████████████████
████████████████████████.[37]

60.     Mr. Cunard concluded:

██████████████████████████████
████████████████████████████
███████████████████████████████
████████████████████████████
███████████████████████████████
███████████████████████████████

[36] ███████████████████████
[37] ████████████████████████████████████████
████

████████████████████████████████████████ [38]
████████████████████████

61.    In other words, despite Amgen and Teva's purported agreement that Teva's sales infringed the '405 patent—a position that if accepted as true and adjudicated as such would entitle Amgen to substantial infringement damages—Amgen required Teva to return only a tiny fraction of the revenues it realized from the "infringing" sales and allowed Teva's product to stay on the market. Such a deal speaks volumes about the true purpose of the Agreement: to eliminate present and future competition from generic Sensipar.

62.    Thus, as a result of the agreement:

(a)    Amgen eliminated existing generic competition from Teva, which was costing it hundreds of millions of dollars in lost revenues;[39]

(b)    Amgen also eliminated (at least temporarily) imminent competition by other generics, ████████████████████████████████████████ ████████████████████

(c)    Teva realized over ***$200 million*** in net revenues from selling between an ████████████████████████ of product in a week and was only required to pay back Amgen $40 million;

(d)    Teva was not required to pull any product distributed over its one-week at-risk launch from the market; and

(e)    Teva obtained ████████████████████████████████████ ████████████████████████████████████████ ████████████████

---

[38] ██████████████████████████████████████
[39] Amgen Inc., SEC Form 10-Q, at 33 (Mar. 31, 2019), http://investors.amgen.com/node/28321/html.

63.     Simply put, two competitors—Amgen and Teva—agreed to divide the market for Sensipar and Teva's generic version of the product. Amgen received Teva's agreement not to enter the market for another two and one-half years, until ███████████ ▮ ████████████████████████████. For this, Teva realized over $200 million in net revenues from its at-risk launch sales. Even when accounting for the $40 million payback to Amgen, Teva still realized over ██████████ in net revenues, which, as explained below, is far more than it could have retained absent the unlawful agreement. Amgen maintained its monopoly of branded and generic Sensipar sales, which amounted to hundreds of millions in additional sales at supra-competitive prices without any competition.

64.     In furtherance of Defendants' scheme to eliminate competition for Sensipar, a week after entering their illegal agreement, Amgen and Teva applied jointly to the Court to vacate its non-infringement judgment in favor of Teva and, instead, enter a judgment stating that Teva's "manufacture, use, sale, offer to sell, and distribution of [its generic Sensipar] in the United States and importation of [its generic Sensipar] into the United States, *would infringe* the ['405] Patent."[40]

65.     Both Teva and Amgen were economically incentivized to vacate Teva's non-infringement ruling. From Amgen's perspective, a vacatur would eliminate the possibility of

████████████████████████████████████████████████████████

████████████████████████████████████████████████

66.     Cipla was one such settling generic. Its settlement stated:

> Notwithstanding anything to the contrary in this Settlement
> Agreement, if any Third Party that has made an At-Risk Launch of
> a Generic [Sensipar] Product . . . *is found not to have infringed*

---

[40] *Amgen Inc. v. Amneal Pharmaceuticals LLC*, No. 16-853, ECF No. 412 (D. Del., filed Jan. 9, 2019) (emphasis added).

> ***one or more valid and enforceable claims of the '405 patent*** . . .
> then Amgen shall not be entitled to seek or recover any relief from
> [Cipla] for [Cipla's] at risk sales, offers for sale, distribution, or
> importation of [Cipla's] Product.[41]

67.     Thus, the vacatur would mean that Teva had in fact infringed one or more valid

and enforceable claims of the '405 patent, thus satisfying a condition necessary to prevent the

Cipla acceleration clause from kicking in.

68.     From Teva's perspective, eliminating prospective generic rivals allowed it to

preserve the hundreds of millions of dollars in revenue it realized from its one-week launch.

Teva's agreements with its wholesale customers allowed ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████[42] As a result, if other, less-

expensive generic versions of Sensipar entered the market, ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████[43] Thus, by entering its illicit agreement with

Amgen, Teva ████████████████████████████████████████████

████████████████████████████████

69.     While Judge Goldberg ultimately denied Defendants' request to vacate the Teva's

non-infringement judgment in March 2019,[44] Defendants' attempt to rewrite the Court's trial

ruling confirms the anticompetitive intent underlying their market division agreement.

---

[41] Amgen-Cipla Agreement § 5.6.

[42] ████████████████████████████████████████████████████

[43] *Id.*

[44] *See Amgen Inc. v. Amneal Pharms. LLC*, C.A. No. 16-853, D.I. 439 (D. Del. Mar. 26, 2019).
Amgen and Teva have both appealed this ruling to the Federal Circuit (Appeal No. 19-1650).

