IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION | C.A. No. 19-md-02895-LPS |
| THIS DOCUMENT RELATES TO: | C.A. No. 19-396-LPS |
| ALL DIRECT PURCHASER ACTIONS | C.A. No. 19-1460-LPS |
| | REDACTED - PUBLIC VERSION |

**AMGEN INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant Amgen Inc.*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
(214) 571-2900

Eric J. Stock
Kate Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Original Filing Date: October 15, 2019
Redacted Filing Date: October 22, 2019

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDING ................................................................. 1

SUMMARY OF ARGUMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

    I.    Sensipar® Litigation and Settlements ................................................................ 3

    II.   Teva's Unlicensed Market Entry and Settlement .............................................. 5

    III.  Antitrust Litigation ............................................................................................ 5

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................. 6

    I.    DPP's Claim Under Section 1 of the Sherman Act Based on the Amgen-Teva
        Settlement Agreement Should Be Dismissed. ................................................... 6

        A.   *Actavis* Requires Application of the Rule of Reason to Reverse Payment
              Settlements. ................................................................................................. 7

        B.   That Teva Was Permitted To Retain Some Revenues from Its Early At-
              Risk Entry Is Not a Basis for Finding an Unlawful Reverse Payment. ........ 7

            1.   The Amgen-Teva Agreement Contains a "Commonplace" and
                 Procompetitive Settlement of Damages Exempt from Antitrust
                 Scrutiny. ............................................................................................. 8

            2.   The Damages Compromise Pertains Only to the Actual Drug at Issue. ....... 11

    II.   DPPs Do Not State a Monopolization Claim Against Amgen Because the
        Challenged Acceleration Clauses Were Lawful and Had No Anticompetitive
        Effect. .............................................................................................................. 14

        A.   An Acceleration Clause Is Not a Reverse Payment. .................................. 15

        B.   The Acceleration Clauses Resulted in Procompetitive Earlier Entry. ......... 17

        C.   DPPs Have Not Plausibly Pled That the Acceleration Clauses
              Disincentivized Generic Manufacturers from Challenging the '405 Patent
              in This Case ................................................................................................ 18

    III.  DPPs' Complaint Fails To Adequately Plead Facts Supporting Its Conclusory
        Definition of the Relevant Market. .................................................................. 20

CONCLUSION .............................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Actos End Payor Antitrust Litig.*,
    2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015)...............................................................16, 20

*Amgen Inc. v. Amneal Pharm. LLC*,
    328 F. Supp. 3d 373 (D. Del. 2018)..........................................................................................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 554 (2007)...............................................................................................................6, 20

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ..............................................................................................17, 18

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)....................................................................................................14

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010)......................................................................................................8

*FTC v. AbbVie Inc.*,
    107 F. Supp. 3d 428 (E.D. Pa. 2015) .................................................................................11, 16

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013)....................................................................................1, 7, 9, 10, 11, 18

*FTC v. Actavis, Inc.*,
    No. 09-cv-00955 (N.D. Ga. Feb. 28, 2019) ......................................................................16, 17

*FTC v. Cephalon, Inc.*,
    C.A. No. 2:08-cv-2141-MSG (Feb. 19, 2019) ........................................................................13

*King Drug Co. of Florence v. Smithkline Beecham Corp.*,
    791 F.3d 388 (3d Cir. 2015)..........................................................................................7, 10, 13

*In re Lamictal Direct Purchaser Antitrust Litig.*,
    18 F. Supp. 3d 560 (D.N.J. 2014) ..............................................................................................8

*In re Lipitor Antitrust Litig.*,
    868 F.3d 231 (3d Cir. 2017)...............................................................................................8, 9, 12

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) ...............................................................................12, 14

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
   692 F. Supp. 52 (D.R.I. 1988)..................................................................................................17

*Queen City Pizza, Inc., v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)......................................................................................................20

*United States v. CIBA Geigy Corp.*,
   508 F. Supp. 1118 (D.N.J. 1976) ..............................................................................................20

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)...................................................................................................................14

*In re Wellbutrin XL Antitrust Litig.*,
   133 F. Supp. 3d 734 (E.D. Pa. 2015) .......................................................................................11

## Statutes

15 U.S.C. §§ 1, 2 (2012) ....................................................................................1, 2, 6, 7, 14, 15

35 U.S.C. § 156 (2012) ...........................................................................................7, 10, 11

## Other Authorities

Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of
   Most-Favored-Nation Provisions*, 27 Antitrust 20 (2013) ......................................................17

## Rules

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 6

## NATURE AND STAGE OF PROCEEDING

Amgen Inc. ("Amgen") hereby moves to dismiss the direct purchaser plaintiffs' Consolidated Class Action Complaint ("DPP Compl.") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

## SUMMARY OF ARGUMENT

If Direct Purchaser Plaintiffs' ("DPPs") baseless attack on the Amgen-Teva Settlement Agreement as violative of the Sherman Act were allowed to proceed, it would completely upend the carefully calibrated balance the Supreme Court struck in *FTC v. Actavis* between the "general legal policy favoring the settlement of disputes" and the "risk of significant anticompetitive effects" that may accompany certain types of settlements. *Actavis*, 570 U.S. 136, 158 (2013). DPPs' theory of liability, if accepted, would threaten to prevent the parties in virtually every Hatch-Waxman litigation involving at-risk entry by the generic from resolving their dispute without incurring significant risk of antitrust litigation. The relief DPPs seek would discourage the very conduct that the Hatch-Waxman and Sherman Acts were intended to encourage—early and aggressive entry by generics.

