## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Direct Purchaser Actions<br><br>All Indirect Purchaser Actions | REDACTED - PUBLIC VERSION<br>C.A. No. 19-md-02895-LPS<br><br><br><br><br>C.A. No. 19-396-LPS<br>C.A. No. 19-1460-LPS<br>C.A. No. 19-369-LPS<br>C.A. No. 19-1461-LPS<br><br>██████████ |

## DIRECT PURCHASER AND END-PAYOR PLAINTIFFS' JOINT BRIEF IN OPPOSITION TO DEFENDANTS TEVA PHARMACEUTICALS USA, INC.'S, WATSON LABORATORIES, INC.'S AND ACTAVIS PHARMA, INC.'S <u>MOTION TO DISMISS</u>

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
Tiffany J. Cramer (Del. Bar No. 4998)
Vera G. Belger (Del. Bar No. 5676)
2711 Centerville Road Suite 201
Wilmington, DE 19808
Tel: (302) 656-2500
rjk@chimicles.com
smt@chimicles.com
tjc@chimicles.com
vgb@chimicles.com

*Counsel for the Proposed Direct Purchaser Class*

**THE BIFFERATO FIRM, P.A.**
Ian Connor Bifferato (Del. Bar No. 3273)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

*Counsel for the Proposed Indirect Purchaser Class*

Dated:  December 6, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.      NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

II.     SUMMARY OF ARGUMENT ........................................................................................1

III.    STATEMENT OF FACTS ...............................................................................................3

        A.      The economic landscape of brand and generic drugs. ...........................................3

        B.      Sensipar and its generic challengers. ....................................................................3

        C.      Amgen sues would-be generic competitors and enters into settlement
                agreements using poison pill "acceleration" clauses to delay generic entry. .........4

        D.      Amgen loses the infringement trial on the '405 patent and Teva launches. ............5

        E.      The Amgen-Teva Delay Agreement is entered, arresting generic
                competition. ........................................................................................................6

IV.     ARGUMENT....................................................................................................................8

        A.      The plaintiffs' *per se* theory of liability under the Sherman Act necessarily
                survives, as Teva has not challenged it. ................................................................9

        B.      The plaintiffs plausibly plead that Teva unlawfully restrained trade under
                Section 1 of the Sherman Act. .............................................................................10

                1.      The Amgen-Teva Delay Agreement provided Teva with a large,
                        and unjustified reverse payment. ..............................................................10

                2.      Plaintiffs adequately allege the Amgen-Teva Delay Agreement
                        constitutes a concerted action under the Sherman Act. .............................11

                3.      The plaintiffs adequately allege that the Amgen-Teva Delay
                        Agreement had both an unlawful purpose and an anticompetitive
                        effect. ......................................................................................................14

                        a.      The complaints adequately allege an unlawful purpose: to
                                allocate the market for cinacalcet hydrochloride. .........................14

                        b.      The complaints adequately allege an anticompetitive effect:
                                delayed market entry for other generic Sensipar. .........................17

                4.      Plaintiffs adequately allege that the Amgen-Teva Delay Agreement
                        caused generic Sensipar sales to cease, resulting in overcharges to
                        the purchasers............................................................................................18

V.      CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015) ...................................................................................16

*Amgen Inc. v. Amneal Pharm. LLC*,
   2019 WL 4538135 (D. Del. Sep. 18, 2019) .........................................................................17

*Amgen Inc. v. Amneal Pharm. LLC*,
   328 F. Supp. 3d 373 (D. Del. 2018) ......................................................................................5

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) ............................................................................................18

*Atl. Spinal Care v. Highmark Blue Shield*,
   2013 WL 3354433 (D.N.J. July 2, 2013) ..............................................................................9

*Big Apple BMW Inc. v. BMW of N. Am., Inc.*,
   974 F.2d 1358 (3d Cir. 1992) ........................................................................................8, 17

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) ..................................................................................................2

*Burtch v. Milberg Factors, Inc.*,
   2009 WL 840589 (D. Del. Mar. 30, 2009) .........................................................................13

*Cipla Ltd. v. Amgen Inc.*,
   386 F. Supp. 3d 386 (D. Del. 2019), *aff'd*, 778 F. App'x 135 (3d Cir. 2019) .............12, 13, 17

*Connelly v. Lane Constr. Corp.*,
   809 F.3d 780 (3d Cir. 2016) ..................................................................................................8

*DeMeo v. Koenigsmann*,
   2015 WL 1283660 (S.D.N.Y. Mar. 20, 2015) ......................................................................9

*In re Effexor XR Antitrust Litig.*,
   2014 WL 4988410 (D.N.J. Oct. 6, 2014) ............................................................................16

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
   129 F.3d 240 (2d Cir. 1997) ................................................................................................18

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) ..................................................................................12

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013)...........................................................................................*passim*

*Gordon v. Lewistown Hosp.*,
423 F.3d 184 (3d Cir. 2005)..........................................................................................10

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*,
615 F.3d 159 (3d Cir. 2010)............................................................................................8

*In re Hypodermic Prods. Antitrust Litig.*,
2007 WL 1959225 (D.N.J. June 29, 2007) .....................................................................8

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)..........................................................................................13

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)...........................................................................13

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
88 F. Supp. 3d 402 (E.D. Pa. 2015) ..............................................................................12

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015)..........................................................................................16

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017)....................................................................................13, 16

*McLain v. Real Estate Bd.*,
444 U.S. 232 (1980)......................................................................................................14

*In re Mushroom Direct Purchaser Antitrust Litig.*,
54 F. Supp. 3d 382 (E.D. Pa. 2014) ..............................................................................14

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ......................................................................14, 16

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ....................................................................15, 16, 19

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
2011 WL 2550835 (D. Del. June 10, 2011)..................................................................13

