# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Direct Purchaser Actions<br><br>All Indirect Purchaser Actions | MDL No. 19-md-02895-LPS<br><br><br><br>C.A. No. 19-396-LPS<br>C.A. No. 19-1460-LPS<br>C.A. No. 19-369-LPS<br>C.A. No. 19-1461-LPS<br><br>**REDACTED -<br>PUBLIC VERSION** |

## PURCHASER PLAINTIFFS' OBJECTION TO REPORT AND RECOMMENDATION

**CHIMICLES SCHWARTZ KRINER<br>& DONALDSON-SMITH LLP**
Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
Tiffany J. Cramer (Del. Bar No. 4998)
2711 Centerville Road Suite 201
Wilmington, DE 19808
Tel: (302) 656-2500
rjk@chimicles.com
smt@chimicles.com
tjc@chimicles.com

*Local Counsel for*
*Direct Purchaser Class Plaintiffs*

**THE BIFFERATO FIRM, P.A.**
Ian Connor Bifferato (Del. Bar No. 3273)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

*Local Counsel for*
*Indirect Purchaser Class Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     STANDARD OF REVIEW ..................................................................................2

III.    ARGUMENT .......................................................................................................2

      A.      Regardless of whether a patent is involved, market allocation by horizontal competitors violates antitrust law. ..........................................................2

      B.      By splitting profits with Teva and granting it an "acceleration" clause designed to keep others off the market, Amgen made a large, unjustified payment to Teva. ....4

      C.      Amgen's web of "acceleration" clauses with other generics were designed to, and did, delay competition in the cinacalcet market........................................................9

IV.     CONCLUSION....................................................................................................10

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Actos End-Payor Antitrust Litigation*,
2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) *aff'd in part, vacated in part*,
848 F.3d 89 (2d Cir. 2017)...............................................................................................9

*Boseman v. Upper Providence Twp.*,
680 F. App'x 65 (3d Cir. 2017) .......................................................................................5

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)...........................................................................................10

*Cipla Ltd. v. Amgen Inc.*,
386 F. Supp. 3d 386 (D. Del.), *aff'd*, 778 F. App'x 135 (3d Cir. 2019) ...............................1, 4

*Eames v. Nationwide Mut. Ins. Co*.,
2008 WL 4455743 (D. Del. Sept. 30, 2008), *aff'd*, 346 F. App'x 859 (3d Cir.
2009) ...................................................................................................................................2

*F.T.C. v. Actavis, Inc.*,
570 U.S. 136 (2013).................................................................................................. *passim*

*King Drug Co. of Florence v. Cephalon, Inc.*,
88 F. Supp. 3d 402 (E.D. Pa. 2015) ................................................................................8

*King Drug Co. of Florence v. Smithkline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015)............................................................................................7

*In re Lipitor Antitrust Litigation*,
868 F.3d 231 (3d Cir. 2017)........................................................................................7, 8

*In re Loestrin 24 Fe Antitrust Litig.*,
261 F. Supp. 3d 355(D.R.I. 2017).................................................................................6, 9

*In re Loestrin 24 Fe Antitrust Litig*.,
433 F. Supp. 3d 274 (D.R.I. 2019)...........................................................................5, 8, 9

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958)..............................................................................................................3

*NCAA v. Board of Regents*,
468 U.S. 85 (1984)............................................................................................................3

*In re Nexium Esomeprazole Antitrust Litig.*,
42 F. Supp. 3d 231 (D. Mass. 2014) ...............................................................................7

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ......................................................................5

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990) ....................................................................................................3

*Simpson v. Union Oil Co. of Cal.*,
  377 U.S. 13 (1964) ....................................................................................................4

*United States v. New Wrinkle, Inc.*,
  342 U.S. 371 (1952) ..................................................................................................3

*United States v. Sealy, Inc.*,
  388 U.S. 350 (1967) ..................................................................................................4

*United States v. Singer Mfg. Co.*,
  374 U.S. 174 (1963) ..................................................................................................3

*United States v. Topco Assoc., Inc.*,
  405 U.S. 596 (1972) ..................................................................................................3

