**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION** | MDL 2895 |
| | C.A. No. 19-02895-LPS |
| | **REDACTED PUBLIC VERSION** |
| *THIS DOCUMENT RELATES TO:* | **JURY TRIAL DEMANDED** |
| *INDIRECT PURCHASER ACTIONS* | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I. NATURE OF THE ACTION .................................................................................. 1

II. JURISDICTION AND VENUE .......................................................................... 6

III. THE PARTIES................................................................................................ 7

    A. The Plaintiffs........................................................................................ 7

    B. The Defendants .................................................................................... 9

IV. INDUSTRY BACKGROUND ........................................................................ 10

    A. Statutory and De Facto Exclusivities Can Incentivize Generic Companies to Challenge Patents and Seek Early Market Entry. ............................................... 11

    B. The Regulatory Structure for Approval and Substitution of Generic Drugs ........ 12

    C. The Competitive Effects of AB-Rated Generic Competition. ............................. 14

    D. Pharmaceutical Manufacturers Sometimes Game the System to Impede Competition, Using Collusive Agreements that Include Pay-for-Delay Provisions, or Acceleration Clauses with Grace Periods..................................... 17

V. FACTUAL ALLEGATIONS ........................................................................... 23

    A. Amgen Develops and Launches Sensipar and Earns Billions of Dollars. ............ 23

    B. The Patents Purportedly Covering Sensipar. ....................................................... 24

    C. Generic Manufacturers Seek FDA Approval for Generic Versions of Sensipar................................................................................................................. 26

    D. Amgen's Sensipar Patents Were Vulnerable to Attack. ...................................... 28

    E. Amgen Commences Generic Delay Tactics, Suing the FDA and Suing Generic Manufacturers............................................................................................ 30

    F. Generic Manufacturers Begin Obtaining Tentative Approval of their Generic Sensipar Products from the FDA. ........................................................... 31

    G. Amgen Begins Settling with Generics in "Waves," Using Acceleration Clauses with Grace Provisions, and Suffers Additional Patent Setbacks and More Generic Sensipar ANDA Approvals. .................................................... 31

        1. "Wave 1": Breckenridge, Hetero, Sun, and Ajanta settle. ........................ 34

2.      With Amgen's Plan to Implement and Leverage Acceleration and
        Grace Provisions Under Way, Amgen Is Denied Pediatric
        Exclusivity for Sensipar, Giving Amgen More Reason to Pursue Its
        Delay Plan. .................................................................................... 37

3.      With the Expiration of the '068 Patent Approaching, Amgen Faced
        a Real Possibility of an At-Risk Generic Launch. .................................. 38

4.      "Wave 2": Cipla and Mylan settle. ......................................................... 39

5.      "Wave 3": Dr. Reddy's and Strides settle.............................................. 41

6.      The '068 Patent Expires and Generics Immediately Obtain Final
        Approval of Their ANDAs from the FDA................................................ 42

7.      "Wave 4": Aurobindo, Alkem, Emcure, Lupin, Macleods, Torrent,
        and Unichem settle................................................................................. 42

H.      The Acceleration Clauses Delayed Generic Competition for Sensipar. ............... 45

I.      Teva and Other Non-Settling Generics Win Non-Infringement Judgment
        at Trial and Other ANDAs Receive Final Approval.............................................. 48

J.      Teva Receives FDA Final Approval and Launches Its Generic Version of
        Sensipar................................................................................................................ 49

K.      Amgen and Teva Enter an Unlawful Market Allocation Agreement to
        Eliminate and Delay Generic Competition. .......................................................... 52

L.      Cipla Sues Amgen and Teva for Antitrust Violations, then Cipla and
        Others Come to Market.......................................................................................... 63

VI.     THE ANTICOMPETITIVE EFFECTS ON INTERSTATE AND INTRASTATE
        COMMERCE.................................................................................................................. 68

VII.    MONOPOLY POWER AND MARKET DEFINITION.................................................. 71

VIII.   CLASS ACTION ALLEGATIONS ............................................................................... 75

IX.     COMPLIANCE WITH STATE ATTORNEYS' GENERAL NOTICE
        PROCEDURES................................................................................................................ 79

X.      CLAIMS FOR RELIEF .................................................................................................. 80

FIRST CLAIM FOR RELIEF Market Allocation Agreement in Violation of
Sherman Act § 1 (Against All Defendants) ........................................................................ 80

SECOND CLAIM FOR RELIEF Contract, Combination, and Conspiracy in
Restraint of Trade in Violation of  Sherman Act § 1 (Against All Defendants) .............. 82

THIRD CLAIM FOR RELIEF Monopolization in Violation of Sherman Act § 2 (Against Amgen).................................................................................................... 84

FOURTH CLAIM FOR RELIEF Market Allocation Agreement in Violation of State Law (Against All Defendants).................................................................... 86

FIFTH CLAIM FOR RELIEF Conspiracy and Combination in Restraint of Trade in Violation of State Law (Against All Defendants) ....................................... 91

SIXTH CLAIM FOR RELIEF Monopolization and Monopolistic Scheme under State Law (Against Amgen)............................................................................. 96

SEVENTH CLAIM FOR RELIEF State Consumer Protection Violations (Against All Defendants)................................................................................................ 101

EIGHTH CLAIM FOR RELIEF Unjust Enrichment (Against All Defendants)............ 107

XI.     DEMAND FOR JUDGMENT........................................................................ 129

XII.    JURY DEMAND .......................................................................................... 130

Plaintiffs UFCW Local 1500 Welfare Fund, Teamsters Local 237 Welfare Fund, Teamsters Local 237 Retirees' Benefit Fund, and Teamsters Western Region & Local 177 Health Care Plan on behalf of themselves and all others similarly situated, file this Complaint against Defendants Amgen Inc. ("Amgen"), Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., and Actavis Pharma, Inc. (collectively, "Teva"). Plaintiffs' claims arise from Defendants' anticompetitive scheme to restrain competition in the market for Sensipar® and its AB-rated generic equivalents sold in the United States. Plaintiffs' allegations are made on personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters.

## I.      NATURE OF THE ACTION

1.       Plaintiffs seek damages and equitable relief arising from Defendants' anticompetitive agreement, which eliminated generic competition in the United States for branded and generic versions of Sensipar (cinacalcet HCl tablets). Sensipar is a drug used to treat certain conditions associated with chronic kidney disease and thyroid cancer.

2.       Amgen received approval from the Food and Drug Administration ("FDA") to market Sensipar in the United States in March 2004. After launch, Sensipar's sales grew rapidly, boosting Sensipar to the unofficial status of a blockbuster drug. Between 2015 and 2018, Amgen's U.S. sales of Sensipar exceeded $1 billion annually.

3.       More than a dozen generic drug manufacturers filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking the approval of generic versions of Sensipar, including Defendant Teva. As part of their applications, these generic manufacturers were required to make certain certifications against the patents purportedly covering Sensipar. Among these patents were U.S. Patent Nos. 6,011,068 (the '068 patent") and 9,375,405 ("the '405 patent"), which expired on March 8, 2018 and September 22, 2016, respectively. While most

ANDA applicants did not challenge the '068 patent, all filed "Paragraph IV" certifications against the '405 patent, stating that the patent was invalid, unenforceable, or not infringed by the proposed ANDA applicants' generic versions of Sensipar. However, no generic manufacturer was entitled to 180-days of marketing exclusivity (also known as "first-filer exclusivity") because the first filer had forfeited its exclusivity. And for nearly all would-be generic competitors, in the event of a patent infringement suit, Amgen would not be entitled to a statutory 30-month stay on FDA's final approval for those manufacturers' ANDAs. Therefore, upon receipt of FDA final approval, many ANDA holders could launch its generic version of Sensipar—even during the pendency of any Amgen patent infringement suit.

4.      Amgen faced other problems that left Sensipar exposed to potential generic competition. The '405 patent was vulnerable both because generic manufacturers could and did design around it and because there was a risk it would be found invalid. Also, Amgen lost a petition for an additional six months of pediatric exclusivity for Sensipar that would have extended its  Sensipar monopoly by barring the launch of any competing generic product until that exclusivity's expiration. Accordingly, Amgen itself anticipated multiple generic launches as early as May 2018, followed by the near-immediate collapse of Amgen's market share (and, consequently, a loss of its Sensipar monopoly profits).

5.      Amgen nonetheless sued each generic manufacturer that filed an ANDA—*i.e.*, its would-be generic rivals—in the United States District Court for the District of Delaware for allegedly infringing the '405 patent. However, realizing its vulnerability to multiple generic Sensipar launches that would lower prices for consumers and payors (like Plaintiffs here), Amgen hatched a scheme to preserve its Sensipar monopoly.

6.     In late 2017, Amgen targeted the weakest generics (in terms of size, relative patent position, and reputation for bringing products to market at risk) that it had sued for patent infringement, offering to settle with each of them on generous terms. While this first wave of generics was given an entry date only weeks before patent expiry, they were also given—indeed Amgen insisted on it—a highly valuable "acceleration clause," allowing each to come to market immediately if any other generic launched without authorization (*i.e.*, at risk) or if another generic succeed in defeating Amgen's patent infringement claims. Amgen also insisted on a "grace period" that allowed Amgen to "resolve" with a generic competitor any unauthorized launch, as described below.

7.     But the competitive veneer of these acceleration clauses hid Amgen's ulterior motive: to use the clauses as weapons against other, still-litigating generic manufacturers. The still-litigating generics faced a Hobson's choice if they opted to litigate rather than settle with delayed entry: (1) risk losing their patent cases and be enjoined from launching until patent expiry or (2) win their patent cases, launch their products, and then be forced to compete with multiple generics who were able to free-ride off the victorious generic's efforts and risk-taking (via those generics' acceleration clauses). Moreover, even if the generics launched at risk, they would similarly face a flood of competition from incoming generics after 11 days, reducing any profits that might otherwise offset the risk of an at-risk launch (*e.g.*, a judgment finding that the launch was infringing Amgen's patent). In effect, Amgen weaponized its settlements with the weak generic manufacturers to destroy the market opportunity that should have existed for the stronger generic manufacturers so as to minimize the chance that the stronger ones would continue challenging Amgen's patent or launch at risk.

8.      And so, after the initial wave of settlements in late 2017, Amgen repeated its tactics with subsequent generic manufacturers. In each wave of settlements, while Amgen was willing to give some ground on entry dates up to a point (*i.e.*, June 2021), it always imposed the same acceleration clause coupled with the grace period. In doing so, each successive wave of settlements reinforced the former further deterring competition.

9.      Amgen's scheme served two anticompetitive ends. First, the acceleration clauses artificially increased Amgen's leverage in settlement negotiations with other generics (by slashing the profits available from a true, unconstrained "at risk" launch). Second, for any generics that remained undeterred by that increased leverage, the grace period provided a mechanism for Amgen to allocate a portion of its monopoly profits to any generic that refused to fall in line without a payoff. Basically, the grace period gave Amgen time to decide whether it wanted to pay the generic competitor to exit the market and, if so, to reach an agreement—as it did with Teva.

10.      Teva, which ultimately secured a non-infringement judgment after trial, launched its generic Sensipar product over the course of one-week period in late December 2018. During that one-week period, Teva flooded the market with multiple months' of product supply worth over $393.4 million, realizing over $212 million in net revenues.[1] With Teva competing in the market, Amgen had limited options: either apply to the trial or appellate court for a stay of the non-infringement order and an injunction against Teva—or engage in self-help.

11.      With the grace periods in hand from its prior settlements, Amgen chose self-help and, in doing so, broke the law. On January 2, 2019, Teva and Amgen entered into a confidential

---

[1] *See* Second Declaration of Robert G. Cunard, at ¶¶6-7, *Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-00044 (D. Del. Mar. 21, 2019) (AM10804-0000006417-423) ("Second Cunard Decl.").

agreement in which Teva agreed to stop selling its generic version of Sensipar in the United States (the "Amgen-Teva Agreement").

12.     Under the Amgen-Teva Agreement, Teva admitted that its generic product infringed claims of the '405 patent and jointly moved with Amgen to have Teva's non-infringement judgment vacated—a stunning reversal of Teva's position in the underlying patent litigation, particularly given that Teva won a non-infringement judgment after trial.[2] (Indeed, that move would be inexplicable were it not clearly part of Amgen and Teva's overall anticompetitive scheme.) Teva also agreed not to re-enter the Sensipar market until the earlier of (1) June 30, 2021, (2) the launch of another generic version of Sensipar, subject to certain conditions, and (3) a final court decision finding certain claims of the '405 patent invalid or unenforceable.[3] In exchange for Teva ceasing its sales and delaying its re-entry for two-and-one-half years, Teva was only required to pay Amgen, at most, $40 million over a series of installments ending in May 2019, thereby allowing Teva to retain over $170 million in net revenues from its one-week at-risk launch.[4] In addition, Teva was not required to remove any previously sold generic product from the market.[5]

13.     Amgen's quickly-reached deal with Teva re-established Amgen's exclusivity as the only seller of cinacalcet HCl tablets. Moreover, the deal eliminated not only Teva as a competitor but other generics as well due to the fact that, per the Amgen-Teva agreement, Teva ceased sales quickly enough that the acceleration clauses in Amgen's settlement agreements with other would-be generic competitors were not triggered. Indeed, the structure of the deal between

---

[2] Amgen-Teva Agreement § 4.1 (AM10804-0000000156).

[3] Amgen-Teva Agreement § 5.2.

[4] Amgen-Teva Agreement § 3.1.

[5] Amgen-Teva Agreement § 3.2.

Amgen and Teva was designed to—and for a period of time did—prevent other settling generics from launching their products and driving the price of cinacalcet HCl well below Teva's discounted price. And although other generic manufacturers have since launched generic versions of Sensipar, competition in the market remains impaired as a result of the Amgen-Teva agreement due to the fact that Teva is no longer selling generic Sensipar.

14.     Absent Defendants' unlawful conduct, Plaintiffs and the members of the Classes would have been able to purchase generic Sensipar tablets at significantly lower prices than Amgen has charged since then. Indeed, the injury to Plaintiffs and the Classes is ongoing, as competition remains stunted. Accordingly, to redress the economic injury Defendants have already caused—and continue to cause—Plaintiffs, on behalf of themselves and all others similarly situated, seeks injunctive and other equitable relief under the federal antitrust laws, as well as damages and other monetary relief under state antitrust, consumer protection, and common laws.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action seeks injunctive and equitable relief under the Clayton Act, 15 U.S.C. § 26. This Court also has jurisdiction under the Clayton Act § 12, 15 U.S.C. § 22.

16.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy for the proposed Damages Class exceeds $5,000,000, and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants. This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

17.     Venue is appropriate in this District under 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §1391(b). Defendants reside, transact business, are found, or have agents within this District, and

a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District. Moreover, the effects of Defendants' conduct on interstate trade or commerce are ongoing.

18.     This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District.

## III.     THE PARTIES

### A.     The Plaintiffs

19.     Plaintiff UFCW Local 1500 Welfare Fund ("**Local 1500**") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York 11590. Local 1500 provides nearly 23,000 plan participants with health and welfare benefits and, with more than 17,000 members, is the largest grocery union in New York. During the Class Period (as defined below), Local 1500 indirectly purchased, paid, or reimbursed for some or all of the purchase price for Sensipar and/or its AB-rated generic equivalents for personal and/or household use of its members from pharmacies located in and/or on behalf of members and eligible dependents located in New York. Local 1500 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct and, accordingly, suffered injury to its business and property.

20.     Plaintiffs Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees'
Benefit Fund (collectively "**Local 237**"), consist of two health and welfare benefit plans and is
headquartered and has a principal place of business in New, York, New York. Local 237
administers the assets of defined contribution plans formed to provide certain benefits including
prescription drug benefits. Local 237 provides health and welfare benefits to active and retired
members and participants who reside in numerous locations in the United States. During the
Class Period, Local 237 indirectly purchased, paid, or reimbursed for some or all of the purchase
price for Sensipar and/or its AB-rated generic equivalents for personal and/or household use of
its members from pharmacies located in and/or on behalf of members located in New York,
Florida, Maryland, Missouri, Pennsylvania, South Carolina, and Tennessee. During the Class
Period, Local 237 paid and reimbursed more for these products than it would have absent
Defendants' anticompetitive conduct and, accordingly, suffered injury to their business or
property.

21.     Plaintiff Teamsters Western Region & Local 177 Health Care Plan ("**TWR**") is a
multiemployer health and welfare plan headquartered in Arizona. TWR provides self-funded
healthcare coverage to over 40,000 employees and their family members. During the Class
Period, TWR purchased, paid, and/or provided reimbursement for some or all of the purchase
price of Sensipar and/or its AB-rated generic equivalents for personal and/or household use of its
members from pharmacies located in and/or on behalf of members located in Alaska, Arizona,
California, Florida, Hawaii, Indiana, Maryland, New Jersey, Oregon, Tennessee, and Utah.
During the Class Period, TWR paid and reimbursed more for these products than it would have
absent Defendants' anticompetitive conduct and, accordingly, suffered injury to their business or
property.

### B.      The Defendants

22.      Defendant Amgen Inc. ("**Amgen**") is a Delaware corporation with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320. Amgen is the holder of NDA 021688 and sells Sensipar throughout the United States.

23.      Defendant Teva Pharmaceuticals USA, Inc. ("**Teva USA**") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva Pharmaceuticals launched generic Sensipar at the end of 2018 and entered the agreement with Amgen, from which this action arises. The relation between Teva USA and the non-Amgen defendants is described below.

24.      Defendant Watson Laboratories, Inc. ("**Watson**") is a Nevada corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson is a subsidiary of Teva Pharmaceuticals. Watson is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva Agreement from which this action arises. Watson is the holder of ANDA 204377 for generic Sensipar tablets.

25.      Defendant Actavis Pharma, Inc. ("**Actavis Pharma**") is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Actavis Pharma is a subsidiary of Teva Pharmaceuticals. Actavis Pharma is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva Agreement from which this action arises. Actavis Pharma is the packager of Teva's generic Sensipar.

26.      Defendants Teva USA, Watson, and Actavis Pharma are collectively referred to as "**Teva**." Between December 27, 2018 and January 2, 2019, Teva sold throughout the United States generic Sensipar under Watson's ANDA.