70.     After settling with Teva, Amgen also threatened other settling generics with legal action if they sought to use Teva's launch as a basis for launching their competing products under their settlements. On January 4, 2019, Amgen's counsel wrote to Cipla's counsel requesting that they "confirm immediately that Cipla has not and will not engage in an at-risk launch based on [Teva]'s Launch. Otherwise Amgen will seek all remedies available under the Cipla Agreement and under applicable law, including injunctive relief, breach of contract, treble damages, and sanctions."[45]

71.     In response, in January 2019, Cipla filed a complaint in this Court against Amgen, alleging, among other claims, that the Amgen-Teva Agreement violated the antitrust laws.[46] After Cipla launched its generic Sensipar in March 2019, Amgen moved for a preliminary injunction claiming that the terms of its settlement with Cipla prohibited a launch. After expedited discovery and a hearing on Amgen's motion, this Court denied Amgen's motion, finding that Amgen failed to demonstrate that it was entitled to relief in connection with Cipla's sales.[47]

72.     The Amgen-Teva Agreement injured Plaintiff and the members of the Classes. They lost the ability to buy Teva's less expensive generic version of Sensipar. Moreover, but for the unlawful agreement, ███████████████████████████ ███████████████████████████ Aurobindo Pharma, Cipla Ltd., Mylan Pharmaceutical, Strides Pharma, and Sun Pharmaceutical each had FDA final approval at the time of Teva's launch, and, but for the Amgen-Teva Agreement, Teva's continued sales would ███████████████████████████

---

[45] ███████████████████████████

[46] *See Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-00044-LPS (D. Del.).

[47] *See Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-00044-LPS, 2019 WL 1970780 (D. Del. May 2, 2019), *aff'd sub nom. Cipla Ltd. v. Amgen Inc*, No. 19-cv-2017, 2019 WL 3202824 (3d Cir. July 16, 2019).

73.     The resulting increased generic competition would have driven down the prices of generic versions of Sensipar below Teva's discount. Although Cipla and Aurobindo have launched generic versions of Sensipar, Defendants' agreement continues to impair competition because Defendants' agreement unlawfully terminated Teva's continued sales of generic Sensipar.

## V.     THE ANTICOMPETITIVE EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

74.     Defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining trade by eliminating competition between Amgen and generic competitors. But for ███████████████████████████████████████████████████████ generic manufacturers would have entered the market with their generic products at least as early as March 8, 2018. Further, but for the market division agreement between Amgen and Teva, Teva would have continued selling its generic Sensipar after January 2, 2019, and other FDA-approved generics would have soon launched their own generic versions of Sensipar. Although Cipla and Aurobindo have launched generic versions of Sensipar, Defendants' illegal agreement continues to impair competition for branded and generic Sensipar because Teva is no longer permitted to continue selling generic Sensipar.

75.     But for Defendants' illegal conduct, Plaintiffs and members of the Classes would have paid less for branded and generic versions of Sensipar. Defendants' conduct proximately caused Plaintiffs' and the Classes' injuries because it forced them to pay millions of dollars in overcharges on purchases of Amgen's branded Sensipar.

76.     If Defendants had not blocked generic competition for branded Sensipar, Plaintiffs and members of the Classes would have paid less for cinacalcet hydrochloride tablets by: (a) purchasing less-expensive generic versions of Sensipar instead of branded Sensipar; (b)

purchasing branded Sensipar at lower prices, if Amgen sought to compete against the generics;

and (c) purchasing generic Sensipar at lower prices sooner. ████████████████████



.[48]

77.      Although Teva's generic version of Sensipar remained in the distribution

"pipeline" for a period of time after Teva entered its agreement with Amgen, its price was higher

than it would have been if other generics had entered contemporaneously. Thus, members of the

Classes who purchased or reimbursed for Teva's pipeline product also sustained injury.

78.      As a result of the delay in generic competition caused by Defendants'

anticompetitive scheme, Plaintiffs and members of the Classes paid, and continue to pay, more

for branded and generic Sensipar than they would have paid absent Defendants' illegal conduct.

79.      Defendants' restraints of competition in the market for branded and generic

versions of Sensipar have substantially affected both interstate and intrastate commerce.

80.      At all material times, Amgen manufactured, promoted, distributed, and sold

substantial amounts of branded Sensipar in a continuous and uninterrupted flow of commerce

across state lines and throughout the United States. Defendants' anticompetitive conduct also had

substantial intrastate effects in every state of purchase in that, among other things, retailers

within each state were foreclosed from offering less-expensive generic versions of Sensipar to

---

[48] ██████████████████

purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

81.     At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of branded and generic versions of Sensipar.

82.     Economics recognizes that an overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top. [49] Professor Hovenkamp also instructs that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[50] Here, wholesalers and retailers passed on the inflated prices of branded and generic versions of Sensipar to Plaintiffs and members of the Classes.