The Amgen-Teva Settlement Agreement is properly seen as a plain vanilla settlement of patent litigation where the generic has already launched at risk. A settlement of such a case has, and must have, two distinct elements: (1) an agreed entry/license date when the parties agree it is appropriate for the generic to be on the market (generally, as here, before expiration of the relevant patent); and (2) a settlement of the brand's claim for damages arising out of the generic's at-risk entry. The Amgen-Teva Settlement Agreement has both of these necessary components.

DPPs here allege, without basis, that, under the Amgen-Teva Settlement Agreement, Amgen *also* "provided . . . a large and unjustified payment to Teva" to stop Teva from continuing to market a generic version of Sensipar®. DPP Compl. ¶ 236. This allegation is flatly contradicted by the

terms of the Amgen-Teva Settlement Agreement, which are pled by DPPs. *Id.* ¶¶ 183, 185. Under that agreement, Amgen made no payment to Teva. In fact, Teva actually agreed to pay millions of dollars to Amgen, a flow of cash going in the opposite direction as that which concerned the *Actavis* Court. The only value that Amgen gave Teva was (1) a license to introduce a competing product more than five years before Amgen's patents expired, and (2) a release of Amgen's potential claim for damages as a result of Teva's early, at-risk entry—two provisions that under the Supreme Court's decision in *Actavis* are lawful and procompetitive means of settling patent litigation. Indeed, in contrast to the "payments for delay" that concerned the Supreme Court in *Actavis*, the value provided here actually enabled and/or facilitated *early* generic entry by Teva.

DPPs' claim based on routine provisions in Amgen's settlements with multiple other generic drug manufacturers is similarly meritless. DPPs allege that inclusion of ordinary acceleration clauses as part of the early entry provisions in those agreements somehow constituted an "illegal scheme to delay the introduction of generic cinacalcet hydrochloride," in violation of Section 2 of the Sherman Act. DPP Compl. ¶ 245. In reality, both in theory and on the facts DPPs allege, these provisions' only effect was the procompetitive one of accelerating entry by those settling generics. DPPs' theory that the acceleration clauses eliminated the incentive of generic manufacturers to continue to litigate is implausible in light of the facts pled in the Complaint, which allege that four such manufacturers *did* challenge Amgen's patents (three successfully).

Because the Complaint fails to plead a reverse payment under *Actavis* or to plead that Amgen's routine agreements with other generic competitors constitute monopolistic conduct or had any anticompetitive effect, the Court should dismiss the Complaint in its entirety.[1]

---

[1] As set forth in Amgen's motion to dismiss the end payors' consolidated complaint, each of the arguments in this motion applies fully to the end payors' consolidated complaint and Amgen advances each against that complaint.

## STATEMENT OF FACTS

### I.   Sensipar® Litigation and Settlements

Amgen is the assignee of the '405 patent, which expires on September 22, 2026 and which claims pharmaceutical compositions that include the active ingredient cinacalcet hydrochloride (along with inactive ingredients) for treatment of various diseases, including hyperparathyroidism and hypercalcemia.[2]  *Id.* ¶¶ 4, 98.  Cinacalcet hydrochloride is the active ingredient in Sensipar®, a medication marketed and sold by Amgen that is indicated for the treatment of secondary hyperparathyroidism and hypercalcemia in certain patients.  *Id.*  The FDA's official publication of approved drugs (the "Orange Book") lists the '405 patent in connection with Sensipar®.  *Id.* ¶ 95.

The Hatch-Waxman amendments to the Food, Drug, and Cosmetic Act provide for expedited regulatory approval of generic drugs that are bioequivalent to the brand drug.  DPP Compl. ¶ 56. Generic drug suppliers wishing to obtain such expedited approval must file an Abbreviated New Drug Application ("ANDA"), which relies on the findings of safety and effectiveness included in the brand manufacturer's original New Drug Application ("NDA") and requires the ANDA applicant to show bioequivalence to the brand drug.  *Id.*  With its ANDA, a generic manufacturer must provide the FDA and the NDA holder with a certification that the generic medication will not infringe any valid and enforceable patents listed in the FDA's Orange Book.  *Id.* ¶ 61.  One such certification (a "Paragraph IV certification") asserts that the patent for the brand drug is invalid, unenforceable, or will not be infringed by the product described in the ANDA.  *Id.*  Upon receiving a Paragraph IV certification, the branded firm may file a patent infringement suit immediately rather than waiting until the generic product is launched.  *Id.* ¶ 62.

Beginning in 2016, at least eighteen generic drug manufacturers (including Teva's

---

[2] For this motion only, Amgen assumes the truth of the factual allegations in the DPPs' Complaint.

subsidiary, Watson) filed ANDAs seeking approval to manufacture and sell generic cinacalcet hydrochloride products, each of which included a Paragraph IV certification to the '405 patent. *Id.* ¶ 9. Amgen sued each of them for infringement of claims 1–6 and 8–20 of the '405 patent. *Id.* ¶ 120. Beginning in the fall of 2017, Amgen began to enter into settlement agreements with many of the generic manufacturers. *Id.* ¶ 13. As is common in settlements of Hatch-Waxman patent litigation, each settlement agreement included a compromise entry date prior to the expiry of the '405 patent on which that generic manufacturer would be licensed to enter the market. *Id.* ¶ 123.