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
2017 WL 4910673 (E.D. Pa. Oct. 30, 2017)..................................................................11

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
738 F. Supp. 2d 505 (D. Del. 2010)...............................................................................13

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008).................................................................................11

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health
    & Welfare Fund v. Teikoku Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ...............................................................12

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health
    & Welfare Fund v. Teikoku Pharma USA, Inc.*,
    74 F. Supp. 3d 1052 (N.D. Cal. 2014) .................................................................16

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)....................................................................................8

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
    198 F. Supp. 3d 366 (D. Del. 2016).......................................................................6

*In re Warfarin Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2000)..................................................................................19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)..............................................................................................19

**Rules**

Fed. R. Civ. P. 12...........................................................................................................1

## I.     NATURE AND STAGE OF THE PROCEEDINGS

In these consolidated class actions, Direct Purchaser Class Plaintiffs, César Castillo, Inc. and KPH Health Services, Inc., and End-Payor Plaintiffs UFCW Local 1500 Welfare Fund, Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund (collectively, "plaintiffs")[1] bring federal antitrust claims against Amgen and Teva with respect to their anticompetitive conduct concerning the drug Sensipar.[2] Defendants Teva and Amgen move separately to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.     SUMMARY OF ARGUMENT

After beating Amgen's patent infringement charges at trial, Teva flooded the market with its less expensive, competing generic version of Amgen's Sensipar. In doing so, Teva realized nearly ██████ million in sales. But Teva's launch came with a competitive threat: if Teva continued selling generic Sensipar, ███████████████████████████████████ █████████████████████████████████.[3] Their entry would collectively reduce generic Sensipar prices and eat into Teva's bottom line. To secure the gains from its launch, Teva quickly negotiated a settlement with Amgen that allowed Teva to keep the vast majority of its fortune, stop other generics from launching, and gave Teva the same acceleration others had in the event another generic launched. In doing so, Teva (and Amgen) violated the antitrust laws.

Teva, however, attempts to spin its deal with Amgen as a commonplace settlement. But

---

[1] All references to the complaint are to the Direct Purchaser Plaintiffs' Consolidated Class Action Complaint filed on September 13, 2019 in the MDL docket. D.I. 13 ("Compl."). Attached as Exhibit 1 is a table that includes the comparable End-Payor Complaint references.

[2] "Amgen" refers to Amgen Inc.; "Teva" refers collectively to Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., and Actavis Pharma, Inc.

[3] An "acceleration" clause, also referred to as a "poison pill," is a type of most favored nation clause ("MFN"), but instead of best price, these MFNs guarantee best entry date. While theoretically, these provisions should benefit consumers, in practice, they often lead to higher prices and decreased competition through economic disincentive.

Teva's arguments hold no water and should be rejected:

1.     When Teva launched its generic product, it became a horizontal market competitor of Amgen. Through their Amgen-Teva Delay Agreement, the two eliminated competition with Teva ceding the market for Sensipar to Amgen. Such market allocation agreements are *per se* violations of Sherman Act § 1. Teva does not challenge this theory and thus it must survive.

2.     Even if viewed as a large and unjustified reverse payment under the framework set out in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), the claims still survive because:

    a.     The Amgen-Teva Delay Agreement bestowed on Teva a large, unjustifiable payment under *Actavis*, as set out in the plaintiffs' opposition to Amgen's motion to dismiss, which is incorporated by reference for the sake of brevity in this submission.[4] The payment consisted of: (1) Teva's retention of over ▓▓▓ million in revenues from the sale of its generic version of Sensipar; and (2) Teva's own "acceleration" provision, assuring Teva's ability to resume sales of its generic if another generic launched before Teva's entry date.

    b.     The plaintiffs adequately allege concerted action. The allegations plausibly establish that Amgen's and Teva's agreement was directed at ensuring Teva was the only generic on the market in the short term, followed by an extension of Amgen's monopoly over Sensipar thereafter. Compl. ¶¶ 181-94.

    c.     The plaintiffs adequately allege that the Agreement was for an unlawful purpose and had anticompetitive effects. Compl. ¶ 193. This is demonstrated by Teva's retention

---

[4] *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, . . . and any 'matters incorporated by reference or integral to the claim . . . .'") (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed.2004)) (citation omitted).

of over $300 million in revenues, receipt of its own acceleration clause, and the delay in generic entry resulting from the Amgen-Teva Delay Agreement. Compl. ¶¶ 24-26, 183-88, 219-31.

d.      The plaintiffs adequately allege a causal connection between the Amgen-Teva Delay Agreement, Amgen's continued monopoly, and resultant overcharges to purchasers. Compl. ¶¶ 181-94.

## III.    STATEMENT OF FACTS

### A.    The economic landscape of brand and generic drugs.

Brand-name drugs and their bioequivalent generic counterparts are functionally identical; the only difference is price. Compl ¶ 57. Prior to generic competition, brand drugmakers enjoy monopoly-level pricing and profits for their drugs. Once a generic enters the market, it quickly captures sales of the corresponding branded drug, often taking 80% or more of the market within the first six months. Compl. ¶¶ 69, 78. The entry of a single generic competitor brings at least a 25% price drop for the drug product, and as multiple generics come on the market, prices drop rapidly. Compl. ¶ 68. These dynamics encourage generics to come to market as soon as possible (the first on the market stands to make the most money). Compl. ¶¶ 72-75. When generics are on the market, purchasers receive the benefit of lower prices. Compl. ¶ 78.