**Statutes and Rules**

28 U.S.C. § 636(b)(1) ...................................................................................................1

28 U.S.C. § 636(b)(1)(C) .............................................................................................2

Fed. R. Civ. P. 72(b) ....................................................................................................1

Fed. R. Civ. P. 72(b)(3) ................................................................................................2

Rule 12(b)(6) .................................................................................................................5

**Other Authorities**

FTC, *Pay–for–Delay: How Drug Company Pay–Offs Cost Consumers Billions*,
  (2010) .........................................................................................................................6

Aaron Edlin, *et al.*, *Activating Actavis*,
  Antitrust 16, 18 (Fall 2013) .....................................................................................7

Scott Hemphill, *Paying For Delay: Pharmaceutical Patent Settlement As a*
  *Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553 (2006) .................................7

## I.     INTRODUCTION

The direct and indirect purchaser class plaintiffs[1] (the "purchasers") respectfully object to Magistrate Judge Hall's July 22, 2020 Report and Recommendation (the "Report") recommending dismissal of their complaints.[2]

This Court already addressed the relevant facts, holding that "[b]ased on the record evidence, it seems plausible that Amgen and Teva may have colluded to divide up the market for cinacalcet, in order to share supracompetitive profits and deter true generic competition" and that this "could be an antitrust violation . . . ."[3] The Report incorrectly concludes to the contrary.

For a first theory, the purchasers allege an allocation agreement among horizontal competitors to divide the cinacalcet market and share hundreds of millions in profits—conduct long condemned as *per se* unlawful. But the Report, incorrectly using *Actavis* as a safe haven, concludes the market allocation escapes antitrust scrutiny based on reasoning devoid of a limiting principle and that immunizes all *per se* violations so long as committed in the patent settlement context.[4] For a second theory, the Report rejects the reverse payment claim based on flawed analysis. The Report improperly atomized the components of the payment alleged here, *i.e.*, defendants' split of several hundred million dollars in profits and an "acceleration" clause that ensured that Teva could return to the market should any other generic launch. Rather than considering these components holistically, the Report isolates them, ignoring the economic realities of the scheme. At bottom, *Teva profited more by settling with Amgen than it would have had it won its patent litigation*. Authority in this Circuit and elsewhere holds that such

---

[1] Direct purchasers are César Castillo, LLC and KPH Health Services, Inc.; indirect purchasers are UFCW Local 1500 Welfare Fund, Teamsters Local 237 Welfare Fund, and Teamsters Local 237 Retirees' Benefit Fund.

[2] D.I. 157. The purchasers object pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).

[3] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 409 (D. Del.), *aff'd*, 778 F. App'x 135 (3d Cir. 2019).

[4] The Report ignores that Teva did not challenge the purchasers' *per se* claims.

arrangements are a payment under *Actavis*. The Report then transposed its piecemeal treatment of the Teva acceleration clause to its analysis of the purchasers' monopolization claims, ignoring the well-pleaded allegations of anticompetitive effect achieved by Amgen through its imposition of such provisions in other generics' settlement agreements.

The Report should be rejected and defendants' motions to dismiss denied.

## II.     STANDARD OF REVIEW

Review of the Report is *de novo*.[5] The Court may "accept, reject, or modify the magistrate judge's recommendations" and may "receive further evidence or return the matter to the magistrate judge with instructions for proceeding."[6]

## III.    ARGUMENT

### A.     Regardless of whether a patent is involved, market allocation by horizontal competitors violates antitrust law.