27.     Defendants Amgen and Teva are collectively referred to as "**Defendants**."

28.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

## IV.     INDUSTRY BACKGROUND

29.     The health of millions of Americans depends on access to safe, effective, and affordable medications. Modern medicine treats chronic conditions and prevents serious illnesses with maintenance prescription drugs—drugs like Sensipar that are taken for many months or years. The high cost of drugs can mean no treatment, or inadequate treatment, for many. Affordable drugs lead to better treatment and prevention.

30.     On the other hand, the American pharmaceutical industry is a business. Companies that sell brand name drugs seek to recoup their research and development investment, cover their marketing costs, and turn a profit for their shareholders.

31.     As long as they are protected from competition by a patent or other regulatory exclusivity, brand-name drugs can charge very high prices for medications that cost little to manufacture. Once the lawful exclusivity period expires, or if they believe the brand patent(s) are invalid or not infringed, prospective generic manufacturers may apply for FDA approval to make and sell a competing generic version of the same drug that is as safe and effective as the brand, but far less expensive.

A.      **Statutory and De Facto Exclusivities Can Incentivize Generic Companies to Challenge Patents and Seek Early Market Entry.**

32.      Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), companies that create a new drug cannot lawfully sell it without filing and obtaining FDA approval of a New Drug Application ("NDA") to do so.[6] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[7]

33.      To obtain FDA approval of an ANDA, an applicant must certify that its generic version of the drug will not infringe any patents listed in the Orange Book as covering that brand. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications with respect to the branded drug and each listed patent:

(a)      that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

(b)      that the patent for the brand drug has expired (a "Paragraph II certification");

(c)      that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

(d)      that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").[8]

34.      To encourage manufacturers to seek approval of generic versions of branded drugs, Hatch-Waxman grants the first paragraph IV ANDA filer a 180-day exclusivity period to

---

[6] 21 U.S.C. §§ 301-392.

[7] 21 U.S.C. § 355(a), (b).

[8] 21 U.S.C. § 355(j)(2)(A)(vii).

market the generic version of the drug. When a company files the first substantially complete ANDA and certifies under Paragraph IV that the brand's unexpired patents listed in the Orange Book are either invalid or not infringed by the generic's product, the FDA cannot approve a later generic company's ANDA until that first-filer's generic has been on the market for 180 days, or until its first-filer exclusivity has been forfeited. Congress created this 180-day window to incentivize generic manufacturers to challenge weak or invalid patents or to invent around them by creating non-infringing generics. As the Supreme Court has recognized, "this 180-day period of exclusivity can prove valuable, possibly worth several hundred million dollars"[9] to the first filer.

35.     Even if a generic filer is not entitled to first-filer exclusivity, it may enjoy a *de facto* exclusivity period during which it faces no competition with other ANDA generics. This can happen, for example, where the FDA has not yet approved any other ANDAs (*i.e.*, lawfully) or where other generics have agreed with the brand company to delay their entry (*i.e.*, unlawfully). De facto exclusivity is just as valuable as Hatch-Waxman 180-day exclusivity in terms of price and market share advantages of being the market's single source of generic product, but it may last for more or less than 180 days.

### B.     The Regulatory Structure for Approval and Substitution of Generic Drugs

36.     Congress had two main purposes for enacting the Hatch-Waxman Amendments. The first was to expedite availability of less expensive generic competitors to branded drugs, thereby reducing healthcare expenses nationwide.

37.     The second was to protect pharmaceutical manufacturers' incentives to create new and innovative drug products. The Hatch-Waxman Amendments achieved both goals, advancing

---

[9] *FTC v. Actavis*, 133 S. Ct. 2223, 2229 (2013) (citation omitted).

substantially the rate of generic product launches, while ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top- selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

38.     One key way that legislation sought to achieve these objectives was through a provision that when the FDA approves a brand manufacturer's NDA, the manufacturer may list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of those patents. If new patents are later approved that cover the drug, the manufacturer may publish them in the Orange Book within thirty days of issuance.[10]

39.     When filing an ANDA, generic manufacturers must notify the relevant brand manufacturer of any Paragraph IV certifications they make.

40.     If a generic manufacturer files a Paragraph IV certification to a patent that is listed in the Orange Book at the time the ANDA is filed, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA product.[11]

---

[10] 21 U.S.C. §§ 355(b)(1) & (c)(2).

[11] 21 U.S.C. § 355(j)(5)(B)(iii).

Until one of those conditions occurs, the FDA may grant "tentative approval" once the ANDA is otherwise ready for commercial marketing, but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval) until condition (a) or (b) is met.

41.     Often, a brand company will try to extend its monopoly by obtaining additional patents covering the same product. And sometimes, such new patents are obtained or listed in the Orange Book *after* an ANDA has already been filed. In such circumstances, the generic whose ANDA is pending must update its ANDA and submit a new patent certification to the newly listed patent. If this certification contains a Paragraph IV certification the brand company is still entitled to file a lawsuit against the generic, but it is not entitled to a 30-month stay as to that filing. This process was designed, at least in part, to prevent brand companies from stacking 30-month stays and indefinitely delaying generic competition.

42.     The FDCA provides for certain other exclusivities that brand companies may claim, even in the absence of an Orange-Book-listed patent. One of these is "pediatric exclusivity" under section 505A, which provides an incentive to the pharmaceutical industry to conduct pediatric studies of their drugs when requested by the FDA. Pediatric exclusivity is an add-on to existing marketing exclusivity or patent protection, allowing six months' additional exclusivity to drugs that otherwise have exclusivity under the New Chemical Entity ("NCE"), Orphan Drug ("ODE") or other statutory exclusivity provisions, or that have patent protection. Thus, a brand product can be entitled to an additional six months of legal monopoly after the last of its valid patents expires, if the FDA grants it pediatric exclusivity.

**C.     The Competitive Effects of AB-Rated Generic Competition.**

43.     Because generics do not differ therapeutically from brands, the only meaningful basis for competition between them (or between generic versions of the same drug) is price. When there is only one generic competitor on the market, their prices are typically between 10%

and 20% lower than their brand counterparts. The discount increases dramatically as more generics enter: when there are multiple generics on the market, the discount off the brand price can be 80% or more. According to the FDA and the Federal Trade Commission ("FTC"), the greatest single drop in generic price occurs when the second generic enters the market.

44.     Since passage of the Hatch-Waxman Amendments, every state has adopted "generic substitution" laws that either require or permit pharmacies to substitute an AB-rated generic when presented with a prescription for its branded counterpart. As a result of these laws and other features of the pharmaceutical marketplace, when generic competition begins (so long as it is un-restrained), brand sales are rapidly converted to generic sales, with generics garnering 80% of unit sales or more within the first six months. The FTC has found that, on average, generics capture 90% of brand unit sales within the first year of generic entry and, with multiple generics on the market, prices drop by 85%.[12] According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. And additional billions of dollars are saved when hospitals use generics."[13]

45.     Thus, the launch of AB-rated generics typically precipitates significant cost savings for all drug purchasers. It also provides strong incentives for brand manufacturers to forestall such launches.

46.     Absent generic competition, brand manufacturers typically sell their drugs at prices far above the marginal cost of production, generating profit margins of 70% and more, sometimes up to 98%. They can do this because, before generic competition, the brand holds a

---

[12] FTC Study, Federal Trade Commission, "Authorized Generics: An Interim Report," 2009 WL 1785171 (June 2009).

[13] *See* FDA Website, Generic Drugs: Questions and Answers, *available at* http://www.fda.gov/drugs/resourcesforyou/consumers/questionsanswers/ucm100100.htm.

legal monopoly on the drug. When the first generic enters, the brand's monopoly disappears, the generic charges less, and profit margins for the drug begin to shrink. When two or more generics enter, prices—and profit margins—drop much more precipitously.

47.     Once the number of generic competitors goes from one to two, the two generic companies compete on price. Some typical estimates are that a single generic launch results in a near term retail price reduction of around 10%. With two generic entrants, the near-term retail price reduction is about 50%. Once third and fourth generics enter, prices drop even lower, until the market is fully "genericized," with price standing as the only meaningful distinction between different products.

48.     A study of U.S. generic drug prices published in January 2019 found that

> [p]rices typically decrease rapidly with the entry of subsequent generic manufacturers. Generic drugs that entered the market between 2002 and 2014 reduced drug prices by 51% in the first year, and after a plateau in drug prices during the 180-day exclusivity when only the first generic drug manufacturer can market its drug, nearly all reductions in the price of oral medications occurred in the first eight months after generic entry. As the number of generic manufacturers within specific drug markets increases, drug prices continue to decline. A 2005 FDA analysis found that after patent and exclusivity expiration, the introduction of one generic manufacturer into the market reduced the price of the drug by only 6%. *With two generic manufacturers, the price reached 52% of the brand-name drug's price.*[14]

---

[14] Gupta, R., et al., Generic Drugs in the United States: Policies to Address Pricing and Competition, *Clin. Pharmacol. Ther.* 2019 Feb; 105(1): 329-337 (emphasis added), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6355356/; *see also*, Conrad, R. and R. Lutter, Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices, FDA Center for Drug Evaluation and Research, December 2019, available at https://www.fda.gov/media/133509/download.

The study's authors represented these findings in a table entitled "Generic Competition and Drug Prices," showing the precipitous price drop after the second generic competitor enters the market:



49.     In general, the more fully genericized the market for a particular drug, the lower the price will be. The presence of multiple generics in the market, competing with the brand and with each other, puts downward pressure on prices, to the benefit of purchasers and consumers.


**D.     Pharmaceutical Manufacturers Sometimes Game the System to Impede Competition, Using Collusive Agreements that Include Pay-for-Delay Provisions, or Acceleration Clauses with Grace Periods.**

50.     When they do not face generic competition, brand drug manufacturers usually price their products far above their marginal cost of production, generating profit margins ranging from 70% to 98%. This can translate to hundreds of millions or even billions of dollars for blockbuster branded drugs. When unconstrained generic competition commences, however, the generics quickly take 90% or more of the unit sales. And when multiple generics are in the

market, the competition between the generics drives their prices to near only 10% above the marginal cost of production. This competition ends the brand manufacturer's market power and delivers enormous savings to drug purchasers. The prospective loss of market power and inevitable drop in brand unit sales and price are sometimes referred to as the brand's "patent cliff."

51.     In Hatch-Waxman patent litigation, the parties are disputing whether the at-issue patent(s) are valid and enforceable, and infringed by proposed ANDA product. Typically, the position of the brand is that as the patent is valid, enforceable and would be infringed, a settlement should provide for entry at or near expiry of the patent. The position of the generic is that the patent(s) is invalid, unenforceable and/or not infringed, so a settlement should provide for immediate or near-immediate entry. A settlement on the merits—with a compromised agreed entry date and without a reverse payment—directly reflects the probabilistic outcome of the litigation. That is, the earlier the entry date, the stronger the generic manufacturer's patent position. The later the entry date, the weaker the generic's patent position.

52.     Brand manufacturers sometimes conspire with one or more generic manufacturers to prevent this competition and its accompanying price drop. If they work together to prevent or delay competition, they can keep the profit margins on all of the unit sales at 70+% rather than 10% and split the resulting excess profits among themselves. They can capture in their coffers the enormous savings that lawful competition would otherwise have delivered to drug purchasers.

53.     Without competition, a brand manufacturer keeps all profit from sales of the drug:



54.     When generics enter, competition converts the brand's profits into purchaser savings:



55.     To avoid this reduction in profits, the brand and generic manufacturer sometimes—illegally—agree not to compete and instead split the potential purchaser savings between themselves:



56.    For such a plan to work, the brand and generic manufacturers need a means by which to divide the excess profits among themselves. The generic manufacturer will only agree to refrain from competing if it shares in the ill-gotten gains. Pay-offs from the brand to the generic are the means by which the brand and generic manufacturers share the excess profits that the delay of competition generate. These pay-off deals are often referred to as "pay-for-delay" agreements or "exclusionary payment" agreements. These sorts of agreement extend the brand manufacturer's monopoly, keeping prices high, and block purchaser and consumer access to more affordable generic drugs.

57.    In reaching such settlements, brand and generic drug companies at times include a so-called "acceleration" clause in their agreement. Generally speaking, under such a clause the agreed entry date (*i.e.*, the date on which the settling generic might enter the market) is advanced under circumscribed conditions ("triggering events"). Those conditions might relate to the

patent(s) (*e.g.*, the patent is adjudicated invalid, or it expires) or to market conditions (*e.g.*, some other generic enters the market by agreement or at-risk).

58.     In the event that the patent(s) is adjudicated invalid or unenforceable, brand manufacturers can induce generics to settle by including acceleration clauses in their agreements. In practice, though, and despite their name, these so-called acceleration clauses *do not accelerate* generic entry—they *delay* it.

59.     The purpose and effect of an acceleration clause is to dramatically reduce any other generic manufacturer's incentive to try to enter the market as quickly as they can. Absent the acceleration clause, other generic manufacturers are incentivized to enter the market as soon as possible, thereby enjoying a period of little or no competition from other generics. An acceleration clause disincentivizes generics that would otherwise be willing and able to come to market from doing so because of the knowledge that other generics would immediately flood the market.

60.     Acceleration clauses "eliminate any incentive for a subsequent filer to continue to litigate for earlier market entry" and thus represent "the primary anticompetitive aspects of settlements."[15] The Chairman and CEO of  Apotex, Inc.—one of the largest generic manufacturers in the world—twice testified to Congress about acceleration clauses, or what he referred to as "poison pill" provisions. He explained that they "eliminate any incentive for a subsequent filer to continue to litigate for earlier market entry" and thus represent "the primary

---

[15] Statement of Bernard Sherman, CEO, Apotex, Inc., before the H. Comm. On Energy & Commerce, Trade and Consumer Protection of the H. Comm. On Energy & Commerce, 110th Cong., Hearing on H.R. 1902, "*Protecting Consumer Access to Generic Drugs Act of 2007*" at 65, 67 (2007),*available at* http://www.gpo.gov/fdsys/pkg/CHRG- 110hhrg38992/pdf/CHRG-110hhrg38992.pdf.

anticompetitive aspects of settlements."[16] Acceleration clauses both induce prospective generic competitors to accept later entry dates and deter others from challenging weak patents:

> [N]o subsequent filer is going to take up the patent fight knowing it will get nothing if it wins. Consumers are the biggest losers under this system. If subsequent filers do not have the incentive to take on the cost of multimillion patent challenges these challenges will not occur. Weak patents that should be knocked out will remain in place, unduly blocking consumer access to generics. The challenges to brand patents by generic companies that Hatch-Waxman was designed to generate will decrease. And settlements that delay consumer access to the generic will, in turn, increase.[17]

61.     Acceleration clauses are usually accompanied by contractual grace periods, in which the generic agrees to a waiting period before it may launch after a triggering event such as an at-risk launch. If the triggering condition no longer applies at the end of the grace period, the acceleration clause is effectually de-activated. Grace periods allow the brand company time to settle with any at-risk launchers whose market entry threatens to trigger acceleration clauses in the brand company's settlements with other generic manufacturers.

62.     Where settlement agreements contain acceleration clauses, brand companies may alert other generic manufacturers to the existence of acceleration clauses in earlier settlements,

---

[16] *Protecting Consumer Access to Generic Drugs Act of 2007: Hearing on H.R. 1902 Before the Subcomm. On Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 110th Cong., at 65, 67 (2007) (statement of Bernard Sherman, CEO, Apotex, Inc.), *available at* http://www.gpo.gov/fdsys/pkg/CHRG- 110hhrg38992/pdf/CHRG-110hhrg38992.pdf.

[17] *Protecting Consumer Access to Generic Drugs Act of 2009: Hearing on H.R. 1706 Before the Subcomm. On Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 111th Cong., at 218 (2009) (statement of Bernard Sherman, CEO, Apotex, Inc.) (hereinafter "Apotex 2009 Statement"), available at http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg67822/pdf/CHRG-111hhrg67822.pdf. Apotex addressed acceleration clauses in the context in which the first-filing generic retained the 180-day exclusivity. Regardless, here as well, the acceleration clause all but eliminates a generic manufacturer's incentive to try to enter before the scheduled date.

thereby dissuading other generic manufacturers from trying to enter the market before the delayed entry date to which the prior settling parties agreed.

63.    Here, Amgen and Teva's overarching scheme has resulted in years of unlawfully prolonged monopolization in the lucrative market for Sensipar and its AB-rated generic equivalents. Amgen's scheme has delayed generic entry since March 8, 2018.

## V.    FACTUAL ALLEGATIONS

### A.    Amgen Develops and Launches Sensipar and Earns Billions of Dollars.

64.    Cinacalcet HCl is a calcium-sensing receptor agonist indicated for secondary hyperparathyroidism ("HPT") in adult patients with chronic kidney disease on dialysis. It is also indicated for the treatment of hypercalcemia in adult patients with parathyroid carcinoma, and for treating severe hypercalcemia in adult patients with primary HPT who are unable to undergo parathyroidectomy. Cinacalcet HCl is available as an oral therapy in 30 mg, 60 mg, and 90 mg strength tablets.[18]

65.    Amgen has sold cinacalcet HCl under the brand name "Sensipar" in the United States since 2004.

66.    The development of Sensipar began with a collaboration between Brigham and Women's Hospital, Inc. (the "Hospital") and NPS Pharmaceuticals, Inc. ("NPS") and led to the application for, and subsequent allowance of, the '068 patent and certain other patents (collectively, the "NPS Patents"). The NPS Patents relate to the production and/or medicinal use of cinacalcet HCl. The '068 patent was the primary substance patent and was set to expire on March 8, 2018.

---

[18] *See* Poon G. "Cinacalcet hydrochloride (Sensipar)." *Proc. (Bayl. Univ. Med. Cent.)* 2005;18(2), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1200722/.

67.     In March 1996, Amgen received a license to the NPS patents. Under its license, Amgen is responsible for all development and commercial activities involving Sensipar as well as enforcing applicable patent rights in the licensed territories.

68.     In March 2004, Amgen received FDA approval for New Drug Application 021688 for Sensipar tablets.

69.     Beginning in April 2004, Amgen marketed, distributed, and sold Sensipar tablets throughout the United States. Sales of Sensipar in the U.S. grew rapidly, ultimately reaching over $1 billion annually by 2015.

| Year | Annual Revenue in U.S. |
|------|------------------------|
| 2015 | $1.069 Billion |
| 2016 | $1.24 Billion |
| 2017 | $1.374 Billion |
| 2018 | $1.4 Billion |

**B.      The Patents Purportedly Covering Sensipar.**

70.     Amgen listed seven patents in the Orange Book as purportedly covering Sensipar:

(a)     U.S. Patent No. 6,211,244 (October 23, 2015 expiry);

(b)     U.S. Patent No. 6,001,884 (December 14, 2016 expiry);

(c)     U.S. Patent No. 6,031,003 (December 14, 2016 expiry);

(d)     U.S. Patent No. 6,313,146 (December 14, 2016 expiry);

(e)     U.S. Patent No. 6,011,068 (March 8, 2018 expiry);

(f)     U.S. Patent No. 7,829,595 (September 22, 2026 expiry); and

(g)      U.S. Patent No. 9,375,405 (September 22, 2026 expiry).