83.     Defendants' unlawful agreement enabled Amgen to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent Defendants' agreement. These prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## VI.     MONOPOLY POWER AND MARKET DEFINITION

84.     To the extent the conduct here may be held subject to the Rule of Reason, the relevant product market is cinacalcet hydrochloride tablets in 30 mg, 60 mg, and 90 mg strengths, including branded Sensipar and its bioequivalent (*i.e.*, AB-rated) generic versions of

---

[49] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

[50] *Id.*

Sensipar. The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

85.    At all relevant times, Amgen has had monopoly power over the market for cinacalcet hydrochloride tablets. Direct evidence of Amgen's monopoly power includes, among other things, the abnormally-high gross margins—likely exceeding ███—enjoyed by Amgen prior to entry of generic versions of Sensipar and Amgen's ability to profitably maintain the price of Sensipar above competitive levels.[51]

86.    A small but significant non-transitory price increase above the competitive level for Sensipar by Amgen would not cause a loss of sales sufficient to make the price increase unprofitable.

87.    Other drugs that are not AB-rated to Sensipar cannot be substituted automatically for Sensipar by pharmacists and do not exhibit substantial cross-price elasticity of demand with respect to Sensipar. For example, as shown in the tables below, during the period 2012 to 2017, Medi-Span Price Rx data for Sensipar shows that Amgen repeatedly raised Sensipar's WAC prices.[52]

**Table 1: Sensipar Tablets WAC – 30 mg**



---

[51] ████████████████████

[52] ████████████████████████████



**Table 2: Sensipar Tablets WAC – 60 mg**



**Table 3: Sensipar Tablets WAC – 90 mg**



88.     Pharmaceutical products with cinacalcet hydrochloride as the active ingredient have pharmacological properties that differentiate them from other drugs for treating secondary hyperparathyroidism and hypercalcemia. The existence of other products indicated for the

treatment of secondary hyperparathyroidism in patients with chronic kidney disease and hypercalcemia in patients with parathyroid carcinoma or other illnesses has not significantly constrained Amgen's pricing of Sensipar.

89.　████████████ sworn declaration in the Cipla-Amgen litigation similarly supports the conclusion that Sensipar has no economic substitutes apart from AB-rated generic versions. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ And ████████████████████

████████████████████████████████████████████████

████████████████████████████████ Finally, ████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ "[53]

90.　Therefore, Amgen needed to control only Sensipar and its AB-rated generic equivalents, and no other products, in order to maintain the price of Sensipar profitably at

---

[53] ████████████████████

supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Sensipar would render Amgen unable to profitably maintain its prices of Sensipar without losing substantial sales. This is particularly true for Medicare-based programs. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████[54] Providers, he therefore admitted, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████[55]

91.     Thus, only generic versions of Sensipar are economic substitutes for branded Sensipar.

92.     Amgen, at all relevant times, enjoyed high barriers to entry with respect to competition in the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

93.     Amgen has maintained and exercised the power to exclude and restrict competition to Sensipar and its AB-rated generics.

94.     At all relevant times, other than the roughly one-week period of Teva's sales, Amgen's market share in the relevant market was at or near 100%.

---

[54] ████████████████████████

[55] ████████████████████████

## VII.    CLASS ACTION ALLEGATIONS

95.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

as a class action under Rules 23(a), (b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure,

on behalf of the following classes (the "Classes"):

### The Injunction Class

All persons and entities that indirectly purchased, paid, and/or
provided reimbursement for some or all of the purchase price of
Sensipar or its AB-rated generic equivalents from Defendants,
beginning at least as early as March 8, 2018 until the effects of
Defendants' conduct cease ("Class Period"), anywhere in the
United States.

### The Damages Class

All persons and entities that indirectly purchased, paid, and/or
provided reimbursement for some or all of the purchase price of
Sensipar or its AB-rated generic equivalents from Defendants,
beginning during the Class Period, in the District of Columbia,
Puerto Rico, or any of the following states and commonwealths:
Alabama, Alaska, Arizona, Arkansas, California, Colorado,
Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois,
Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,
Massachusetts, Michigan, Minnesota, Mississippi, Missouri,
Montana, Nebraska, Nevada, New Hampshire, New Jersey, New
Mexico, New York, North Carolina, North Dakota, Oklahoma,
Oregon, Pennsylvania, Rhode Island, South Carolina, South
Dakota, Texas, Tennessee, Utah, Vermont, Virginia, Washington,
West Virginia, Wisconsin, or Wyoming.