To ensure that settling parties would not be disadvantaged by their settlements if Amgen ultimately did not prevail in its patent infringement suits, each settlement agreement provided for narrow circumstances in which the entry date would be accelerated, ████████████████████ ████████████████████████████████████████████████████████ The agreements further provided that ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ DPP Compl. ¶ 122. Amgen reached settlements with Breckenridge Pharmaceutical, Sun Pharmaceutical, Hetero Labs, Ajanta Pharma, Cipla Ltd., Mylan Pharmaceuticals, Strides Pharma, Dr. Reddy's Laboratories, Aurobindo Pharma, Macleods Pharma, Lupin Pharmaceuticals, Alkem Laboratories, Torrent Pharma, and Heritage/Emcure (together, the "Settling Generics"). *Id.* ¶ 138.

In direct contrast to DPPs' theoretical claims that Amgen's settlement agreements could have made it uneconomical for any other manufacturers to test their cases at trial, four generic manufacturers *did* proceed to trial on Amgen's claims of patent infringement: Amneal, Piramal, Watson (a subsidiary of Teva), and Zydus. *Id.* ¶ 165. On July 27, 2018, the Honorable Judge Goldberg issued a ruling with respect to infringement by the non-settling generic manufacturers. *Id.*

¶ 168.  The Court held that Amgen's patent was infringed by one defendant, Zydus Pharmaceuticals, but was not infringed by Teva, Amneal, or Piramal.  *Id.* ¶¶ 168–69; *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 387, 399 (D. Del. 2018).  Because Amgen appealed the decision, the judgment █████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

The FDA began approving Sensipar® ANDAs on March 8, 2018 and has approved ANDAs from eight different generic manufacturers to date.  *Id.* ¶ 175.

## II.    Teva's Unlicensed Market Entry and Settlement

On December 28, 2018, with no notice to or authorization from Amgen, Teva began selling its generic cinacalcet hydrochloride product.  On January 2, 2019, Amgen and Teva entered into an agreement stopping Teva's sales and resolving Amgen's still-pending infringement claims against Teva (the "Amgen-Teva Settlement Agreement").  *Id.* ¶ 181.  Pursuant to the Amgen-Teva Settlement Agreement, Teva agreed to cease selling its generic product immediately and to pay Amgen up to $40 million in damages.  *Id.* ¶ 185(c); Amgen-Teva Settlement Agreement § 3.1.  The Amgen-Teva Settlement Agreement also contained an early entry license, allowing Teva to enter the market in mid-2021 or possibly earlier under the same type of acceleration conditions provided for in Amgen's agreements with the Settling Generics.  DPP Compl. ¶ 185.

## III.    Antitrust Litigation

On January 8, 2019, Cipla filed suit (the "Cipla Litigation"), seeking a declaratory judgment that it was licensed to sell its generic cinacalcet product under its settlement agreement with Amgen, allegedly due to Teva's December 28 launch.  Cipla also asserted patent misuse and antitrust violations under federal and California law based on the Amgen-Teva Settlement Agreement.  On March 2, 2019, Cipla asserted it would begin selling its generic cinacalcet product, in breach of its settlement agreement.  Public evidence indicates that Cipla began sales on March 6, 2019.  Amgen

moved to restrain and enjoin Cipla's sales of its generic cinacalcet product, but this Court held that Amgen was not likely to succeed on the merits of that claim. At least one other manufacturer, Aurobindo, has launched a generic version of Sensipar®. DPP Compl. ¶ 196.

Although Amgen's settlement agreements involved no payments from Amgen to any generic manufacturer and permit the Settling Generics and Teva to market competing versions of Sensipar® far earlier than expiration of the relevant patent, DPPs filed four separate lawsuits, piggybacking on the Cipla Litigation and alleging that the settlements violate the Sherman Act and state laws. After the Joint Panel on Multidistrict Litigation transferred all of the cases to this Court, DPPs filed a Consolidated Amended Complaint. Defendants now move to dismiss that Complaint with prejudice.

## LEGAL STANDARD

To withstand a Rule 12(b)(6) motion, a complaint alleging a Sherman Act violation "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A plaintiff must, therefore, do more than "plead facts that are merely consistent with a defendant's liability"; the facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citations omitted). When the allegations of a pleading fail to plausibly suggest any entitlement to relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558. This will prevent the "potentially enormous expense of discovery" in an antitrust case such as this that lacks any plausible basis. *Id.* at 559.

## ARGUMENT

**I.  DPP's Claim Under Section 1 of the Sherman Act Based on the Amgen-Teva Settlement Agreement Should Be Dismissed.**

DPPs' Section 1 claim asserts that Amgen agreed to make an unlawful reverse payment to

Teva but fails to include any factual allegations that could support that conclusory statement. Without a plausibly alleged reverse payment, DPPs have no actionable Section 1 claim.