### B.    Sensipar and its generic challengers.

On March 8, 2004, the FDA approved Amgen's NDA No. 021688 for cinacalcet, which Amgen promptly marketed, distributed, and sold under the brand name "Sensipar." Compl. ¶¶ 100-101. Once, the primary substance patent (the '068 patent) expired on March 8, 2018, Amgen knew it would have to rely on its '405 patent—a formulation patent set to expire in September 2026—to retain its Sensipar monopoly and block generics from market entry. Compl. ¶ 103-04. By March 2008, more than 20 generic manufacturers had filed ANDAs containing certifications claiming that Amgen's '405 patent was invalid, unenforceable, or not infringed by their proposed

generic. Compl. ¶ 113. Upon final approval, each such manufacturer planned to market their generic Sensipar products beginning on or about March 8, 2018, when the '068 patent expired. Compl. ¶ 111.

### C. Amgen sues would-be generic competitors and enters into settlement agreements using poison pill "acceleration" clauses to delay generic entry.

Between September 22, 2016 and October 11, 2016, Amgen filed fourteen lawsuits alleging infringement of the '405 patent by generic companies. Compl. ¶ 115.[5] In June 2017, Amgen sued four more. Compl. ¶ 119.[6] All cases were assigned to U.S. District Judge Mitchell Goldberg. In fall of 2017, with the '068 patent's expiration just months away, Amgen began systematically settling with its generic rivals. By the January 2019, Amgen had entered fourteen settlements. Each included an admission of infringement of the '405 patent, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl. ¶¶ 122-29, 138, 150.

Under the "acceleration" clauses, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl. ¶¶ 125-126. Several of Amgen's settlements with generics provided that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] The generic manufacturer defendants included: Aurobindo, Micro Labs, Teva (for the Watson ANDA), Cipla, Strides, Sun Pharma, Dr. Reddy's, Ajanta, Amneal, Apotex, Hetero, Breckenridge, Mylan, and Zydus.

[6] The generic manufacturer defendants included: Piramal, Alkem, Lupin, and Macleods.

████████████████████████████████████████████ Compl. ¶ 127.[7] The

"acceleration" clauses were intended to ensure that ██████████████████████

████████████████████████████ Compl. ¶¶ 129, 155-59. Amgen

controlled the drafting of the settlement agreements, including the "acceleration" clauses. Compl.

¶ 131.

On March 8, 2018—the same day that the '068 patent expired—Cipla and Aurobindo

received final approval to market their generic cinacalcet hydrochloride products, and but for

Amgen's unlawful conduct, they would have immediately launched. Compl. ¶ 149.

**D.      Amgen loses the infringement trial on the '405 patent and Teva launches.**

On July 27, 2018, Judge Goldberg ruled that the Watson, Amneal and Piramal ANDA

products did not infringe the '405 patent. Compl. ¶ 168.[8] On August 24, 2018, Judge Goldberg

entered final judgment of non-infringement of claims 1-6 and 8-20 of the '405 patent for the

generics. Compl. ¶ 170. Amgen appealed this judgment to the Federal Circuit.[9]

On December 27, 2018, the FDA approved Teva's generic version of Sensipar, and Teva

immediately launched, flooding the market with at least five months-worth of generic product in

seven days and generating over $393 million in revenues. Compl. ¶ 179. As a result, Amgen lost

millions in sales of branded Sensipar. During the infringement litigation, Amgen told the Court

that it expected to lose up to 73% of its market share in the first month of generic competition.

Compl. ¶ 180.[10] ████████████████████████████████████████████████

---

[7] Amgen-Cipla Settlement § 5.6; Amgen-Ajanta Settlement § 5.6; Amgen-Mylan Settlement § 5.6; Amgen-Dr. Reddy's Settlement § 5.6; Amgen-Torrent Settlement § 5.6.

[8] *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 386, 396 (D. Del. 2018).

[9] *See Amgen Inc. v. Amneal Pharm., LLC*, Nos. 2018-2414, 2019-1086 (Fed. Cir. Sept. 25, 2018).

[10] *See* Compl. ¶ 30 (quoting declaration of Christos Georghiou, submitted by Amgen in the Cipla preliminary injunction proceeding).

████████████████████████████████████████████████████████

████████████████████████████████████ Compl. ¶¶ 124-25. Amgen

chose to settle and further allocate the Sensipar market.

**E.     The Amgen-Teva Delay Agreement is entered, arresting generic competition.**

On January 2, 2019, one week after Teva's launch, Amgen and Teva finalized an

agreement which, *inter alia*, avoided triggering all the poison pill "acceleration" clauses and the

full generic competition that would result. Compl. ¶ 181. Under the terms of the deal, Teva got to

leave all its generic product in the market and for Teva's customers to resell the Teva product.

This term was particularly significant to Teva because if other generics entered the market with

lower prices, ████████████████████████████████████████████

████████████████████████████ Compl. ¶¶ 183, 190. What's more, Teva

got to keep virtually all the revenue derived from those sales. The agreement only required Teva

to share a fraction of the revenues realized from its allegedly infringing sales (just $40 million of

the $██ million it had made) with Amgen. Teva also got its own "acceleration" clause, assuring

Teva that it could ████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████ Compl. ¶¶ 185, 236.[11]

The two also agreed to seek Judge Goldberg's approval of a consent judgment stating that

Watson had in fact infringed the '405 patent—a statement directly contradictory to the ruling

Teva had previously obtained (and one which, if borne out on appeal would have entitled Amgen

---

[11] Teva's entry date, or "license date," under the Agreement was mid-2021. Compl. ¶ 185.

to far more than ▮ million). Compl. ¶ 182.[12] The Court denied the requested judgment of infringement, observing it was "solely based on [the defendants'] settlement agreement," and the two had "provided no other basis whatsoever which would amount to exceptional circumstances permitting . . . vacatur." Compl. ¶ 184.[13]

In accordance with the Amgen-Teva Delay Agreement, Teva:

- immediately ceased sales of its generic product;

- agreed to stay out of the market until a "license date" in mid-2021, subject to limited conditions;

- agreed to pay Amgen no more than $40 million, a small fraction of the hundreds of millions Teva made launching at risk and a small fraction of its potential liability;

- was not required to remove from the market any of its product keeping revenues in excess of ▮ million from the fruits of its launch; and

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Compl. ¶¶ 185, 236.