The Report rejects the purchasers' market allocation theory—a theory of antitrust misconduct so aberrant to competitive markets that federal law affords it *per se* treatment—on the basis that any horizontal arrangements between competitors involved in a patent suit must be pigeon-holed into the *Actavis* rule of reason framework, asserting that: (1) this case "involves the settlement of patent litigation," and (2) the Amgen/Teva agreement is "an agreement by a generic drug manufacturer to stay off the market."[7]

The presence of a patent does not foreclose antitrust scrutiny of non-reverse payment forms of anticompetitive misconduct, particularly forms of it (such as price-fixing, and market allocation) that the law affords *per se* treatment. Rather than creating a new safe haven, *Actavis* builds upon a long line of cases holding "that the possession of a valid patent . . . does not give

---

[5] Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).
[6] *Eames v. Nationwide Mut. Ins. Co.*, 2008 WL 4455743, at *13 (D. Del. Sept. 30, 2008), *aff'd*, 346 F. App'x 859 (3d Cir. 2009).
[7] Report at 14-15.

the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly."[8] The Report itself observes that "*Actavis* did not insulate 'all schemes' that 'involve' patents from *per se* scrutiny."[9] Yet the Report's holding suggests that settling Hatch-Waxman litigation requires all forms of anticompetitive misconduct to fit the *Actavis* model.

The purchasers allege a rank allocation agreement between Teva and Amgen, which became actual market competitors the moment Teva launched. Market division and agreements to restrict output among horizontal competitors has long been *per se* unlawful.[10] The Report cites no authority demonstrating that *Actavis* changed this. Rather, *Actavis* addressed settling the risk of *prospective* competition, not the termination of *actual* competition, as is the case here.[11]

And unlike in *Actavis*,[12] the post-launch patent litigation settlement here occurred after a non-infringement ruling in Teva's favor, significantly reducing Teva's risk of paying damages and incentivizing Amgen to pay Teva in order to maintain its monopoly.[13] By settling prior to triggering other generics' acceleration clauses, Teva and Amgen had a pot of money, earned by supracompetitive prices, to divide up. And they did. Teva was able to price its generic at

---

[8] *United States v. Singer Mfg. Co.*, 374 U.S. 174, 196-97 (1963), cited by *Actavis*, 570 U.S. at 149. *See also United States v. New Wrinkle, Inc.*, 342 U.S. 371, 377-78 (1952), cited by *Actavis*, 570 U.S. at 149 ("Patents give no protection from the prohibitions of the Sherman Act . . . when the licenses are used, as here, in the scheme to restrain").

[9] Report at 14.

[10] *See NCAA v. Board of Regents*, 468 U.S. 85, 100 (1984) ("output limitation [is] ordinarily condemned" as illegal *per se*); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("division of markets" is *per se* unlawful) (citing *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899)); *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 608 (1972) ("agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" is a "classic example" of a *per se* violation); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (same; quoted in indirect purchasers' complaint, D.I. 12 ("IPP Compl."), ¶ 106)).

[11] *Compare F.T.C. v. Actavis, Inc*., 570 U.S. 136, 145 (2013) *with* direct purchasers' complaint, D.I. 13 ("DPP Compl."), ¶¶ 22-25; IPP Compl. ¶¶ 7, 49-51, 56-57.

[12] The Report criticizes the purchasers' reliance on *Topco* because *Topco* did not involve patent rights. It did, however, involve intellectual property rights in the form of an agreement among grocers to market Topco trademarked products in certain territories. *Topco*, 405 U.S. at 608. The lesson is the same: horizontal market allocation is *per se* unlawful.

[13] DPP Compl. ¶¶ 21,168-72; IPP Compl. ¶¶ 48, 56. The non-infringement finding was not, however, without its risk. Amgen could, and did, appeal. DPP Compl. ¶ 173; IPP Compl. ¶ 48.

supracompetitive levels, reaping hundreds of millions in revenue that it would have never seen even had it won the patent litigation.[14] And Amgen got to keep its billion-dollar monopoly for several more years. This was not, as the Report claims, an agreement for Teva to "*stay* off the market." It was an agreement to *remove* Teva from the market and *preclude other* generics from entering. The Report ignores the economic realities of this agreement.