71.      As it relates to this action, only three of these patents are relevant: the '068 patent, the '595 patent, and '405 patent.

72.      In 2000, the U.S. Patent and Trademark Office ("PTO") issued the '068 patent, which purportedly describes an invention "relat[ing] to the different roles inorganic ion receptors have in cellular and body processes."[19] The '068 patent was assigned to Brigham and Women's Hospital Inc. and NPS Pharmaceuticals Inc. As explained above, Amgen received a license to the '068 patent in connection with the development and commercialization of Sensipar. Amgen submitted the '068 patent for listing in the Orange Book.

73.      In 2008, Barr Laboratories Inc. and Teva filed Paragraph IV certifications against the '068 patent (among others), leading to a lawsuit by Amgen, NPS Pharmaceuticals, and Brigham and Women's Hospital. Amgen (and the other plaintiffs) were successful at trial and obtained an order enjoining Teva and Barr from selling generic versions of Sensipar under their ANDAs until the expiration of the '068 patent in March 2018.[20] The resulting litigation caused the Paragraph IV certifications in Teva's and Barr's ANDAs to be converted into Paragraph III certifications and also caused Teva and Barr to forfeit any entitlement to 180 days of marketing exclusivity associated with their ANDAs.[21]

74.      In 2016, the PTO issued the '405 patent. The '405 patent purportedly describes "a pharmaceutical composition comprising a therapeutically effective amount of calcium receptor-active compound and at least one pharmaceutically acceptable excipient, wherein the

---

[19] Abstract, U.S. Patent No. 6,011,068.

[20] *See Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 761 F. Supp. 2d 210 (D. Del. 2011), *appeal dismissed*, No. 2011-1217 (Fed Cir.).

[21] 21 U.S.C. § 355(j)(5)(D)(i)(III).

composition has a controlled dissolution profile."[22] The '405 patent was assigned to Amgen. On July 22, 2016, Amgen submitted the '405 patent for listing in the Orange Book.

75. The '595 patent is a formulation patent reciting largely similar, but narrower, claims as the '405 patent. On December 2, 2010, Amgen submitted the '595 patent for listing in the Orange Book.

### C. Generic Manufacturers Seek FDA Approval for Generic Versions of Sensipar.

76. Pharmaceutical companies can seek FDA approval of generic versions of a brand drug by filing an ANDA. To have an ANDA approved, a company must demonstrate, among other things, that its proposed generic is therapeutically equivalent to the brand drug. Beginning at least as early as March 2008, over a dozen generic drug manufacturers filed ANDAs seeking approval of generic versions of Sensipar and containing a Paragraph IV certification as to the '405 patent. These manufacturers included:

- Accord Healthcare and Intas Pharmaceuticals ("Accord");

- Ajanta Pharma, Ltd. and Ajanta Pharma USA, Inc. ("Ajanta");

- Alkem Laboratories Ltd ("Alkem");

- Amneal Pharmaceuticals LLC, Amneal Pharmaceuticals of New York, LLC and Amneal Pharmaceuticals Co. India Private Ltd. ("Amneal");

- Aurobindo Pharma Ltd. and Aurobindo Pharma USA Inc. ("Aurobindo");

- Barr Pharmaceuticals ("Barr");

- Breckenridge Pharmaceutical, Inc. ("Breckinridge");

- Cipla Limited and Cipla USA, Inc. ("Cipla");

- Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's");

---

[22] Abstract, U.S. Patent No. 9,375,405.

- Emcure Pharmaceuticals Ltd. and Heritage Pharmaceuticals ("Emcure-Heritage");

- Hetero USA Inc., Hetero Labs Ltd. and Hetero Labs Ltd. Unit V ("Hetero");

- Lupin Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin");

- Macleods Pharmaceuticals Ltd., Macleods, and Macleods Pharma USA Inc. ("Macleods");

- Mylan Pharmaceuticals, Inc. and Mylan, Inc. ("Mylan");

- Piramal Healthcare UK Ltd. ("Piramal");

- Strides Pharma Global PTE Ltd. and Strides Pharma, Inc. ("Strides");

- Sun Pharma Global FZE and Sun Pharmaceutical Industries, Inc. ("Sun Pharma");

- Teva Pharmaceuticals, USA, Inc. ("Teva USA")

- Watson Laboratories, Inc., Actavis, Inc., and Actavis Pharma, Inc. ("Watson");

- Torrent Pharmaceuticals Ltd. ("Torrent");

- Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Ltd. ("Zydus"); and

- Unichem Laboratories Ltd. ("Unichem").

77.     As part of their ANDAs, each manufacturer submitted a Paragraph IV certification against Amgen's '405 patent. In these Paragraph IV certifications, each ANDA applicant represented that the '405 patent was invalid, unenforceable, or not infringed by the generic's proposed ANDA product.

78.     While numerous generic manufacturers filed Paragraph IV certifications with their ANDAs as to the '595 patent, Amgen never asserted—and to this day has never asserted—that patent because the ANDA filers were able to easily develop generic tablets that were different from the formulations described in the '595 patent.

**D.      Amgen's Sensipar Patents Were Vulnerable to Attack.**

79.      By 2017, Amgen's remaining patent real estate purportedly covering Sensipar was vulnerable. Of the NPS Patents, only the '068 patent remained in force, and the protection it conferred would soon end when the '068 patent and its related exclusivities expired on March 8, 2018. That left only the '405 patent and the '595 patent protecting Amgen's monopoly. But neither patent was capable of preventing generic entry.

80.      The '405 patent was far from ironclad. Claim 1 of the '405 patent requires, among other things, "from about 1% to 10% by weight of at least one disintegrant selected from the group consisting of crospovidine, sodium starch glycolate, croscarmellose sodium, and mixtures thereof." Thus, if a generic ANDA product formulation does not contain at least one of crospovidine, sodium starch glycolate, croscarmellose sodium, and mixtures thereof, there can be no literal infringement of claim 1 or any of its dependent claims.

81.      Indeed, generic manufacturers could and did design around the limitations in the '405 patent. Piramal, for example, used a particular binder that Amgen had abandoned during its prosecution of the '405 patent in order to overcome the patent examiner's obviousness objection.[23] As a result, Piramal's generic version of Sensipar, and many others' generic versions of Sensipar, did not infringe the '405 patent.

82.      Moreover, one or more of the claims of the '405 patent were at risk of being found invalid as obvious in light of prior art, including, among others:

- U.S. Patent No. 5,861,179 to Hiskett et al.;

- U.S. Patent No. 6,211,244 to Van Wagenen et al.;

- U.S. Patent No. 6,245,352 to Arbuthnot et al.;

---

[23] *See Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1381-82 (Fed. Cir. 2019).

- A. Kibbe, HANDBOOK OF PHARMACEUTICAL EXCIPIENTS (3d ed. 2000);

- W.G. Goodman, et al., The Calcimimetic Agent AMG 073 Lowers Plasma Parathyroid Hormone Levels in Hemodialysis Patients with Secondary Hyperparathyroidism, 13 J. AM. SOC'Y NEPHROLOGY 1017 (2002);

- Remington: The Science and Practice of Pharmacy (Alfonso Gennaro, ed. 20th ed. 2000);

- International PCT Application Publication No. WO 02/11699 A1;

- U.S. Patent Application Publication No. 2002/0022649 A1 to Rasmussen et al.;

- European Patent Application Publication No. 132744 to Fujihara;

- Goodman et al., Future role calcimimetics in end-stage renal disease, Advances in Renal Placement Therapy, 9(3):200-8 (July 2002);

- Frazão et al., The calcimimetic agents: Perspectives for treatment, KIDNEY INTERNATIONAL, Vol. 61, Supplement 80, pp. S149-S154 (2002);

- Cases, Recent Advances in Nephrology: Highlights from the 35th Annual Meeting of the American Society of Nephrology, DRUGS OF TODAY, 38(12):797-805 (2002);

- Sorbera et al., Cinacalcet Hydrochloride, DRUGS OF THE FUTURE, 27(9):831-836 (2002); and

- Narayan, Overview of Drug Product Development, Unit 7.3, CURRENT PROTOCOLS IN PHARMACOLOGY, 7.3.1-7.3.29 (December 2001).

83.     The '595 patent was equally, if not more, vulnerable because it recited an even narrower set of limitations that generic manufacturers could and did design around. Amgen's failure to sue any generic manufacturer on the '595 patent demonstrates Amgen's belief that the patent could not be asserted in good faith against its would-be generic rivals.

84.     Accordingly, Amgen faced a significant threat to its continued monopoly over Sensipar, and as explained below, undertook a series of actions designed to stall and eliminate prospective and actual competition from generic manufacturers.

29

E.     **Amgen Commences Generic Delay Tactics, Suing the FDA and Suing Generic Manufacturers.**

85.     To delay the onset of generic competition and continue reaping more than a billion-dollar annually from its Sensipar sales, Amgen embarked on a scheme to block generics from entering the market.

86.     Between September 22, 2016 and October 11, 2016, Amgen filed over a dozen lawsuits, which were later consolidated, alleging infringement of the '405 patent in the District of Delaware. The generic manufacturer defendants included: Aurobindo, Teva (for the Watson ANDA), Cipla, Strides, Sun Pharma, Dr. Reddy's, Ajanta, Amneal, Hetero, Breckenridge, Mylan, and Zydus.

87.     On May 25, 2017, Amgen sued the FDA for denying its application for pediatric exclusivity for Sensipar. Obtaining pediatric exclusivity would have given Amgen six months of additional protection against generic manufacturers' market entry.

88.     In its lawsuit, Amgen alleged that the FDA had improperly denied an additional six months of pediatric exclusivity for Sensipar. Amgen needed the FDA to grant approval by June 8, 2017 in order to satisfy the statutory requirement that pediatric exclusivity for a pharmaceutical product be granted no later than nine months before the expiration of the relevant patent.[24]

89.     On June 5, 2017, the FDA agreed to reconsider Amgen's request, and Amgen and the FDA agreed to stay the litigation pending that review. The FDA also agreed that if Amgen

---

[24] *Amgen Inc. v. Price*, C.A. No. 17-1006, D.I. 1 (D.D.C. May 25, 2017).

achieved a favorable outcome in the future, it would apply retroactively in order to satisfy the deadline.[25] On August 2, 2017 the FDA again denied Amgen's request.[26]

90.     In June 2017 Amgen also sued four more generic cinacalcet HCl ANDA-filers: Piramal, Alkem, Lupin and Macleods. Amgen claimed in each of these lawsuits, *inter alia*, that the generic cinacalcet HCl product would infringe claims 1-6 and 8-20 of the '405 patent.

91.     The generic manufacturer defendants responded with defenses including non-infringement, invalidity and prosecution history estoppel. Macleods also included a counterclaim alleging sham litigation in violation of the Sherman Act, which Amgen denied.

**F.      Generic Manufacturers Begin Obtaining Tentative Approval of their Generic Sensipar Products from the FDA.**

92.     Underscoring the threat to Amgen's Sensipar monopoly, several generic Sensipar ANDA filers had their applications approved by the FDA beginning in 2015.

93.     On October 22, 2015, Mylan's generic Sensipar ANDA (No. 203422) was tentatively approved.

94.     On January 31, 2017, Aurobindo's generic Sensipar ANDA (No. 206125) was tentatively approved.

95.     On April 25, 2017, Teva's generic Sensipar ANDA (No. 090539) was tentatively approved.

**G.      Amgen Begins Settling with Generics in "Waves," Using Acceleration Clauses with Grace Provisions, and Suffers Additional Patent Setbacks and More Generic Sensipar ANDA Approvals.**

96.     In Fall 2017, Amgen faced mounting pressure from the tentative approval of generic Sensipar ANDAs and the March 8, 2018 expiration of its '068 patent approaching

---

[25] *Amgen Inc. v. Price*, C.A. No. 17-1006, D.I. 15 (D.D.C. June 5, 2017).

[26] *Amgen Inc. v. Price*, C.A. No. 17-1006, D.I. 24 (D.D.C. Aug. 10, 2017).

leaving only the vulnerable '405 patent to prop up its billion-dollar monopoly over Sensipar. In response, Amgen initiated a scheme to delay generic Sensipar market entry.

97.     Amgen's plan was to settle or license with the generic Sensipar ANDA filers—starting with those in the weakest patent positions—and include a combination of acceleration clauses and grace provisions in the settlement agreements.

98.     The acceleration clauses were highly attractive terms to the generics with weak patent positions, whose ANDAs essentially copied Amgen's NDA instead of designing around it. In exchange for these provisions, Amgen demanded only that the settling generic (1) admit to infringement of the '405 patent, and (2) promise not to launch before an agreed entry date at some time before the expiration of the '405 patent, except if an acceleration clause was triggered. The agreed entry dates were commensurate with the settling generic Sensipar manufacturer's relative patent positions.

99.     The purpose and effect of the acceleration clauses was to dramatically reduce every other generic manufacturer's incentive to try to enter the market before its licensed entry date.

100.    Despite this disincentive, if a generic firm did launch at risk, the grace provisions in Amgen's settlement agreements with the other generics would give Amgen █ business days to prevent the acceleration clause from triggering (and therefore give Amgen the opportunity to prevent those generics from coming to market). Under the grace provisions, Amgen had █ days to either ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████ its generic Sensipar product within 30 days. If neither of these conditions was met, on the ███████ business day after an at-

risk launch, other ANDA filers' acceleration clauses would allow them to come to market immediately, regardless of their agreed-upon entry date.

101.    For generic manufacturers contemplating launching at risk, Amgen's scheme of imposing acceleration clauses and grace provisions created two choices: (1) market through the tenth business day and then cease its sales to avoid triggering other generic manufacturer's accelerations, or (2) cut a deal with Amgen to come off the market.

102.    Staying on the market, however, would not be a rational business decision for two reasons. First, the acceleration clauses in Amgen's settlement agreements with other generics would mean near immediate and complete genericization, driving prices and profits down significantly. Second, even if the at-risk launching generic manufacturer had managed to sell a large quantity of its product before others reached the market via their acceleration clauses, "shelf-stock adjustment" provisions in the at-risk launching generic manufacturer's agreements with its distributors—which are customary in the pharmaceutical industry—would require the generic manufacturer to match the purchase price for its product in response to any lower offer from a competing generic Sensipar manufacturer.[27]

103.    An at-risk generic Sensipar launcher would effectively be forced to make a deal with Amgen that included coming off the market. The at-risk generic could not stop the triggering of the acceleration clauses by itself: even if it withdrew from the market before the grace periods expired, the acceleration clauses would still permit other generics to launch

---

[27] A shelf-stock adjustment is a lowering of the net purchase price for on-hand inventory of a generic product in response to an offer from a supplier of a competing generic equivalent. Shelf-stock adjustments are included in most, if not all pharmaceutical distribution agreements, and their presence would be assumed throughout the industry. *See, e.g.*, *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 391 (D. Del. 2019); *Impax Labs., Inc. v. Turing Pharmaceuticals AG*, C.A. No. 16-3241, 2017 WL 7893, at *6 n.9 (S.D.N.Y. Sept. 20, 2017).

because no preliminary injunction had been filed against the at-risk generic, nor had Amgen reached a deal that stopped sales of the at-risk product. The at-risk generic would have leverage against Amgen because it could always threaten Amgen with complete genericization by accelerating other generic Sensipar ANDA filers to market. Amgen, therefore, would have to pay the at-risk generic manufacturer to prevent that from happening. More specifically, Amgen would have to agree to share part of its Sensipar monopoly with the at-risk generic (*e.g.*, by allowing the generic to leave its product in the market and reap huge profits from its de facto exclusivity)—a creative solution that would be lucrative for both Amgen and the at-risk generic. Indeed, the grace provision was particularly useful with an aggressive generic manufacturer like Teva, which has a history of launching products at risk.

### 1.   "Wave 1": Breckenridge, Hetero, Sun, and Ajanta settle.

104.   On September 15, 2017, Amgen commenced its launched its plan to delay generic Sensipar by entering into a settlement agreement with Breckenridge, resolving Amgen's infringement claims against Breckenridge. The settlement agreement provided for an entry date of only ██████████████████████████████████ of the '405 patent. Despite the clear weakness of Breckenridge's patent position, Amgen inserted ██████████ ████ into the settlement agreement which would allow Breckenridge to come to market if another generic Sensipar ANDA filer launched at risk. The agreement also contained ████ ████████ giving Amgen ██ business days to resolve any such at-risk launch.

105.   On September 21, 2017, Amgen entered into a consent decree with Breckenridge. Breckenridge stipulated "to entry of judgment of infringement and validity of the '405 patent and an injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution

into the United States of the respective defendant's cinacalcet product during the term of the

'405 Patent unless specifically authorized under the confidential settlement agreement."[28]

106.    Amgen's settlement with Breckenridge had the purpose and effect of forcing any

generic that later launched at risk to either cut a deal with Amgen or stay on the market, inviting

others (starting with Breckenridge) to come to market via their acceleration clauses, eliminating

any opportunity for that at-risk launching generic to enjoy the benefit of de facto generic

exclusivity.

107.    On October 24, 2017, Amgen entered into settlement agreements with each of

Hetero and Sun, resolving its infringement claims against the two generic firms. Both of those

agreements, like the Breckenridge agreement, provided for an entry date of ███████████

██████████████████████ of the '405 patent. Each likewise contained ██

██████████████████████

108.    On November 2, 2017, Amgen entered into consent decrees with Sun Pharma and

Hetero, respectively, stipulating "to entry of judgment of infringement and validity of the '405

Patent and an injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or

distribution into the United States of the respective defendant's cinacalcet product during the

term of the '405 Patent unless specifically authorized under the confidential settlement

agreement."[29]

109.    On November 1, 2017, Amgen entered into a settlement agreement with Ajanta,

resolving Amgen's infringement litigation against Ajanta. The agreement provided for an entry

---

[28] Amgen 2017 Form 10-K, *available at* https://www.sec.gov/Archives/edgar/data/
318154/000031815418000004/amgn-12312017x10k.htm.