96.    The following persons and entities are excluded from each of the above-described

proposed Classes:

(a)    Defendants and their counsel, officers, directors, management, employees,

subsidiaries, or affiliates;

(b)    All governmental entities, except for government-funded employee benefit

plans;

(c)     All persons or entities who purchased Sensipar for purposes of resale or directly from Defendants or their affiliates;

(d)     Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

(e)     Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs);

(f)     Pharmacy Benefit Managers;

(g)     All Counsel of Record; and

(h)     The Court, Court personnel, and any member of their immediate families.

97.     Members of the Classes are so numerous and geographically dispersed that joinder of all members of the Classes is impracticable. Plaintiffs believe that there are thousands of members of the Classes widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

98.     Plaintiffs' claims are typical of the claims of members of the Classes. Plaintiffs and members of the Classes were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for branded and generic Sensipar and were deprived of the benefits of earlier and more robust competition from less-expensive generic equivalents of Sensipar as a result of Defendants' wrongful conduct.

99.     Plaintiffs will fairly and adequately protect and represent the interests of the members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes.

100.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation involving pharmaceutical products.

101.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to both Classes. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

102.    Questions of law and fact common to the Classes include:

(a)    Whether Defendants conspired to delay generic competition in the market for cinacalcet hydrochloride tablets;

(b)    Whether Defendants' agreement was a *per se* violation of federal and state antitrust laws;

(c)    Whether Defendants' agreement violated federal and state antitrust laws under a "quick look" analysis;

(d)    Whether Defendants' agreement violated federal and state antitrust laws under a Rule of Reason analysis;

(e)    To the extent the Rule of Reason applies, whether the relevant product market is cinacalcet hydrochloride tablets;

(f)    To the extent the Rule of Reason applies, whether the relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

(g)    Whether Amgen unlawfully maintained monopoly power through Defendants' Agreement;

(h)     Whether Defendants' scheme, in whole or in Part, has substantially affected intrastate and interstate commerce;

(i)     Whether Defendants' agreement harmed competition;

(j)     For the Injunction Class, the nature and scope of injunctive relief;

(k)     For the Damages Class, whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiffs and the members of the Class; and

(l)     For the Damages Class, the quantum of overcharges paid by the Class in the aggregate.

103.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

104.    Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### <u>FIRST CLAIM FOR RELIEF</u>
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1
(Against All Defendants)**

105.    Plaintiffs incorporate the preceding paragraphs by reference.

106.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[56] Defendants here entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until ███████;

(b)    delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

(c)    raise and maintain the prices that Plaintiffs and the Injunction Class Members would pay for Sensipar to and at supra-competitive levels.

107.    The unlawful Amgen-Teva market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[57] That is, "an observer with even a rudimentary understanding of economics could conclude that the [Amgen-Teva agreement] in question would have an anticompetitive effect on customers and markets."[58]

---

[56] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).
[57] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).
[58] *Id.*

108.    Even if the conduct alleged in this Complaint is held subject to the Rule of
Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value
Teva received that outweighs the agreement's harmful effects. Specifically, under *FTC v.
Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and
generic manufacturer may be unlawful when the brand provides the generic manufacturer a
"large and unjustified" payment in exchange for the generic manufacturer dropping its challenge
to the brand manufacturer's patents. This is particularly the case when the size of the payment
exceeds any saved or avoided litigation costs.

109.    Here, in exchange for Teva's agreement to delay entering the market until ██
████ notwithstanding its judgment of non-infringement, under the Amgen-Teva Agreement,
Teva received (a) over $212 million in net revenues from its sales of generic Sensipar, which it
largely retained, only ceding at most $40 million back to Amgen, and (b) ████████
████████████████████████████████████████████████
████████████████████████

110.    Individually and collectively, the value that Amgen transferred and Teva received
under their agreement exceeded the costs of continued litigation or any arguably procompetitive
benefits—and thus was "large and unjustified." Indeed, given that Teva made the calculated
decision to launch at risk, presumably based on its own assessment of the strength of its
arguments on appeal, it would have been unlikely to change course by withdrawing from the
market just one week later absent some significant inducement by Amgen. Accordingly, the
Amgen-Teva Agreement is unlawful.

111.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiffs and the Injunction Class have been injured in their business and property throughout the Class Period.

112.    Plaintiffs and the Injunction Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF
### Monopolization under the Sherman Act § 2
### (Against Amgen)

113.    Plaintiffs incorporate the preceding paragraphs by reference.

114.    Amgen possessed and possesses monopoly power in the relevant market and possessed the power to raise and maintain supracompetitive prices and exclude competitors from the relevant market.