### A.   *Actavis* **Requires Application of the Rule of Reason to Reverse Payment Settlements.**

The Supreme Court in *Actavis* held that antitrust scrutiny for a patent settlement in the context of the Hatch-Waxman Act is triggered where a patent settlement features a "large and unjustified" "reverse payment."  A "reverse payment" "requires the patentee to pay the alleged infringer, rather than the other way around." *Actavis*, 570 U.S. at 141.  In such settlements, "a party with no claim for damages . . . walks away with money simply so it will stay away from the patentee's market." *Id*. at 152.  These settlements are sometimes referred to as "pay for delay."

Importantly, *Actavis* rejected the argument that a reverse payment settlement of patent infringement litigation is *presumptively* unlawful.  Instead, particularly in light of the branded manufacturer's patent rights, the Court cautioned that "the likelihood of a reverse payment bringing about anticompetitive effects" depended on the circumstances.  *Actavis*, 570 U.S. at 159.  This holding forecloses DPPs' claim that the Amgen-Teva Settlement Agreement violates the Sherman Act "per se" or under a "quick look" approach.  *Actavis*, 570 U.S. at 158–59 ("The FTC urges us to hold that reverse payment settlements are presumptively unlawful . . . We decline to do so. . . . [T]he FTC must prove its case as in other rule-of-reason cases.").  Accordingly, the "per se" aspect of DPPs' Section 1 claim (DPP Compl. ¶ 234)  is frivolous and should be dismissed with prejudice. *See King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 403–04 (3d Cir. 2015) (*Actavis* Court refused to find reverse payment settlement agreements "per se anticompetitive" and declined to apply "presumptive rules (or a 'quick-look' approach)").

### B.   **That Teva Was Permitted To Retain Some Revenues from Its Early At-Risk Entry Is Not a Basis for Finding an Unlawful Reverse Payment.**

The fact that the Amgen-Teva Settlement Agreement allowed Teva to retain some of the

profits it earned from early entry is not a basis for finding that settlement to be unlawful. Under *Actavis*, a patent settlement with a compromise entry date can violate the antitrust laws *only* if it is accompanied by a "large and unjustified reverse payment." *In re Lamictal Direct Purchaser Antitrust Litig.*, 18 F. Supp. 3d 560, 567 (D.N.J. 2014), *rev'd on other grounds, sub nom. King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) ("*Actavis* requires scrutiny only of patent settlements that contain reverse payments."). Accordingly, "to survive a motion to dismiss," plaintiffs challenging a patent settlement "must allege facts sufficient to support the legal conclusion that the settlement at issue involves a large and unjustified reverse payment under *Actavis*." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 251–52 (3d Cir. 2017). But the Complaint's allegation that Teva retained some of its profits from early entry shows no payment from Amgen to Teva in return for delay—instead, Teva's profits derive exclusively from income it earned as a result of its aggressive and risky *early* entry.

### 1. The Amgen-Teva Agreement Contains a "Commonplace" and Procompetitive Settlement of Damages Exempt from Antitrust Scrutiny.

The crux of DPPs' reverse payment claim is the misguided assertion that Teva's "retained revenue" from its at-risk launch is, in effect, a reverse payment. DPP Compl. ¶ 236. But Amgen's agreement to release Teva from liability for damages it may owe to Amgen *as a result of Teva's early entry into the market* is not the type of consideration that can constitute a large and unjustified payment under *Actavis*. Indeed, were it otherwise, *no* settlement of any at-risk launch would ever be possible without incurring the risk of antitrust treble damages actions.

The Amgen-Teva Settlement Agreement was reached after Teva exposed itself to potential liability by launching at risk, providing consumers with a competitive but potentially infringing cinacalcet product and earning revenue as a result. Teva then determined that, rather than continue to manufacture and sell its product at risk, increasing its potential liability, it would resolve its

dispute with Amgen by agreeing to a compromise entry date, as litigants are encouraged to do. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010).

Importantly, the only revenue retained by Teva as part of its settlement with Amgen was revenue that Teva earned from bringing its product to market early and *competing* against Amgen—this was not revenue earned from *delaying* competition. Indeed, this type of resolution was actually specifically contemplated by the Supreme Court in *Actavis,* which endorsed it as a procompetitive and utterly "commonplace form[]" of settlement. *Actavis*, 570 U.S. at 152. As the Court noted, "when Company A sues Company B for patent infringement and demands, say, $100 million in damages, it is not uncommon for B (the defendant) to pay A (the plaintiff) some amount less than the full demand as part of the settlement—$40 million, for example." *Id.* at 151. Although the *Actavis dissent* claimed that the *Actavis* decision would expose such settlements to antitrust scrutiny, *see id.* at 169 (Roberts, C.J., dissenting), the majority disagreed. Instead, the majority stated that "[i]nsofar as the dissent urges that settlements taking these commonplace forms have not been thought for that reason alone subject to antitrust liability, we agree, and *do not intend to alter that understanding*." *Id*. at 152 (emphasis added).