The agreement and its effects undeniably raise antitrust concerns. As the former Aurobindo CEO and VP of sales at Teva, Robert Cunard, summarized the effects of the agreement:

> [T]he terms of the Amgen-Teva Agreement let Teva retain hundreds of millions of dollars in profits on sales of generic cinacalcet products while paying relatively small amounts of money to Amgen only if certain circumstances are met under certain provisions of the Amgen-Teva Agreement, which include other generics staying off the market (Sections 3.1(a)-3.1(c)). In other words, Teva only pays Amgen if Teva is able to realize higher profits due to other generics not entering the market. The rebates and discounts that Teva would normally offer to wholesalers and distributors once other generics enter the market are paid to

---

[12] "A patentee may recover lost profits caused by a defendant's infringement." *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 198 F. Supp. 3d 366, 374 (D. Del. 2016). The lost profits to Amgen well exceeded those made by Teva by selling a less expensive product.

[13] *Amgen Inc. v. Amneal Pharms. LLC*, C.A. No. 16-853, D.I. 439 (D. Del. Mar. 26, 2019).

Amgen. These payments are capped at $40 million, potentially less than 20% of the profit made by Teva.[14]

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Compl. ¶¶ 189-90. The

Amgen-Teva Delay Agreement, therefore, removed a significantly less expensive generic

product from the market and forestalled the launch of other generic versions of Sensipar. Compl.

¶ 193. Teva reaped hundreds of millions of dollars from its abbreviated launch—money that it

would have never made absent its allocation agreement with Amgen. Compl. ¶¶ 132, 186, 190.[15]

## IV.    ARGUMENT

A complaint need only contain "enough factual matter (taken as true) to suggest . . . that

discovery will reveal evidence" of the conduct averred for a motion to dismiss to be denied.

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010)

(citations and quotations omitted). "[T]he question is not whether plaintiffs will prevail at trial,

but whether they should be given an opportunity to offer evidence in support of their claims." *In

re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *6 (D.N.J. June 29, 2007).

"[T]he Third Circuit has explained that antitrust complaints, in particular, should be

liberally construed," *(id.)* and their allegations "should be analyzed as a whole, rather than

compartmentalized." *Big Apple BMW Inc. v. BMW of N. Am.*, *Inc.*, 974 F.2d 1358, 1365 (3d Cir.

1992) (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-699 (1962)).

Accordingly, "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in

---

[14] Compl. ¶ 186 (citing Declaration of Robert G. Cunard at 5, *Cipla Ltd. v. Amgen, Inc.*, at No. 19-44 (LPS) (D. Del. Feb. 25, 2019)).

[15] *See also* Compl. ¶ 188 (citing *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 391 (D. Del. 2019)*, aff'd,* 778 F. App'x 135 (3d Cir. 2019) ("Teva . . . agreed to pay Amgen up to $40 million dollars, depending (in part) on how long the cinacalcet market remains free of non-Amgen and non-Teva generic products, and appears to have agreed to stop selling the Teva Product. (*See id.* §§ 3.1, 7.1, 7.3).").

antitrust and other complex cases." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). All inferences must be resolved in the plaintiffs' favor. *See, e.g.*, *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 n.2 (3d Cir. 2016).

A.  **The plaintiffs'** *per se* **theory of liability under the Sherman Act necessarily survives, as Teva has not challenged it.**

The plaintiffs allege that Teva and Amgen, in order to avoid a flood of generic competition that would eat away not just at Amgen's branded Sensipar sales and profits, but also the revenue that Teva was set to earn from its abbreviated launch (if it remained the sole generic in the market), the two entered into a settlement agreement. This agreement effectively delayed further generic entry, while preventing Teva from introducing any further generic Sensipar product to the market to the detriment of purchasers.

These allegations may be viewed under one of two lenses. The first is that the Amgen-Teva Delay Agreement is a naked market allocation agreement between horizontal competitors, in *per se* violation of the Sherman Act. Compl. ¶ 234. Notably, Teva did not so much as mention the plaintiffs' *per se* theory, let alone challenge it.[16] Accordingly, this theory survives the motion to dismiss.[17] Plaintiffs also allege that the Amgen-Teva Delay Agreement constitutes an unlawful reverse payment settlement agreement subject to a rule of reason analysis under *Actavis*. Compl. ¶¶ 232-236.

---

[16] *See, e.g.*, *Atl. Spinal Care v. Highmark Blue Shield*, 2013 WL 3354433, at *3 n.2 (D.N.J. July 2, 2013) ("Because this argument was raised for the first time in Defendant's reply brief, Plaintiff has not been given an opportunity to respond. As a result . . . the Court declines to address this argument at this time."); *DeMeo v. Koenigsmann*, 2015 WL 1283660, at *16 (S.D.N.Y. Mar. 20, 2015) ("[D]efendants do not challenge this theory of liability. I decline to address the adequacy of this aspect of the complaint *mea sponte* because plaintiff has not had an opportunity to address the issue.").

[17] As we explain in our opposition to Amgen's motion, *Actavis* did not foreclose *per se* scrutiny of all settlement agreements, particularly where, as here, the facts evince a horizontal market allocation. Such agreements remain *per se* violations of the Sherman Act. *See* Plaintiffs' Joint Br. in Opposition to Amgen's Motion at 7 and n.17 (citing*, e.g.*, *United States v. Topco Assocs., Inc*., 405 U.S. 596, 608 (1972)).