Nor were the purchasers required to plead that the defendants pre-arranged Teva's launch, as the Report suggests.[15] The harm to competition alleged—supracompetitive pricing of cinacalcet because of reduced competition in that market—is the same whether pre-arranged or not. As the Supreme Court instructs, "legality for antitrust purposes" does not turn on the labels assigned because that would "let a matter so vital to a competitive system rest on such easy manipulation"[16] Regardless, if the Court determines that plausible allegations of anticompetitive conduct have been made, the question of whether *per se* treatment is appropriate should wait.[17]

**B.      By splitting profits with Teva and granting it an "acceleration" clause designed to keep others off the market, Amgen made a large, unjustified payment to Teva.**

If *Actavis* controls, the purchasers sufficiently pled that Teva received a large and unjustified payment under *Actavis*. This Court has noted that these facts (the same as at issue in the *Cipla* action) could establish "an antitrust violation under a rule of reason analysis."[18] The purchasers allege that the profit-split between Amgen and Teva and the "acceleration" clause enabling Teva to immediately return to market should another generic launch constitute,

---

[14] Where multiple generics enter the market, those generics are priced lower than 80% or more than that of the brand drug. DPP Compl. ¶ 68l; IPP Compl. 52. Amgen itself admits that if a full-scale generic launch occurred, it would lose 70% of the market in the first month and 95% of the market in the first six months. DPP Compl. ¶ 30; IPP Compl. ¶ 53.

[15] Report at 15.

[16] *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24 (1964); *United States v. Sealy, Inc.*, 388 U.S. 350, 353 (1967) ("We seek the central substance of the situation, not its periphery.").

[17] *See* Purchasers' Joint Opp. to Amgen's MTD, D.I. 106, at 8. The Report also suggest the purchasers do not adequately explain their market allocation theory. Report at 15. But a fair reading of the purchasers' complaints and briefing explains the allocation theory in detail.

[18] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 409 (D. Del. 2019).

4

separately or together, a reverse payment.[19] The Report incorrectly concludes otherwise.[20]

*Holistic treatment of the components of a reverse payment is required.* Reverse payments must "be considered holistically to determine [their] alleged effect[s] on competition."[21] Courts should not, as the Report does here, assess each payment "in piecemeal fashion and argue that each individual payment fails to rise to the level of a large and unjustified payment."[22]

*Teva's retained profits far exceeded what it would have realized had it won the infringement litigation. Actavis* closely scrutinizes agreements that put the generic in a better position than it could have by winning the patent litigation.[23] By allowing Teva to keep its allegedly "infringing" product on the market, Amgen enabled Teva to retain at least $350 million from the exclusive sale of its generic—significantly more than Teva would have obtained if Teva had prevailed in its infringement litigation with Amgen.[24] Had Teva continued litigating and prevailed, other generics would have entered, dramatically driving down prices, and triggering

---

[19] DPP Compl. ¶¶ 147, 148; IPP Compl. ¶¶ 8, 62, 109-110.

[20] *See* Report at 17-22 (addressing each component under separate headings). While the Report claims, in two instances, to have considered the two alleged components of the payment here at issue "together," Report at 17, 22, a fair reading of the Report reveals that it did not.

[21] *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 322 (D.R.I. 2019) (collecting cases).

[22] *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 718 (N.D. Ill. 2016). The Report's separate treatment of these payments is underscored by its observation that "although Plaintiffs argue that the acceleration clause "along with the other benefits granted Teva under the agreement, amount to a reverse payment . . . , *I have already concluded* that the only 'other' alleged benefit—the compromise of Amgen's damages claim—is not subject to scrutiny under *Actavis*." Report at 22 (emphasis added).

[23] *Actavis*, 570 U.S. at 152 ("In reverse payment settlements, . . . a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market. That, we think, is something quite different [from a traditional damages-discount settlement].").

[24] Any factual dispute about whether Teva earned more by settling than it would have realized had it continued litigation cannot be resolved on a Rule 12(b)(6) motion. D.I. 123 at 17. *See also Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 72 (3d Cir. 2017) (Rule 12(b)(6) dismissal inappropriate where there are fact disputes).

full-credit returns and shelf-stock adjustments in Teva's customer contracts.[25]

The Report ignores these allegations and economic realities, basing its conclusion primarily upon a hypothetical described in *Actavis:* "Company A sues Company B for patent infringement and demands, say, $100 million in damages," and Company B pays "A (the plaintiff) some amount less than the full demand as part of the settlement—$40 million, for example[.]"[26] This hypothetical is irrelevant. As *Actavis* explained: where a "plaintiff agreed to pay the defendants many millions of dollars to stay out of its market, even though the defendants did not have any claim that the plaintiff was liable to them for damages. That form of settlement is unusual."[27] Here, Teva received something it could not have otherwise obtained through successful litigation: the retention of profits from its exclusive generic launch.