[29] Amgen 2017 Form 10-K, *available at* https://www.sec.gov/Archives/edgar/data/318154/
000031815418000004/amgn-12312017x10k.htm.

date of ███████████████████████████████████████ of the
'405 patent. The agreement also contained ████████████████████

110.    On November 9, 2017, Amgen entered into a consent decree with Ajanta, stipulating "to entry of judgment of infringement and validity of the '405 Patent and an injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution into the United States of the respective defendant's cinacalcet product during the term of the '405 Patent unless specifically authorized under the confidential settlement agreement."[30]

111.    Unlike the entry dates received by the other, later-settling generic manufacturers, the entry dates provided to each of Breckenridge, Hetero, Sun, and Ajanta are a proxy for their ostensibly weak patent positions, which left them with little power to bargain for a better entry date. Yet, in addition to the entry dates reflecting the strengths of their relative patent positions, Amgen gave each of them an acceleration clause and reserved for itself, through the grace provision, █ business days to cure any at-risk launch that may bring them to market early. By doing so, Amgen had made them an offer these generics could not refuse. Its scheme to delay generic market entry was under way.

112.    Shortly after Amgen entered these first-wave agreements, on December 15, 2017, the FDA tentatively approved Cipla's generic Sensipar ANDA (No. 208915).

---

[30] Amgen 2017 Form 10-K, *available at* https://www.sec.gov/Archives/edgar/data/318154/000031815418000004/amgn-12312017x10k.htm.

2.  **With Amgen's Plan to Implement and Leverage Acceleration and Grace Provisions Under Way, Amgen Is Denied Pediatric Exclusivity for Sensipar, Giving Amgen More Reason to Pursue Its Delay Plan.**

113.   In January and February 2018, Amgen—having previously sued the FDA for rejecting its request for pediatric exclusivity—learned that it would be unable to obtain pediatric exclusivity and further delay generic Sensipar market entry.

114.   On January 26, 2018, the Federal District Court for the District of Columbia granted the FDA summary judgment on all but one of Amgen's claims against the FDA and remanded the matter to the FDA for the limited purpose of the FDA addressing whether the FDA's denial of pediatric exclusivity in the case was inconsistent with a prior FDA pediatric-exclusivity decision on Johnson & Johnson's Ortho Tri-Cyclen.

115.   The FDA's position was that its denial of pediatric exclusivity was appropriate and not inconsistent with its prior decision. Amgen appealed the decision to the district court.[31]

116.   On February 17, 2018, the district court ruled in the FDA's favor. This ended Amgen's bid for six additional months' exclusivity to stay on the market without any generic competition.

117.   In its February 2018 earnings call, "Amgen executives cited uncertainty around Sensipar's loss of exclusivity as a big reason for the billion-dollar gap between the low end and high end of the company's 2018 guidance."[32]

118.   Realizing that the district court's summary judgment rulings and the FDA's denial of pediatric exclusivity would permit the FDA to approve ANDAs for generic Sensipar upon the

---

[31] *Amgen Inc. v. Azar II*, No. 1:17-cv-1006, ECF No. 88 (D.D.C. Feb. 17, 2018).

[32] Eric Sagonowsky, "Amgen sued FDA for a 6-month reprieve from Sensipar generics—and lost," *FiercePharma* (Feb. 21, 2018), https://www.fiercepharma.com/legal/amgen-comes-up-short-lawsuit-against-fda-sensipar-pediatric-exclusivity-as-generics-inch.

expiration the '068 patent on March 8, 2018, Amgen sought an order enjoining the FDA from approving any ANDAs for generic Sensipar while it appealed the district court's summary judgment orders to the D.C. Circuit. On February 22, 2018, the district court, however, denied Amgen's request for an injunction and held that (1) Amgen's failure to meet its burden at summary judgment demonstrated it was unlikely to succeed on the merits, and (2) Amgen's irreparable harm based on the potential "flood of generic" entrants did not outweigh the harm to competitors would be restrained by virtue of the injunction.[33]

### 3. With the Expiration of the '068 Patent Approaching, Amgen Faced a Real Possibility of an At-Risk Generic Launch.

119.     By early 2018, Amgen faced a significant threat of one or more at-risk launches by generic competitors. Several facts demonstrate the threat Amgen faced.

120.     *First*, the '068 patent—the only remaining NPS Patent—was set to expire on March 8, 2018. And as explained above, while Amgen maintained two additional formulation patents purportedly covering Sensipar through September 2026—the '405 patent and the '595 patent—neither stood as a significant impediment to generic entry.

121.     *Second*, Amgen itself anticipated generic entry by the second quarter of 2018. Amgen's ███████ forecasts anticipated generic entry at least as early as ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████.

---

[33] *Amgen Inc. v. Azar*, C.A. No. 17-1006, 2018 WL 1990521, at *1-2 (D.D.C. Feb. 22, 2018).

122.    **Third**, no would-be generic rival seeking approval of generic Sensipar was entitled to 180 days of marketing exclusivity. Many generic manufacturers had filed their ANDAs prior to Amgen's listing of the '405 patent in the Orange Book, meaning those generic ANDAs did not face the typical 30-month stay of FDA approval. Thus, the market was free for any generic manufacturer to enter upon receiving final FDA approval of their ANDAs.

123.    **Fourth**, compounding the risk for Amgen was that the FDA had rejected Amgen's application for pediatric exclusivity for Sensipar, which would have added another six months of exclusivity on top of any patents it held. Amgen's efforts to reverse the FDA's pediatric exclusivity determination, which included suing the FDA and attempting to obtain an injunction against the FDA following the district court's grant of summary judgment in the FDA's favor in January and February 2018 (just weeks before the '068 patent would expire), were ineffective.

124.    **Fifth**, by March 2018, several generic manufacturers had received tentative approval from the FDA, including Teva, Mylan, Cipla, and Aurobindo Pharma. Tentative approval indicates that the generic manufacturer has otherwise satisfied all the requisite steps for final approval—including demonstrating that the drug is safe and effective as recommended in the submitted labeling—but for some regulatory hurdle—here, the expiration of the '068 patent. Other generics received tentative or final approval in the months following the '068 patent's expiration, including, among others: Aurobindo (final), Ascend Pharmaceuticals (tentative and final), Mylan (final), Cipla (final), Piramal (final), Sun Pharmaceutical (final), Zydus Pharmaceuticals (final), and Teva/Watson (final).

### 4.    "Wave 2": Cipla and Mylan settle.

125.    As Amgen battled the FDA on pediatric exclusivity, Amgen pushed to settle with additional generic manufacturers, using the same tactics with the first wave. On February 6,

2018, nine of the remaining consolidated cases were reassigned to Judge Mitchell S. Goldberg

from the Eastern District of Pennsylvania, who was acting as a visiting judge in the District of

Delaware. Judge Goldberg bifurcated the remaining claims of infringement and invalidity.

126.    On February 26, 2018, just ahead of the March 5 bench trial in the consolidated

patent infringement action, Amgen entered into an agreement with Cipla to settle their patent

infringement litigation. The agreement provided for an entry date of ███████████████

████████████████████████████████████ of the '405 patent. The agreement also

contained ████████████████████████

127.    Amgen made clear that its objective in settling the Cipla litigation was the same

as its objective in its earlier settlements: "[T]he Amgen-Cipla Agreement ensures that Cipla is on

the same footing as other third parties who launch at risk."[34] While Cipla could come to market

after any launch that Amgen prevented or "resolved" within ██ days, Cipla, like other generics,

was assured that if it launched, it faced the prospect of immediate market entry by multiple

generics.

128.    On February 27, 2018, Amgen and Mylan settled their patent infringement

litigation. The settlement agreement provided for an entry date of █████████████████

████████████████████ of the '405 patent. The agreement also contained ██

████████████████████████████.

129.    In a February 27, 2018 pre-trial ruling, Judge Goldberg ruled that Amgen had

"not overcome the very strong presumption that the Markush groups for the binder and

---

[34] Amgen's Opening Br. in Support of its Expedited Mot. for an Injunction Pending Appeal, at 5, *Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-44 (D. Del.).

disintegrant elements are closed to unrecited binders and disintegrants."[35] Judge Goldberg construed the Markush groups for the binder and disintegrant elements as "closed to unrecited binders and disintegrants" and, thus, as articulated in an April 2018 Order denying Amgen's motion for re-argument, "there could be no literal infringement if the Defendants' ANDA product contained an unrecited (or unlisted) binder or disintegrant."[36]

130.    In ruling that Markush groups were closed, Judge Goldberg ultimately agreed that Amgen could argue infringement under the doctrine of equivalents.[37] But this left Amgen in a significantly weaker position heading into the bench trial in March 2018.

### 5.    "Wave 3": Dr. Reddy's and Strides settle.

131.    On March 2, 2018, Amgen and Dr. Reddy's settled their patent infringement litigation. The settlement agreement provided Dr. Reddy's with an entry date of ███████. And like the agreements before it, Amgen's agreement with Dr. Reddy's also contained an ████████████████████████████.

132.    Also, on March 2, 2018, Amgen and Strides settled their patent infringement litigation. The settlement agreement likewise provided for an entry date of ██████████ and ████████████████████████████.

---

[35] *Amgen Inc. v. Aurobindo Pharma Ltd. et al.*, C.A. No. 16-853, 2018 WL 1061369, at *3 (D. Del. Feb. 27, 2018).

[36] *Amgen Inc. v. Amneal Pharm. LLC*, C.A. No. 16-853, 2018 WL 1885664, at *3 (D. Del. Apr. 19, 2018).

[37] *Amgen Inc. v. Aurobindo Pharma Ltd., et al.*, C.A. No. 16-853, 2018 WL 1061369, at *3 (D. Del. Feb. 27, 2018).

6. **The '068 Patent Expires and Generics Immediately Obtain Final Approval of Their ANDAs from the FDA.**

133.    On March 8, 2018, the '068 patent expired, leaving only the vulnerable '405 patent to protect Amgen's billion-dollar Sensipar monopoly.

134.    The same day, Cipla and Aurobindo received final approval to market their generic cinacalcet HCl products under their respective ANDAs (Nos. 208915 and 206125).

7. **"Wave 4": Aurobindo, Alkem, Emcure, Lupin, Macleods, Torrent, and Unichem settle.**

135.    On March 19, 2018—just 11 days after Aurobindo received final approval of its generic Sensipar ANDA—Amgen and Aurobindo settled their infringement litigation. The settlement agreement provided for an entry date of ██████████ and contained an ██████████ ██████████████████████████.

136.    On March 27, 2018, Amgen and Macleods settled their infringement litigation. The settlement agreement provided for an entry date of ██████████ and contained ██ ████████████████████████████.

137.    On April 18, 2018, Amgen and Lupin settled their infringement litigation. The settlement agreement provided for an entry date of ██████████ and contained ██████████ ██████████████████.

138.    On April 30, 2018, Amgen and Alkem, settled their infringement litigation. The settlement agreement provided for an entry date of ██████████ and contained ██████████ ██████████████████.

139.    Alkem later confirmed that it was no coincidence that each infringement settlement Amgen entered contained virtually identical terms, save the entry date. In seeking to observe a hearing addressing another generic manufacturer's Sensipar settlement with Amgen, Alkem counsel claimed that, in all such cases, "the brand controls the drafting of the settlement

42

agreement"; "the brand offers the template up in the negotiations and carries it through . . . with each [generic] defendant"; and that, as a result, "they're all going to contain substantially the same language."[38] The terms of the relevant settlement agreements, including the acceleration clauses, reflect the plausibility of Alkem's assertions: Amgen imposed the terms on the settling generics, they were not bargained for.

140.    On May 23, 2018, Amgen and Torrent, settled their infringement litigation. The settlement agreement provided for an entry date of ████████ and contained ████████ ████████████████.

141.    On May 23, 2018, Amgen and Unichem settled their infringement litigation. The settlement agreement provided for an entry date of ████████ and contained ████████ ████████████████.

142.    On December 4, 2018, Amgen and Emcure-Heritage settled their infringement litigation. Like every agreement before it, the settlement agreement provided for an entry date of ████████████ and contained ████████████████████████.

143.    Those clauses had the purpose and effect of eviscerating any profits that could be earned by an unconstrained at-risk launch. So any threat from a settling generic that it might launch at risk and endanger Amgen's monopoly was emptier with each settlement containing an acceleration clause because that company would be less likely to launch at risk knowing that its profits would be significantly cut back on ████████ of its launch, when numerous other generics would have a green light to jump into the market. Because of shelf-stock pricing adjustments, any at-risk launching generic would be obligated to reimburse the distributor the difference in price between any product that the distributor purchased from that generic at a higher price and

---

[38] July 9, 2019 Hr'g Tr. at 10-11, *Amgen, Inc. v. Amneal Pharms.*, C.A. 16-853 (D. Del.).

lower prices offered for the same product after ▮▮▮▮▮, when additional generics would enter and drive down the price dramatically.

*    *    *    *

144.    In total, between March 2017 and December 2018, Amgen settled with 18 would-be generic Sensipar manufacturers (the date of each settlement is included in parentheses):

(a)    Breckenridge (September 15, 2017)

(b)    Sun (October 24, 2017)

(c)    Hetero (October 24, 2017)

(d)    Ajanta (November 1, 2017)

(e)    Cipla (February 26, 2018)

(f)    Mylan (February 27, 2018)

(g)    Strides (March 2, 2018)

(h)    Dr. Reddy's (March 2, 2018)

(i)    Aurobindo (March 19, 2018)

(j)    Macleods (March 27, 2018)

(k)    Lupin (April 18, 2018)

(l)    Alkem (April 30, 2018)

(m)    Torrent (May 23, 2018)

(n)    Unichem (May 23, 2018)

(o)    Emcure-Heritage (December 4, 2018)

(p)    Accord (Oct. 8, 2019)

**H.     The Acceleration Clauses Delayed Generic Competition for Sensipar.**

145.    The acceleration clauses were intended to, and did, delay the generic competition for Sensipar by dramatically reducing every generic manufacturer's incentive to try to enter the market before its licensed entry.

146.    The acceleration clauses Amgen imposed in each of its settlements provided it with greater leverage against the next settling generic because those clauses had the purpose and effect of eviscerating any profits that could be earned by any generic manufacturer that secured litigation victory or launched at risk. Any generic manufacturer threatening Amgen with an at-risk launch would not gain any meaningful leverage over Amgen because doing so would jeopardize its own profits when, on ███████ after the at-risk launch, numerous other generics could likewise enter the market at lower prices, triggering shelf-stock adjustments. Similarly, the generic manufacturers who opted to continue litigating faced a similar problem if they won the litigation—*i.e.*, triggering other, settling generics to enter the market—along with the possibility that they could lose the patent litigation and then be unable to launch until post-patent expiration. As a result, these clauses had the cumulative effect of stifling competition.

147.    Amgen's scheme to delay full generic competition and secure for itself monopoly profits to which it was not lawfully entitled depended on its ability to convince at least some (but as many as possible) of the generic ANDA filers to accept a delayed entry date. And as an enticement, Amgen dangled an acceleration clause that provided any generic who agreed to delay its entry with (a) an assurance that no other generic would receive an extended period of exclusivity, (b) the certainty of an entry date (that would be no worse than any other generic), and (c) the ability to stop paying litigation costs and incurring associated time and distraction.

148.    Of course, it was not in the independent self-interest of any of the generics to delay its generic entry without being assured that others would do the same. Applied

microeconomic theory, industry experience, and the facts as they played out shows that the coordinated Amgen agreements had a significant deleterious impact on competition.

149.    Under applied microeconomic theory, and as it is for the economic inferences used by the Supreme Court in *Actavis*, the telling behavior is from the brand company, and what a rational brand company would do. An acceleration clause is in the interest of a rational brand company *only if* the clause actually reduces the likelihood of competition in the first place. Of course, the likelihood that a spoiler might be able to circumvent the scheme and gain early entry depends on the facts of each case. And the extent to which serial acceleration clauses might inhibit the interest of the would-be spoiler in continuing its efforts to achieve early entry is also case dependent. But under microeconomic theory, the brand's decision to coordinate the clauses means that in all cases the clause must reduce to some extent the likelihood of the spoiler continuing the chase.

150.    Since these clauses are a form of "most favored nation" agreement which, if triggered, would work to the disadvantage of the party granting the MFN, then the grant must in some way also work to the advantage of the brand. And industry experience also shows that the presence of coordinated acceleration clauses for early-filed generics often work to cause the later-filed generics drop patent challenges and simply accept the later-agreed entry dates.

151.    In this case, the fact is that the more generic companies Amgen could entice to accept a delayed entry/acceleration clause agreement, the greater reduction there would be in the likelihood that any non-settling generic would continue its efforts to play the spoiler and trigger full generic competition.

152.    The coordinated acceleration clauses and grace periods were intended to have, and did have, significant, anticompetitive consequences. Reducing the incentive for non-settling

generics to enter the market in a manner that resulted in full competition was of enormous benefit to the brand but came at great cost to purchasers because the clauses were a substantial cause for other generics to avoid full generic competition.

153.    Under the various agreements, Amgen purportedly gave "licenses" to each settling generic to market generic Sensipar, but in reality these were not licenses at all. Because the agreements actually contained commitments by each generic to ***not*** market generics for an extended period of time, then for the duration of that time period, the provisions cannot fairly be characterized as licenses and are instead better characterized as "anti-licenses"—agreements that prohibit, rather than grant, market entry. And while, ostensibly, the agreements provided a licensed entry date after the delayed entry period lapsed, a license (in the sense of a consensually derived business arrangement) was neither needed nor appropriate to settle the patent challenge. Amgen's use of the term license was crafted in the agreements as a pretext to hide the reality that the substance of the arrangements was delay of entry (not permission of entry), with a barren covenant not to sue thereafter.

154.    The structure of these licenses through the use of the acceleration clauses was such that they disincentivized competition from coming to market at all. This disincentive took the following form: Any non-settling generic knew that if it litigated, won, and entered the market, the acceleration clauses previously granted to the settling generics would mean that the other generic manufacturers would share in the fruits of the win, while expending none of the time, effort, and money necessary to achieve that win. Absent the acceleration clauses, the other generics would be bound by their agreed entry dates and would not share in the earlier entry.

155.    The licenses and related scheme served as a mask for collusive conduct. If Amgen's scheme had not unlawfully enticed its would-be generic competitors to work together,

consumers would have been able to purchase generic options earlier, and those purchases all would have been made at lower prices than they did once those generics came to market.