115.    Amgen engaged in exclusionary and anticompetitive conduct that involved (i) paying Teva to remove its generic product from the market and delay its entry; and (ii) deterring all generic manufacturers from marketing generic cinacalcet hydrochloride before the expiration of the '405 patent or another agreed to delayed date, ███████████████████ ███████

116.    The goal, purpose, and effect of Amgen's scheme was to maintain and extend its monopoly power with respect to cinacalcet hydrochloride. Amgen's illegal scheme to delay the introduction of generic cinacalcet hydrochloride allowed it to continue charging supra-competitive prices for cinacalcet hydrochloride without a substantial loss of sales.

117.    Amgen engaged in exclusionary and anticompetitive conduct that involved (i) paying Teva to remove its generic product from the market and delay its entry and (ii) deterring all generic manufacturers from marketing generic cinacalcet hydrochloride before the expiration

of the '405 patent or another agreed to delayed date, ████████████████████████

████

118.   The goal, purpose, and effect of Amgen's scheme was to maintain and extend its monopoly power with respect to Sensipar. Amgen's illegal scheme to delay the introduction of generic Sensipar allowed it to continue charging supra-competitive prices for cinacalcet hydrochloride without a substantial loss of sales.

119.   As a result of Amgen's illegal scheme, Plaintiffs and the Injunction Class paid more than they would have paid for brand and generic Sensipar, absent the illegal conduct. But for the illegal conduct, competitors would have begun marketing generic versions of Sensipar by at least as early as March 8, 2018, resulting in cost savings to Plaintiffs and the Injunction Class.

120.   Amgen's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2. Amgen's agreement with Teva perpetuates Amgen's monopoly in the relevant market by excluding competition from Teva, ████████████████████████████████████ ████████████████████████████ As a result, Amgen's share of the cinacalcet hydrochloride tablet market is at or near 100%.

121.   As a direct and proximate result of Defendants' violation of Sherman Act § 2, Plaintiffs and the Injunction Class have been injured in their business and property throughout the Class Period.

122.   Plaintiffs and the Injunction Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF
**Conspiracy and Combination in Restraint of Trade under State Law**
**(Against All Defendants)**

123.   Plaintiffs incorporate the preceding paragraphs by reference.

124.    Defendants entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until ██████████;

(b)    delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

(c)    raise and maintain the prices that Plaintiffs and the Damages Class Members would pay for Sensipar to and at supra-competitive levels.

125.    The unlawful Amgen-Teva market division agreement is a *per se* violation of the below-listed state antitrust laws. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[59] That is, "an observer with even a rudimentary understanding of economics could conclude that the [Amgen-Teva agreement] in question would have an anticompetitive effect on customers and markets."[60]

126.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Teva received that outweighs the agreement's harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful, when the brand provides the generic manufacturer a

---

[59] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[60] *Id.* at 770.

"large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

127.    Here, in exchange for Teva's agreement to delay entering the market until ███ ██████ notwithstanding its judgment of non-infringement, under the Amgen-Teva Agreement, Teva received (a) over $212 million in revenues from its sales of generic Sensipar, which it largely retained, only ceding at most $40 million back to Amgen, and (b) ████████████ ███████████████████████████████████████████████████████████ ████████████████████

128.    Individually and collectively, the value that Amgen transferred and Teva received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Indeed, given that Teva made the calculated decision to launch at risk, presumably based on its own assessment of the strength of its arguments on appeal, it would have been unlikely to change course by withdrawing from the market just one week later absent some significant inducement by Amgen. Accordingly, the Amgen-Teva Agreement is unlawful.

129.    Defendants' conduct violated the following state antitrust laws:

        (a)     Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

        (b)     Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Damages Class Members;

        (c)     Conn. Gen. Stat. § 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d)      D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)      Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f)      740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g)      Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Damages Class Members;

(h)      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)      Md. Code, Com. Law § 11-201, et seq., with respect to purchases in Maryland by the Damages Class Members;

(j)      Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Damages Class Members;

(m)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

(n)      Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Damages Class Members, in that thousands of sales of branded and generic versions of Sensipar took place at Nevada pharmacies, purchased by Nevada end payors at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Damages Class Members;

(v)     S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Damages Class Members;

(w)     Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Damages Class Members, with thousands of end payors in Tennessee paying substantially higher prices for branded and generic versions of Sensipar at Tennessee pharmacies;

44

(x)    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(y)    Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Damages Class Members;

(z)    W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(aa)    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

130.    Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

131.    Defendants are jointly and severally liable for all damages suffered by Plaintiffs and the Damages Class Members.

### FOURTH CLAIM FOR RELIEF
**Monopolization and Monopolistic Scheme under State Law**
**(Against Amgen)**

132.    Plaintiffs incorporate the preceding paragraphs by reference.

133.    Amgen possessed and possesses monopoly power in the relevant market and possessed the power to raise and maintain supracompetitive prices and exclude competitors from the relevant market.