The Amgen-Teva Settlement Agreement is exactly the kind of settlement that the Court "exempted . . . from scrutiny." *Lipitor*, 868 F.3d at 250. Amgen incurred damages caused by Teva's at-risk launch, and the parties settled Amgen's claim for those damages for $40 million. Absent a settlement, if Amgen *prevailed* on appeal, it would receive far more than $40 million; if Amgen *lost* on appeal, it would receive nothing. The fact that Amgen and Teva's settlement was not a total victory for Amgen entitling it to *all* of its damages—with no discount for uncertainty—does not somehow turn this "commonplace" settlement into an antitrust violation.

The Supreme Court recognized that in this kind of "traditional" settlement, the party with the

claim for damages may receive a sum that is "*less than* the value of its claim," such as in the *Actavis* hypothetical with $100 million damages and a $40 million settlement. *Actavis*, 570 U.S. at 152 (emphasis added). And the Court assigned significance to the fact that outside the "unique regulatory framework" of the Hatch-Waxman Act, "it is virtually unheard of" for a plaintiff "to pay an accused infringer to settle the lawsuit." *Actavis*, 570 U.S. at 155–56 (quoting 1 H. Hovenkamp, M. Janis, M. Lemley, & C. Leslie, IP and Antitrust § 15.3, p. 15–45, n.161 (2d ed. Supp. 2011). Given that it is "commonplace" for settlements to include the "tender by an infringer of *less than the patentee's full demand*," it is evident that the *Actavis* Court did not consider such settlements to include reverse payments. *King Drug*, 791 F.3d at 402 (emphasis added).

The existence of a payment from Teva *to* Amgen also does not raise the antitrust concern identified in *Actavis*. When a payment is made *to the generic*, the Court theorized that the generic may be accepting compensation in return for agreeing to a later compromise entry date than would be justified by the merits of the patent litigation. That is, but for the reverse payment, market entry of the generic should have occurred sooner. But here, the revenues retained by Teva were income that Teva earned as a result of its *earlier* entry. The greater the amount retained by Teva, the greater its reward for its *early* entry—that is in total contrast to a payment for "delayed" entry.

Adopting DPPs' theory of the case would also be directly contrary to the policies of the Sherman and Hatch-Waxman Acts. If, as DPPs propose, generic manufacturers at risk must either litigate the case to completion (risking massive patent infringement liability) or pay back *all* of their revenues, future generic manufacturers will not launch at risk; the risk would be too great. The policy concerns animating *Actavis* are reversed where there is no reverse payment, only a settlement of liability that rewards and encourages early at-risk entry to the benefit of consumers.

Defendants' proposed interpretation is also consistent with the teaching in *Actavis* that not all

types of consideration provided to the generic constitute a "large and unjustified payment"—and in particular its reasoning that allowing early entry by the generic is not an improper payment.  Indeed, *Actavis* expressly approved of agreements that "allow[] the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point." *Actavi*s, 570 U.S. at 158.  That reasoning, by analogy, applies directly here. Teva, by launching at risk, "enter[ed] [Amgen's] market prior to the ['405 patent's expiration." *Id*. Of course, Teva, like any generic granted early entry by the brand in a compromise—earned money by competing with the branded manufacturer.  But, as noted, *Actavis* expressly authorized that type of profit by a generic manufacturer in a patent settlement.  *Id.*

*Actavis* "did not seek to make it impossible to settle Hatch-Waxman patent infringement actions," *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 752 (E.D. Pa. 2015), and this Court should not permit DPPs to do so here.  Indeed, the *Actavis* Court cautioned "that undue scrutiny of settlements . . . can endanger the amicable resolution of disputes." *FTC v. AbbVie Inc.*, 107 F. Supp. 3d 428, 435 (E.D. Pa. 2015).  Exposing parties to antitrust risk, merely because they resolved the brand manufacturer's damages claim for the at-risk launch for less than full value of those claims, would be incorrect under the antitrust laws and would unduly interfere with the ability of parties to Hatch-Waxman Act litigation to settle their disputes.

### 2.  The Damages Compromise Pertains Only to the Actual Drug at Issue.

It is also important that the Amgen-Teva Settlement Agreement released Teva from potential liability for its sales of the same drug that was the subject of the compromise entry date in that settlement.  In other words, the release to Teva rewarded Teva for bringing a product to market that benefited Sensipar® consumers.  That is starkly different from cases where the brand manufacturer releases potential liability in connection with a *different* drug from the one subject to the compromise entry date in the settlement agreement.  Where the at-risk entry occurred with respect to a different

drug, the benefits of that early at-risk entry applied in a different market and were received by a different set of consumers than those affected by the drug subject to the compromise entry date. That alters the considerations before the Court in *Actavis* in a way that does not apply where the at-risk entry occurred with respect to the same drug.  Indeed, as noted below, a recent settlement by the FTC makes precisely this distinction.

In *In re Lipitor*, for example, Pfizer sued the generic for patent infringement over Pfizer's branded drug, Lipitor.  868 F.3d at 243.  While that case was pending, the parties also litigated another patent infringement suit regarding a separate drug, Accupril.  *Id.* at 243–44.  In the Accupril case, the generic had launched at risk, but Pfizer had won a preliminary injunction, affirmed on appeal, halting the generic sales.  *Id.* at 244.  In connection with the injunction, Pfizer posted a $200 million bond, and "expressed confidence" to its shareholders thereafter "that it would succeed in obtaining a substantial monetary judgment" from the generic.  *Id.*

Pfizer's past damages claim against the generic in the Accupril litigation was still pending when the parties settled the *Lipitor* case.  *Id.*  As part of the *Lipitor* settlement, the generic agreed to delay its entry with generic Lipitor, and also to pay $1 million to Pfizer in connection with the Accupril litigation.  *Id.*  Pfizer, for its part, agreed to release its Accupril claim.  *Id.*; *id.* at 253.