But regardless of whether each theory (and their corresponding standard of review), or both, are considered, the plaintiffs' Section 1 claims easily survive.

## B.   The plaintiffs plausibly plead that Teva unlawfully restrained trade under Section 1 of the Sherman Act.

A plaintiff alleging an unlawful restraint of trade under the Sherman Act must allege: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citations omitted). Each element is plausibly pleaded here.

### 1.   The Amgen-Teva Delay Agreement provided Teva with a large, and unjustified reverse payment.

Like Amgen, Teva denies that it received a "payment" under the Amgen-Teva Delay Agreement. Teva Br. at 12-13. Like Amgen, Teva is wrong. As the plaintiffs explained in their opposition to Amgen's equally flawed motion to dismiss (*see* Plaintiffs' Joint Br. in Opposition to Amgen's Motion at 9)—which the plaintiffs incorporate by reference here—the unlawful payment in this case took two forms:

(1)   Teva's retained revenue of at leas ▮ million from its generic product launch— revenue that Teva did not have to relinquish back to its distributors in the form of shelf stock adjustments because Amgen and Teva thwarted other generic entrants by settling before any of the "acceleration" clauses in Amgen's earlier settlement agreements were triggered; and

(2)   Teva's own acceleration provision ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Comp. ¶¶ 185, 236. Amgen and Teva attempt to attack these payment allegations separately. But these allegations when considered holistically—as they must be at this stage—show a massive transfer of value and guarantee thereof to Teva that easily passes muster at this stage under *Actavis*. *See* Plaintiffs' Joint Br. in Opposition to Amgen's Motion at 9-14.

### 2.     Plaintiffs adequately allege the Amgen-Teva Delay Agreement constitutes a concerted action under the Sherman Act.

The Amgen-Teva Delay Agreement itself is direct and conclusive evidence of the two companies' conspiracy. Teva's argument to the contrary is legally and factually unsupportable.[18]

To adequately allege a "[c]oncerted action," a plaintiff need only plead facts showing at least two entities (here, Teva and Amgen) having "a unity of purpose or a common design and understanding, or a meeting of the minds" to engage in an unlawful conspiracy. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 219 (3d Cir. 2008) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Plaintiffs need not allege particular acts by the defendants, but merely "raise the plausibility of a defendant's participation in the alleged conspiracy above the speculative level and create the reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4910673, *10 (E.D. Pa. Oct. 30, 2017) (quoting *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (quotation marks omitted).

The facts here easily meet these criteria. Plaintiffs allege, among other things, that:

- Amgen and Teva executed the Amgen-Teva Delay Agreement. Compl. ¶ 181.

- Under the Amgen-Teva Delay Agreement, the parties agreed to move for the entry of a consent judgment undoing the favorable ruling Teva had previously obtained. Compl. ¶ 182. To affect this reversal, defendants jointly moved for an indicative ruling to vacate its non-infringement ruling. Compl. ¶ 184.

- Despite defendants' agreement that Teva's sales allegedly infringed the '405 patent, Amgen allowed Teva's product to remain on the market.

---

[18] *See* Teva Br. at 14-15 (claiming that the plaintiffs' "claims fail for want of factual allegations plausibly suggesting any concerted action by Amgen and Teva" because there is "nothing that is inconsistent with Teva independently deciding to enter into the settlement agreement" with Amgen).

Compl. ¶ 183.

- Teva also: (a) immediately ceased sales of its generic, eliminating future competition from Teva, which was costing Amgen tens of millions of dollars; (b) agreed to stay out of the market until a "license date" in mid-2021, subject to limited conditions; and (c) agreed to pay Amgen no more than $40 million, a small fraction of the hundreds of millions the company made launching at risk for just six days. Compl. ¶ 185.

- The Amgen-Teva Delay Agreement prevented the acceleration clauses in Amgen's settlements with other generics from being triggered, which would have increased competition. Compl. ¶ 189. Teva was incentivized to enter the Agreement because doing so would avoid additional generic competition. Compl. ¶ 190.

- After Amgen staved off the most immediate threat to its monopoly, Amgen threatened legal action against Cipla if Cipla made an at risk launch based on Teva's Launch. Compl. ¶ 191.

- Through the Amgen-Teva Delay Agreement, the defendants arrested Teva's continued sales of generic Sensipar, forestalled the launch of other approved generic versions of Sensipar by prior settling generic manufacturers, and Teva secured, *inter alia*, hundreds of millions from its abbreviated launch. As a result, class members were unlawfully deprived of less expensive generic Sensipar. Compl. ¶ 193.

These facts, taken, as they must be, as true and in the light most favorable to plaintiffs, establish that Amgen and Teva voluntarily entered into an agreement with one another, which they knew would unlawfully delay the entry of generic Sensipar, causing significant harm to the direct purchaser and end-payor classes.

Courts analyzing other reverse payment agreements, agree that the existence of the agreement itself is sufficient to establish concerted action.[19] But this Court need not look beyond

---

[19] *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1301-02 (D. Kan. 2018) (complaint alleged facts capable of supporting an inference that the Mylan and Pfizer were two separate entities that engaged in concerted action to jointly advance their economic interests in an effort to prevent EpiPen competitors from entering the market and, thus, refusing to apply the *Copperweld* doctrine); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1165 (N.D. Cal. 2017) (granting summary judgment to plaintiff on this issue in pay-for-delay case); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d

its previous decision in the *Cipla* action to find the allegations at issue here plausible. Although the ruling came in the context of Amgen's preliminary injunction motion, this Court stated that "***it seems plausible that Amgen and Teva may have colluded to divide up the market for cinacalcet***, in order to share supracompetitive profits and deter true generic competition. ***This collusion, if proven, could be an antitrust violation under a rule of reason analysis***." *Cipla v. Amgen*, 386 F. Supp. 3d at 409-10 (emphasis added).