The Report exalts form over substance in identifying a "second problem" with the purchasers' payment claims—that the "payment" did not come *from* Amgen but through competition *with* Amgen.[28] *Actavis* and its progeny expressly reject this reasoning.[29] The anticompetitive effects of reverse payments are *always* borne by purchasers.[30] An example is a no-authorized generic agreement ("no-AG"), where the brand agrees not to compete for a period of time in exchange for the generic agreeing to delay its entry. The Report acknowledges such a payment is subject to *Actavis* scrutiny. Under such agreements, the value is generated from sales

---

[25] Shelf-stock adjustments required Teva to remit the difference between what Teva charged and what other generics charged (which would have been orders of magnitude less as generics entered the market). *See* DPP Compl. ¶¶ 183, 190; IPP Compl. ¶¶ 60, 68.

[26] *Actavis*, 570 U.S. at 151-52.

[27] *Id.* at 147.

[28] Report at 18.

[29] *E.g.*, *Actavis*, 570 U.S. at 147; *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d at 335 (D.R.I. 2017) ("It is not the form but the purpose of a reverse payment that renders it subject to antitrust scrutiny.") (collecting authorities).

[30] *Actavis*, 570 U.S. at 154 (in reverse payments, "[t]he patentee and the challenger gain; the consumer loses"); FTC, *Pay–for–Delay: How Drug Company Pay–Offs Cost Consumers Billions*, at 2 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (reverse payments cost consumers $3.5 billion annually).

*in the market*, not a direct payment from the brand.[31] The Report also ignores that as a condition

of Teva's retention of profits, Teva agreed to *leave* the market for more than two years.[32]

In concluding that Teva's revenue windfall—derived through the Amgen-Teva

agreement that keeps others off the market—cannot be considered a payment, the Report

immunizes payments created by anticompetitive conditions created by the two co-conspirators.

And the reasoning is inconsistent with courts in this Circuit and elsewhere which have held that

sweetheart settlements of liability may give rise to reverse payment claims.[33]

*Lipitor* is instructive. There, the Third Circuit held that the release of a contingent

damages claim stated a claim under *Actavis*.[34] Here, the purchasers allege that the Amgen/Teva

agreement enabled Amgen to retain its monopoly by inducing Teva to abandon its generic

through the release of a damages claim that allowed Teva to retain the bulk of the profits from its

exclusive generic sales—a trade-off *Lipitor* condemned. The Report, however, cabins *Lipitor*

solely to instances where the damages claim release involved a different drug, again elevating

form over substance.[35] By alleging that Teva's receipt of a portion of Amgen's monopoly profits

---

[31] *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 404-405 (3d Cir. 2015) ("The no-AG agreement transfers the profits the patentee would have made from its authorized generic to the settling generic—plus potentially more, in the form of higher prices, because there will now be a generic monopoly instead of a generic duopoly.").

[32] DPP Compl. ¶¶ 123, 237; IPP Compl. ¶¶8, 63, 106.

[33] *See, e.g.*, *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 253–54 (3d Cir. 2017) (reversing dismissal and finding that Pfizer's release of substantial damages claim arising from Ranbaxy's at-risk launch sales for a token sum stated a reverse payment); *In re Nexium Esomeprazole Antitrust Litig.*, 42 F. Supp. 3d 231, 281 (D. Mass. 2014) ("Teva and AstraZeneca's settlement of a contingent liability . . . amounted to an illegal reverse payment . . . .").

[34] *Lipitor*, 868 F.3d at 253–54.