156.    All of these benefits had substantial value to the generics and are compensation that they could not have obtained if they had litigated and won the various patent cases. The arrangements led multiple generics to stay out of the market for far longer than they otherwise would have.

157.    In the absence of Amgen's scheme, reasonable generic companies in the position of those here would each have demanded, and received, an entry date dependent upon an individual assessment of the strength or weakness of their particular product, position, and circumstances. Instead, they all agreed to delay entry in exchange for Amgen's promise that they could come in "earlier" if any other (dis-incentivized) generic did so.

## I.    Teva and Other Non-Settling Generics Win Non-Infringement Judgment at Trial and Other ANDAs Receive Final Approval.

158.    While Amgen settled with the fourth wave of settling generic manufacturers, the four remaining non-settling generics—Amneal, Piramal, Watson and Zydus— headed to trial on March 5, 2018 on the '405 patent.

159.    Before trial, Amgen claimed that the elements used by the defendants were functionally equivalent to those listed in claim 1 of the '405 patent, and that these Markush[39] groups were thus open.

160.    As noted above, the February 27, 2018 claim construction ruling on the '405 patent placed Amgen in a weak position going into trial against the remaining generics Watson (Teva), Amneal, Piramal, and Zydus.

---

[39]"A 'Markush' claim recites a list of alternatively useable members." M.P.E.P. § 2117.

161.    On July 27, 2018, following a four-day bench trial, Judge Goldberg ruled that Watson, Amneal, and Piramal did not infringe any of the asserted claims of the '405 patent.[40]

162.    Judge Goldberg also found that the product described in Zydus's ANDA would not infringe some of the asserted claims but would infringe others.[41]

163.    On August 1, 2018, the FDA granted final approval to Piramal's ANDA 210207.

164.    On August 24, 2018, Judge Goldberg entered final judgment in Amgen's case against Watson, stating, among other things, that "[a] judgment of NON-INFRINGEMENT of claims 1-6 and 8-20 of the '405 patent is hereby entered in favor of Watson and against Amgen."

165.    The court dismissed without prejudice, as moot, the generic manufacturers' invalidity counterclaims.

166.    On September 25, 2018, Amgen appealed to the United States Court of Appeals for the Federal Circuit. The next month, Zydus, which lost the infringement bench trial, also appealed to the Federal Circuit.

167.    On October 11, 2018, the FDA granted final approval to Sun Pharmaceutical's ANDA 207008.

168.    On October 16, 2018, the FDA granted final approval to Mylan's ANDA 203422.

**J.      Teva Receives FDA Final Approval and Launches Its Generic Version of Sensipar.**

169.     Because Watson (Teva) received a non-infringement ruling, it only needed to obtain FDA final approval of its ANDAs to launch their generic versions of Sensipar.

---

[40] *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 386, 396 (D. Del. 2018).

[41] *Id.* at 399.

170.    On December 27, 2018, the FDA granted final approval to Watson's (Teva's) ANDA for generic Sensipar. Upon receiving approval, Teva immediately launched its generic version of Sensipar, shipping at least ███████ bottles—its entire inventory—to wholesalers.

171.    Over a one-week period, Teva sold a multi-month supply of generic Sensipar, valued at over $393.4 million.[42] Teva, which set its wholesale acquisition cost ("WAC") at approximately ████ of Amgen's WAC,[43] realized over $212 million in net revenues during this short period of sales.

172.    Teva's launch caused Amgen to lose hundreds of millions of dollars in Sensipar revenues. In its Q1 2019 SEC Form 10-Q, Amgen reported that its Q1 2019 Sensipar revenues decreased by $274 million over Q1 2018 Sensipar revenues, which Amgen stated "was driven primarily by the impact of at-risk launches by generic competitors."[44]

173.    Teva knew that if it continued selling generic Sensipar, Teva's entry would have triggered the acceleration clauses in settlements Amgen had with other generic manufacturers, resulting in full generic competition.

174.    Teva also knew it could leverage its launch so as to both (a) maximize its own profits and (b) allow Amgen to unlawfully maintain its monopoly by using the grace provisions in each of its prior settlement agreements to come to a deal with Amgen. In other words, Teva launched knowing that Amgen would pay Teva to arrest its launch.

---

[42] *See* Second Cunard Decl. at ¶¶6-7 (estimating several months' worth of supply); TEVA_PROD_0000001. *See also* Christine Baeder Dep., at 14-15 (AM1084-0000008059, at 63) (testifying that Teva's launch was equivalent to ███████ supply assuming the entire market went generic)

[43] TEVA_PROD_0000001; TEVA_PROD_0007363.

[44] Amgen Inc., SEC Form 10-Q, at 33 (Mar. 31, 2019), http://investors.amgen.com/node/28321/html.

175.   Had the other settling generics entered, the price for generic versions of Sensipar would have dropped significantly below that offered by Teva, as is typical when multiple generics compete. And as more generics entered the market to compete, Amgen's share cinacalcet HCl tablet sales would have eroded by 90%.

176.   Amgen's own executives and experts submitted declarations in a related litigation stating that the effects of Cipla's launch on Amgen's Sensipar revenues and market share would be catastrophic.[45] Specifically, Amgen submitted a declaration from Christos Georghiou, its former Executive Director of U.S. Nephrology Marketing, who stated that:


.[46]

177.   And even if Amgen was ultimately successful in arresting generic Sensipar sales at some later date, Mr. Georghiou stated that Amgen's Sensipar prices would be permanently lowered. With multiple generic versions of Sensipar on the market, Mr. Georghiou stated that


.[47]         Mr. Georghiou stated,

---

[45] Declaration of Christos Georghiou in Support of Amgen Inc.'s Motion for a Preliminary Injunction (Mar. 11, 2019) (AM10804-0000005302) ("Georghiou Decl."); Declaration of Jerry A. Hausman in Support of Amgen Inc.'s Motion for a Preliminary Injunction (Mar. 11, 2019) (AM10804-0000005315) ("Hausman Decl.").

[46] Georghiou Decl. at ¶14.

[47] Georghiou Decl. at ¶¶21-22.

█████████ [48] In other words, Amgen's customers would continue to reap the economic benefits of the very competition Amgen was seeking to eliminate.

178.    Amgen had to move quickly once Teva launched—both to stop sales by Teva and to avoid triggering the acceleration clauses in its patent settlements with other generics. And it did just that.

### K.    Amgen and Teva Enter an Unlawful Market Allocation Agreement to Eliminate and Delay Generic Competition.

179.    Having lost against Teva at trial, in order to stop Teva's sales of its competing generic product, Amgen had to either persuade the district court or the Federal Circuit to stay the non-infringement ruling and to enjoin Teva's sales—or engage in self-help through the grace periods Amgen imposed in prior generic manufacturer settlements. Amgen chose the latter and quickly negotiated an agreement to end competition from Teva and keep Teva—as well as other generics—off the market for an extended period of time.

180.    On January 2, 2019, Amgen and Teva executed an agreement that ended competition from Teva's generic product and prohibited Teva from re-entering the market until June 30, 2021 (or earlier under certain circumstances). Under the Amgen-Teva Agreement, Amgen agreed to withdraw its appeal of the district court's judgment of non-infringement by the Teva cinacalcet product and release any claims Amgen might have against Teva in connection with Teva's launch.

181.    In exchange for ceasing its generic Sensipar sales, Teva agreed to pay up to $40 million to Amgen—an amount that would decrease if other generics entered the market. But

---

[48] Georghiou Decl. at ¶22.

Teva's $40 million "payback" was barely 10% of Teva's gross revenues realized after its one-week launch (and is not even 20% of the estimated total net revenues).

182.     In addition, the $40 million payback was spread out over six payment beginning in January 2019 (shortly after execution of the agreement) and terminating in May of 2019. Teva's payments to Amgen immediately terminate ████████████████████████ ███████████████████████ on the market besides Teva's. These are neither royalty payments nor damages payments. The payments were not calculated based on Teva's allegedly "infringing" sales of cinacalcet HCl and are completely unrelated to patent merits. Rather, they are a kickback payment, based solely on the success of their efforts to exclude *other* generics from the market and preserving the full value of Teva's limited launch.

183.     This arrangement was only possible because the acceleration clauses that Amgen had included in its prior settlements with would-be generic Sensipar manufacturers included a grace period, permitting Amgen an opportunity to try to stop the generic that launched. Because the acceleration clause would only take effect after the grace period lapsed, Amgen's quick deal with Teva prevented the triggering of these acceleration clauses.

184.     Delaying additional generics for at least a few months was critical to preserving Teva's outsized profit margins because wholesale customers could have, among other things, made full-credit returns or received shelf-stock adjustments in the event that Teva's contract price was higher than the prices offered by other competing generics. Those returns would have cost Teva tens of millions in sales or profits had the ██████ day come without a settlement and another generic launched; if two or more additional generics launched following Teva's at-risk launch, Teva stood to lose well over $100 million in sales or profits.

185.     Importantly, Teva could not have ensured itself these monopolistic profits on its own without reaching an agreement with Amgen. The acceleration clauses in prior settlements would automatically be triggered on ██████ after Teva's launch unless: (1) Amgen moved for a preliminary injunction seeking to halt Teva's sales or (2) Teva and Amgen entered an agreement halting Teva's sales.

186.     If Amgen had any reasonable expectation of prevailing on its patent merits, it would have pursued the preliminary injunction route. But Amgen did not. Instead, Amgen relied on the failsafe that it built into the architecture of its settlements from the very beginning: a market allocation agreement with any generic(s) that it could not exclude from the market via its patents alone.

187.     Because (1) the Amgen-Teva Agreement effectively avoided (at least until Cipla received a favorable judicial ruling permitting it to launch) triggering other settling generics' acceleration clauses and (2) Teva was not required to remove any of its previously sold generic Sensipar from the market, the Amgen-Teva Agreement ensured that Teva would retain nearly the full value of its at risk launch.

188.     Former Aurobindo CEO, Robert Cunard, who was retained as an expert by Cipla in a related litigation to evaluate the Amgen-Teva Agreement, similarly summarized the effect of Defendants' Agreement:





189.    Mr. Cunard concluded:



190.    In other words, despite Amgen and Teva's purported agreement that Teva's sales infringed the '405 patent—a position that if accepted as true and adjudicated as such would entitle Amgen to substantial infringement damages—Amgen required Teva to return only a tiny fraction of the revenues it realized from the "infringing" sales and allowed Teva's product to stay on the market, effectively paying Teva more than $170 million, as explained below.

191.    In fact, the nature and purpose of Teva's "payment" to Amgen is reflected in four emails from Teva's primary negotiator with Amgen the day before Defendants finalized their agreement, which included the following:

(a)    

---

[49] Declaration of Robert G. Cunard, at ¶20 (emphases added) (AM10804-0000003126) ("Cunard Decl.").

[50] Second Cunard Decl. at ¶10 (emphasis added).

[51] TEVA_PROD_0007168, at -169.



(c)

(d)

192.    This evidence, the circumstances surrounding the negotiation of the deal, and the Amgen-Teva Agreement itself speak volumes about the true purpose of the Agreement: to eliminate present and future competition from generic Sensipar.

193.    Thus, there were multiple effects as a result of the Amgen-Teva Agreement.

(a)    Amgen eliminated existing generic competition from Teva, which was costing Amgen hundreds of millions of dollars in lost revenues.[55]

---

[52] TEVA_PROD_0007166.

[53] TEVA_PROD_0001934, at -1938.

[54] TEVA_PROD_0004353.

[55] Amgen Inc., SEC Form 10-Q, at 33 (Mar. 31, 2019), http://investors.amgen.com/node/28321/html.

(b)     Amgen also eliminated imminent competition from other generic manufacturers whose acceleration clauses would have been triggered had Teva not left the market and delayed such competition until mid-2021.

(c)     Teva realized over *$212 million* in net revenues from selling multiple months' worth of supply of product in a week and was only required to pay back Amgen $40 million in payments extending to May 2019—but only so long as no other generics entered the market, reflecting Teva's shared interests in preventing competition from other generics.

(d)     Teva was not required to pull any product distributed over its one-week at-risk launch from the market.

(e)     Teva obtained acceleration and most-favored nations provisions that ensured that Teva would be able to re-enter the market on a date no less favorable than other settling generics. Because Teva, through its launch, had demonstrated that it was ready, willing, and able to come to market and had the product and infrastructure to do so, Teva's acceleration clause itself created a deterrent against full-scale launches by other generic Sensipar manufacturers.

(f)     Teva agreed to cease any and all challenges to the validity, infringement, or enforceability of Amgen's Sensipar patents and agreed not to assist any other party in challenging Amgen's patents.

194.    Significantly, in the Amgen-Teva Agreement, Teva admitted that its generic Sensipar product infringed valid and enforceable claims of the '405 patent, ***directly contradicting*** its then-existing litigation position and Judge Goldberg's non-infringement judgment in Teva's favor.[56] Indeed, under the Amgen-Teva Agreement, the parties agreed to

---

[56] Amgen-Teva Agreement § 4.1.

request that the district court approve a consent judgment stating the ***opposite*** of the non-infringement ruling Teva previously obtained:

> that the manufacture, use, sale, offer to sell, and distribution of [its] Products in the United States and importation of [its] Product into the United States, would infringe the ['405 Patent"; and [that], except as otherwise provided in the Agreement, Watson, along with its "successors and assigns, [is] enjoined until the date of expiration or lapse of the last to expire claim of the ['405] Patent, including any extensions and/or additional periods of exclusivity to which Amgen is or becomes entitled, from infringing the ['405] Patent by making, having made, using, selling, offering to sell, or distributing [its] Products in the United States, or importing [its] Products into the United States.[57]

195.    Pursuant to this provision, on January 9, 2019, Amgen and Teva jointly moved the district court to issue an Indicative Ruling (under Federal Rule of Civil Procedure 62.1) that it would grant the parties' motion under Federal Rule of Civil Procedure 60(b) to vacate its non-infringement ruling as to the Watson ANDA's generic product and enter the parties' proposed consent judgment, including Teva's admission of infringement.

196.    Both Teva and Amgen were economically incentivized to vacate Teva's non-infringement ruling. From Amgen's perspective, a vacatur would eliminate the possibility of triggering other settling generics' acceleration clauses permitting launches in the event of an at-risk launch by a third party that had secured a non-infringement judgment (like Teva had).

197.    Cipla was one such settling generic. Its settlement agreement stated:

> Notwithstanding anything to the contrary in this Settlement Agreement, if any Third Party that has made an At-Risk Launch of a Generic [Sensipar] Product . . . ***is found not to have infringed one or more valid and enforceable claims of the '405 patent*** . . . then Amgen shall not be entitled to seek or recover any relief from

---

[57] *Amgen Inc. v. Amneal Pharms. LLC*, C.A. 16-853, D.I. 412 (D. Del. Jan. 9, 2019).

[Cipla] for [Cipla's] at risk sales, offers for sale, distribution, or importation of [Cipla's] Product.[58]

198.    Thus, the vacatur would mean that Teva had in fact infringed one or more valid and enforceable claims of the '405 patent, thus satisfying a condition necessary to prevent the Cipla acceleration clause from kicking in.

199.    From Teva's perspective, eliminating prospective generic rivals allowed it to preserve the hundreds of millions of dollars in revenue it realized from its one-week launch. Teva's agreements with its wholesale customers allowed those customers to, among other things, make full-credit returns or receive "shelf-stock adjustments" in the event that Teva's contract price was higher than the prices offered by other competing generics. As a result, if other, less-expensive generic versions of Sensipar entered the market, Teva would likely have realized less revenue on its sales because (1) Teva would owe additional credits and discounts to its customers to make Teva's prices competitive with the prices other generics and (2) Teva's customers could return product they could not sell for a profit. Thus, by entering the illicit Amgen-Teva Agreement, Teva ensured that the enormous profits it reaped from its one-week of sales would not be significantly reduced by price competition from rival Sensipar generics.

200.    While Judge Goldberg ultimately denied Defendants' request to vacate the Teva's non-infringement judgment in March 2019,[59] Defendants' attempt to rewrite the Court's trial ruling confirms the anticompetitive intent underlying their market division agreement.

201.    Simply put, two competitors—Amgen and Teva—agreed to divide the market for Sensipar and Teva's generic version of the product. Amgen received Teva's agreement not to

---

[58] Amgen-Cipla Agreement § 5.6.

[59] *See Amgen Inc. v. Amneal Pharms. LLC*, C.A. No. 16-853, D.I. 439 (D. Del. Mar. 26, 2019). Amgen and Teva have both appealed this ruling to the Federal Circuit (Appeal No. 19-1650).

enter the market for another two and one-half years, until June 30, 2021, unless another generic broke Amgen's monopoly by launching first. For this, Teva realized over $212 million in net revenues from its at-risk launch sales. Even when accounting for the $40 million payback to Amgen, Teva still realized over $170 million in net revenues (profits), which, as explained below, is far more than it could have retained absent the unlawful agreement. Amgen re-established its status as the exclusive seller of cinacalcet HCl.

202.    Indeed, as this Court recently observed in a May 2, 2019 ruling on Cipla's patent misuse claim against Amgen, "Based on the record evidence, ***it seems plausible that Amgen and Teva may have colluded to divide up the market for cinacalcet, in order to share supracompetitive profits and deter true generic competition***."[60]

203.    By including the acceleration clauses in its early agreements with other generic Sensipar ANDA filers, Amgen successfully disincentivized earlier at-risk generic launches, ███████████████████████████████████████████████████████████. And the Amgen-Teva agreement had the purpose and effect of creating the conditions—established beginning with Amgen's earliest agreements with generic Sensipar ANDA filers—that would extend that delay of true generic competition through us of the grace periods, to allocate a portion of the market to Teva while avoiding the triggering of other generics' entry provisions.

204.    Immediately after Amgen coopted Teva into its monopolistic scheme through a massive payoff in the form of retained profits from its at-risk launch, it turned to addressing other competitive threats. On January 4, 2019, counsel for Amgen wrote a letter to counsel for Cipla stating: ███████████████████████████████████████████

---

[60] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 409 (D. Del. 2019).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████[61] The strategy worked.