134.    Amgen engaged in exclusionary and anticompetitive conduct that involved (i) paying Teva to remove its generic product from the market and delay its entry and (ii) deterring all generic manufacturers from marketing generic cinacalcet hydrochloride before the expiration

of the '405 patent or another agreed to delayed date. ████████████████████

████████

135.     The goal, purpose, and effect of Amgen's scheme was to maintain and extend its monopoly power with respect to Sensipar. Amgen's illegal scheme to delay the introduction of generic Sensipar allowed it to continue charging supra-competitive prices for cinacalcet hydrochloride without a substantial loss of sales.

136.     As a result of Amgen's illegal scheme, Plaintiffs and the Injunction Class paid more than they would have paid for brand and generic Sensipar, absent the illegal conduct. But for the illegal conduct, competitors would have begun marketing generic versions of Sensipar by at least as early as March 8, 2018, resulting in cost savings to Plaintiffs and the Damages Class. As a result, Amgen's share of the cinacalcet hydrochloride tablet market is at or near 100%.

137.     Amgen's conduct violated the following state antitrust laws:

(a)     Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

(b)     Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Damages Class Members;

(c)     Conn. Gen. Stat. § 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d)     D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)     Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f)        740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in

Illinois by the Damages Class Members;

(g)        Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the

Damages Class Members;

(h)        Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by

Damages Class Members;

(i)        Md. Code, Com. Law § 11-201, et seq., with respect to purchases in

Maryland by the Damages Class Members;

(j)        Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in

Maine by the Damages Class Members;

(k)        Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in

Michigan by the Damages Class Members;

(l)        Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by

the Damages Class Members;

(m)        Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in

Mississippi by members of the Damages Class Members;

(n)        Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska

by the Damages Class Members;

(o)        Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada

by the Damages Class Members, in that thousands of sales of branded and generic versions of

Sensipar took place at Nevada pharmacies, purchased by Nevada end payors at supracompetitive

prices caused by Defendant's conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New

Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New

Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York

by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North

Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North

Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by

the Damages Class Members;

(v)     S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in

South Dakota by the Damages Class Members;

(w)     Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in

Tennessee by the Damages Class Members, with thousands of end payors in Tennessee paying

substantially higher prices for branded and generic versions of Sensipar at Tennessee

pharmacies;

(x)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah

by Damages Class Members who are either citizens or residents of Utah;

(y)     Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by

the Damages Class Members;

48

(z)      W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(aa)      Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

138.    Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Amgen's anticompetitive conduct.

### FIFTH CLAIM FOR RELIEF
### State Consumer Protection Violations
### (Against All Defendants)

139.    Plaintiffs incorporate the preceding paragraphs by reference.

140.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the Damages Class Members were deprived of the opportunity to purchase generic versions of Sensipar and were forced to pay higher prices for branded and generic versions of Sensipar.

141.    There is gross disparity between the price that Plaintiffs and the Damages Class Members paid for Sensipar compared to what they would have paid for less expensive generic versions of Sensipar, which should and would have been available but for Defendants' unlawful conduct.

142.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

## Florida Deceptive & Unfair Trade Practices Act ("FDUTPA")
## Florida Stat. §§ 501.201, et seq.

143.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. §§ 501.202(2).

144.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

145.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.

146.     Amgen engaged in exclusionary and anticompetitive conduct that involved (i) paying Teva to remove its generic product from the market and delay its entry and (ii) deterring all generic manufacturers from marketing generic cinacalcet hydrochloride before the expiration of the '405 patent or another agreed to delayed date, ███████████████████████████ ████████ Teva is jointly liable for the anticompetitive effects of entering into an agreement with Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet hydrochloride tablets.

147.     As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for cinacalcet hydrochloride, absent the illegal conduct.

148.     Defendants sold branded and generic versions of Sensipar in Florida, and their conduct had a direct and substantial impact on trade and commerce in Florida. Accordingly, such conduct falls within the prohibitions in Florida Stat. §§ 501.202(2).

## Massachusetts Consumer Protection Act ("MCPA")
## Mass. Gen. L. Ch. 93A, et seq.

149.    The MCPA regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

150.    Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

151.    Amgen engaged in exclusionary and anticompetitive conduct that involved (i) paying Teva to remove its generic product from the market and delay its entry and (ii) deterring all generic manufacturers from marketing generic cinacalcet hydrochloride before the expiration of the '405 patent or another agreed to delayed date, █████████████████████████ ██████ Teva is jointly liable for the anticompetitive effects of entering into an agreement with Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet hydrochloride tablets.

152.    As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for cinacalcet hydrochloride, absent the illegal conduct.

153.    Defendants sold branded and generic versions of Sensipar in Massachusetts, and their conduct had a direct and substantial impact on trade and commerce in Massachusetts. Accordingly, such conduct falls within the prohibitions in Ch. 93A § 2.