The Third Circuit held that, on those facts, the plaintiffs had plausibly alleged an unlawful reverse payment consisting of the brand's agreement to release the Accupril claims in exchange for the generic's delay in launching its generic version of Lipitor.  *Id.* at 253.  The court concluded that the plaintiffs had plausibly alleged that the $1 million payment was not related to the settlement of the Accupril damages action at all, but was rather a smokescreen for the real deal:  the release of the Accupril claims in exchange for delay in an entirely different drug market.  *Id.* at 258.  As such, the Third Circuit concluded that the alleged reverse payment was subject to antitrust scrutiny; *see also In*

*re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 391 (D. Mass. 2013) (similar).

These cases are very different from the facts here. Providing a release of a valuable claim in a different, unrelated product litigation does not benefit the same market or consumers who are affected by the compromise entry date with respect to a different drug. In contrast, here, Amgen agreed to waive a portion of the potential liability *in the Sensipar*® *case* as a condition of settling and agreeing to a compromise entry date with respect to *that same case*. Customers of Sensipar® received the benefits of Teva's early entry, and Teva's retention of revenues, rewarding it for that competitive early entry, cannot have harmed cinacalcet consumers. Such revenues cannot be a "large and unjustified" reverse payment under *Actavis*.

The FTC—which pushed for even broader liability in *Actavis* than the Supreme Court was willing to adopt—makes precisely the same distinction for which Defendants are advocating here. In a recent settlement with Teva, the FTC prohibited Teva from entering settlements that involved a compromise generic entry date plus a "transfer of value" to the generic, but *expressly permitted* settlements where the only value provided to the generic is a release or limitation of a damages claim for an at-risk launch *for the same drug* at issue in the litigation. *See* Stip. Rev. Order, ¶ 38(h), *FTC v. Cephalon, Inc.*, C.A. No. 2:08-cv-2141-MSG (Feb. 19, 2019), D.I. 409-1, https://www.ftc.gov/system/files/documents/cases/teva_proposed_stipulated_revised_order.pdf.

Moreover, there is nothing anticompetitive about the payment provisions in the Amgen-Teva Settlement Agreement, which are structured to adjust downward as competition *increases*. Unlike *Actavis*' concern about "delay in competition for longer than the patent's strength would otherwise permit," *King Drug*, 791 F.3d at 409, the payment provisions here in effect require Teva to pay more where Amgen's patent has proven sufficiently strong to deter additional generic launches. If, on the other hand, Amgen's patent proved weak and other generics did launch, then Teva would pay less.

13

This is exactly how patent and antitrust law is supposed to work.[3]

## II.    DPPs Do Not State a Monopolization Claim Against Amgen Because the Challenged Acceleration Clauses Were Lawful and Had No Anticompetitive Effect.

In order to state a claim under Section 2 of the Sherman Act, a plaintiff must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  In other words, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Thus, even accepting DPPs' assertions regarding Amgen's market power as true, DPPs would still need to allege some "anticompetitive conduct" in order to state a Section 2 claim.

DPPs allege an "exclusionary conduct scheme" by Amgen to monopolize the relevant market using routine acceleration clauses in their agreements with the Settling Generics followed by a reverse payment in the Amgen-Teva Settlement Agreement.  Because the Amgen-Teva Settlement Agreement is not anticompetitive for all of the reasons discussed above, DPPs' monopolization claim hinges on whether the acceleration clauses in Amgen's agreements with the Settling Generics are anticompetitive.  They are not.

DPPs have not alleged a viable challenge to the acceleration clauses for three reasons.  First, as an initial matter, the acceleration clauses in Amgen's settlement agreements with other generics

---

[3] Even if the damages provision theoretically could cause direct purchasers anticompetitive harm, DPPs have not—and cannot—plausibly allege that it actually harmed them.  Because Judge Goldberg rejected the request for an Indicative Ruling, the payment provision of the settlement agreement never came into operation.  Moreover, as DPPs themselves concede, both Cipla and Aurobindo have launched.  DPP Compl. ¶¶ 195–96.  Thus, the clause clearly did not "ensure[] that [Teva's] generic would be the only one on the market." *Nexium*, 842 F.3d at 42.

cannot constitute "reverse payments" under *Actavis*, and DPPs do not appear to argue that as a basis for liability.  Rather, DPPs appear to allege that the acceleration clauses are unlawful because, in the aggregate, they allegedly had the anticompetitive effect of discouraging the generics from challenging Amgen's patents.  *See* DPP Compl. ¶¶ 240–46.  Second, even based on their own allegations, DPPs' theory of such an anticompetitive effect is wrong because the principal effect of acceleration clauses is to increase competition by accelerating generic entry.  Third, in practice, in this case, DPPs' own allegations demonstrate conclusively that the acceleration clauses here did not have the anticompetitive effect DPPs theorize—discouraging patent challenges—because four generic companies proceeded to trial against Amgen's patents.  That is sufficient, by itself, to warrant dismissal of DPPs' Section 2 claims.