Relying on the same order, Teva contends that "Amgen and Teva may have reasonably assessed the risks each faced on appeal (and otherwise) and reached a rational compromise of their patent disputes." Teva Br. at 15. But, given the plausibility of plaintiffs' allegations, Teva's counter-explanations have no place at the motion to dismiss stage. "'A court ruling on a motion to dismiss need not choose among plausible interpretations of the evidence.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*, 383 F. Supp. 3d 187, 242 (S.D.N.Y. 2019) (quoting *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012)); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 257-58 (3d Cir. 2017) (defendants' counter-explanations "do[] not withstand . . . plaintiffs' plausible allegations and the reasonable inferences arising therefrom.").[20]

Plaintiffs' complaints pleads more than enough facts to meet the pleading standard. The

---

402, 410 n.9 (E.D. Pa. 2015) (denying summary judgment, where "Plaintiffs have presented direct evidence of concerted action through the settlement agreements between Cephalon and each of the Generic Defendants[.]").

[20] Teva's reliance on *Shionogi Pharma, Inc. v. Mylan, Inc.*, 2011 WL 2550835 (D. Del. June 10, 2011), is misplaced because there, unlike here, the antitrust defendants were in a partnership as patentee and NDA holder. Teva's other authorities are similarly distinguishable because they involved price-fixing or other conduct that requires plaintiffs to plead more than just parallel behavior to demonstrate the existence of a conspiracy. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 328 (3d Cir. 2010) (customer allocation and bid-rigging among insurance brokers and companies); *Burtch v. Milberg Factors, Inc.*, 2009 WL 840589, at *10 (D. Del. Mar. 30, 2009) (price-fixing, group boycott); *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 515 (D. Del. 2010) (price-fixing).

complaints raise the plausibility of Teva's participation in the alleged conspiracy above the speculative level and, thus, creates a reasonable likelihood that the discovery process will reveal relevant evidence to the plaintiffs' claims. These allegations are sufficient at this stage.

### 3. The plaintiffs adequately allege that the Amgen-Teva Delay Agreement had both an unlawful purpose and an anticompetitive effect.

Teva's assumption that the plaintiffs are required to allege anticompetitive effects is incorrect. The Supreme Court has long instructed that "in a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect." *McLain v. Real Estate Bd.*, 444 U.S. 232, 243 (1980) (collecting cases).[21] Regardless, the plaintiffs have alleged facts sufficient to plausibly plead both.

### a. The complaints adequately allege an unlawful purpose: to allocate the market for cinacalcet hydrochloride.

Teva erroneously charges the plaintiffs with advancing a "remarkable theory—that Teva's mere settlement of the patent claims against it was, in and of itself, unlawful." Teva Br. at 11. This is a straw man; plaintiffs advance no such theory. While it may be true that the "law favors settlement,"[22] *Actavis* made clear that the social benefits of terminating costly litigation generally do not justify payments that provide value to the settling generic that it could not have obtained even if it had won the litigation. *Id.*, 570 U.S. at 154 (the value of settlements generally "should not determine the result" in reverse payment cases).[23] Here, Teva could not have

---

[21] *See also In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 392 (E.D. Pa. 2014) ("[T]he 'general rule' is that a civil antitrust offense can be 'established by proof of either an unlawful purpose or an anticompetitive effect.'") (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978)).

[22] Teva Br. at 12 (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)).

[23] Of course, none of the cases Teva cites in this context stands for the proposition that the general policy favoring settlement of patent litigation, or any other kind of litigation, is absolute. *See* Teva Br. at 11-12. As Teva acknowledges, "certain types of patent settlement agreements may indeed be subject to antitrust scrutiny." *Id.* at 12. *See also In re Nexium (Esomeprazole)*

monopolized the market for generic Sensipar for any period of time "even if it had won the litigation." *Id.* Yet that is exactly what the defendants sought to achieve via the Amgen-Teva Delay Agreement. Under the terms of the Agreement, Amgen granted Teva a period of de facto generic exclusivity that expired only when all the generic product that Teva was able to sell prior to settling with Amgen was completely exhausted.[24]

*Actavis* did not, as Teva suggests, bless all patent settlements where an accused infringer is allowed to enter the market prior to the expiration of the patent at issue. *Cf.* Teva Br. at 12. While *Actavis* did not consider an at-risk launch (such as Teva's), given the Supreme Court's rejection of reverse payment settlements when done to avoid the *risk of competition*, there is little reason to think that the Court would bless a settlement that *stopped actual competition* in exchange for a share of the brand's monopoly profits prior to that exit.

Teva further contends that *Actavis* blessed as "commonplace" all patent settlement agreements in which an infringer pays some portion of its alleged damages to the patentee. Teva Br. at 12. That Teva made a token payment to Amgen (and not vice-versa) does not mean that there was no "reverse payment" in this case.[25] It is well recognized that a generic monopoly is

---

*Antitrust Litig.*, 968 F. Supp. 2d 367, 392-93 (D. Mass. 2013) ("The lone conceivable benefit of reverse payment agreements—namely, the settlement of patent disputes—cannot overcome the anticompetitive consequences" of reverse payments).

[24] Not only was this a benefit that Teva could not have achieved were it to receive a final non-appealable judgment of non-infringement, it was more than Teva would have been entitled to had it received the 180-days of generic exclusivity awarded by the FDA to first-filing generics—which it was not.