[35] Report at 18-19. Scholars agree that this exact scenario may give rise to *Actavis* scrutiny: A reverse payment "could include forgiving a debt owed by the claimed infringer to the patent holder. The debt may include patent infringement damages. The claimed damages could pertain to the product whose infringing entry is at issue (if there has been entry) or another product." Aaron Edlin, *et al.*, *Activating Actavis*, Antitrust 16, 18 (Fall 2013). *See also* C. Scott Hemphill, *Paying For Delay: Pharmaceutical Patent Settlement As a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1576 (2006) (reverse payment where "an alleged infringer who has entered the market . . . later agrees to exit the market, in exchange for which the patentee waives a claim to accrued damages.").

*induced* it to exit the market, purchasers have sufficient pleaded an *Actavis*-type payment.[36]

       *Teva's "acceleration" provision assured its profit-split with Amgen.* The Report likewise

errs in concluding that Teva's acceleration clause is not a reverse payment—either by itself or

together with Teva's profit-split with Amgen.[37] The purchasers allege that the acceleration clause

served as additional consideration for Teva to abandon competing in the Sensipar market.[38]

       These allegations are well supported. In *Staley v. Gilead Sciences, Inc.*,[39] as here, the

plaintiff alleged that Teva received an acceleration clause, along with another provision[40] as

payment to abandon its patent challenge.[41] As the Report does here, the defendant argued that

this was not a reverse payment because "[Teva] received no compensation from [Gilead], but . . .

only through the market."[42] The court rejected this argument.[43] The Report criticizes *Gilead* only

for not "explicitly" scrutinizing the "acceleration" clause under *Actavis*,[44] underscoring the

Report's improper piecemeal treatment of the alleged payment.[45]

       *Loestrin* is also supportive. There, as here, the plaintiffs "plausibly alleged that the

acceleration clause had anticompetitive effects" by alleging that but for the acceleration clause

---

[36] The Report also mistakenly believed that because purchasers claimed Amgen was likely to win the litigation, *Lipitor* was inapplicable. Report at 19. Even when a "generic believes there is a 100% likelihood that the patent will be found invalid, it may still be more valuable for the generic to share the monopoly returns." *King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 417 (E.D. Pa. 2015) (citation omitted).

[37] Report at 20-22.

[38] DPP Compl. ¶¶ 132, 148, 150; IPP Compl. ¶¶ 8, 62, 109.

[39] *Staley*, 2020 WL 1032320.

[40] This second was as a most-favored entry plus provision, under which was promised Teva some period of exclusivity if no one launches at risk before it. *Gilead*, 2020 WL 1032320, at *6.

[41] *Staley*, 2020 WL 1032320, at *6. Notably, while Teva was the first-to-file generic, it had forfeited its 180-day exclusivity period by failing to gain timely tentative approval from the FDA. The MFEP clause was essentially an attempt to resurrect that exclusivity. *Id*. at *25.

[42] *Id.* at *24 (citing as *Gilead* did, *Actos*, 2015 WL 5610752, at *15).

[43] *Id.* ("*Actavis* did not preclude a patent settlement agreement from being anticompetitive in the absence of a reverse payment if there were other circumstances that posed potential anti-competitive concern.").

[44] Report at 22 (quoting *Gilead*, 2020 WL 1032320 at *25).

[45] The purchasers also pleaded and argued that significant empirical evidence corroborates these allegations, which the Report did not consider. *See, e.g.,* D.I. 123, at 15-16.

with one generic, other generics would have secured earlier entry dates.[46] The Report dismisses *Loestrin* because it also involved a no-AG provision and promotional deals. But, here too, the purchasers allege a multi-faceted scheme that rewarded Teva with hundreds of millions in revenue to which it would not otherwise have been entitled.

The Report's reliance on *In re Actos End-Payor Antitrust Litigation*[47] is misplaced. There, many of the generics that received "acceleration" clauses were also entitled to 180 days of generic marketing exclusivity, blocking other generics from the market. As a result, "there [wa]s no plausible scenario in which another generic would have been entitled to earlier entry" because generic entry could only occur after exclusivity.[48] Here, *no generic* was entitled to exclusivity. The lone barrier to entry was the "acceleration" clauses. The Report ignores this key distinction.