205.    As Cipla later stated to this Court:

> The purpose and effect of the Amgen-Teva Agreement was to
> restrict supplies of, and maintain artificially high prices for,
> Cinacalcet Products sold in United States commerce, and to share
> in monopoly profits that would have been lost to competition if
> Defendants had not colluded with one another as they did and if
> the Defendants had not intentionally misled Cipla with false press
> releases and other false public communications.
>
> The Amgen-Teva Agreement was specifically designed and
> intended to cut off Cipla's rights to sell Cinacalcet Products by
> means of (i) a sham public "admission" of patent infringement by
> Teva, which Amgen procured by secretly ceding approximately
> $200 million in sales revenues to Teva; and (ii) a public joint
> motion seeking issuance of a "consent judgment" purporting to
> declare, falsely, that Cinacalcet Products sold by Teva …
> embodied the claimed invention of the '405 Patent. Defendants'
> deceptive joint actions caused Cipla to delay its launch of
> Cinacalcet Products for several weeks.[62]

206.    The Amgen-Teva Agreement was specifically designed and intended to cut off

Cipla's rights to sell Cinacalcet Products by means of (i) a sham public "admission" of patent

infringement by Teva, which Amgen procured by secretly ceding approximately $200 million in

sales revenues to Teva and (ii) a public joint motion seeking issuance of a "consent judgment"

purporting to declare, falsely, that Cinacalcet Products sold by Teva … embodied the claimed

---

[61] AM10804-0000014018, at -14020.

[62] *See* Pl.'s Br. In Opp. to Def.'s Partial Mot. to Dismiss at 4, *Cipla Ltd. v. Amgen Inc*., C.A.
No. 19-44, (D. Del. Dec. 6, 2019) (citations omitted).

invention of the '405 Patent. Defendants' deceptive joint actions caused Cipla to delay its launch of Cinacalcet Products for several weeks.[63]

207.    As noted above, pursuant to the Amgen-Teva Agreement, on January 9, 2019, Amgen and Teva applied jointly to the Court to vacate its non-infringement judgment in favor of Teva and, instead, enter a judgment stating that Teva's "manufacture, use, sale, offer to sell, and distribution of [its generic Sensipar] in the United States and importation of [its generic Sensipar] into the United States, *would infringe* the ['405] Patent."[64]

208.    The Amgen-Teva Agreement injured Plaintiff and the members of the Classes. They lost the ability to buy Teva's less expensive generic version of Sensipar. Moreover, but for the unlawful agreement, Teva's sales would have allowed market entry by other generic manufactures, further driving the price down. Aurobindo, Cipla, Mylan, Strides, and Sun each had FDA final approval at the time of Teva's launch, and, but for the Amgen-Teva Agreement, Teva's continued sales would have triggered the acceleration clauses in their settlements with Amgen.

209.    The resulting increased generic competition would have driven down the prices of generic versions of Sensipar below Teva's discount. Although Cipla and Aurobindo have launched generic versions of Sensipar, Defendants' agreement continues to impair competition because Defendants' agreement unlawfully terminated Teva's continued sales of generic Sensipar.

---

[63] *See* Pl.'s Br. In Opp. to Def.'s Partial Mot. to Dismiss at 4, *Cipla v. Amgen Inc.*, C.A. No. 19-44, (D. Del. Dec. 6, 2019) (citations omitted).

[64] *Amgen Inc. v. Amneal Pharmaceuticals LLC*, No. 16-853, ECF No. 412 (D. Del., filed Jan. 9, 2019) (emphasis added).

**L.     Cipla Sues Amgen and Teva for Antitrust Violations, then Cipla and Others Come to Market.**

210.    The events that followed Amgen's and Teva's market allocation and delay agreement demonstrate that Amgen's monopolistic scheme to systematically enter into agreements with generic Sensipar ANDA filers, which included anticompetitive acceleration and grace provisions and the Amgen-Teva Agreement itself operated to further delay generic Sensipar ANDA filers from entering the market.

211.    In response to the unlawful agreement between Amgen and Teva, on January 8, 2019, Cipla filed a lawsuit against Amgen seeking declaratory relief that under its settlement with Amgen, Cipla had the right to launch generic cinacalcet HCl (had Cipla proceeded directly to market without assurance, it would have been sued by Amgen for breach of contract and patent infringement, subject possibly to millions in damages). Cipla also sought damages and injunctive relief under the Sherman Act and state law.

212.    Among other things, Cipla alleged that "[b]y entering into the Amgen-Teva Agreement, Amgen misused the '405 Patent to exclude competition in the sale of pharmaceutical products which did not embody the claimed invention of the '405 Patent."[65]

213.    On January 11, 2019, Mylan sent a sealed letter to this Court requesting to review Cipla's sealed complaint for purposes of evaluating whether to intervene or file its own suit. Its letter stated, ████████████████████████████████████████ and that Mylan had ████████████████████████████ ████████████████████████████████████████████████ ████████████████████[66]

---

[65] *Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-44, D.I. 2 ¶37 (D. Del.).

[66] AM10804-0000001554.

214.    On February 25, 2019, Cipla amended its complaint to add Teva as a defendant.

215.    On or about March 6, 2019, Cipla and Piramal (through its commercial partnership with Slate Run Pharmaceuticals LLC) launched their respective generic versions of cinacalcet HCl tablets.

216.    On March 6, 2019, Judge Goldberg denied Amgen and Teva's joint motion for an indicative ruling, holding that the extraordinary relief sought by Amgen and Teva was not justified.

217.    On March 11, 2019, upon learning about Cipla's generic launch, Amgen moved for a preliminary injunction seeking to restrain Cipla's launch of any generic cinacalcet product. In response, among other things, Cipla contended that Teva had not ceased and/or agreed to have ceased selling its generic cinacalcet product, thereby barring Amgen from seeking relief against Cipla under section 5.6 of Amgen's settlement agreement with Cipla. Amgen responded that the Amgen-Teva agreement "can only fairly be read as a commitment by Teva not to sell its generic product between the Signing Date and the Effective Date."[67] In other words, Amgen took the position that the acceleration and grace provisions worked exactly as designed, allowing it to prevent other generics from launching and preserving its monopoly.

218.    Cipla also contended that it had a "unique" opportunity to be the sole or, at a minimum, a major player in the market for cinacalcet. The Court even noted that that opportunity "may very well be fleeting, given the potential entry of other generic challengers."[68]

219.    On March 19, 2019, Amgen filed an emergency motion for an injunction pending Amgen's Federal Circuit appeal of the trial court's non-infringement ruling as to Piramal.

---

[67] *Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-44, D.I. 170 at 4 (D. Del.).

[68] *Id.* (citing Preliminary Injunction Hr. Tr. at 29-30).

220.    On March 21, 2019, in the consolidated infringement actions before Judge Goldberg, Sun Pharmaceutical (and related entities) moved to enforce its settlement agreement with Amgen—specifically, for an order declaring that Sun's rights to launch its generic version of cinacalcet under the terms of its settlement had been triggered by operation of Teva's generic cinacalcet launch.

221.    On April 4, 2019, during a telephonic hearing before the Court in the *Cipla v. Amgen* antitrust action, Cipla's counsel underscored that the anticompetitive effects of the Amgen-Teva Agreement were continuing despite other generic market entry: "although Cipla is on the market," Cipla's counsel remarked, "Cipla is not selling in anything like the volume it would sell if it did not have this threat hanging over it."[69]

222.    On April 10, 2019, Amgen filed a notice of appeal to the Federal Circuit, appealing Judge Goldberg's indicative ruling order.

223.    On April 15, 2019, Piramal and Amgen stipulated to an injunction pending the Federal Circuit appeal, with Amgen agreeing to post an appeal bond in the amount of $39,000,000 and Piramal and Slate Run agreeing to cease all generic cinacalcet sales pending the appeal.

224.    On May 2, 2019, this Court denied Amgen's preliminary injunction motion, holding that Amgen failed to demonstrate a likelihood of success on the merits in light of the ambiguity in the Cipla-Amgen settlement with respect to whether Teva's indirect sales of generic cinacalcet triggered Cipla's acceleration clause, despite also finding that Amgen would suffer

---

[69] Transcript of Proceedings at 19, *Cipla v. Amgen Inc.*, C.A. No. 19-44 (D. Del. Apr. 4, 2019).

"irreversible price erosion" and "long-term loss of market share."[70] The Court also recognized

the nature of Teva's payment: "Teva . . . agreed to pay Amgen up to $40 million dollars,

depending (in part) on how long the cinacalcet market remains free of non-Amgen and non-Teva

generic products, and appears to have agreed to stop selling the Teva Product. (*See id.* §§ 3.1,

7.1, 7.3)."[71]

225.    The same day, Amgen filed its notice of appeal to the Third Circuit, appealing this

Court's preliminary injunction ruling.

226.    The next day, on May 3, 2019, Strides notified Amgen of its intent to launch in

light of the preliminary injunction denial.

227.    On May 23, 2019, Mylan launched its generic version of cinacalcet tablets.

228.    On July 8, 2019, Alkem launched its generic version of cinacalcet tablets.

229.    On July 11, 2019, Aurobindo announced that it had launched its generic version

of cinacalcet tablets.

230.    On July 16, 2019, the Third Circuit affirmed this Court's preliminary injunction

ruling.

231.    That same day, July 16, 2019, Strides launched its generic version of cinacalcet

tablets.

232.    On August 27, 2019, Sun launched its generic version of cinacalcet tablets.

233.    On September 19, 2019, in the consolidated infringement action, Judge Goldberg

denied Sun Pharmaceutical's motion to enforce its settlement with Amgen. The court held that

Sun's settlement with Amgen was not triggered by virtue of Teva's launch.

---

[70] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 401-03 (D. Del. 2019), *aff'd sub nom.*, 778
F. App'x 135 (3d Cir. 2019).

[71] *Id.* at 391.

234.     On January 7, 2020, the Federal Circuit affirmed in part, and vacated in part, Judge Goldberg's bench verdict on the infringement of the '405 patent.[72]

(a)     Specifically, the Federal Circuit vacated the district court's claim construction ruling on the Markush Group in Claim 1, holding that it had erred in construing the Markush Group to be limited to only those products specifically identified in claim.

(b)     The Federal Circuit's claim construction holding also resulted in the vacatur of the district court's non-infringement verdict in Amneal Pharmaceuticals favor, with instructions to consider whether Amneal's binder contained a certain concentration of hydroxypropyl methylcellulose.

(c)     Notwithstanding the Federal Circuit's claim construction holding, the Court ruled that as to Piramal, the district court correctly found that Amgen was estopped from asserting infringement against Piramal's use of a pregelatinized starch as a binder because Amgen surrendered that specific binder during the course of the '405 patent's prosecution.

(d)     Finally, as to Zydus, the Federal Circuit affirmed the district court's finding that Zydus infringed the '405 patent.

235.     In July 2020, Cipla and Amgen entered into a settlement agreement, resolving Cipla's claims against Amgen in this multidistrict litigation. On July 21, 2020, this Court entered a stipulation of dismissal, under which Cipla dismissed its claims against Amgen, and Amgen dismissed its counterclaims against Cipla.

236.     After the Federal Circuit affirmed Judge Goldberg's ruling of non-infringement in favor of Piramal, Piramal and Slate Run resumed their launch of generic cinacalcet. Since then, Piramal has sought to recover damages arising from the injunction.

---

[72] *Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368 (Fed. Cir. 2020).

237.    On July 8, 2020, Amgen and Teva moved to dismiss the Federal Circuit appeal concerning Judge Goldberg's indicative ruling decision. The next day, on July 9, 2020, the Federal Circuit granted the motion.

238.    On August 14, 2020, Slate Run—Piramal's commercial partner with respect to generic cinacalcet—moved to intervene in the dispute between Piramal and Amgen over damages from the injunction.

239.    On August 17, 2020, this Court entered a stipulation of dismissal  between Cipla and Teva.

240.    On October 1, 2020, Dr. Reddy's announced that it had launched its generic version of cinacalcet tablets.

241.    On October 16, 2020, Judge Goldberg granted Slate Run's motion to file an intervenor complaint.

242.    On November 2, 2020, Slate Run filed an intervenor complaint against Amgen, seeking the recovery of the appeal bond and additional damages arising from the injunction on Piramal/Slate Run sales during the pendency of the Federal Circuit appeal.

## VI.    THE ANTICOMPETITIVE EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

243.    Defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining trade by eliminating competition between Amgen and generic competitors. As described above, but for the acceleration clauses and grace periods in the Amgen Sensipar settlement agreements, generic manufacturers would have entered the market with their generic products at least as early as March 8, 2018. Further, but for the market allocation agreement between Amgen and Teva, Teva would have continued selling its generic Sensipar after January 2, 2019, and other FDA-approved generics would have soon launched their own generic versions

of Sensipar. Although other companies have launched generic versions of Sensipar, Defendants'

illegal agreement continues to impair competition for branded and generic Sensipar because

Teva is no longer permitted to continue selling generic Sensipar. Moreover, the Amgen-Teva

Agreement created significant uncertainty in the market resulting in less robust generic

competition than would have existed in the absence of such an unlawful agreement.

244.    But for Defendants' illegal conduct, Plaintiffs and members of the Classes would

have paid less for branded and generic versions of Sensipar. Defendants' conduct proximately

caused Plaintiffs' and the Classes' injuries because it forced them to pay millions of dollars in

overcharges on purchases of Amgen's branded Sensipar.

245.    If Defendants had not blocked generic competition for branded Sensipar,

Plaintiffs and members of the Classes would have paid less for cinacalcet HCl tablets by: (a)

purchasing less-expensive generic versions of Sensipar instead of branded Sensipar; (b)

purchasing branded Sensipar at lower prices, if Amgen sought to compete against the generics;

and (c) purchasing generic Sensipar at lower prices sooner. Mr. Georghiou, Amgen's former

Executive Director of U.S. Nephrology Marketing, acknowledged under oath the competitive

effects of full-scale launch of generic Sensipar:



.[73]

246.    Although Teva's generic version of Sensipar remained in the distribution

"pipeline" for a period of time after Teva entered its agreement with Amgen, its price was higher

---

[73] Georghiou Decl. at ¶14.

than it would have been if other generics had entered contemporaneously. Thus, members of the Classes who purchased or reimbursed for Teva's pipeline product also sustained injury.

247.    As a result of the delay in generic competition caused by Defendants' anticompetitive scheme, Plaintiffs and members of the Classes paid, and continue to pay, more for branded and generic Sensipar than they would have paid absent Defendants' illegal conduct.

248.    Defendants' restraints of competition in the market for branded and generic versions of Sensipar have substantially affected both interstate and intrastate commerce.

249.    At all material times, Amgen manufactured, promoted, distributed, and sold substantial amounts of branded Sensipar in a continuous and uninterrupted flow of commerce across state lines and throughout the United States. Defendants' anticompetitive conduct also had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering less-expensive generic versions of Sensipar to purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

250.    At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of branded and generic versions of Sensipar.

251.    Economics recognizes that an overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive

price at the top. [74] Professor Hovenkamp also instructs that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[75] Here, wholesalers and retailers passed on the inflated prices of branded and generic versions of Sensipar to Plaintiffs and members of the Classes.

252.    Defendants' unlawful agreement enabled Amgen to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent Defendants' agreement. These prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## VII.    MONOPOLY POWER AND MARKET DEFINITION

253.    To the extent the conduct here may be held subject to the Rule of Reason, the relevant product market is cinacalcet HCl tablets in 30 mg, 60 mg, and 90 mg strengths, including branded Sensipar and its bioequivalent (*i.e.*, AB-rated) generic versions of Sensipar. The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

254.    Prior to the launch of Teva's generic cinacalcet HCl product, Amgen had monopoly power in the market for cinacalcet HCl tablets. Direct evidence of Amgen's monopoly power includes, among other things, ██████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████.[76]

---

[74] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

[75] *Id.*

[76] Second Cunard Decl., at ¶ 4.

255.     A small but significant non-transitory price increase above the competitive level for Sensipar by Amgen would not cause a loss of sales sufficient to make the price increase unprofitable.

256.     Other drugs that are not AB-rated to Sensipar cannot be substituted automatically for Sensipar by pharmacists and do not exhibit substantial cross-price elasticity of demand with respect to Sensipar. For example, as shown in the tables below, during the period 2012 to 2017, Medi-Span Price Rx data for Sensipar shows that Amgen repeatedly raised Sensipar's WAC prices.[77]

### Table 1: Sensipar Tablets WAC – 30 mg



### Table 2: Sensipar Tablets WAC – 60 mg



[77] Data derived from AM10804-0000006905-907.



**Table 3: Sensipar Tablets WAC – 90 mg**



257.    Pharmaceutical products with cinacalcet HCl as the active ingredient have pharmacological properties that differentiate them from other drugs for treating secondary hyperparathyroidism and hypercalcemia. The existence of other products indicated for the treatment of secondary hyperparathyroidism in patients with chronic kidney disease and hypercalcemia in patients with parathyroid carcinoma or other illnesses has not significantly constrained Amgen's pricing of Sensipar.

258.    Mr. Georghiou's sworn declaration in the Cipla-Amgen litigation similarly supports the conclusion that Sensipar has no economic substitutes apart from AB-rated generic versions. Mr. Georghiou acknowledged that ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████ quickly drive purchases away from branded Sensipar to generic

versions of Sensipar. He also noted that even for those states that do not mandate generic switching, pharmacists are permitted to dispense generics in lieu of branded products when it is in the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ And ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Finally, he admitted that ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ As a result, Mr. Georghiou admitted that he expected that in the event of a sustained generic launch Sensipar ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓[78]

259.    Therefore, Amgen needed to control only Sensipar and its AB-rated generic equivalents, and no other products, in order to maintain the price of Sensipar profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Sensipar would render Amgen unable to profitably maintain its prices of Sensipar without losing substantial sales. This is particularly true for Medicare-based programs. As Mr. Georghiou noted, Medicare reimbursements under the "Transitional Drug Add-on Payment Adjustment" policy ("TDAPA") are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓[79] Providers, he therefore admitted, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



---

[78] Georghiou Decl. at ¶¶18-20.

[79] Georghiou Decl. at ¶16.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████[80]

260.    Thus, only generic versions of Sensipar are economic substitutes for branded

Sensipar.

261.    Amgen, at all relevant times, enjoyed high barriers to entry with respect to

competition in the above-defined relevant product market due to patent and other regulatory

protections and high costs of entry and expansion.

262.    Amgen has maintained and exercised the power to exclude and restrict

competition to Sensipar and its AB-rated generics.

263.    Prior to the launch of Teva's generic cinacalcet HCl product, Amgen's market

share in the relevant market was at or near 100%.