## Missouri Merchandising Practices Act ("MMPA")
## Mo. Rev. Stat. 407.020

154.    Under Section 407.020, the MMPA prohibits "[t]he act, use or employment by

any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair

practice or the concealment, suppression, or omission of any material fact in connection with the

sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. 407.020.

155.    The Missouri Attorney General has defined an "unfair practice" as:

> any practice which . . . [o]ffends any public policy as it has been
> established by the Constitution, statutes or common law of this
> state, or by the Federal Trade Commission, or its interpretive
> decisions; or . . . [i]s unethical, oppressive, or unscrupulous; and
> . . . [p]resents a risk of, or causes, substantial injury to consumers.

Mo. Att'y Gen. Reg., 15 CSR 60-8.02.

156.    Amgen engaged in exclusionary and anticompetitive conduct that involved (i)

paying Teva to remove its generic product from the market and delay its entry and (ii) deterring

all generic manufacturers from marketing generic cinacalcet hydrochloride before the expiration

of the '405 patent or another agreed to delayed date, ███████████████████████

██████ Teva is jointly liable for the anticompetitive effects of entering into an agreement with

Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet

hydrochloride tablets.

157.    As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than

they would have paid for cinacalcet hydrochloride, absent the illegal conduct.

158.    Defendants sold branded and generic versions of Sensipar in Missouri, and

Defendants' conduct had a direct and substantial impact on trade and commerce in Missouri.

Upon information and belief, Defendants also directed advertising and marketing efforts for

branded and generic versions of Sensipar in Missouri. Accordingly, Defendants' conduct falls

within the prohibitions in the MMPA.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants)**

159.    Plaintiffs incorporate by reference the preceding allegations.

160.    To the extent required, this claim is pleaded in the alternative to the other claims

in this Complaint.

161.    This claim is pled by Plaintiffs and the Damages Class against all Defendants.

162.    Defendants have financially benefited from overcharges on sales of branded and

generic versions of Sensipar, which resulted from the unlawful and inequitable acts alleged in

this Complaint. These overcharges were borne by Plaintiffs and the Damages Class Members

who purchased and/or reimbursed all or part of the purchase price of branded and generic

Sensipar. The benefits conferred upon Defendants are substantial and measurable, in that the

revenues Defendants have earned due to unlawful overcharges are ascertainable by review of

both sales records and the unlawful agreement itself.

163.    There is gross disparity between the price that Plaintiffs and the Damages Class

Members paid for Sensipar compared to what they would have paid for less expensive generic

versions of Sensipar, which should and would have been available but for Defendants' unlawful

and inequitable conduct.

164.    Defendants repeatedly and continuously received financial benefits at the expense

of Plaintiffs and the Damages Class Members through each sale of branded and generic versions

of Sensipar at an inflated price.

165.    It would be futile for Plaintiffs and the Damages Class Members to seek a remedy

from any party with whom they had or have privity of contract. Defendants have paid no

53

consideration to any other person for any of the benefits they received indirectly from Plaintiffs
and the Damages Class Members.

166.    It would be futile for Plaintiffs and the Damages Class Members to seek to
exhaust any remedy against the immediate intermediary in the chain of distribution from which
they indirectly purchased Sensipar, as those intermediaries cannot reasonably be expected to
compensate Plaintiffs and the Damages Class Members for Defendants' unlawful conduct.

167.    The financial benefits that Defendants derived rightfully belong to Plaintiffs and
the Damages Class Members, which paid anticompetitive prices that inured to Defendants'
benefit.

168.    It would be inequitable under the unjust enrichment principles of the states listed
below for Defendants to retain any of the overcharges that Plaintiffs and the Damages Class
Members paid for branded and generic versions of Sensipar, which were derived from
Defendants' anticompetitive, unfair, and unconscionable methods, acts, and trade practices.

169.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds
received by them into a common fund for the benefit of Plaintiffs and the Damages Class
Members.

170.    A constructive trust should be imposed upon all unlawful or inequitable sums
Defendants received, which arise from overpayments for branded and generic versions of
Sensipar by Plaintiffs and the Damages Class Members.

171.    Plaintiffs and the Damages Class Members have no adequate remedy at law.

172.    By engaging in the foregoing unlawful or inequitable conduct, which deprived
Plaintiffs and the Damages Class Members of the opportunity to purchase lower-priced generic
versions of Sensipar and forced them to pay higher prices for branded and generic versions of

Sensipar, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

173.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. It is inequitable for Defendants to accept and retain the benefits received without compensating the Damages Class.