### A.    An Acceleration Clause Is Not a Reverse Payment.

DPPs seem at times to suggest that acceleration clauses can amount to a reverse payment, but any such suggestion lacks merit.  As an initial matter, DPPs' allegations focus largely on the acceleration clauses contained in the *earlier* settlements of Amgen's patent infringement litigation.[4] Yet DPPs do not allege any of those *earlier* settlement agreements are reverse payment settlements, much less plead facts to support such an allegation.  Because DPPs' theory of anticompetitive effect applies primarily, if not only, to the pre-verdict acceleration clauses in the early settlement agreements that DPPs make no claim include reverse payments, DPPs do not appear to contend—at least not plausibly—that any acceleration clause is a reverse payment.

Even if DPPs alleged that the acceleration clauses were somehow anticompetitive reverse payments, that argument would fail because the direct effect of an acceleration clause is to allow

---

[4] DPPs include no allegations to suggest that the acceleration clause in the Amgen-Teva Settlement Agreement—which was entered after fourteen other settlements containing acceleration provisions are alleged, and after the supposedly disincentivized competitors already litigated their defenses to verdict—had any anticompetitive effect whatsoever.

*even earlier* entry than would otherwise be permitted based on the compromise early entry date in each settlement agreement. *See In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part on other grounds*, 848 F.3d 89 (2d Cir. 2017); *FTC v. AbbVie Inc.*, 107 F. Supp. 3d 428 (E.D. Pa. 2015). In *In re Actos*, indirect purchasers of a branded diabetes drug brought a putative class action against the brand manufacturer and certain generic manufacturing companies, alleging that the defendants' settlements of Hatch-Waxman patent litigation were anticompetitive. *Id.* at *9. In particular, the *Actos* plaintiffs alleged that the settlement agreement at issue—which provided only non-cash consideration, including an early entry license and an acceleration clause providing for earlier entry in the event another generic entered the market prior to that licensed entry date—constituted an impermissible reverse payment under *Actavis*. *Id.* at *12. The court concluded that "as to the acceleration clauses, Plaintiffs have failed to set forth any plausible basis for viewing them as anticompetitive." *Id.* at *15. The court reasoned that "*[t]he practical effect of the acceleration clauses was thus to increase competition* in the event that other generics entered the market earlier than contemplated by the agreement. If no other generic entered before the licensed entry date, the effect would be neutral." *Id.* (emphasis added). The court dismissed the complaint, holding that the plaintiffs had failed to plead a reverse payment warranting antitrust scrutiny. *Id.* at *20.

The FTC agrees. In its settlement of the *Actavis* case on remand, the FTC specifically excluded similar acceleration clauses from its definition of reverse payments. *See* Stipulated Order for Permanent Injunction, *FTC v. Actavis, Inc.*, No. 09-cv-00955 (N.D. Ga. Feb. 28, 2019), ECF 868. The definition of an impermissible "payment" in that order carves out an exception for contractual provisions conditioning earlier market entry by a generic manufacturer on entry by another generic manufacturer—the exact kind of settlement provision challenged by DPPs. *Id.*

**B.      The Acceleration Clauses Resulted in Procompetitive Earlier Entry.**

Not only are the acceleration clauses not "reverse payments" under *Actavis*, DPPs fail to allege that those clauses—which are the reason that generic versions of cinacalcet hydrochloride are being sold now—are anticompetitive at all.  DPPs' theory is basically a variation on a claim that some antitrust plaintiffs have made against so-called "most favored nation" agreements.  A most-favored nation agreement is a contractual provision in which a party guarantees that none of its counterparties will be treated more favorably than the contracting counterparty.  Most-favored nation provisions are ubiquitous in today's economy because they generate enormous negotiating efficiencies.  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (most favored nation provisions "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers").  A most-favored nation clause can help an early contracting party protect against the risk that it misjudged the market by ensuring that if later contracting parties receive better terms, the party with the most-favored nation clause will also receive those terms.

It is for this reason that courts and commentators have acknowledged that most-favored nation clauses are "the sort of [procompetitive] conduct that the antitrust laws seek to encourage." *Id.*; *see also* Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored-Nation Provisions*, 27 Antitrust 20 (2013) (identifying several procompetitive "efficiency reasons" for using such clauses).  Most-favored nation clauses are a procompetitive tool to ensure fair treatment.  *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 692 F. Supp. 52, 71 (D.R.I. 1988) ("It would seem silly to argue that a policy to pay the same amount for the same service is anticompetitive.").  This is true even though plaintiffs in other cases have argued, similarly to DPPs here, that most-favored nation clauses may be used by a dominant firm to discourage counterparties from striving for better terms because they will know that their

17

competitors will receive the same terms. *Blue Cross*, 65 F.3d at 1415.   But as explained below, DPPs make no plausible allegation that the acceleration clauses had that type of effect here.