[25] *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014) (in a reverse payment settlement, the generic's agreement to pay a royalty on its generic sales during its 180-day exclusivity is "consistent with the contention that the [Agreement] payments. . . did not 'reflect[ ] traditional settlement considerations,' . . . but rather the desire to ensure that [the generic] would not market its generic version of Niaspan or otherwise challenge the validity of [the brand's] patents.") (citation omitted).

highly lucrative.[26] The Court in *Actavis* explained that, "*in substance*, the plaintiff agreed to pay the defendants many millions of dollars to stay out of its market." 570 U.S. at 147 (emphasis added). This language acknowledges that antitrust scrutiny attaches not only to pure cash reverse payments, but to other forms of reverse payment that induce the generic to abandon a patent challenge that unreasonably eliminates competition at the expense of consumers. Most courts have held that "payment" is not limited to cash transfers.[27]

As the Third Circuit recently explained in *Lipitor*, "[i]n contrast to those commonplace forms of settlement, a reverse payment in pharmaceutical drug litigation occurs when "a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market." *Id.*, 868 F.3d at 250-51 (citing Actavis, 570 U.S. at 157).[28] Here, Teva "walk[ed] away with money"—in the form of monopoly revenues arising from its sales of generic Sensipar, and a ███████████ ███████████████████████████████████████████—in exchange for "stay[ing] away from the patentee's market" until mid-2021. Compl. ¶ 188.

Moreover, there is nothing commonplace about an agreement, such as the Amgen-Teva Delay Agreement here, that requires a victorious litigant to petition the trial court for a reversal of its verdict. That the defendants ultimately did not succeed in their scheme to terminate the

---

[26] *See Actavis*, 570 U.S. at 144 (quoting Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006)) (noting that a six-month generic exclusivity period is "possibly 'worth several hundred million dollars'").

[27] *See, e.g., King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 403 (3d Cir. 2015); *In re Effexor XR Antitrust Litig.*, 2014 WL 4988410 (D.N.J. Oct. 6, 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735 (E.D. Pa. Sept. 5, 2014); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052 (N.D. Cal. 2014); *Nexium*, 968 F. Supp. 2d 367; *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015).

[28] *Cf.* Teva Br. at 12 (contending that *Lipitor* blesses all patent settlement agreements in which an infringer pays some portion of its alleged damages to the patentee).

launch rights of *all* generics, due in large part to the refusal of this Court to grant the requested indicative ruling, is irrelevant, as their "unlawful purpose" alone is sufficient to establish their liability. Moreover, Teva quotes language from certain agreements ███████████████

████████████████████████████████████████████████████████

███████[29] *See* Teva Br. at 10. Finally, that certain generics launched months after the defendants entered into the Amgen-Teva Delay Agreement is likewise irrelevant to the defendants' anticompetitive purpose.[30]

These facts show that the defendants' acts were driven by an "unlawful purpose," *i.e.*, the allocation and subsequent monopolization of the market for generic Sensipar. Compl. ¶¶ 2, 26, 41, 150, 178, 187, 248.

> **b.     The complaints adequately allege an anticompetitive effect: delayed market entry for other generic Sensipar.**

Teva incorrectly contends that the plaintiffs condemn Teva's launch, rather than its exit from the market. *See* Teva Br. at 10. To the contrary, a fair reading of the complaints demonstrate that the plaintiffs' claims against Teva arise from the Amgen-Teva Delay Agreement. Even if Teva's launch could be considered procompetitive, it is not determinative because the evidence must be "analyzed as a whole." *Big Apple BMW*, 974 F.2d at 1364-65.

It is irrelevant that Teva's launch may have █████████████████████████████

████████████████████ because the Amgen-Teva Delay Agreement then put the genie back in

---

[29] The definition of "selling" in those agreements remains unresolved by virtue of this Court's opinion of May, 2 2019. *Cipla v. Amgen*, 386 F. Supp. 3d at 402. But that lack of certainty alone may have influenced the decisions of one or more generics to refrain from launching. In fact, Judge Goldberg subsequently found that the definition of "selling" in Amgen's settlement agreement with another would-be generic rival did not include selling by Third Party distributors, and held that the generic did not have the license to market its generic cinacalcet products. *Amgen Inc. v. Amneal Pharm. LLC*, 2019 WL 4538135, at *7-8 (D. Del. Sep. 18, 2019).

[30] In this context, that purpose is particularly evident in Amgen's exhaustive effort before this Court to preclude Cipla from launching its generic.

the bottle by ███████████ Teva's repeated claim that its withdrawal is not actionable is contrary to the authority on which Teva relies. The Amgen-Teva Delay Agreement—and in particular, the provision requiring the defendants to seek the reversal of Teva's favorable ruling—was in fact directed at effectively terminating those rights of any generic to launch. Compl. ¶¶ 128-32, 147-48, 155-58. Teva's launch is likewise irrelevant to the question of whether Cipla's and Aurobindo's launches were either delayed or limited by virtue of the Amgen-Teva Delay Agreement.

With respect to Teva's immediate withdrawal from the market, Teva cites its "freedom to determine how to distribute [its] products" Teva Br. at 9. But even the Second Circuit authority upon which Teva relies makes an exception for "activity that is manifestly anticompetitive." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245-46 (2d Cir. 1997). Here, Teva flooded the market with several months' worth of product in six days before executing the Amgen-Teva Delay Agreement, after which, Teva ceased producing and selling generic Sensipar on the market. This conduct, which perpetuated monopoly profits at the expense of consumers, is "manifestly anticompetitive." And, again, that the defendants were not able to terminate the launch rights of *all* generics—due in large part to the actions of Judge Goldberg—is irrelevant, as their "unlawful purpose," combined with any success at all in achieving that purpose, is sufficient to establish their liability. *McClain,* 444 U.S. at 243.

Accordingly, plaintiffs' allegations as to the anticompetitive effects of the Amgen-Teva Delay Agreement are not only sufficient but far exceed what is necessary at this early stage.