Together, Teva's profit-split with Amgen and its "acceleration" clause amount to a large, unjustified payment. Teva received hundreds of millions of dollars and a clause discouraging other would-be generic competition (because Teva would simply come back to market, cannibalizing their sales), securing Teva's ill-gotten gains. These allegations are sufficient to trigger *Actavis* scrutiny. A holding to the contrary would condone rank market allocation agreements over expensive and crucial drugs, to the significant detriment of consumers.

## C.   Amgen's web of "acceleration" clauses with other generics were designed to, and did, delay competition in the cinacalcet market.

Pleading a monopolization claim requires allegations of "some anticompetitive conduct on the part of the possessor"—"generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."[49] Here, the purchasers

---

[46] *Loestrin*, 261 F. Supp. 3d at 333-34.
[47] 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part* , 848 F.3d 89 (2d Cir. 2017).
[48] *Id.* at *15.
[49] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (citations omitted).

allege that Amgen's use of over a dozen acceleration provisions with other settling generics stifled competition in the generic Sensipar market, allowing Amgen to pick each off individually should any enter the market, as Amgen did with Teva, which enabled Amgen to maintain its monopoly. The Report disregards these allegations, transposing its flawed Teva acceleration clause analysis. It then criticizes the purchasers for "not explain[ing] why Amgen (as opposed to Congress) should be the one to provide [an] incentive" for generics to remain in the patent fight.[50] Yet neither the Report, nor the defendants, cite any support for this added burden.

## IV.   CONCLUSION

The Report should be rejected and the dismissal motions denied.

Dated: August 5, 2020

CHIMICLES SCHWARTZ KRINER
  & DONALDSON-SMITH LLP

*/s/ Tiffany J. Cramer*
Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
Tiffany J. Cramer (Del. Bar No. 4998)
2711 Centerville Road Suite 201
Wilmington, DE 19808
Tel: (302) 656-2500
rjk@chimicles.com
smt@chimicles.com
tjc@chimicles.com

*Liaison Counsel for the Proposed Direct
Purchaser Class*

OF COUNSEL:

Linda P. Nussbaum
Bart D. Cohen
Peter Moran
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Fl.

Respectfully submitted:

THE BIFFERATO FIRM, P.A.

*/s/ Ian Connor Bifferato*
Ian Connor Bifferato (Del. Bar No. 3273)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

OF COUNSEL:

Gregory S. Asciolla
Karin E. Garvey
Matthew J. Perez
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
mperez@labaton.com

*Interim Lead Counsel for the Indirect*

---

[50] Report at 22-24.

New York, NY 10036
Tel: (917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
pmoran@nussbaumpc.com

Thomas M. Sobol
Kristen A. Johnson
Hannah Schwarzschild
Bradley J. Vettraino
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
tom@hbsslaw.com
grega@hbsslaw.com
bradleyv@hbsslaw.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Class*

Dianne M. Nast
Michael Tarringer
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
mtarringer@nastlaw.com

Mike Roberts
Debra G. Josephson
ROBERTS LAW FIRM, P.A.
20 Rahling Cir.
Little Rock, AR 72223
Tel: (501) 821-5575
mikeroberts@robertslawfirm.us
debrajosephson@robertslawfirm.us

*Counsel for KPH Healthcare Services, Inc.,
 a/k/a Kinney Drugs, Inc.*

*Purchaser Class*

Brian P. Murray
Lee Albert
Gregory B. Linkh
Glancy Prongay & Murray LLP
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

Scott A. Martin
Irving Scher
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
smartin@hausfeld.com
ischer@hausfeld.com

Brent Landau
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
blandau@hausfeld.com

Melinda R. Coolidge
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, DC 20006
Tel: (202) 540-7200
mcoolidge@hausfeld.com

Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa
Adam J. Pessin
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com

jistvan@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

*Counsel for UFCW Local 1500 Welfare Fund,*
*Teamsters Local 237 Welfare Fund, and*
*Teamsters Local 237 Retirees' Benefit Fund*