## VIII.   CLASS ACTION ALLEGATIONS

264.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

as a class action under Rules 23(a), (b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure,

on behalf of the following classes (the "Classes"):

> **The Injunction Class**
>
> All persons and entities that indirectly purchased, paid, and/or
> provided reimbursement for some or all of the purchase price of
> Sensipar or its AB-rated generic equivalents, beginning at least as
> early as March 8, 2018 until the effects of Defendants' conduct
> cease ("Class Period"), anywhere in the United States.

---

[80] Georghiou Decl. at ¶17.

**The Damages Class**

All persons and entities that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Sensipar or its AB-rated generic equivalents, beginning during the Class Period, in the District of Columbia, Puerto Rico, or any of the following states and commonwealths: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, or Wyoming.

265.    The following persons and entities are excluded from each of the above-described proposed Classes:

(a)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)    All governmental entities, except for government-funded employee benefit plans;

(c)    All persons or entities who purchased Sensipar for purposes of resale or directly from Defendants or their affiliates;

(d)    Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

(e)    Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs);

(f)    Pharmacy Benefit Managers;

(g)    All Counsel of Record; and

(h)    The Court, Court personnel, and any member of their immediate families.

266.    Members of the Classes are so numerous and geographically dispersed that joinder of all members of the Classes is impracticable. Plaintiffs believe that there are thousands of members of the Classes widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

267.    Plaintiffs' claims are typical of the claims of members of the Classes. Plaintiffs and members of the Classes were harmed by the same wrongful conduct committed by Defendants in that they paid artificially inflated prices for branded and generic Sensipar and were deprived of the benefits of earlier and more robust competition from less-expensive generic equivalents of Sensipar as a result of Defendants' wrongful conduct.

268.    Plaintiffs will fairly and adequately protect and represent the interests of the members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes.

269.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation involving pharmaceutical products.

270.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to both Classes. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

271.    Questions of law and fact common to the Classes include:

(a)    Whether Defendants conspired to delay generic competition in the market for cinacalcet HCl tablets;

(b)     Whether Defendants' agreement was a *per se* violation of federal and state antitrust laws;

(c)     Whether Defendants' agreement violated federal and state antitrust laws under a "quick look" analysis;

(d)     Whether Defendants' agreement violated federal and state antitrust laws under a Rule of Reason analysis;

(e)     To the extent the Rule of Reason applies, whether the relevant product market is cinacalcet HCl tablets;

(f)     To the extent the Rule of Reason applies, whether the relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

(g)     Whether Amgen unlawfully maintained monopoly power through the Amgen-Teva Agreement;

(h)     Whether Defendants' scheme, in whole or in Part, has substantially affected intrastate and interstate commerce;

(i)     Whether Defendants' agreement harmed competition;

(j)     For the Injunction Class, the nature and scope of injunctive relief;

(k)     For the Damages Class, whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiffs and the members of the Class; and

(l)     For the Damages Class, the quantum of overcharges paid by the Class in the aggregate.

272.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

273.     Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## IX.     COMPLIANCE WITH STATE ATTORNEYS' GENERAL NOTICE PROCEDURES

274.     In accordance with the requirements of Arizona Revised Statute § 44-1415; Hawaii Revised Statute § 480-13.3(a); Massachusetts General Laws Ch. 93A, § 10; Nevada Revised Statute § 598A.210(3); New York General Business Law § 340(5); and Utah Code § 76-10-3109, on or about April 30, 2019, counsel sent letters informing them of the existence of this action, identifying the relevant state antitrust and/or consumer law provisions, and enclosing a copy of UFCW Local 1500's February 21, 2019 complaint.[81]

    (a)     Mark Brnovich, Attorney General of Arizona;

    (b)     Clare E. Connors, Attorney General of Hawaii;

    (c)     Maura Healey, Attorney General of Massachusetts;

    (d)     Aaron Ford, Attorney General of Nevada;

    (e)     Letitia James, Attorney General of New York; and

---

[81] *UFCW Local 1500 Welfare Fund v. Amgen Inc.*, C.A. 19-369, D.I. 1 (D. Del.).

(f)     Sean Reyes, Attorney General of Utah.

275.     Upon the filing of a public, redacted version of this Complaint, Plaintiffs shall, pursuant to Arizona Revised Statute § 44-1415; Connecticut General Statutes § 35-37; Hawaii Revised Statute § 480-13.3(a); 815 Illinois Compiled Statutes § 505/10a(d); Nevada Revised Statute § 598A.210(3); New York General Business Law § 340(5); Rhode Island General Laws § 6-36-21; and Utah Code § 76-10-3109, serve copies upon:

(a)     Mark Brnovich, Attorney General of Arizona;

(b)     William Tong, Attorney General of Connecticut;

(c)     Clare E. Connors, Attorney General of Hawaii;

(d)     Kwame Raoul, Attorney General of Illinois;

(e)     Aaron Ford, Attorney General of Nevada;

(f)     Letitia James, Attorney General of New York;

(g)     Peter F. Neronha, Attorney General of Rhode Island; and

(h)     Sean Reyes, Attorney General of Utah.

## X.     CLAIMS FOR RELIEF

### <u>FIRST CLAIM FOR RELIEF</u>
### Market Allocation Agreement in Violation of Sherman Act § 1
### (Against All Defendants)

276.     Plaintiffs incorporate the preceding paragraphs by reference.

277.     An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another [market] for the other."[82] Defendants here entered into an unlawful market division agreement that restrained competition in the market for branded

---

[82] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

and generic versions of Sensipar. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)     eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until June 30, 2021;

(b)     delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

(c)     raise and maintain the prices that Plaintiffs and the Injunction Class Members would pay for Sensipar to and at supra-competitive levels.

278.     The Amgen-Teva market allocation agreement was preceded by, and built upon, Amgen's numerous patent infringement settlements with other generic Sensipar manufacturers. By strategically settling infringement cases with the specific ANDA filers that held the weakest patent positions and offering each an acceleration clause that its patent position could not otherwise leverage from Amgen, Amgen assured two things. One, that such generic Sensipar manufacturers would accept the settlement, and for a later agreed entry dates than they otherwise would, And two, that Amgen could use the existence of such clauses to disincentivize other would-be generic Sensipar competitors that held stronger patent positions and greater resources from launching at-risk because once they did, other generics would immediately accelerate to market as well, cannibalizing the profits the early-launching generic would otherwise have enjoyed.

279.     When Teva launched its generic Sensipar at risk, Teva and Amgen became horizontal market competitors. By then entering the Amgen-Teva Agreement on January 2,

2020, Amgen and Teva utilized the grace period that Amgen had also inserted into each of its prior settlement agreements with generic Sensipar ANDA holders, thwarting market entry by those other generics. Amgen and Teva agreed to divide up the market for Sensipar and its generic equivalent, sharing hundreds of millions in profits from sales at supra-competitive prices.

280.    The unlawful Amgen-Teva market allocation agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the market allocation alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[83] That is, "an observer with even a rudimentary understanding of economics could conclude that the [Amgen-Teva agreement] in question would have an anticompetitive effect on customers and markets."[84]

281.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiffs and the Injunction Class have been injured in their business and property throughout the Class Period.

282.    Plaintiffs and the Injunction Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

### SECOND CLAIM FOR RELIEF
**Contract, Combination, and Conspiracy in Restraint of Trade in Violation of
Sherman Act § 1
(Against All Defendants)**

283.    Plaintiffs incorporate the preceding paragraphs by reference.

284.    Amgen and Teva violated 15 U.S.C. § 1 by entering into an unlawful reverse payment agreement that restrained competition in the market for Sensipar and its generic equivalents.

---

[83] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[84] *Id.*

285.    The unlawful conspiracy consisted of Amgen and Teva entering into the unlawful Amgen-Teva Agreement on or about January 2, 2019, in which Amgen provided a large and unjustified payment to Teva in the form of (1) Teva's retained revenue from its generic product launch, (2) an agreed entry date that provides Teva with exclusive market entry before other generic entrants, and (3) an acceleration provision, assuring Teva an ability to resume sales of its generic product if another generic launched before Teva's entry date, among other things—to delay generic entry into the cinacalcet HCl market.

286.    Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until June 30, 2021;

(b)    delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

(c)    raise and maintain the prices that Plaintiffs and the Injunction Class Members would pay for Sensipar to and at supra-competitive levels.

287.    There is no legitimate, non-pretextual, procompetitive business justification for the value that Teva received that outweighs the agreement's harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer

dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

288.    When the Amgen-Teva Agreement was entered, Amgen shared its monopoly power with Teva. Together, the companies jointly maintained an illegal monopoly throughout that time.

289.    The Amgen-Teva Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

290.    Amgen and Teva are liable for this reverse payment agreement under a "rule of reason" standard under the antitrust laws.

291.    The Amgen-Teva Agreement between and among Amgen and Teva and their conduct under the agreement is an illegal restraint of trade or commerce and a continuing violation of the Sherman Act. There is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose, nor was it the least restrictive means of achieving any such purported justification.

292.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiffs and the Injunction Class have been injured in their business and property throughout the Class Period.

293.    Plaintiffs and the Injunction Class are entitled to injunctive and other equitable relief pursuant to 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF
**Monopolization in Violation of Sherman Act § 2**
**(Against Amgen)**

294.    Plaintiffs incorporate the preceding paragraphs by reference.

295.    Amgen possessed and/or possesses monopoly power in the relevant market and possessed the power to raise and maintain supracompetitive prices and exclude competitors from the relevant market.

296.    Amgen engaged in exclusionary and anticompetitive conduct that involved (a) imposing acceleration clauses across numerous settlements and licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's agreement to withdraw from the market following its abbreviated at-risk launch.

297.    The use of such clauses across Amgen's many patent infringement settlements with would-be generic competitors was designed to, and did, massively disincentivize those generics from entering and/or remaining on the market for fear that their profits would be immediately cannibalized by other, accelerated generic firms. But in the event of an at-risk launch, Amgen reserved for itself, via the grace provision, the opportunity to quash such a launch by paying off that at-risk generic thereby preventing other would-be generic competitors from accelerating to market. And through the grace period mechanism, Amgen would be able to reclaim its monopoly.

298.    Indeed, following Teva's launch, Amgen used the grace provisions in several of its agreements with generic Sensipar ANDA filers to enter into an unlawful market division agreement with Teva, under which Teva would cease its sale of generic Sensipar in exchange for

an agreement to retain hundreds of millions of dollars from its launch. Amgen decided to exercise the grace provision—despite the payment Amgen therefore had to pay to Teva—for the purpose of delaying other generic cinacalcet manufacturers from coming to market.

299.    The goal, purpose, and effect of Amgen's scheme was to maintain and extend its monopoly power with respect to cinacalcet HCl. Amgen's illegal scheme to delay the introduction of generic cinacalcet HCl allowed it to continue charging supra-competitive prices for cinacalcet HCl without a substantial loss of sales.

300.    As a result of Amgen's illegal scheme, Plaintiffs and the Injunction Class paid more than they would have paid for brand and generic Sensipar, absent the illegal conduct. But for the illegal conduct, competitors would have begun marketing generic versions of Sensipar by at least as early as March 8, 2018, resulting in cost savings to Plaintiffs and the Injunction Class.

301.    Amgen's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2. Amgen's agreement with Teva perpetuates Amgen's monopoly in the relevant market by excluding competition from Teva, as well as other generics that would have entered pursuant to acceleration clauses in their settlements with Amgen. As a result, Amgen's share of the cinacalcet HCl tablet market is at or near 100%.

302.    As a direct and proximate result of Defendants' violation of Sherman Act § 2, Plaintiffs and the Injunction Class have been injured in their business and property throughout the Class Period.

303.    Plaintiffs and the Injunction Class are entitled to injunctive and other equitable relief pursuant to 15 U.S.C. § 26.

**FOURTH CLAIM FOR RELIEF**
**Market Allocation Agreement in Violation of State Law**
**(Against All Defendants)**

304.    Plaintiffs incorporate the preceding paragraphs by reference.

305.     An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another [market] for the other."[85] Defendants here entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)     eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until June 30, 2021;

(b)     delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

(c)     raise and maintain the prices that Plaintiffs and the Injunction Class Members would pay for Sensipar to and at supra-competitive levels.

306.     The Amgen-Teva market allocation agreement was preceded by, and built upon, Amgen's numerous patent infringement settlements with other generic Sensipar manufacturers. By strategically settling infringement cases with the specific ANDA filers that held the weakest patent positions and offering each an acceleration clause that its patent position could not otherwise leverage from Amgen, Amgen assured two things. One, that such generic Sensipar manufacturers would accept the settlement, and for a later agreed entry dates than they otherwise would, And two, that Amgen could use the existence of such clauses to disincentivize other would-be generic Sensipar competitors that held stronger patent positions and greater resources

---

[85] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

from launching at-risk because once they did, other generics would immediately accelerate to market as well, cannibalizing the profits the early-launching generic would otherwise have enjoyed.

307.    When Teva launched its generic Sensipar at-risk, Teva and Amgen became horizontal market competitors. By then entering the Amgen-Teva Agreement on January 2, 2020, Amgen and Teva utilized the grace period that Amgen had also inserted into each of its prior settlement agreements with generic Sensipar ANDA holders, thwarting market entry by those other generics. Amgen and Teva agreed to divide up the market for Sensipar and its generic equivalent, sharing hundreds of millions in profits from sales at supra-competitive prices.

308.    The unlawful Amgen-Teva market allocation agreement is a *per se* violation of the state laws identified below. Moreover, if the market allocation alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[86] That is, "an observer with even a rudimentary understanding of economics could conclude that the [Amgen-Teva agreement] in question would have an anticompetitive effect on customers and markets."[87]

309.    Defendants' conduct violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California by the Damages Class Members;

---

[86] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[87] *Id.*

(c)     Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d)     D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)     Haw. Rev. Stat. Ann. §§ 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f)     740 Ill. Comp. Stat. Ann. 10/3, et seq., with respect to purchases in Illinois by the Damages Class Members;

(g)     Iowa Code Ann. §§ 553, et seq., with respect to purchases in Iowa by the Damages Class Members;

(h)     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)     Md. Code, Com. Law §§ 11-201, et seq., with respect to purchases in Maryland by the Damages Class Members;

(j)     Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Damages Class Members;

(k)     Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Damages Class Members;

(l)     Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Damages Class Members;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

(n)     Neb. Rev. Stat. §§ 59-801, et seq., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Damages Class Members, in that thousands of sales of branded and generic versions of Sensipar took place at Nevada pharmacies, purchased by Nevada end payors at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by the Damages Class Members;

(v)     R.I. Gen. Laws Ann. §§ 6-36-1, et seq., with respect to purchases in Rhode Island by the Damages Class Members;

(w)     S.D. Codified Laws Ann. §§ 37-1-3.1, et seq., with respect to purchases in South Dakota by the Damages Class Members;

(x)     Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Damages Class Members, with thousands of end payors in Tennessee paying substantially higher prices for branded and generic versions of Sensipar at Tennessee pharmacies;

(y)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)     Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

310.    Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

311.    Defendants are jointly and severally liable for all damages suffered by Plaintiffs and the Damages Class Members.

## FIFTH CLAIM FOR RELIEF
**Conspiracy and Combination in Restraint of Trade in Violation of State Law**
**(Against All Defendants)**

312.    Plaintiffs incorporate the preceding paragraphs by reference.

313.     Amgen and Teva violated the state laws identified below by entering into an unlawful reverse payment agreement that restrained competition in the market for Sensipar and its generic equivalents.

314.     The unlawful conspiracy consisted of Amgen and Teva entering into the unlawful Amgen-Teva Agreement on or about January 2, 2019, in which Amgen provided a large and unjustified payment to Teva in the form of (1) Teva's retained revenue from its generic product launch, (2) an agreed entry date that provides Teva with exclusive market entry before other generic entrants, and (3) an acceleration provision, assuring Teva an ability to resume sales of its generic product if another generic launched before Teva's entry date, among other things—to delay generic entry into the cinacalcet HCl market.

315.     Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)     eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until June 30, 2021;

(b)     delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

(c)     raise and maintain the prices that Plaintiffs and the Injunction Class Members would pay for Sensipar to and at supra-competitive levels.

316.     There is no legitimate, non-pretextual, procompetitive business justification for the value that Teva received that outweighs the agreement's harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a

brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

317.     When the Amgen-Teva Agreement was entered, Amgen shared its monopoly power with Teva. Together, the companies jointly maintained an illegal monopoly throughout that time.

318.     The Amgen-Teva Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

319.     Amgen and Teva are liable for this reverse payment agreement under a "rule of reason" standard under the antitrust laws.

320.     The Amgen-Teva Agreement between and among Amgen and Teva and their conduct under the agreement is an illegal restraint of trade or commerce and a continuing violation of the state laws identified below. There is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose, nor was it the least restrictive means of achieving any such purported justification.

321.     Defendants' conduct violated the following state antitrust laws:

(a)     Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

(b)     Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California by the Damages Class Members;

(c)      Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d)      D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)      Haw. Rev. Stat. Ann. §§ 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f)      740 Ill. Comp. Stat. Ann. 10/3, et seq., with respect to purchases in Illinois by the Damages Class Members;

(g)      Iowa Code Ann. §§ 553, et seq., with respect to purchases in Iowa by the Damages Class Members;

(h)      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)      Md. Code, Com. Law §§ 11-201, et seq., with respect to purchases in Maryland by the Damages Class Members;

(j)      Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Damages Class Members;

(m)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

(n)     Neb. Rev. Stat. §§ 59-801, et seq., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Damages Class Members, in that thousands of sales of branded and generic versions of Sensipar took place at Nevada pharmacies, purchased by Nevada end payors at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by the Damages Class Members;

(v)     R.I. Gen. Laws Ann. §§ 6-36-1, et seq., with respect to purchases in Rhode Island by the Damages Class Members;

(w)     S.D. Codified Laws Ann. §§ 37-1-3.1, et seq., with respect to purchases in South Dakota by the Damages Class Members;

(x)      Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Damages Class Members, with thousands of end payors in Tennessee paying substantially higher prices for branded and generic versions of Sensipar at Tennessee pharmacies;

(y)      Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)      Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Damages Class Members;

(aa)      W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)      Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

322.      Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

323.      Defendants are jointly and severally liable for all damages suffered by Plaintiffs and the Damages Class Members.

<u>SIXTH CLAIM FOR RELIEF</u>
**Monopolization and Monopolistic Scheme under State Law**
**(Against Amgen)**

324.      Plaintiffs incorporate the preceding paragraphs by reference.

325.    Amgen possessed and possesses monopoly power in the relevant market and possessed the power to raise and maintain supracompetitive prices and exclude competitors from the relevant market.