**Alaska**

174.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Alaska at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefits bestowed upon them by the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Arizona**

175.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Arizona at prices

that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**Arkansas**

176.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Arkansas at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**California**

177.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in California at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Damages Class.

**Colorado**

178.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Connecticut**

179.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Damages Class.

**Delaware**

180.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants'

enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**District of Columbia**

181.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in the District of Columbia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

182.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Florida at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Georgia**

183.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Georgia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Hawaii**

184.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Hawaii at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Idaho**

185.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Idaho at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Illinois**

186.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Illinois at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

187.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar, which revenue resulted from anticompetitive prices paid by the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**Kansas**

188.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Kansas at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefits

bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### Kentucky

189.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Kentucky at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### Louisiana

190.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Louisiana at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no other remedy at law.

**Maine**

191.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Maine at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Maryland**

192.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Maryland at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Massachusetts**

193.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Massachusetts at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were

aware of or appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Michigan**

194.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Minnesota**

195.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Minnesota at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Mississippi**

196.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Mississippi at

prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of branded and generic versions of Sensipar, which in equity and good conscience belong to the Damages Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### Missouri

197.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Missouri at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class.

### Montana

198.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Montana at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Nebraska**

199.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to the Damages Class.

**Nevada**

200.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Nevada at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. Defendants appreciated the benefits bestowed upon them by the Damages Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**New Hampshire**

201.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of

Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

### New Jersey

202.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from the Damages Class with respect to Defendants' sales of branded and generic versions of Sensipar. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

### New Mexico

203.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

66

**New York**

204.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar, which revenue resulted from anticompetitive prices paid by the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Damages Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

205.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in North Carolina at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. The Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the Damages Class. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

206.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in North Dakota at

prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

### Oklahoma

207.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Oklahoma at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. The Damages Class has no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### Oregon

208.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Oregon at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of the

benefit bestowed upon them by the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

### Pennsylvania

209.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Pennsylvania at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### Puerto Rico

210.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Puerto Rico at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**Rhode Island**

211.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Rhode Island at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**South Carolina**

212.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Damages Class. Defendants realized value from the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**South Dakota**

213.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in South Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of

Defendants. Defendants were aware of the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing the Damages Class.

**Tennessee**

214.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Tennessee at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class. It would be futile for the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the Damages Class with respect to Defendants' sales of branded and generic versions of Sensipar. It would be futile for The Damages Class to exhaust all remedies against the entities with which the Damages Class has privity of contract because the Damages Class did not purchase branded and generic versions of Sensipar directly from any Defendant.

**Texas**

215.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of

71

Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. The circumstances under which Defendants have retained the benefits bestowed upon them by the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has no remedy at law.

**Utah**

216.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Utah at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Vermont**

217.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Vermont at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants accepted the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Virginia**

218.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Virginia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of branded and generic versions of Sensipar. Defendants have paid no consideration to any other person for any of the benefits they have received from the Damages Class.

**Washington**

219.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Washington at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**West Virginia**

220.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in West Virginia at

prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Wisconsin**

221.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Wisconsin at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Wyoming**

222.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Wyoming at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

## IX.    DEMAND FOR JUDGMENT

223.    Accordingly, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully demand that this Court:

(a)    Determines that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiffs as the representative of the Classes;

(b)    Enters joint and several judgments against Defendants and in favor of Plaintiffs and the Classes;

(c)    Enjoins Defendants from continuing their unlawful market division agreement;

(d)    Grants Plaintiffs and the Classes equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

(e)    Awards the Damages Class damages, and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial;

(f)    Award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

(g)    Awards such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## X.    JURY DEMAND

224.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury on all issues so triable.

Date: September 13, 2019

**Public Redacted Version Filed**
**September 20, 2019**

**THE BIFFERATO FIRM, P.A.**

By: */s/ Ian Connor Bifferato*
Ian Connor Bifferato (Bar No. 3273)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

**OF COUNSEL:**

Gregory S. Asciolla
Jay L. Himes
Karin E. Garvey
Robin A. van der Meulen
Matthew J. Perez
Domenico Minerva
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com
dminerva@labaton.com

*Interim Class Counsel for the Indirect*
*Purchaser Classes*

Brian P. Murray
Lee Albert
Gregory B. Linkh
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

Scott A. Martin
Irving Scher
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

smartin@hausfeld.com
ischer@hausfeld.com

Brent Landau
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
blandau@hausfeld.com

Melinda R. Coolidge
**HAUSFELD LLP**
1700 K Street, NW
Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mcoolidge@hausfeld.com

Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa
Adam J. Pessin
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
jistvan@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

*Additional Counsel for UFCW Local 1500*
*Welfare Fund, Teamsters Local 237 Welfare*
*Fund, and Teamsters Local 237 Retirees'*
*Benefit Fund*