At bottom, the acceleration clauses in Amgen's agreements with the Settling Generics are simply more procompetitive versions of the standard early-entry agreement that was expressly sanctioned by the Supreme Court in *Actavis*.   570 U.S. at 158 (noting that its holding "does not prevent litigating parties from settling their lawsuit" and that they may do so "by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point").  Rather than set the early entry date of each agreement at a date certain, the acceleration clauses guarantee the generic counterparty that it

████████████████████████████████████████████████████████████████

████████████████████  Far from delaying entry, these acceleration clauses ensure that each Settling Generic is treated fairly and none ████████████████████████████████

████████████  Thus, again, the acceleration clauses have the effect of increasing, or accelerating, generic entry to the benefit of consumers.

**C.     DPPs Have Not Plausibly Pled That the Acceleration Clauses Disincentivized Generic Manufacturers from Challenging the '405 Patent in This Case.**

Even if acceleration clauses could theoretically disincentivize litigation, and thus limit competition in some circumstances, the facts pled in the Complaint establish unambiguously that the acceleration clauses had no such effect in this case.  DPPs allege that the acceleration clauses could deter generic manufacturers from continuing to defend their respective Hatch-Waxman patent litigations, and from entering the market at risk, because "[a]ny non-settling generic knew that if it litigated, won, and entered the market, the acceleration clauses previously granted to the settling generics would mean that the other generic manufacturers would share in the fruits of the win." DPP Compl. ¶ 157; *see also id.* ¶ 147.

Whether there are some theoretical circumstances where acceleration clauses could deter generics from challenging a brand manufacturer's patents is irrelevant here because we know that did not happen with respect to Sensipar®. Instead, the allegations in DPPs' Complaint directly disprove DPPs' own theory. DPPs concede that four Non-Settling Generics continued their Hatch-Waxman litigation against Amgen all the way through trial. As DPPs note, "[o]n July 27, 2018, Judge Goldberg ruled that Watson, Amneal and Piramal did not infringe any of the asserted claims of the '405 patent." DPP Compl. ¶ 168. A fourth generic manufacturer, Zydus, also pursued its litigation through trial, though Judge Goldberg found that Zydus' product would infringe certain of the claims in the '405 patent. *Id.* ¶ 169. DPPs concede that those four manufacturers went to trial despite the fact that *thirteen* other manufacturers had already settled their Hatch-Waxman litigation with Amgen before July 27, 2018. *Id.* ¶ 138. And DPPs further concede that at least five of the agreements with Settling Generics contained "acceleration clauses." Thus, DPPs' own allegations belie their conclusory assertion that Amgen's agreements with the Settling Generics "were intended to, and did" induce other generics to settle their own litigations. *Id.* ¶ 147.

DPPs also concede that at least three generics—Teva, Cipla, and Aurobindo—entered the market prior to their licensed entry dates. DPP Compl. ¶¶ 195–96. Cipla filed a lawsuit to do so after realizing that, if it prevailed, it could use its greater willingness to depart from the obligations it undertook in its settlement agreement to make far *more* money than it would have if it had waited for a final judgment in federal court. The fact that Teva litigated to judgment and then entered the market, and that Cipla litigated with Amgen and subsequently entered as well, renders DPPs' theoretical analysis of harm not only implausible, but in fact inapplicable to the real world, at least with respect to cinacalcet. Under DPPs' logic, all of these manufacturers would have known that by entering the market they could trigger the acceleration clauses in Amgen's agreements with other

Settling Generics, and yet still all three entered the market.  Thus, both of the alleged anticompetitive effects of Amgen's "acceleration clauses" are belied by the facts pled in the Complaint, confirming that the provisions are not anticompetitive and thus not warranting of further antitrust scrutiny under *Actavis*.  *See In re Actos*, 2015 WL 5610752, at *15 (noting that "Plaintiffs' theory [regarding disincentives to litigate] is not borne out here for several reasons," including that "after Takeda settled with the Generic Defendants, other generics continued to pursue litigation regarding ACTOS").  Indeed, only the procompetitive aspects of the acceleration clauses—earlier market entry—occurred.

### III. DPPs' Complaint Fails To Adequately Plead Facts Supporting Its Conclusory Definition of the Relevant Market.

DPPs' Complaint also fails to adequately define the relevant market.  DPPs' allegations are purely conclusory, asserting that products other than Sensipar® and its generic equivalents will not "prevent Amgen from raising or maintaining the price of Sensipar" above competitive prices and that there is no "significant, positive cross-elasticity of demand" between such products and Sensipar®.  Absent well-pled facts to make these assertions "more than labels and conclusions," *Twombly*, 550 U.S. at 555, DPPs have inadequately pled market definition and Amgen's alleged market power.  *See Queen City Pizza, Inc., v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  Because DPPs fail to provide a "plausible explanation" for why the relevant market should be limited to a single class of drug, their claims must be dismissed.  *United States v. CIBA Geigy Corp.*, 508 F. Supp. 1118, 1155 (D.N.J. 1976) (rejecting single-drug "relevant market" where different classes of drugs were medically interchangeable).

### CONCLUSION

For the foregoing reasons, DPPs' Complaint fails to state a claim and should be dismissed.

Morris, Nichols, Arsht & Tunnell LLP

*/s/ Brian P. Egan*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201-6912
(214) 571-2900

Eric J. Stock
Kate Dominguez
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

October 15, 2019

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant Amgen Inc.*