### 4. Plaintiffs adequately allege that the Amgen-Teva Delay Agreement caused generic Sensipar sales to cease, resulting in overcharges to the purchasers.

"To sufficiently plead causation, a plaintiff must allege that the defendant violated the antitrust laws, that the defendant's alleged violation had a tendency to injure the plaintiff's

business or property, and that the plaintiff suffered a decline in its business or property not shown to be attributable to other causes." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 808 (D.C. Cir. 2001) (citations and quotations omitted). "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury . . . ." *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 114 n.9 (1969).

Plaintiffs allege that the Amgen-Teva Delay Agreement both removed Teva as a competitor from the cinacalcet hydrochloride market and further delayed other generic versions of Sensipar from market entry. This fixed, raised, or maintained, the price plaintiffs would pay for Sensipar or its AB-rated generic equivalent at supracompetitive prices, causing harm to plaintiffs in the form of overcharges. *See* Compl, ¶¶ 30-32, 45, 219-28, 232-41.[31] These allegations are sufficient to plead causation and "[m]ore is not required at the pleading stage, particularly given that antitrust injury `involves complex questions of fact,' ill-suited for resolution on a motion to dismiss." *Niaspan*, 42 F. Supp. 3d at 757.

Teva cites no law to support its contrary position, only its own spin on the facts. Such conjecture is inappropriate. Even if the Court could credit those counter-explanations—which it should not at this stage—Teva's speculation why delayed entry to the market of generic Sensipar "perhaps" has occurred (Teva Br. at 10-11) cannot overcome the plausible inference in the plaintiffs' favor that the cause of delay is directly attributable to Amgen-Teva Delay Agreement.

Nor can Teva's claim that the launch rights of Piramal and Amneal—both of whom prevailed in the patent litigation—"had nothing to do with Teva." Teva Br. at 11. Teva

---

[31] The Third Circuit has observed that "[i]t is difficult to imagine a more formidable demonstration of antitrust injury" than overcharges from impaired generic drug competition. *In re Warfarin Sodium Antitrust Litig*., 214 F.3d 395, 401 (3d Cir. 2000).

negotiated the delay agreement with Amgen that incentivized Amgen to keep Piramal and Amneal out of the market, by providing for higher payments from Teva to Amgen based in part on whether Piramal and Amneal entered the market. Compl. ¶¶ 182-88. Whether Amgen took any steps to that end and, if it did, whether it was motivated in whole or in part by maximizing its payment from Teva, are questions that are surely relevant in this context, which can only be resolved through discovery.

## V.     CONCLUSION

Teva's efforts to describe its agreement with Amgen as above board fails. Teva was not an innocent actor trying to bring consumers the best product and price possible. Consumers had that when Teva's generic product and branded Sensipar occupied the market, but Teva resolved with Amgen to divvy up that market, to each company's handsome reward. This is market allocation, and a quintessential antitrust wrong. Teva's motion must be denied.

Dated: December 6, 2019                    Respectfully submitted,


**CHIMICLES SCHWARTZ KRINER**          **THE BIFFERATO FIRM, P.A.**
  **& DONALDSON-SMITH LLP**

/s/ Tiffany J. Cramer                        /s/ Ian Connor Bifferato
Robert J. Kriner, Jr. (Del. Bar No. 2546)    Ian Connor Bifferato (Del. Bar No. 3273)
Scott M. Tucker (Del. Bar No. 4925)          1007 N. Orange Street, 4th Floor
Tiffany J. Cramer (Del. Bar No. 4998)        Wilmington, DE 19801
Vera G. Belger (Del. Bar No. 5676)           Tel.: (302) 225-7600
2711 Centerville Road Suite 201              cbifferato@tbf.legal
Wilmington, DE 19808
Tel: (302) 656-2500                          **OF COUNSEL:**
rjk@chimicles.com                            Gregory S. Asciolla
smt@chimicles.com                            Karin E. Garvey
tjc@chimicles.com                            Matthew J. Perez
vgb@chimicles.com                            **LABATON SUCHAROW LLP**
                                             140 Broadway
*Liaison Counsel for the Proposed Direct*    New York, NY 10005
*Purchaser Class*                            Tel: (212) 907-0700

**OF COUNSEL:**
Linda P. Nussbaum
Bart D. Cohen
Peter Moran
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
Tel: (917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
pmoran@nussbaumpc.com

Thomas M. Sobol
Gregory T. Arnold
Bradley J. Vettraino
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
tom@hbsslaw.com
grega@hbsslaw.com
bradleyv@hbsslaw.com

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*

Dianne M. Nast
Michael Tarringer
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
mtarringer@nastlaw.com

Mike Roberts
Debra G. Josephson
**ROBERTS LAW FIRM, P.A**.
20 Rahling Cir.
Little Rock, AR 72223
Tel: (501) 821-5575
mikeroberts@robertslawfirm.us
debrajosephson@robertslawfirm.us

gasciolla@labaton.com
kgarvey@labaton.com
mperez@labaton.com

*Interim Lead Counsel for the Indirect Purchaser Class*

Brian P. Murray
Lee Albert
Gregory B. Linkh
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

Scott A. Martin
Irving Scher
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
smartin@hausfeld.com
ischer@hausfeld.com

Brent Landau
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
blandau@hausfeld.com

Melinda R. Coolidge
**HAUSFELD LLP**
1700 K Street, NW
Suite 650
Washington, DC 20006
Tel: (202) 540-7200
mcoolidge@hausfeld.com

Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa
Adam J. Pessin

*Counsel for KPH Healthcare Services, Inc.,*
*a/k/a Kinney Drugs, Inc.*

**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

*Counsel for UFCW Local 1500 Welfare Fund,*
*Teamsters Local 237 Welfare Fund, and*
*Teamsters Local 237 Retirees' Benefit Fund*