326.    Amgen engaged in exclusionary and anticompetitive conduct that involved (a) imposing acceleration clauses across numerous settlements and licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's agreement to withdraw from the market following its abbreviated at-risk launch.

327.    The use of such clauses across Amgen's many patent infringement settlements with would-be generic competitors was designed to, and did, massively disincentivize those generics from entering and/or remaining on the market for fear that their profits would be immediately cannibalized by other, accelerated generic firms. But in the event of an at-risk launch, Amgen reserved for itself, via the grace provision, the opportunity to quash such a launch by paying off that at-risk generic thereby preventing other would-be generic competitors from accelerating to market. And through the grace period mechanism, Amgen would be able to reclaim its monopoly.

328.    Indeed, following Teva's launch, Amgen used the grace provisions in several of its agreements with generic Sensipar ANDA filers to enter into an unlawful market division agreement with Teva, under which Teva would cease its sale of generic Sensipar in exchange for

an agreement to retain hundreds of millions of dollars from its launch. Amgen decided to exercise the grace provision—despite the payment Amgen therefore had to pay to Teva—for the purpose of delaying other generic cinacalcet manufacturers from coming to market.

329.    The goal, purpose, and effect of Amgen's scheme was to maintain and extend its monopoly power with respect to Sensipar. Amgen's illegal scheme to delay the introduction of generic Sensipar allowed it to continue charging supra-competitive prices for cinacalcet HCl without a substantial loss of sales.

330.    As a result of Amgen's illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for brand and generic Sensipar, absent the illegal conduct. But for the illegal conduct, competitors would have begun marketing generic versions of Sensipar by at least as early as March 8, 2018, resulting in cost savings to Plaintiffs and the Damages Class. As a result, Amgen's share of the cinacalcet HCl tablet market is at or near 100%.

331.    Amgen's conduct violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d)    D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)    Haw. Rev. Stat. Ann. §§ 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f)      740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g)      Iowa Code Ann. §§ 553 et seq., with respect to purchases in Iowa by the Damages Class Members;

(h)      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)      Md. Code, Com. Law §§ 11-201, et seq., with respect to purchases in Maryland by the Damages Class Members;

(j)      Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Damages Class Members;

(m)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

(n)      Neb. Rev. Stat. §§ 59-801, et seq., with respect to purchases in Nebraska by the Damages Class Members;

(o)      Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Damages Class Members, in that thousands of sales of branded and generic versions of Sensipar took place at Nevada pharmacies, purchased by Nevada end payors at supracompetitive prices caused by Defendant's conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by the Damages Class Members;

(v)     R.I. Gen. Laws Ann. §§ 6-36-1, et seq., with respect to purchases in Rhode Island by the Damages Class Members;

(w)     S.D. Codified Laws Ann. §§ 37-1-3.1, et seq., with respect to purchases in South Dakota by the Damages Class Members;

(x)     Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Damages Class Members, with thousands of end payors in Tennessee paying substantially higher prices for branded and generic versions of Sensipar at Tennessee pharmacies;

(y)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)     Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Damages Class Members;

(aa)     W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)     Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

332.     Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Amgen's anticompetitive conduct.

### SEVENTH CLAIM FOR RELIEF
**State Consumer Protection Violations**
**(Against All Defendants)**

333.     Plaintiffs incorporate the preceding paragraphs by reference.

334.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, unfair, unlawful, and unconscionable conduct, Plaintiffs and the Damages Class Members were deprived of the opportunity to purchase generic versions of Sensipar and were forced to pay higher prices for branded and generic versions of Sensipar.

335.     There is a gross disparity between the price that Plaintiffs and the Damages Class Members paid for Sensipar compared to what they would have paid for less expensive generic versions of Sensipar, which should and would have been available but for Defendants' unlawful conduct.

336.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

### California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, et seq.

337.    Plaintiffs incorporate the preceding paragraphs by reference.

338.    The UCL prohibits "unfair competition," which includes any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. Code § 17200.

339.    The UCL permits any person to seek restitution arising from any violation of the UCL.

340.    As alleged in more detail above, Amgen engaged in unlawful and unfair acts by engaging conduct that involved (a) imposing acceleration clauses across numerous settlements and licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's agreement to withdraw from the market following its abbreviated at-risk launch. Teva is jointly liable for the anticompetitive effects of entering into an agreement with Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet HCl tablets.

341.    As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for cinacalcet HCl, absent the illegal conduct.

342.    Defendants sold branded and generic versions of Sensipar in California, and their conduct had a direct and substantial impact on trade and commerce in California. Accordingly, such conduct falls within the prohibitions of the UCL.

### Illinois Consumer Fraud Act ("ICFA")
### 815 Ill. Comp. Stat. Ann. 505/1, et seq.

343.    The ICFA prohibits all "[u]nfair methods of competition and unfair or deceptive acts or practices." 815 Ill. Comp. Stat. Ann. 505/2. The ICFA is construed consistent with Section 5 of the FTC Act.

344.    The ICFA permits "any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 Ill. Comp. Stat. Ann. 505/10a.

345.    As alleged in more detail above, Amgen engaged in unfair acts and unfair methods of competition by engaging conduct that involved (a) imposing acceleration clauses across numerous settlements and licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's agreement to withdraw from the market following its abbreviated at-risk launch. Teva is jointly liable for the anticompetitive effects of entering into an agreement with Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet HCl tablets.

346.    As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for cinacalcet HCl, absent the illegal conduct.

347.    Defendants sold branded and generic versions of Sensipar in Illinois, and their conduct had a direct and substantial impact on trade and commerce in Illinois. Accordingly, such conduct falls within the prohibitions in 815 Ill. Comp. Stat. Ann. 505/2.

### Florida Deceptive & Unfair Trade Practices Act ("FDUTPA")
### Florida Stat. §§ 501.201, et seq.

348.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. §§ 501.202(2).

349.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

350.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.

351.    As alleged in more detail above, Amgen engaged in unfair acts or practices and unfair methods of competition by engaging in conduct that involved (a) imposing acceleration clauses across numerous settlements and licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's agreement to withdraw from the market following its abbreviated at-risk launch. Teva is jointly liable for the anticompetitive effects of entering into an agreement with

Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet HCl tablets.

352.     As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for cinacalcet HCl, absent the illegal conduct.

353.     Defendants sold branded and generic versions of Sensipar in Florida, and their conduct had a direct and substantial impact on trade and commerce in Florida. Accordingly, such conduct falls within the prohibitions in Florida Stat. §§ 501.202(2).

### Massachusetts Consumer Protection Act ("MCPA")
### Mass. Gen. L. Ch. 93A, et seq.

354.     The MCPA regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

355.     Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

356.     As alleged in more detail above, Amgen engaged in unfair acts and unfair methods of competition by engaging conduct that involved (a) imposing acceleration clauses across numerous settlements and licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay

off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace

provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's

agreement to withdraw from the market following its abbreviated at-risk launch. Teva is jointly

liable for the anticompetitive effects of entering into an agreement with Amgen, in which Teva

agreed to stop competing against Amgen in the market for cinacalcet HCl tablets.

357.    As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than

they would have paid for cinacalcet HCl, absent the illegal conduct.

358.    Defendants sold branded and generic versions of Sensipar in Massachusetts, and

their conduct had a direct and substantial impact on trade and commerce in Massachusetts.

Accordingly, such conduct falls within the prohibitions in Ch. 93A § 2.

### Missouri Merchandising Practices Act ("MMPA")
### Mo. Rev. Stat. 407.020

359.    Under Section 407.020, the MMPA prohibits "[t]he act, use or employment by

any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair

practice or the concealment, suppression, or omission of any material fact in connection with the

sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. 407.020.

360.    The Missouri Attorney General has defined an "unfair practice" as:

> any practice which . . . [o]ffends any public policy as it has been
> established by the Constitution, statutes or common law of this
> state, or by the Federal Trade Commission, or its interpretive
> decisions; or . . . [i]s unethical, oppressive, or unscrupulous; and
> . . . [p]resents a risk of, or causes, substantial injury to consumers.

Mo. Att'y Gen. Reg., 15 CSR 60-8.02.

361.    As alleged in more detail above, Amgen engaged in unfair practices by engaging

in conduct that involved (a) imposing acceleration clauses across numerous settlements and

licenses with generic Sensipar ANDA filers with the purpose and effect of disincentivizing

generics from continuing their challenges to Amgen's vulnerable '405 patent or launching at-risk; (b) imposing grace provisions in each settlement and license executed with generic Sensipar ANDA filers for the purpose of preserving the opportunity to pay off any at-risk generic by allocating the market for Sensipar; and (c) leveraging those grace provisions to, in fact, pay off Teva by allocating monopoly profits to Teva in return for Teva's agreement to withdraw from the market following its abbreviated at-risk launch. Teva is jointly liable for the anticompetitive effects of entering into an agreement with Amgen, in which Teva agreed to stop competing against Amgen in the market for cinacalcet HCl tablets.

362.   As a result of the illegal scheme, Plaintiffs and the Damages Class paid more than they would have paid for cinacalcet HCl, absent the illegal conduct.

363.   Defendants sold branded and generic versions of Sensipar in Missouri, and Defendants' conduct had a direct and substantial impact on trade and commerce in Missouri. Upon information and belief, Defendants also directed advertising and marketing efforts for branded and generic versions of Sensipar in Missouri. Accordingly, Defendants' conduct falls within the prohibitions in the MMPA.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

364.   Plaintiffs incorporate by reference the preceding allegations.

365.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

366.   This claim is pled by Plaintiffs and the Damages Class against all Defendants.

367.   Defendants have financially benefited from overcharges on sales of branded and generic versions of Sensipar, which resulted from the unlawful and inequitable acts alleged in this Complaint. These overcharges were borne by Plaintiffs and the Damages Class Members

who purchased and/or reimbursed all or part of the purchase price of branded and generic

Sensipar. The benefits conferred upon Defendants are substantial and measurable, in that the

revenues Defendants have earned due to unlawful overcharges are ascertainable by review of

both sales records and the unlawful agreement itself.

368.    There is a gross disparity between the price that Plaintiffs and the Damages Class

Members paid for Sensipar compared to what they would have paid for less expensive generic

versions of Sensipar, which should and would have been available but for Defendants' unlawful

and inequitable conduct.

369.    Defendants repeatedly and continuously received financial benefits at the expense

of Plaintiffs and the Damages Class Members through each sale of branded and generic versions

of Sensipar at an inflated price.

370.    It would be futile for Plaintiffs and the Damages Class Members to seek a remedy

from any party with whom they had or have privity of contract. Defendants have paid no

consideration to any other person for any of the benefits they received indirectly from Plaintiffs

and the Damages Class Members.

371.    It would be futile for Plaintiffs and the Damages Class Members to seek to

exhaust any remedy against the immediate intermediary in the chain of distribution from which

they indirectly purchased Sensipar, as those intermediaries cannot reasonably be expected to

compensate Plaintiffs and the Damages Class Members for Defendants' unlawful conduct.

372.    The financial benefits that Defendants derived rightfully belong to Plaintiffs and

the Damages Class Members, which paid anticompetitive prices that inured to Defendants'

benefit.

373.    It would be inequitable under the unjust enrichment principles of the states listed below for Defendants to retain any of the overcharges that Plaintiffs and the Damages Class Members paid for branded and generic versions of Sensipar, which were derived from Defendants' anticompetitive, unfair, and unconscionable methods, acts, and trade practices.

374.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds received by them into a common fund for the benefit of Plaintiffs and the Damages Class Members.

375.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for branded and generic versions of Sensipar by Plaintiffs and the Damages Class Members.

376.    Plaintiffs and the Damages Class Members have no adequate remedy at law.

377.    By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiffs and the Damages Class Members of the opportunity to purchase lower-priced generic versions of Sensipar and forced them to pay higher prices for branded and generic versions of Sensipar, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

378.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. It is

inequitable for Defendants to accept and retain the benefits received without compensating the Damages Class.

**Alaska**

379.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Alaska at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefits bestowed upon them by the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Arizona**

380.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**Arkansas**

381.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Arkansas at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**California**

382.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in California at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Damages Class.

**Colorado**

383.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Connecticut**

384.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Damages Class.

**Delaware**

385.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**District of Columbia**

386.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in the District of Columbia at prices that were more than they would have been but for Defendants' actions. The

Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

387.   Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Florida at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Georgia**

388.   Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Georgia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Hawaii**

389.   Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Hawaii at prices that were more than they would have been but for Defendants' actions. The Damages Class has

conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Idaho**

390.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Idaho at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Illinois**

391.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Illinois at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

392.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been

114

enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar, which revenue resulted from anticompetitive prices paid by the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**Kansas**

393.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Kansas at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Kentucky**

394.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Kentucky at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Louisiana**

395.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Louisiana at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no other remedy at law.

**Maine**

396.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Maine at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Maryland**

397.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Maryland at

prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Massachusetts**

398.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Massachusetts at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Michigan**

399.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Minnesota**

400.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Minnesota at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Mississippi**

401.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of branded and generic versions of Sensipar, which in equity and good conscience belong to the Damages Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Missouri**

402.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Missouri at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants

appreciated the benefit bestowed upon them by the Damages Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class.

**Montana**

403.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Montana at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Nebraska**

404.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to the Damages Class.

**Nevada**

405.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Nevada at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful

119

overcharges for branded and generic versions of Sensipar. Defendants appreciated the benefits bestowed upon them by the Damages Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**New Hampshire**

406.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

407.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from the Damages Class with respect to Defendants' sales of branded and generic versions of Sensipar. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**New Mexico**

408.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

409.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar, which revenue resulted from anticompetitive prices paid by the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Damages Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

410.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in North Carolina at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. The Damages Class did

not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the Damages Class. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

411.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**Oklahoma**

412.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Oklahoma at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have

retained this money. Defendants have paid no consideration to any other person in exchange for this money. The Damages Class has no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### Oregon

413.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Oregon at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

### Pennsylvania

414.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Pennsylvania at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### Puerto Rico

415.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Puerto Rico at prices that were more than they would have been but for Defendants' actions. Defendants have

been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

### Rhode Island

416.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Rhode Island at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### South Carolina

417.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Damages Class. Defendants realized value from the benefit bestowed upon them by the Damages Class. Under

the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

### South Dakota

418.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in South Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing the Damages Class.

### Tennessee

419.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Tennessee at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class. It would be futile for the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the Damages Class with respect to Defendants' sales of branded and generic versions of Sensipar. It would be futile for The Damages Class to exhaust all remedies against the entities with which the Damages Class has

privity of contract because the Damages Class did not purchase branded and generic versions of Sensipar directly from any Defendant.

**Texas**

420.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. The circumstances under which Defendants have retained the benefits bestowed upon them by the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for branded and generic versions of Sensipar. The Damages Class has no remedy at law.

**Utah**

421.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Utah at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

126

**Vermont**

422.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Vermont at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants accepted the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Virginia**

423.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Virginia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of branded and generic versions of Sensipar. Defendants have paid no consideration to any other person for any of the benefits they have received from the Damages Class.

**Washington**

424.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Washington at

127

prices that were more than they would have been but for Defendants' actions. The Damages

Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting

from unlawful overcharges to the economic detriment of the Damages Class. Defendants were

aware of or appreciated the benefit conferred upon them by the Damages Class. Under the

circumstances, it would be inequitable for Defendants to retain such benefits without

compensating the Damages Class.

**West Virginia**

425.    Defendants unlawfully overcharged Damages Class Members, who made

purchases of or reimbursements for branded and generic versions of Sensipar in West Virginia at

prices that were more than they would have been but for Defendants' actions. The Damages

Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting

from unlawful overcharges to the economic detriment of the Damages Class. Defendants were

aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the

circumstances, it would be inequitable for Defendants to retain such benefits without

compensating the Damages Class.

**Wisconsin**

426.    Defendants unlawfully overcharged Damages Class Members, who made

purchases of or reimbursements for branded and generic versions of Sensipar in Wisconsin at

prices that were more than they would have been but for Defendants' actions. The Damages

Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting

from unlawful overcharges to the economic detriment of the Damages Class. Defendants

appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it

would be inequitable for Defendants to retain such benefits without compensating the Damages

Class.

**Wyoming**

427.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Wyoming at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

## XI.     DEMAND FOR JUDGMENT

428.     Accordingly, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request that this Court:

(a)     Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiffs as the representative of the Classes;

(b)     Enter joint and several judgments against Defendants and in favor of Plaintiffs and the Classes;

(c)     Enjoin Defendants from continuing their unlawful market division agreement;

(d)     Grant Plaintiffs and the Classes equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

(e)     Award the Damages Class damages, and, where applicable, treble,

multiple, punitive, and other damages, in an amount to be determined at trial;

(f)     Award Plaintiffs and the Classes their costs of suit, including reasonable

attorneys' fees as provided by law; and

(g)     Award such further and additional relief as the case may require and the

Court may deem just and proper under the circumstances.

## XII.   JURY DEMAND

429.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf

of themselves and the proposed Classes, demand a trial by jury on all issues so triable.

Date: March 5, 2021

**THE BIFFERATO FIRM, P.A.**

By: */s/ Ian Connor Bifferato*

**OF COUNSEL:**

Gregory S. Asciolla
Karin E. Garvey
Domenico Minerva
Matthew J. Perez
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
kgarvey@labaton.com
dminerva@labaton.com
mperez@labaton.com

*Interim Lead Counsel for the Indirect*
*Purchaser Class and counsel for UFCW*
*Local 1500 Welfare Fund*

Brian P. Murray
Lee Albert
Gregory B. Linkh

Ian Connor Bifferato (Bar No. 3273)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

*Counsel for Teamsters Local 237 Welfare*
*Fund and Teamsters Local 237 Retirees'*
*Benefit Fund*

Todd A. Seaver
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: 415-433-3200
Facsimile: 415-433-6382
tseaver@bermantabacco.com

*Counsel for Teamsters Western Region &*
*Local 177 Health Care Plan*

Scott A. Martin
Irving Scher
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
ischer@hausfeld.com

Brent Landau
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
blandau@hausfeld.com

Melinda R. Coolidge
**HAUSFELD LLP**
1700 K Street, NW
Suite 650
Washington, DC 20006

Tel: (202) 540-7200
Fax: (202) 540-7201
mcoolidge@hausfeld.com

Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa
Adam J. Pessin
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
jistvan@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

*Additional Counsel*