**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION | C.A. No. 19-md-02895-LPS |
| THIS DOCUMENT RELATES TO: | C.A. No. 19-396-LPS |
| ALL DIRECT PURCHASER ACTIONS | C.A. No. 19-1460-LPS |
| ALL INDIRECT PURCHASER ACTIONS | C.A. No. 19-369-LPS |
| | C.A. No. 19-1461-LPS |
| | **REDACTED - PUBLIC VERSION** |

**PURCHASER PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
Tiffany J. Cramer (Del. Bar No. 4998)
2711 Centerville Road Suite 201
Wilmington, DE 19808
Tel: (302) 656-2500
rjk@chimicles.com
smt@chimicles.com
tjc@chimicles.com

**THE BIFFERATO FIRM, P.A.**
Ian Connor Bifferato (Del. Bar No. 3273)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

Dated: April 27, 2021

# TABLE OF CONTENTS

**Page**

I.      NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

II.     SUMMARY OF ARGUMENT ...................................................................................3

III.    STATEMENT OF FACTS .........................................................................................4

        A.      The economic landscape of brand and generic drugs. ............................................4

        B.      Amgen's billion-dollar Sensipar franchise and its generic challengers. ................4

        C.      Amgen sued and then settled with more than a dozen generic Sensipar ANDA
                filers, inserting into each settlement agreement "acceleration" and "grace"
                provisions. ............................................................................................5

        D.      Teva won a non-infringement judgment and received final approval from the
                FDA, then launched its generic Sensipar product at risk. .....................................8

        E.      Within days, Amgen and Teva came to an agreement that removed Teva from the
                market, allowed Teva to keep hundreds of millions from its days-long launch, and
                settled what was left of the infringement litigation. ............................................8

        F.      Other generics, tied up in legal battles over whether they too could enter or
                waiting on those results, did not launch until months after the Amgen-Teva
                agreement. ......................................................................................10

IV.     STANDARD OF REVIEW .....................................................................................12

V.      ARGUMENT .......................................................................................................12

        A.      The complaints allege that Amgen's overarching scheme to delay and impair
                generic competition to Sensipar violated Section 2 of the Sherman Act. .............13

                1.      The components of Amgen's monopolization scheme, including the use of
                        "acceleration" and "grace" provisions, must be viewed collectively. ........15

                        a.      The "acceleration" clauses were central to Amgen's
                                anticompetitive scheme because they deterred generics from
                                coming to market. ....................................................................16

                        b.      The "grace" provisions enabled Amgen to strike its allocation deal
                                with Teva, further delaying generic competition. .........................19

                2.      Amgen's scheme effectively delayed generic market entry for a year. ....21

        B.      The complaints allege that Amgen and Teva agreed to allocate the cinacalcet
                market in violation of Section 1 of the Sherman Act. ...........................................23

1.      Teva entered an actual agreement to allocate the market and fully understood and intended the anticompetitive consequences of doing so. .25

2.      The Supreme Court's decision in *Actavis* does not foreclose the plaintiffs' market allocation theory. ........................................................................26

3.      The Amgen-Teva agreement impaired other generics' market entry........27

4.      Hindsight cannot save an anticompetitive agreement, which is to be assessed at the time of, and in the context in which, it was made............30

C.      The complaints allege that the Amgen-Teva agreement contained an unlawful reverse payment in violation of Sherman Act § 1. .............................................30

1.      The amended complaints neither contradict the plaintiffs' prior pleadings nor upset the Court's finding of an actionable reverse payment..............31

2.      The defendants' repackaged arguments do not defeat the plaintiffs' well-pleaded allegations of an unlawful reverse payment from Amgen to Teva. ...............................................................................................................32

a.      Amgen made a large, unjustified payment to Teva. ....................33

b.      The Amgen-Teva agreement extended generic delay..................36

D.      The plaintiffs have standing to sue Teva...........................................................38

VI.     CONCLUSION ............................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Teva Pharm. USA, Inc.*,
    432 F. Supp. 2d 408 (D. Del. 2006) ................................................................. 15, 16

*In re Actos End Payor Antitrust Litigation*,
    No. 13-cv-9244, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) .................................... 18, 19

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
    521 F.2d 1230 (3d Cir. 1975) ......................................................................... 23

*Amgen Inc. v. Amneal Pharm., LLC*,
    328 F. Supp. 3d 373 (D. Del. 2018) ..................................................................... 8

*Amgen Inc. v. Amneal Pharm., LLC*,
    No. 16-cv-853, D.I. 439 (D. Del. Mar. 26, 2019) ......................................................... 9

*Amgen Inc. v. Amneal Pharm., LLC*,
    Nos. 2018-2414, 2019-1086 (Fed. Cir.) .................................................................. 8

*Apotex Inc. v. Cephalon Inc.*,
    255 F. Supp. 3d 604 (E.D. Pa. 2017) .................................................................... 30

*Bogosian v. Gulf Oil Co.*,
    561 F.2d 434 (3d Cir. 1977) ............................................................................ 40

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ....................................................................... 13, 14

*Cipla Ltd. v. Amgen Inc.*,
    386 F. Supp. 3d 386 (D. Del. 2019) ................................................................*passim*

*Connelly v. Lane Constr. Corp.*,
    809 F.3d 780 (3d Cir. 2016) ........................................................................... 12

*EMC Corp. v. Zerto, Inc.*,
    2014 WL 3809365 (D. Del. July 31, 2014) ................................................................ 21

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ...............................................................................*passim*

*FTC v. Cephalon, Inc.*,
    No. 08-2141 (E.D. Pa. Aug. 12, 2009) ................................................................... 16

*In re Gabapentin Patent Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ..................................................................... 15

*Great W. Mining & Min. Co. v. Fox Rothschild LLP*,
   615 F.3d 159 (3d Cir. 2010) ............................................................. 12

*In re High-Tech Emple. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............................................ 25

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
   846 F.3d 625 (3d Cir. 2017) ............................................................. 38

*In re Hypodermic Prods. Antitrust Litig.*,
   No. 05-cv-1602, 2007 WL 1959225 (D.N.J. June 29, 2007) .............. 12

*Impax Labs., Inc. v. Fed. Trade Comm'n*,
   2021 WL 1376984 (5th Cir. Apr. 13, 2021) ................................. 30, 37

*King Drug Co. of Florence v. SmithKline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015) ............................................................. 32

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ....................................................... 15, 28

*In re Lidoderm Antitrust Litig.*,
   14-md-02521, ECF No. 95 (N.D. Cal. Jul. 28, 2014) ....................... 30

*In re Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017) ....................................................... 34, 35

*In re Loestrin 24 Fe Antitrust Litig.*,
   433 F. Supp. 3d 274 (D.R.I. 2019) ............................................. 18, 36

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993) ........................................................... 29

*In re Magnesium Oxide Antitrust Litig.*,
   No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) .............. 26

*Marian Bank v. Elec. Payment Srvs. Inc.*,
   No. 95-cv-614, 1997 WL 367332 (D. Del. Feb. 5, 1997) .................. 40

*MidWest Underground Storage, Inc. v. Porter*,
   717 F.2d 493 (10th Cir. 1983) .......................................................... 24

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) ............................................................................. 23

*In re Neurontin Antitrust Litig.*,
   MDL No. 1479, 2009 WL 2751029 (D.N.J. Aug. 27, 2009) ......... 15, 16

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015) ................................................................ 30

*In re Nexium Esomeprazole Antitrust Litig.*,
 42 F. Supp. 3d 231 (D. Mass. 2014) ...................................................................34

*Staley v. Gilead Sciences*,
 446 F. Supp. 3d 578, 609-12 (N.D. Cal. 2020)...................................................17

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
 967 F.3d 264 (3d Cir. 2020) ...............................................................................15

*In re Sulfuric Acid Antitrust Litig.*,
 743 F. Supp. 2d 827 (N.D. Ill. 2010)...................................................................24

*U.S. Gypsum Co. v. Indiana Gas Co., Inc.*,
 350 F.3d 623 (7th Cir. 2003) ..............................................................................29

*U.S. v. Brown Univ.*,
 5 F.3d 658 (3d Cir. 1993) ...................................................................................25

*United States v. Blue Cross Blue Shield*,
 809 F. Supp. 2d 665 (E.D. Mich. 2011) .............................................................19

*United States v. Delta Dental*,
 943 F. Supp. 172 (D.R.I. 1996)...........................................................................19

*United States v. Grinnell Corp.*,
 384 U.S. 563 (1966) ............................................................................................13

*United States v. Topco Assoc., Inc.*,
 405 U.S. 596 (1972) ............................................................................................23

*Valley Drug Co. v. Geneva Pharm., Inc.*,
 344 F.3d 1294 (11th Cir. 2003)...........................................................................30

*W. Penn Allegheny Health Sys. v. UPMC*,
 627 F.3d 85 (3d Cir. 2010) ...........................................................................12, 37

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
 198 F. Supp. 3d 366 (D. Del. 2016) .....................................................................9

*In re Wellbutrin XL Antitrust Litig.*,
 868 F.3d 132 (3d Cir. 2017) ..........................................................................21, 38

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*,
 588 F.2d 221 (7th Cir. 1978) ...............................................................................23

**Statutes**

15 U.S.C. §§ 1, 2..................................................................................*passim*

21 U.S.C. § 355(j)(2)......................................................................................34

21 U.S.C. § 355(j)(5)................................................................................34

Cal. Health & Safety Code § 134002(d) ...................................................38

**Rules**

Fed. R. Civ. P. 12(b)(6).........................................................................3, 34

**Other Authorities**

Fiona Scott Morton, *Entry Decisions in the Generic Pharmaceutical Industry*, RAND Journal of Economics 30(3) (Autumn 1999) ............................6

Herbert Hovenkamp, *Sensible Antitrust Rules for Pharmaceutical Competition*, 39 U.S.F.L. REV. 11 (2004) ...........................................................................27

Keith M. Drake and Thomas G. McGuire, *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, JOURNAL OF COMPETITION LAW AND ECONOMICS, 16(2) (May 11, 2020) .............................................28

Mark S. Levy, *Big Pharma Monopoly: Why Consumers Keep Landing on "Park Place" and How the Game Is Rigged*, 66 AM. U. L. REV. 247, 295 (2016) .........................29

Michael A. Carrier, *Payment After Actavis*, 100 IOWA L. REV. 7, 38 (2014) .............................16

*Protecting Consumer Access to Generic Drugs Act of 2009: Hearing on H.R. 1706 Before the Subcomm. on Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 111th Cong. 218 (2009) (statement of Bernard Sherman, CEO, Apotex, Inc.)...................................................17

Steven C. Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 ANTITRUST 15 (2013) ...................................19

I.      NATURE AND STAGE OF THE PROCEEDINGS

These consolidated civil antitrust class actions are brought on behalf of direct purchaser and indirect purchaser (end-payor) classes[1] seeking damages arising out of (a) an unlawful monopolistic scheme by Amgen to impair generic competition and thereby maintain supra-competitive pricing of branded and generic cinacalcet hydrochloride tablets (brand named, Sensipar®) and (b) an unlawful agreement in restraint of trade by Amgen and Teva that further impaired generic competition and effectuated supra-competitive pricing in the market for cinacalcet hydrochloride tablets.

Last November, this Court sustained in part and overruled in part (D.I. 177)[2] Magistrate Judge Hall's Report and Recommendation (D.I. 157) on defendants Amgen's and Teva's[3] motions to dismiss these consolidated direct purchaser and end-payor class actions. The Court found that the class plaintiffs sufficiently alleged that Amgen and Teva entered into an agreement containing an unlawful reverse payment in violation Section 1 of the Sherman Act.[4] Under that agreement, Teva agreed to exit the Sensipar market only days after it had launched significant generic product into the marketplace and to stay out until mid-2021. In exchange, Amgen made a large and unjustified payment to Teva in the form of (a) waiving objection to

---

[1] The direct purchaser class plaintiffs are César Castillo, LLC and KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc., on behalf of themselves and all others similarly situated. The end-payor class plaintiffs are UFCW Local Welfare Fund, Teamsters Local 237 Welfare Fund, Teamsters Local 237 Retirees' Benefit Fund, and Teamsters Western Region & Local 177 Health Care Plan, on behalf of themselves and all others similarly situated. Collectively, the direct purchaser and end-payor class plaintiffs are referred to herein as the "class plaintiffs."

[2] Unless otherwise noted, "D.I." references are to those entered in *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 19-md-02895-LPS (D. Del.).

[3] "Amgen" refers to Amgen Inc. "Teva" refers collectively to Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., and Actavis Pharma, Inc.

[4] The Court held that the alleged unlawful reverse payment is governed by the rule of reason under the Supreme Court's decision in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). D.I. 177 at 7-8.

Teva's retention of more than $350 million in revenues from Teva's at-risk launch and (b) an "acceleration" clause to Teva, permitting it "to reenter the market with its ANDA product earlier than the otherwise agreed-to reentry date upon market entry by another generic competitor." D.I. 177 at 9-12. The Court also found that the class plaintiffs sufficiently alleged that Amgen secured Teva's exit from the market until mid-2021 "for the purpose and effect of raising and maintaining the supra-competitive prices Plaintiffs would have to pay for Sensipar" in violation of Section 2 of the Sherman Act. D.I. 177 at 12.

The Court dismissed, without prejudice, the class plaintiffs' theory that Amgen's use of "acceleration" clauses in its agreements with more than a dozen other generic Sensipar ANDA filers—including Teva—constituted an unlawful market allocation. According to the Court, the "market allocation theory *as pled* contain[ed] insufficient specificity to survive the motions to dismiss."[5] In particular, the Court found it implausible that the Amgen-Teva agreement's acceleration clause actually delayed other generic Sensipar manufacturers from coming to market because several did, in fact, later launch, and because ANDA filers "understand the nature of competition in the pharmaceutical marketplace." D.I. 177 at 15-16.

As permitted by the Court, the class plaintiffs filed their respective amended complaints on February 23, 2021,[6] adding specificity to their overarching scheme and market allocation allegations and clarifying that it was the post-hoc *delay* to other generics' launches (not failure to

---

[5] D.I. 177 at 14-15 (emphases in original). Amgen argues that the plaintiffs were not granted leave to replead their monopolization claims based on the acceleration clauses. D.I. 212 ("Amgen Br.") at 18. But the Court's dismissal was *without* prejudice; by definition, the order does not preclude re-pleading. And the Court's statement that "*as pled*" the market allocation theory needed more specificity to survive a motion to dismiss, indicates that revision of the allegations might satisfy the Court's reservations, which we have now attempted to do.

[6] *See* Second Amended Consolidated Direct Purchaser Class Action Complaint ("DPC"), D.I. 197; Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint ("EPC."), D.I. 202. The plaintiffs principally reference the DPC herein. Attached as Exhibit 1 is a table that includes additional, comparable EPC references.

launch) that impaired competition and injured the plaintiffs.[7] The defendants have moved to dismiss under Rule 12(b)(6). Again, we oppose.[8]

## II.      SUMMARY OF ARGUMENT

The plaintiffs allege (a) an overarching monopolistic scheme by Amgen in violation of Section 2 of the Sherman Act and corresponding state laws, and (b) an unlawful agreement in restraint of trade by Amgen and Teva in violation of Section 1 of the Sherman Act and corresponding state laws. The motions to dismiss should be denied in full for the following reasons:

1.      The plaintiffs plausibly allege an overarching anticompetitive scheme by Amgen to delay competition in the cinacalcet market, in violation of Sherman Act § 2. Viewed holistically, as is required, the scheme was designed to and did impair generic competition for over a year, resulting in hundreds of millions of dollars in overcharges to the plaintiffs.

2.      The plaintiffs plausibly allege that Amgen and Teva entered into an agreement that unreasonably restrained trade in violation of Section 1 of the Sherman Act, as the Court previously held. This agreement gives rise to claims under two theories of liability: (a) unlawful allocation of the cinacalcet market and (b) an unlawful reverse payment under the Supreme Court's decision in *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 145 (2013).

3.      The plaintiffs have Article III and antitrust standing to assert these Sherman Act claims against Teva (Amgen does not challenge standing). The plaintiffs allege they were injured by paying and/or reimbursing more for branded and generic Sensipar than they would have absent the overarching scheme and the Amgen-Teva agreement. No more is required.

---

[7] The direct purchaser plaintiffs also added a claim against Amgen under Section 2 of the Sherman Act for attempted monopolization.

[8] The end-payors respond separately to Amgen's motion directed to the EPC, D.I. 209, 210.

### III.    STATEMENT OF FACTS

**A.    The economic landscape of brand and generic drugs.**

Before generic entry, brand drug manufacturers enjoy monopoly-level pricing and profits for their drugs. DPC ¶ 31. When the first generic competitor enters its prices are typically 10-20% lower than the brand's, and the discount increases dramatically as more generics enter the market, often by 80% or more. DPC ¶ 44. These dynamics encourage generics to come to market as soon as possible, as the first to launch a generic product stands to make the most money. In a genericized market, purchasers pay lower prices. DPC ¶¶ 44-52.

**B.    Amgen's billion-dollar Sensipar franchise and its generic challengers.**

Amgen has sold cinacalcet under the brand name "Sensipar" since the drug received FDA approval in 2004. DPC ¶¶ 71-72. Sensipar was very profitable and by 2015 had revenues over $1 billion per year. DPC ¶ 85.

By the summer of 2017, market conditions created the real prospect of a race by some generic makers to be first to market generic Sensipar as early as the spring of 2018. Amgen's primary Sensipar patent (the '068 patent) would expire March 8, 2018; Amgen's remaining relevant patent (the '405 patent) only claimed a highly specific way to formulate a cinacalcet product.[9] DPC ¶¶ 77-82. By mid-2017, more than 20 generic companies had submitted ANDAs seeking to market generic Sensipar before the '405 patent expired, each certifying that the '405 patent was invalid as obvious, unenforceable, or not infringed by their proposed generics. DPC

---

[9] The '405 patent can be "designed around" since generic competitors can make a bioequivalent product without infringing the patent. While Amgen had one other patent—the '595 patent (a formulation patent reciting claims that were similar to, but even narrower than, the '405 patent's claims), Amgen has never asserted the '595 patent. DPC ¶ 75-76. The '595 patent is therefore irrelevant.

¶¶ 84, 86-87.[10] While the ANDA filers were differently situated (depending on the extent to which each had done the work to design around the '405 patent), some had clearly avoided infringement of the '405 patent in the design of their product. DPC ¶¶ 54, 163. No generic maker had a right the 180-day exclusivity;[11] as a result, any company could launch upon FDA final approval and those with non-infringing formulations would face little at-risk exposure. DPC ¶ 84. FDA had already begun, in October 2015, tentatively approving Sensipar ANDAs. DPC ¶¶ 95-98.[12]

In sum, Amgen faced a generic field where some patent challengers were in a race to be first to market generic cinacalcet following the March 2018 expiry of the '068 patent. Doing so, and being alone in the market for even a short time, would reward the non-infringing generic company with a period of lucrative *de facto* generic exclusivity. Other non-infringing companies would also seek final FDA approval and entry as soon as practicable thereafter. The market for Sensipar and its generic equivalents would become fully genericized in 2018. Amgen would lose its billion dollar a year franchise. DPC ¶ 36.

## C.  Amgen sued and then settled with more than a dozen generic Sensipar ANDA filers, inserting into each settlement agreement "acceleration" and "grace" provisions.

In response, Amgen sought to arrest generic competition by removing the possibility for that *de facto* exclusivity by disincentivizing the well-positioned generics from mounting

---

[10] In September-October 2016, Amgen filed 14 Hatch-Waxman lawsuits alleging infringement of the '405 patent by generic company defendants. DPC ¶ 89. In June 2017, Amgen filed four more. DPC ¶ 93.

[11] Amgen prevailed in a 2009 challenge to the '068 patent's validity, which stripped any ANDA filer of first-to-file exclusivity.

[12] The FDA grants tentative approval to an ANDA if the ANDA is ready for approval before the expiration of any patents or exclusivities accorded to the reference listed (brand) drug product. The FDA delays final approval of the generic product until all patent or exclusivities issues have been resolved. A tentative approval does not allow the applicant to market the generic drug. https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms.

vigorous challenges to the '405 patent or launching at risk[13] So, Amgen designed a scheme to disincentivize the *bona fide* Sensipar challengers from seeking *de facto* exclusivity. Amgen did so through what it now calls its patent "settlement strategy." Amgen Br. at 11.

In the fall of 2017—and with expiration of the '068 patent only months away and three ANDAs already tentatively approved by the FDA—Amgen implemented a patent settlement strategy that was designed to reduce, and had the effect of reducing, market incentives for an early generic launch. DPC ¶¶ 99-100.

Amgen first settled with those generic companies whose patent challenges had *the lowest chances* of succeeding. Although in this first wave Amgen settled with the weakest ANDA filers (i.e., those who posed no credible threat to Amgen's patent or of launching at risk), Amgen insisted that the agreements include a right that these generics could advance their market entry right upon entry by another company's at-risk entry. DPC ¶¶ 5, 100, 143.[14] The use of the ostensible "acceleration" clause would threaten to reduce or eliminate the benefits of a generic seeking early, de facto exclusivity. Amgen then used the first wave settlements as leverage against another group of patent challengers with which it settled in the next wave. DPC ¶ 151.[15] Amgen repeated the pattern with a third[16] and finally a fourth wave of generic rivals.[17]

---

[13] Fiona Scott Morton, *Entry Decisions in the Generic Pharmaceutical Industry*, RAND Journal of Economics 30(3), 421, 422 (Autumn 1999) ("The generic pharmaceutical entry decision is complex because evidence suggests that payoffs depend on the number of firms in a market, which affects the margin and quantity per firm. The profits of an entrant therefore depend on others' entry decisions."). Thus each potential competitor's decision to enter or not enter (i.e., compete or not compete) would be, and was, based in substantial part on competitive intelligence and calculations regarding what was in other potential competitors' interests and what others would do.

[14] The first wave of settlements included those with Breckenridge, Hetero, Sun, and Ajanta. DPC ¶¶ 109-117.

[15] The second wave settlements were with Cipla and Mylan. DPC ¶¶ 124-127.

[16] The third wave settlements were with Dr. Reddy's and Strides. DPC ¶¶ 135-136.

[17] The fourth wave settlements were with Aurobindo, Alkem, Emcure, Lupin, Macleods, Torrent, and Unichem. DPC ¶¶ 139-146.

In each agreement, Amgen drafted largely identical terms, including the "acceleration" and "grace period" clauses. DPC ¶¶ 5, 8, 143. The only material term that varied was the agreed-upon date of the various generics' market entry. DPC ¶ 11. The entry terms for the later waves were as follows: the second wave companies would be permitted to launch three months before the '405 patent expired. DPC ¶¶ 125, 127. The third wave, those with much stronger-positioned generics, would be able to launch four *years* before the '405 patent expired. DPC ¶¶ 135-36. And the strongest generics, those in the last wave, would be permitted to launch in June 2021, five years before the '405 patent's expiry. DPC ¶¶ 139-42, 144-46.

At Amgen's insistence, each agreement included a poison pill "acceleration" clause, which permitted the settling generic to come to market should another generic launch at risk—but also included a 10-day "grace period" in which Amgen could either move to enjoin or cut a quick deal with the at-risk launcher. DPC ¶¶ 5-10, 61, 100-03, 143. If Amgen did neither, the settling generics would be permitted to launch upon expiration of the grace period. DPC ¶ 103. These provisions served as powerful disincentives to any other generic considering an early at-risk launch because the resulting avalanche of accelerated launches would prevent any one company from enjoying a dominant market position or the resulting supra-competitive profits. DPC ¶¶ 59-60, 92-93, 102, 107, 150-51, 157, 160, 202, 206, 283-84. Thus, the provisions ensured that if any generic launched at risk and was still on the market 10 days later, all the other approved generics could launch without penalty, which would effectively splinter the market and cause a precipitous drop in all manufacturers' prices. DPC ¶¶ 59-60, 107, 151, 160. To induce any at-risk launcher to stop selling its generic product during the "grace period," Amgen would split its profits with that company. DPC ¶¶ 10, 12, 108. The practical effect of the agreements, and importantly the relationships *between* the agreements, was that each settling defendant would stay out of the cinacalcet market for an extended period. DPC ¶ 159.

On March 8, 2018, the day that the primary patent expired, the FDA gave final approval to Cipla's and Aurobindo's ANDAs. DPC ¶¶ 137-38. But for Amgen's anticompetitive scheme, they both would have launched immediately. DPC ¶ 178.

**D.     Teva won a non-infringement judgment and received final approval from the FDA, then launched its generic Sensipar product at risk.**

Some ANDA filers did not settle. In July 2018, following a bench trial, Judge Goldberg ruled that the Teva/Watson ANDA product,[18] as well as those of Amneal and Piramal, *did not infringe* the '405 patent. DPC ¶ 168.[19] A few weeks later, the court entered final judgment of non-infringement for all three. DPC ¶ 174. Amgen appealed to the Federal Circuit. DPC ¶ 177.[20]

On December 27, 2018, the FDA gave final approval to Teva's ANDA. DPC ¶ 183. Teva launched the next day. DPC ¶ 184. In late December 2018, Teva dumped a huge quantity of cinacalcet into the market in a matter of days, generating over $393 million in revenues. DPC ¶¶ 184, 187. Amgen had previously advised the patent court that it expected to lose up to ███ of its market share in the first month of generic competition. DPC ¶ 188.[21] Amgen in fact lost millions in sales of brand Sensipar to competition from Teva's generic. *Id.*

**E.     Within days, Amgen and Teva came to an agreement that removed Teva from the market, allowed Teva to keep hundreds of millions from its days-long launch, and settled what was left of the infringement litigation.**

As Amgen and Teva both expected and intended, the two came quickly to the table to take advantage of the "grace" periods in the earlier settlements and make a deal that would prevent other generics from launching under their respective "acceleration" provisions. DPC ¶

---

[18] Watson filed its ANDA, No. 204377, in 2008. Watson was subsequently acquired by Teva. The owner of ANDA 204377 is referred to as "Teva" in the remainder of this brief.

[19] *Amgen Inc. v. Amneal Pharm.*, *LLC*, 328 F. Supp. 3d 373, 386, 391, 396 (D. Del. 2018).

[20] *See Amgen Inc. v. Amneal Pharm., LLC*, Nos. 2018-2414, 2019-1086 (Fed. Cir.).

[21] *See also* DPC ¶ 259 (quoting declaration of Christos Georghiou, submitted by Amgen in the *Cipla* preliminary injunction proceeding).

198. On January 2, 2019, a week after Teva's launch, Amgen and Teva inked an agreement intended to avoid triggering the "acceleration" clauses and avoid full generic competition. DPC ¶¶ 189-91. Under its terms, Teva could leave all its generic product in the field, and Teva's customers could continue to resell Teva's product. DPC ¶ 190. Teva agreed to not directly sell any more generic Sensipar until mid-2021, allocating its share of the market back to Amgen. DPC ¶ 190. For its part, Amgen agreed that Teva could keep 90% of the nearly $400 million it made from its brief launch and agreed to an "acceleration" provision permitting Teva to re-enter if another generic company launched at risk. DPC ¶¶ 187, 190, 312.

By allowing Teva's product to remain in the market and ceding to Teva the enormous profits Teva realized from its limited launch, Amgen and Teva allocated the cinacalcet market. DPC ¶ 191. Amgen and Teva also agreed to seek the district court's approval of a consent judgment stating that Teva *had* in fact infringed the '405 patent—directly contradicting the non-infringement ruling Teva had previously won.[22] DPC ¶¶ 192-93. The court denied the motion, noting that the request was "solely based on [the defendants'] settlement agreement" and that there was "no other basis whatsoever which would amount to exceptional circumstances permitting . . . vacatur." DPC ¶ 196.[23]

Teva immediately ceased directly selling its generic product; it agreed to pay Amgen up to $40 million, a small fraction of the hundreds of millions Teva made launching at risk and a small fraction of its potential liability; and Teva was not required to remove any of its product

---

[22] If upheld on appeal, the non-infringement decision would have been worth far more than $393 million to Teva. "A patentee may recover lost profits caused by a defendant's infringement." *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 198 F. Supp. 3d 366, 374 (D. Del. 2016). Amgen's lost profits well exceeded Teva's revenue from its less expensive product.

[23] *Amgen Inc. v. Amneal Pharm., LLC*, No. 16-cv-853, D.I. 439 (D. Del. Mar. 26, 2019).

from the market, keeping revenues of more than $350 million. DPC ¶¶ 190-97. During the *Cipla*

litigation, Teva's former VP of Sales described the agreement as follows:



[24]

### F. Other generics, tied up in legal battles over whether they too could enter or waiting on those results, did not launch until months after the Amgen-Teva agreement.

Because the deal was done within the time prescribed by the "grace" provisions

following Teva's launch, Amgen argued that the "acceleration" clauses were not triggered and

Teva's limited quantity product remained the only competitor to brand Sensipar in the following

months. DPC ¶¶ 184, 190. The Amgen-Teva agreement enabled Amgen to drag out arguments

with other generics about their ability under the "acceleration" clauses to exercise those rights.

The Amgen-Teva agreement thus extended the delay to generic competition already

achieved by means of the "acceleration" clauses and their strategic implementation. DPC ¶ 209.

Days after Amgen and Teva finalized their agreement, Cipla sued Amgen (and later Teva)

seeking a declaratory judgment that, under Cipla's settlement with Amgen, Cipla could now

come to market with its own generic version of Sensipar. DPC ¶ 210. Cipla's suit also claimed

violations of antitrust law and patent misuse, alleging that "[b]y entering into the Amgen-Teva

Agreement, Amgen misused the '405 Patent to exclude competition in the sale of pharmaceutical

products that did not embody the claimed invention of the '405 Patent." DPC ¶¶ 210-11, 213.

---

[24] EPC ¶ 188 (Decl. of Robert G. Cunard at 5, *Cipla Ltd. v. Amgen, Inc.*, No. 19-cv-44 (LPS), ECF No. 75, ¶ 20 (D. Del. Feb. 25, 2019)).

Mylan, another generic that Amgen had previously settled with (and whose settlement agreement also included acceleration clause and grace period), notified the *Cipla* court that Mylan had also "suffered injury as a result of conduct by Amgen." DPC ¶ 212.

Cipla and Piramal (with its partner, Slate Run) did not launch their cinacalcet products until March 6, 2019. DPC ¶ 214. Amgen moved to enjoin the launches;[25] Cipla opposed, noting its "unique" opportunity to seize a major part of the cinacalcet market. DPC ¶¶ 216-18. Cipla subsequently confirmed that "although Cipla is on the market . . . Cipla is not selling in anything like the volume it would sell if it did not have this threat hanging over it"—*i.e.*, the threat of Amgen seeking damages based on its position that the "acceleration" clause had not been triggered. DPC ¶ 220. Generic competition was not merely delayed, it was also impaired.

On May 2, 2019, the Court denied Amgen's request for a preliminary injunction against Cipla based on ambiguity in the Cipla-Amgen settlement with respect to whether Teva's indirect sales of generic cinacalcet triggered Cipla's acceleration clause. DPC ¶ 223.[26] The Court observed that any money Teva paid back to Amgen was "depend[ent] (in part) on how long the cinacalcet market remains free of non-Amgen and non-Teva generic products." DPC ¶¶ 223, 224.[27] The next day, at least one generic manufacturer notified Amgen of its intent to launch at risk given the Court's ruling. DPC ¶ 227. Mylan launched in late May 2019 (DPC ¶ 228), joined

---

[25] On March 19, 2019, Amgen filed an emergency motion for an injunction pending Amgen's Federal Circuit appeal. On April 15, 2019, Piramal and Amgen stipulated to an injunction pending the appeal, with Amgen agreeing to post an appeal bond of nearly $40 million. DPC ¶¶ 217, 222. After the Federal Circuit upheld Judge Goldberg's non-infringement ruling as to Piramal in January 2020, Piramal and Slate Run resumed their cinacalcet launch and have since sought to recover damages against Amgen arising from the injunction. DPC ¶¶ 234, 240.

[26] Another generic, Sun Pharmaceutical, later moved to enforce its settlement with Amgen and come to market, claiming that its "acceleration" clause was triggered. The district court (Judge Goldberg) held the "acceleration" clause was not triggered, precluding Sun's entry. DPC ¶ 233.

[27] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 391 (D. Del. 2019), *aff'd*, 778 F. App'x 135 (3d Cir. 2019).

in July by several additional generics. DPC ¶¶ 229-32. One more launched in October 2020.
DPC ¶ 243. Absent the allocation agreement, the cinacalcet market could have been genericized
with lower-cost generics within weeks of Teva's launch, if not earlier. DPC ¶¶ 178-82.

## IV.    STANDARD OF REVIEW

To survive a motion to dismiss, a complaint need only contain "enough factual matter
(taken as true) to suggest . . . . that discovery will reveal evidence" of the conduct averred.[28]
"[T]he Third Circuit has explained that antitrust complaints, in particular, should be liberally
construed."[29] Thus, "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite
in antitrust and other complex cases."[30] All inferences must be resolved in the plaintiffs' favor.[31]

## V.    ARGUMENT

The plaintiffs plausibly allege three distinct theories of liability.

*First*, Amgen orchestrated an overarching anticompetitive scheme, consisting of (a)
inserting poison pill "acceleration" clauses into settlement agreements with Sensipar ANDA
filers to disincentivize other generics from launching at-risk and gaining de facto exclusivity, and
(b) inserting "grace" provisions into those agreements to enable it, in the event a subsequent
generic did launch at-risk, Amgen could quickly allocate the market with that generic and
thereby prevent triggering the "acceleration" provisions. And Amgen operationalized its "grace"
period scheme by striking a quick (also grossly anticompetitive) deal with Teva, following
Teva's cinacalcet launch, to remove Teva from the market and maintain Amgen's monopoly.
This conduct violated Sherman Act § 2.

---

[28] *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (citations omitted).

[29] *In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602, 2007 WL 1959225 at *6 (D.N.J. June 29, 2007).

[30] *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

[31] *See, e.g., Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 n.2 (3d Cir. 2016).

*Second*, after Teva received a non-infringement ruling and launched (becoming a horizontal competitor to Amgen), Amgen and Teva entered a market allocation agreement in violation of Sherman Act §1.

*Third*, as this Court already held, in connection with the allocation agreement, Amgen made a large, unjustified payment to Teva in the form of Teva's retention of hundreds of millions in at-risk profits and in granting Teva's own "acceleration" clause. This, too, violated Sherman Act § 1.

**A.**   **The complaints allege that Amgen's overarching scheme to delay and impair generic competition to Sensipar violated Section 2 of the Sherman Act.**

To state a claim for monopolization under Section 2, the plaintiffs must allege "(1) the possession of monopoly power in the relevant market," which Amgen does not dispute, and "(2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[32] The Third Circuit instructs that this element requires only "some anticompetitive conduct on the part of the possessor," which is "generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."[33] Thus, "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive."[34]

---

[32] *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *Grinnell*).

[33] *Broadcom*, 501 F.3d at 308 (citations omitted).

[34] *Id.*

The plaintiffs plausibly allege that in attempting to maintain,[35] and in actually maintaining, its monopoly power, Amgen engaged in a multi-faceted scheme to delay and impair generic Sensipar market competition.

That scheme included the strategic settlement of patent litigation, starting with the weakest patent challengers, and deliberate injection into those agreements of "acceleration" clauses designed to deter *bona fide* competitors from coming to market under threat of immediate and overwhelming additional generic competition. DPC ¶¶ 4-7, 100-02, 143, 147-60, 283-84, 292-93. The scheme also included Amgen's injection of "grace" provisions into the dozen-plus agreements with generics, giving it the opportunity to quickly pay off any generic that decided to launch (with little risk given the weakness of the '405 patent) despite the economic disincentives to do so created by the "acceleration" clauses. DPC ¶¶ 8-9, 147-60, 285-86, 294-95. The scheme reached its penultimate stage in late December 2018 when Teva—fresh with a judgment of non-infringement, and well aware of the terms of Amgen's deals with other generics as well as Amgen's economic interests in preserving its monopoly—dumped a huge volume of cinacalcet into the market at once. DPC ¶¶ 184, 187. The scheme culminated when Amgen and Teva, now a co-conspirator, jointly leveraged the "grace" provisions in earlier agreements and struck a deal that required Teva to cease its output and allocate the entire Sensipar market back to Amgen. DPC ¶¶ 189, 190. In exchange, Teva got to keep all but a small fraction of the profits from its brief launch which, despite Teva's non-infringement judgment, was more than Teva ever could have earned in an undistorted market. DPC ¶¶ 190-91. The

---

[35] Although the direct purchaser plaintiffs plead a claim for attempted monopolization, the defendants do not challenge any of the attempt elements beyond arguing that they have not behaved anticompetitively. The direct purchasers have adequately alleged that Amgen "has engaged in predatory or anticompetitive conduct with [] a specific intent to monopolize and [] a dangerous probability of achieving monopoly power.'" *Id.* at 317 (quoting *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998)).

agreement was designed to hinder other generics' market entry. DPC ¶¶ 202-03. And indeed, both Amgen and Teva made far more money under the structure of their deal the longer other generics stayed off the market—Teva because, if others had launched, shelf-stock adjustments and full-credit return provisions in Teva's customer contracts would have eviscerated its profits and revenues from its abbreviated launch (which would need to be returned to customers if lower-priced generics launched at the end the 10-day grace period), and Amgen because additional generic sales would have quickly put an end to its blockbuster sales. DPC ¶¶ 107-08, 197-200, 217, 224.

As a result of the defendants' anticompetitive acts, not until months after their agreement did other generics—mired in legal proceedings or waiting by to see the results—started trickling into the market in limited quantities; competition was thus impaired. DPC ¶¶ 214-220, 228-32, 243.[36] These allegations suffice.

### 1. The components of Amgen's monopolization scheme, including the use of "acceleration" and "grace" provisions, must be viewed collectively.

In assessing overarching monopolistic schemes, the Third Circuit requires that courts "look at 'all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly.'"[37] This is so even absent allegations that each of the scheme's

---

[36] *In re Neurontin Antitrust Litig.,* MDL No. 1479, 2009 WL 2751029 at *16 (D.N.J. Aug. 27, 2009); *see also* DPC ¶¶ 12-13, 16-17, 153, 158, 161, 203, 248, 276, 307, 319.

[37] *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* 967 F.3d 264, 270 (3d Cir. 2020). *See also LePage's Inc. v. 3M,* 324 F.3d 141, 162 (3d Cir. 2003) ("[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."); *In re Gabapentin Patent Litig.,* 649 F. Supp. 2d 340, 359 (D.N.J. 2009) ("If a plaintiff can allege that a series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions, as an overall scheme, may trigger antitrust liability."); *Abbott Labs. v. Teva Pharm. USA, Inc.,* 432 F. Supp. 2d 408, 428 (D. Del. 2006) (Jordan, J.) ("Plaintiffs are entitled to claim that individual acts are antitrust violations, as well as claiming that those acts as a group have an anticompetitive effect even if the acts taken separately do not.").

predicate actions independently violated the antitrust laws.[38] But Amgen focuses its attack on the plaintiffs' monopolization claims on their individual components.[39]

> **a.   The "acceleration" clauses were central to Amgen's anticompetitive scheme because they deterred generics from coming to market.**

Amgen argues that "acceleration" clauses cannot be anticompetitive as a matter of law since they "allow even earlier entry than would otherwise be permitted" and "ke[ep] the settling generics on a relatively equal playing field." Amgen Br. at 19-20. Even if the "acceleration" clauses could be treated independently, Amgen's legal argument has been rejected by courts, the FTC, legal scholars, and industry professionals that know the effects of such clauses first-hand.

Despite the moniker, "acceleration" clauses often have the opposite effect and instead delay generic competition. DPC ¶¶ 59-60. As the FTC has explained, "the effect of [an acceleration] clause [is] to make it less attractive for each successive generic company to continue to litigate or enter at risk because [the acceleration] clause would automatically permit each generic company that had settled to compete without any risk with any non-settling generic company."[40] Legal scholars and industry leaders echo this understanding, noting that "acceleration" clauses can delay generic entry and raise prices because they "reduce[] the incentive" of other generic manufacturers to continue challenging the patent.[41]

Pharmaceutical companies understand the effects of these "acceleration" clauses denounce them as anticompetitive. The former Chairman and CEO of Apotex, Inc.—one of the

---

[38] *Abbott Labs.*, 432 F. Supp. 2d at 428; *see also In re Neurontin Antitrust Litig.*, 2009 WL 2751029 at *14-16.

[39] *See* Amgen Br. at 18 (arguing "acceleration" clauses were "ordinary and routine").

[40] *FTC v. Cephalon, Inc*., No. 08-2141, ECF No. 40 at 16 (E.D. Pa. Aug. 12, 2009).

[41] Michael A. Carrier, *Payment After Actavis*, 100 Iowa L. Rev. 7, 38 (2014) ("[P]oison-pill clauses provide a type of consideration that the generic could never obtain as a result of winning a district court ruling that the patent is invalid or not infringed. Such provisions allow settling generics to enjoy exclusivity even after agreeing to late entry dates that occur long after a subsequent generic wins in litigation.").

largest generic manufacturers in the world—testified before Congress that acceleration clauses represent "the primary anticompetitive aspects of settlements" because they "eliminate any incentive for a subsequent filer to continue to litigate for earlier market entry."[42] Although such clauses may appear, "[a]t first blush," to be advantageous to purchasers by potentially expediting the settling generic's entry, this benefit is illusory:

> [N]o subsequent filer is going to take up the patent fight knowing it will get nothing if it wins. Consumers are the biggest losers under this system. If subsequent filers do not have the incentive to take on the cost of multimillion dollar patent challenges these challenges will not occur. Weak patents that should be knocked out will remain in place, unduly blocking consumer access to generics. The challenges to brand patents by generic companies that Hatch-Waxman was designed to generate will decrease. And settlements that delay consumer access to the generic will, in turn, increase.[43]

Because of the perverse market effects of "acceleration" clauses, courts recognize that their use in patent infringement settlements may support claims under the Sherman Act. *Staley v. Gilead Sciences*, for example, recently held that "acceleration" clauses may give rise to claims under Sections 1 and 2.[44] There, as here, the plaintiff alleged that Teva received an "acceleration clause" as part of a brand company's payment for abandoning a patent challenge.[45] And as here, the defendants insisted that such "acceleration" clauses are necessarily procompetitive. The court disagreed, explaining that "*Actavis* does not hold that an early entry date (relative to the patent

---

[42] DPC ¶ 60. *Protecting Consumer Access to Generic Drugs Act of 2009: Hearing on H.R. 1706 Before the Subcomm. on Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 111th Cong. 218 (2009) (statement of Bernard Sherman, CEO, Apotex, Inc.), https://archive.org/stream/gov.gpo.fdsys.CHRG-110hhrg38992.

[43] DPC ¶ 60.

[44] 446 F. Supp. 3d 578, 609-12 (N.D. Cal. 2020).

[45] There, Teva also received a most-favored entry plus provision, under which it was promised a period of exclusivity if no one launched at risk before it. *Id.* at 612. Notwithstanding this provision, which attempted to resurrect the first-to-file exclusivity that Teva had previously forfeited, the court nonetheless observed that even if an "acceleration" clause were the only anticompetitive device, it still might support the plaintiff's antitrust claims. *Id.*

expiration date) is *automatically* procompetitive."[46] Rather, the court said, a settlement may be anticompetitive even in the absence of a reverse payment "if there were other circumstances that posed potential anti-competitive concern."[47] These other "indicators of anti-competitiveness" included the fact that—as in the first deals Amgen struck with generic Sensipar competitors—the licensed entry date was "close in time to the patent expiration dates (in one case only six weeks before the patent expiration date[)]. . . .[48] Such conditions, the court observed, "give[] rise to a concern that Teva was induced to accept a late entry date (*i.e.,* giving up the right to pursue its challenge to the patent and earlier entry) in return for a significant benefit—even if that benefit did not come at [the brand manufacturer's] expense," and it was evidence of an illegal reverse payment and monopolization in violation of Section 2.[49]

Likewise, in *Loestrin 24 Fe Antitrust Litigation*, the purchaser plaintiffs alleged that an analogous acceleration clause "very substantially diminished, if not altogether eliminated, the incentive for later generic filers to enter before [the delayed entry date]."[50] The *Loestrin* court found that the acceleration clause could be considered "a component in the greater calculus" of both the reverse payment and the overarching scheme there alleged and that plaintiffs had "plausibly alleged that the acceleration clause had anticompetitive effects."[51]

Amgen cites *In re Actos End Payor Antitrust Litigation*,[52] claiming *Actos* holds the effects of the "acceleration" clauses cannot be anticompetitive as a matter of law. Amgen Br. at

---

[46] *Id*. at 610 (emphasis in original).

[47] *Id*. at 611.

[48] *Id.* at 612. In this case, the entry dates given by Amgen to the first wave of settling generics were likewise just six weeks before patent expiry.

[49] *Id.*

[50] 261 F. Supp. 3d 307, 333 (D.R.I. 2017) (quoting purchasers' complaint).

[51] *Id.* at 334.

[52] No. 13-cv-9244, 2015 WL 5610752 at *15 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part*, 848 F.3d 89 (2d Cir. 2017).

19. *Actos* is inapposite. Unlike this case, *Actos* concerned settlements with several generics considered to be "first filers" under the Hatch-Waxman amendments and entitled jointly to 180-days of exclusivity.[53] "[U]nder the statutory scheme, there [wa]s no plausible scenario in which another generic would have been entitled to earlier entry."[54] Thus in *Actos*, it was statutory hurdles—not "acceleration" clauses—that prevented generic entry. And in holding the plaintiffs had not plausibly alleged "that the acceleration clauses had the anticompetitive effect of deterring" subsequent generic filers, the court noted that "another case may present circumstances in which such a deterrent effect is plausible."[55] This case presents such circumstances. DPC ¶¶ 59-60, 102, 107, 150-51, 157, 160, 202, 206, 283-84.

Holding that "acceleration" provisions are pro-competitive as a matter of law would "run counter to the Sherman Act's preference for fact-specific inquiries, implausibly reject the premise that MFN clauses produce substantial anticompetitive effects in particular circumstances and contradict the Sherman Act's animating concern for low consumer prices."[56] Indeed, MFNs employed by dominant firms are particularly suspect.[57]

> **b.  The "grace" provisions enabled Amgen to strike its allocation deal with Teva, further delaying generic competition.**

Amgen's attack on the "grace" provisions outside the context of its overall scheme also fails. Amgen makes a textual argument: the "grace" provisions, it says, live within a part of the

---

[53] *Id*.

[54] *Id*. And even though the *Actos* plaintiffs countered that another generic could have entered early by relying on a different statutory mechanism, the court explained "that avenue was foreclosed by [another FDA] . . . decision." *Id*.

[55] *Id.*

[56] *United States v. Delta Dental*, 943 F. Supp. 172, 176 (D.R.I. 1996).

[57] *See* Steven C. Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 ANTITRUST 15, 18 (2013). *See also United States v. Blue Cross Blue Shield*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) ("[I]t is plausible that the MFNs entered into by Blue Cross with various hospitals in Michigan establish anticompetitive effects as to other health insurers and the cost of health services in those areas.").

generic settlement agreements that Amgen now calls the "no-injunction clauses," which, so the argument goes, only restrict Amgen from seeking preliminary injunctive relief against any generic that launches ahead of its entry date. Amgen Br. at 24-25.

Yet no fewer than eight settlement agreements with generic Sensipar ANDA filers—including Cipla and ███████████,[58] whose products the FDA approved in March 2018 and which the plaintiffs allege would have then launched absent Amgen's scheme—contained provisions stating the exact opposite. In denying Amgen's motion for a preliminary injunction against Cipla, this Court analyzed one such provision, § 5.6 of the Amgen-Cipla Agreement, in detail. That provision provides, in part, (and the emphasis is the Court's own):

> [2] *Notwithstanding* anything to the contrary in this Settlement Agreement, *if* [i] any Third Party that has made an At Risk Launch of a Generic Cinacalcet Product (where such At Risk Launch is before or after an at risk launch by Defendants) *is not found to have infringed* one or more valid and enforceable claims of the '405 patent *or* [ii] *has not ceased or agreed to cease selling* such Generic Cinacalcet Product following an At Risk Launch, *then Amgen shall not be entitled to seek or recover any relief* from Defendants for Defendants' at risk sales, offers for sale, distribution, or importation of Defendants' Product.[59]

---

[58] *See, e.g.*, ███████████ Settlement, § 5.6, attached hereto as Exhibit 2. The ███████████ agreement states that "███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████"

[59] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 398 (D. Del.), *aff'd*, 778 F. App'x 135 (3d Cir. 2019) (quoting Amgen-Cipla Agreement, § 5.6).

The Court found that this sentence "restricts Amgen [from seeking any relief] if either condition [i] or [ii] is satisfied."[60] Tellingly, Amgen has never sought damages against any of the generic Sensipar ANDA filers that are now on the market (before their agreed entry date).[61]

## 2. Amgen's scheme effectively delayed generic market entry for a year.

Up to the point of Teva's launch, Amgen's alleged scheme had distorted the market and delayed the start of generic competition by at least ten months. After Teva launched and agreed with Amgen to allocate the market for Sensipar, there were additional months of delay, followed by impaired, piecemeal generic entry.

Amgen disputes that its scheme had anticompetitive effects because (a) four of the generics "continued their Hatch-Waxman litigation against Amgen all the way through trial"; and (b) certain generics ultimately entered earlier than their licensed entry dates. Amgen Br. at 19-20. These hindsight arguments are factually irrelevant and cannot defeat the plaintiffs' monopolization claims.

In a healthy market, each generic firm sued for patent infringement would pursue its claims and defenses, or accept a settlement, based on multiple factors, including the relative

---

[60] *Id.* In that proceeding, Amgen took the opposite position it does here: "this provision restricts Amgen only from seeking *permanent* injunctive relief . . . ." *Id.* at 400 (emphasis in original). The Court disagreed. *Id.*

[61] Despite the plain language of its own settlements, Amgen argues the plaintiffs "cannot plead anticompetitive harm . . . by alleging that a generic 'would have [entered] earlier than it actually did' if that entry would have been 'at risk." Amgen Br. at 23 (citing DPC ¶ 268). Amgen cites *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017) and *EMC Corp. v. Zerto, Inc.*, 2014 WL 3809365 (D. Del. July 31, 2014), but neither helps. A summary judgment ruling, *Wellbutrin* has no bearing here, at the pleading stage, where the plaintiffs allege that the '405 patent was weak and subject to invalidity and/or non-infringement findings. 868 F.3d at 143. *EMC* involved a conclusory, one-sentence invalidity counterclaim, which the court dismissed as insufficient. 2014 WL 3809365 at *2. In so holding, the court observed that invalidity claims "do not need detailed factual allegations" but rather need just "be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). Here, we point to invalidating prior art, more than meeting *EMC*'s standard. DPC ¶¶ 128-30.

strength of its non-infringement and/or invalidity arguments, and the timing of its ANDA's approval. DPC ¶¶ 54, 163. Because generics are seldom, if ever, equally strong across all factors, in a competitive market they would have different entry dates, whether negotiated or not.[62]

Here, the first part of this equation held true: each generic was unique, with non-infringement claims of varying strengths despite the easily-designed-around '405 patent. Yet, as Amgen concedes (and even touts), the terms of its settlement agreements put all settling generics on "equal footing" with respect to entry dates in case of at-risk launch, regardless of the merits of their respective positions. Amgen Br. at 3, 4. Amgen's settlement with the generics in the weakest patent positions included "acceleration" clauses. This disincentivized those in stronger patent positions, which otherwise would be incentivized to pursue an early launch and some period of *de facto* exclusivity, from doing so because their entry would bring about that of others, cannibalizing profits in the process. DPC ¶¶ 5-7, 12, 101-102, 303.

The acceleration clauses thus eliminated the stronger competitors' incentives to enter as early as possible—either by launching at risk or negotiating a settlement with an earlier entry date. For example, even though the FDA approved Cipla's and Aurobindo's ANDAs in March 2018 (DPC ¶ 178), because the weakest generics had acceleration clauses, both companies accepted settlements that delayed their entries. DPC ¶ 303. Those delayed entries deprived the plaintiffs of the benefits of a competitive cinacalcet market. DPC ¶ 270.

It does not matter that four generics litigated their non-infringement claims through trial. The dispositive question is whether generics capable of earlier entry were delayed because of the

---

[62] If a generic's settlement with a brand reflects the strength of the generic's case and entry position, that settlement is not anticompetitive. The Supreme Court recognized this reality in *Actavis*, explaining that not all reverse payments are unlawful: "[w]here a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, . . . the parties may have provided for a reverse payment without having sought or brought about the anticompetitive consequences we mentioned above." 570 U.S. at 156.

web of "acceleration" clauses and grace periods. The plaintiffs allege that they were: although Teva briefly entered the market, it settled with Amgen within the 10-day grace period and before the acceleration clauses in Amgen's other settlements were triggered. DPC ¶¶ 198, 270, 274. Amgen previously argued to this Court that Teva's short-lived launch did *not* trigger the "acceleration" clauses and that other generics were required to stay off the market.[63] Amgen now argues that Teva's at-risk launch enabled multi-generic entry. Amgen Br. at 17. Amgen cannot have it both ways.

And while several generics entered beginning in March of 2019, the plaintiffs allege that Amgen's web of "acceleration" clauses delayed those launches beginning in March 2018. DPC ¶¶ 178-80, 82. Amgen's arguments do not address those allegations. Nor do they address the allegations that after Amgen leveraged its "grace" provisions to buy off Teva and hinder further generic entry, Sensipar ANDA filers were actually delayed by several more months. DPC ¶¶ 210, 219. Even when Cipla did enter, for example, it did so only in limited fashion due to Amgen's conduct and the threat of liability. DPC ¶ 220. The plaintiffs adequately allege an overarching scheme to delay and impair generic competition, and its anticompetitive effects.

**B.     The complaints allege that Amgen and Teva agreed to allocate the cinacalcet market in violation of Section 1 of the Sherman Act.**

Agreements between horizontal competitors to allocate a given market, whether by output restriction or by market division, violate Section 1 of the Sherman Act.[64] "Conspiring to

---

[63] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 396 (D. Del.), *aff'd.*, 778 F. App'x 135 (3d Cir. 2019).

[64] *See United States v. Topco Assoc., Inc.*, 405 U.S. 596, 608 (1972). *See also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("division of markets" unlawful) (citing *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899)); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1242 (3d Cir. 1975); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978) ("[A]n agreement to restrict the production of uranium unquestionably is a price fixing arrangement . . . . In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output.").

reduce industry output as a means of stabilizing or raising prices is prototypical of conduct that has time and again been condemned by courts" as anticompetitive.[65]

"The essence of a market allocation violation . . . is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers."[66] The allegations show that Amgen and Teva did just that: as of December 28, 2018, Teva had launched its generic Sensipar product and was actively competing with Amgen in the market for cinacalcet—making Amgen and Teva horizontal competitors. DPC ¶¶ 14, 304. Amgen and Teva then entered into an agreement under which Teva completely restricted its output for a period of time (*i.e.*, either (a) until mid-2021 or (b) until another generic came on, which would trigger Teva's "acceleration" clause and its ability to resume sales). DPC ¶¶ 189-90. During its brief market presence, Teva enjoyed supra-competitive profits on its generic product (which competed only with the brand and no other generics, and thereby earning Teva far more than Teva would have otherwise earned). DPC ¶¶ 197-204. Teva and Amgen struck their deal in the narrow "grace period" window before the "acceleration" clauses of other settling generics were triggered. DPC ¶ 198. The fact of their hurry-up deal evinces Amgen and Teva's intention to impede other generics coming to market, which the parties knew would eviscerate both Amgen's and Teva's hold on the market and their resulting ability to charge supra-competitive prices and, for Teva, to retain the profits from its launch.[67] Under the Amgen-Teva agreement, Amgen received token

---

[65] *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 869 (N.D. Ill. 2010) (citing *U.S. v. Socony-Vacuum Oil Co*., 310 U.S. 150, 190-91(1940)) (horizontal agreement to remove surplus gasoline from the market, despite continuing competition among defendants, artificially raised prices in violation of the Sherman Act).

[66] *MidWest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983).

[67] If other generics entered, Teva's profits would shrivel due to shelf-stock adjustments and return provisions in Teva's customer contracts. DPC ¶¶ 107, 199.

payments up to $40 million—but only if and so long as other generics stayed off the market. DPC ¶¶ 190, 197-99.

The complaints, as amended, thus plausibly allege an agreement between Teva and Amgen to restrict Teva's output and allocate the Sensipar market back to Amgen. DPC ¶¶ 190, 208, 313. Thus, while the plaintiffs allege that one anticompetitive consequence of the Amgen-Teva agreement is the delay of *other* generics coming to market (discussed *infra)*, they also allege that the agreement was unlawful because it *eliminated competition between Amgen and Teva* by removing Teva as a competitor.[68] As such, it violated Section 1 of the Sherman Act.[69]

### 1. Teva entered an actual agreement to allocate the market and fully understood and intended the anticompetitive consequences of doing so.

The defendants claim that the plaintiffs' market allocation theory fails because the plaintiffs have not alleged that Amgen and Teva jointly planned to allocate the market before actually doing so. Amgen Br. at 14-15. This argument is without legal or logical foundation: in market allocation schemes, defendants are often competitors before reaching a deal to stop competing. For example, in *Palmer v. BRG of Georgia*, two bar review companies "had previously competed in the Georgia market" before they agreed to eliminate that competition.[70]

---

[68] Amgen's reliance on Magistrate Judge Hall's observation that "there is no legal requirement that parties reach the most procompetitive settlements possible either generally or in the patent context" is a red herring. Amgen Br. at 16 (citing D.I. 157 at 24, quotes omitted). Antitrust laws and controlling precedent specifically permit plaintiffs to show that a result can be reached through a less restrictive alternative. *See U.S. v. Brown Univ.*, 5 F.3d 658, 679 (3d Cir. 1993) ("To determine if a restraint is reasonably necessary, courts must examine first whether the restraint furthers the legitimate objectives, and then whether comparable benefits could be achieved through a substantially less restrictive alternative.") (citations omitted).

[69] While market allocation agreements are frequently assessed under the *per se* standard, the question of which standard to apply is irrelevant to this motion as the plaintiffs have adequately pleaded a market allocation agreement under the rule of reason standard. At any rate, courts defer the decision of which standard to apply until later in the case. *See In re High-Tech Emple. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (decision as to which standard applies "is more appropriate on a motion for summary judgment").

[70] 498 U.S. 46, 49 (1990).

The Supreme Court found their market division agreement violated Section 1. The same reasoning applies here. Amgen and Teva entered into an *actual agreement* that restricted Teva's output entirely until mid-2021, allocating the entire U.S. cinacalcet market back to Amgen.

But if some pre-agreement understanding need be reached, the plaintiffs allege that too. Amgen, having set the wheels of its monopolistic scheme in motion, was aware of the purpose behind its insertion of "grace" provisions as a safe harbor opportunity to make a quick deal if a generic did decide to launch at risk, so that the "acceleration" clauses Amgen also injected into its agreements would not be triggered. And Teva fully understood that other generics had received "acceleration" clauses as part of their settlements with Amgen. DPC ¶¶ 110, 115, 126, 143, 185-86.[71] Teva's conscious commitment is further evidenced by the manner of its launch (*i.e.*, months-worth in a single day), and its quick deal with Amgen before the "acceleration" clauses in those other agreements could be triggered. DPC ¶¶ 184, 198.[72]

### 2.   The Supreme Court's decision in *Actavis* does not foreclose the plaintiffs' market allocation theory.

Amgen argues that "[t]he existence of a patent" distinguishes this case from other market allocation cases, and therefore, if any theory is to survive, it "depends upon an allegation of an unlawful 'reverse payment'" under *Actavis*. Amgen Br. at 15, n. 10.

---

[71] Publicly available analyst reports indicate, as early as April 2018, industry understanding that "Amgen presumably provided the settled generics with acceleration clause and they will all enter the market soon after the generics who wins the [infringement] case . . . ." Aaron (Ronny) Gal, Ph.D., *Wkly Biotech/Spec Note (4/23/18): Teva departures; ALK8700 and RG7916 at AAN; Sensipar case workup; Akorn cross-reads*, Bernstein Global Specialty Pharma & US Biotech, April 23, 2018 at 4, attached hereto as Exhibit 3.

[72] *Cf. In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090 at *12 (D.N.J. Oct. 20, 2011) (Section 1 requires "'some form of concerted action' *indicating* a 'unity of purpose or a common design and understanding or a meeting of the minds or a conscious commitment to a common scheme.'") (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)) (emphasis added).

Yet neither *Actavis*, nor any case since, holds that pharmaceutical companies are immune from scrutiny for otherwise anticompetitive agreements that do not neatly fit the reverse payment mold simply because a patent is involved.[73] *Actavis* itself explicitly declined to extend its ruling beyond the circumstances there at issue: a particular (albeit common) situation where brand and generic drug manufacturers settle infringement litigation *before* any potentially dispositive ruling *and before* any generic market entry. In rejecting the FTC's bid for a "quick look" approach, the *Actavis* Court explained that "[w]e do not believe that reverse payment settlements, *in the context we here discuss*, meet th[e] criterion" for presumptive unlawfulness.[74] *Actavis* did not consider a market allocation agreement and did not hold that pharmaceutical manufacturers can only commit antitrust wrongs in the context of infringement litigation through a reverse payment.

### 3.    The Amgen-Teva agreement impaired other generics' market entry.

The defendants also claim they cannot be held liable for the delay to other generics' entry because it was those generics' own decisions to settle with Amgen and to launch or not launch. Amgen Br. at 15-17. The argument finds no support in the law and defies basic principles of antitrust.

That the behavior of dominant firms impacts the decisions and behavior of others in the market, and competition itself, and may give rise to liability, is a foundational premise of antitrust law. As the Third Circuit has observed, "[w]hen a monopolist's actions are designed to

---

[73] Indeed, as Magistrate Judge Hall correctly observed, "*Actavis* did not insulate 'all schemes' that 'involve' patents from *per se* scrutiny." D.I. 157 at 14. While some commentators mused before *Actavis* that a rule of reason analysis should apply to all patent-related settlements (*e.g.*, Herbert Hovenkamp, *Sensible Antitrust Rules for Pharmaceutical Competition*, 39 U.S.F.L. REV. 11, 22 (2004)), they did not suggest that entire theories of recovery (*e.g.*, market allocation) be foreclosed and that only the particular reverse payment scenario later addressed by the Supreme Court in *Actavis* could give rise to liability under the antitrust laws where a patent is involved. And the Supreme Court did not so hold.

[74] *Id.* at 159.

prevent one *or more* new or potential competitors from gaining a foothold in the market by exclusionary . . . conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general . . . ."[75] When firms harm competition, as Amgen and Teva have done here, they are subject to antitrust scrutiny notwithstanding some modicum of agency by other economic actors.

The plaintiffs plausibly allege that Amgen's and Teva's output restriction and market allocation agreement delayed other generics' market entry—and that both parties understood that to be a necessary feature of the agreement. *First*, both parties were aware that Amgen's then-existing settlements with other generic competitors contained "acceleration" clauses that would be triggered if Teva remained on the market and, with that knowledge, leveraged the "grace" period to prevent the "acceleration" clauses from triggering.[76] *See supra* § V.B.1. *Second*, Amgen and Teva structured the potential "payback" to Amgen to be contingent upon any launch by another generic manufacturer; if another generic launched within the prescribed period, Teva's payback would be reduced or eliminated entirely. DPC ¶¶ 197-200, 224. *Third*, the longer other generics stayed off the market, the more money Amgen and Teva would make. DPC ¶¶ 108, 186, 197-200. Obviously, Amgen's monopoly (and monopoly profits) would erode as additional generics entered the market. DPC ¶¶ 44-52. Teva also knew that other generics' launches would trigger shelf-stock adjustments and the full-credit return provisions in their customer contracts, significantly reducing Teva's profits from its launch. DPC ¶¶ 107, 199.

---

[75] *LePage's*, 324 F.3d at 159 (emphasis added). *See also*, Fiona Scott Morton, *supra* note 13 at 424-25. ("[P]rofits depend on the actions of rival firms.").

[76] *See* Keith M. Drake and Thomas G. McGuire, *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, JOURNAL OF COMPETITION LAW AND ECONOMICS, 16(2), 188, 9 (May 11, 2020) ("The presence of such [acceleration] clauses in patent settlements may (1) induce generics to accept later licensed entry dates in settlements and/or (2) deter other potential generic competitors from pursuing challenges to the brand's patent(s). Acceleration clauses thus risk having exactly the opposite effect; that is, they may retard generic entry.")

The Amgen-Teva agreement thus had the intended and foreseeable effect of preventing the other "acceleration" clauses from being triggered—which would have hastened market genericization. Teva got to keep its supra-competitive profits; Amgen got to keep its monopoly; and other prospective competitors were held at bay for months. This was a direct and clear anticompetitive effect of the settlement. The plaintiffs do not contend that Amgen and Teva were obligated to maximize competition; rather, that they cannot unreasonably restrain it.

For its part, Teva protests that it is not illegal for a company to act in its own self-interest. D.I. 214 ("Teva Br.") at 2. The plaintiffs do not dispute that Teva acted in its own financial best interests; companies engaging in anticompetitive acts usually do.[77] But pursuing those interests in a way that intentionally and effectively impairs competition is unlawful (even if other economic actors have some agency themselves—as is also usually the case). And the timing of the Amgen-Teva agreement within the "grace" periods betrays an intent to keep the other "acceleration" clauses from being triggered. The fair inference is that Teva and Amgen acted specifically to forestall other generics from coming to market.[78]

---

[77] *See, e.g.*, Mark S. Levy, Big Pharma Monopoly: Why Consumers Keep Landing on "Park Place" and How the Game Is Rigged, 66 Am. U. L. Rev. 247, 295 (2016) ("[F]irms irrefutably remain entitled to make business decisions that maximize profits. . . . [But] they are not granted unfettered discretion to preclude generic market entry. Firms may not avoid antitrust scrutiny by merely asserting that their conduct serves an economic, self-interested purpose.").

[78] Further undercutting the defendants' position, courts have held that plaintiffs may recover damages arising from the actions of non-defendants. For example, the Seventh Circuit in *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003), held that a plaintiff may sue defendants for overcharges arising a non-conspirator's decision to price at the cartel level: when a "cartel cuts output" it "elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price and thus suffer antitrust injury, just like customers of the cartel members." *See also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167 (3d Cir. 1993) (upholding plaintiffs' injury, which arose from overcharges paid to non-conspirators who were able to reap supra-competitive prices based on defendants' ability to "thwart[] the development" less expensive alternatives to loading iron ore). Thus, like the non-conspirator who "independently" raises prices in response to cartel pricing, the independent decisions of generics to delay their launch in response to the conditions Amgen and Teva produced through their illicit conduct can form the basis of the plaintiffs' injuries here.

4.    **Hindsight cannot save an anticompetitive agreement, which is to be assessed at the time of, and in the context in which, it was made.**

As the Fifth Circuit reiterated just weeks ago, "it is a basic antitrust principle that the impact of an agreement on competition is assessed as of 'the time it was adopted.'"[79] Yet the defendants contend they should be immunized from liability because the agreement did not ultimately work to keep other generics off the market. *See* Amgen Br. at 16-17. So long as some impact is alleged, the Court may not properly consider post-agreement events in assessing whether an agreement was plausibly alleged to be anticompetitive. Here, the plaintiffs allege months more delay and impairment as to other generics following the Amgen-Teva deal.

And there can be no credible argument that the Amgen-Teva agreement did not unlawfully restrain competition by eliminating Teva as a competitor and removing it from the market. The extent to which the defendants eliminated additional competition or otherwise corrupted market pricing or output is a factual question of damages, not injury.[80] Hindsight cannot save Amgen and Teva's naked market division deal from antitrust scrutiny.

C.    **The complaints allege that the Amgen-Teva agreement contained an unlawful reverse payment in violation of Sherman Act § 1.**

Under *Actavis*, the splitting of monopoly profits in the Amgen-Teva agreement constitutes an "large and unjustified" reverse payment. The amended complaints allege the same

---

[79] *Impax Labs., Inc. v. Fed. Trade Comm'n*, 2021 WL 1376984 at *8 (5th Cir. Apr. 13, 2021) (citing *Polk Bros. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985); *see Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003) (reverse payment agreements must be adjudged as of the time they are entered); *Apotex Inc. v. Cephalon Inc.*, 255 F. Supp. 3d 604, 610 (E.D. Pa. 2017) (patent ruling occurring after the challenged reverse payment); *see also In re Lidoderm Antitrust Litig.*, 14-md-02521 (N.D. Cal. Jul. 28, 2014), ECF No. 95 at 18-19 ("An agreement's reasonableness must be judged as of the time it was entered into, rather than in hindsight after contingencies and unknowns have played out.").

[80] *See, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.") (citation omitted).

core reverse payment allegations that the Court already determined were plausibly pleaded. There is no basis to disturb that ruling.

### 1.      The amended complaints neither contradict the plaintiffs' prior pleadings nor upset the Court's finding of an actionable reverse payment.

The defendants' efforts to manufacture "contradictions" in the plaintiffs' amended complaints cannot defeat the plaintiffs' well-pleaded allegations of a large, unjustified payment from Amgen to Teva in violation of Section 1 of the Sherman Act.

Amgen and Teva argue that the plaintiffs' "attack on Amgen's patent" contradicts "any theory that Amgen's release was disproportionally valuable compared to the up-to-$40 million that Teva agreed to pay for it." Amgen Br. at 10. But there is nothing inconsistent in the plaintiffs' market allocation and reverse payment allegations: they are two sides of the same coin, and both arise from the '405 patent's notable weakness. The infirmity of the '405 patent (also alleged in the plaintiffs' earlier complaints) simply demonstrates that Amgen was incentivized to pay Teva to leave the market, and that it had no meaningful expectation of using that patent to secure judicial relief against Teva. DPC ¶ 201. By allowing Teva to retain its at-risk launch profits and to re-enter should anyone secure a more favorable entry date, Amgen provided Teva a benefit that Teva could not have obtained through the patent litigation. Had Teva litigated and won on appeal (or remand) rather than settling, it would have (a) remained on the market (*i.e.*, not exited), earning far less in profits, since the launch of other generics would have triggered both full-credit returns and shelf stock adjustments, as discussed above, and (b) not obtained the "acceleration" clause. DPC ¶¶ 199-200, 202. In light of these facts, the claim that Teva and Amgen received "nothing more than a compromise of the enforcement of claims tied to the disputed patent" strains credulity. At any rate, the plaintiffs can meet their pleading burden "without describing in perfect detail the world [absent the restraint]," and need not allege the value of Amgen's release at this stage. The pleaded facts show that both Amgen and Teva

were in a better position as a result of the settlement than they would have been without it, and that purchasers and consumers were injured as a result. DPC ¶¶ 197-203. No more is required.

Amgen also argues that "DPPs' claims are self-contradictory because DPPs . . . claim that the original acceleration clauses were unlawful—so it is difficult to see how they can then claim that the alleged failure to trigger those clauses was anticompetitive." Amgen Br. at 11. The plaintiffs do not claim that the "failure to trigger the acceleration clauses was anticompetitive." Rather, they claim that inclusion of the "acceleration" clauses in Amgen's various settlement agreements was part of Amgen's overarching scheme to impair generic competition, maintain its market power, and continue its monopoly pricing. By disincentivizing would-be generic competitors' launches, Amgen's systematic insertion of those clauses into its patent settlement agreements impaired competition in the cinacalcet market, just as it was intended to do.

2.   **The defendants' repackaged arguments do not defeat the plaintiffs' well-pleaded allegations of an unlawful reverse payment from Amgen to Teva.**

The plaintiffs' amended complaints, like their earlier complaints, describe "an unexplained large transfer of value from the patent holder to the alleged infringer[.]"[81] As the following chart illustrates, the same core factual allegations that the Court found adequate to support a violation under Sherman Act §1 remain:

| Key allegations cited in the Court's Order on Defendants' initial Motions to Dismiss, D.I. 177 at 10 | Amended Allegations | |
|---|---|---|
| | DPC ¶¶ | EPC ¶¶ |
| EPC ¶ 63 ("Teva still realized over $170 million in net revenues, which … is far more than it could have retained absent the unlawful agreement.") | 87, 203, 208, 304 | 201; *see also* 190, 193 |
| EPC ¶ 68 ("[B]y entering its illicit agreement with Amgen, Teva ensured that the enormous profits it reaped from its one-week of sales would not be significantly reduced by price competition from rival Sensipar generics.") | 107-108, 197-208, 304, 313 | 199; *see also* 182-187, 193, 203, 208 |

---

[81] *King Drug Co. of Florence v. SmithKline Beecham Corp.*, 791 F.3d 388, 403 (3d Cir. 2015).

| | | |
|---|---|---|
| DPC ¶¶ 72–78 (describing economics of generic pricing.) | 36, 44-53 | 43, 52-58 |
| DPC ¶ 90 (alleging Teva agreement ensured no additional generics would erode de facto-exclusivity pricing). | 198-200, 206, 285, 294, 302, 313 | 35, 102-103, 187, 199, 277, 305 |

Seeking to relitigate the issue, however, the defendants lob several repackaged arguments at the plaintiffs' reverse payment allegations. For the same reasons previously explained[82] and upheld by the Court, these arguments again fail.

### a.   Amgen made a large, unjustified payment to Teva.

The defendants contend that no large, unjustified payment to Teva was made, claiming that (a) "by releasing Teva's at-risk sales and allowing accelerated entry, Amgen's agreement to release Teva's liability . . . functions like the early entry compromise explicitly blessed by *Actavis*"; (b) even if Teva's retention of more than $350 million in revenue could be unlawful under *Actavis*, the plaintiffs have failed to allege facts suggesting that "Amgen's release of its claim for at-risk damages was 'unjustified' in the sense that it exceeded the 'fair value' of what Amgen received in return—*i.e.*, the up-to-$40 million payment"; and (c) the "acceleration" clause provided to Teva was not itself a large and unjustified payment. Amgen Br at 9-11.

These arguments remain meritless. First, the plaintiffs allege (DPC ¶¶ 197, 204, 208) that, as the Court previously recognized, Teva received "a share of monopoly profits the brand would otherwise have earned over the few days of seeming competition, before the brand induced the generic to exit the market in exchange for (among other things) keeping most of the profits the generic earned over those few days." D.I. 177 at 10. These retained revenues *far exceeded* what Teva would have realized had its non-infringement judgment been upheld on

---

[82] The plaintiffs incorporate their prior 12(b)(6) opposition briefs. D.I. 71, 74, 76, 167, and 168.

appeal. *Actavis* teaches that courts must closely scrutinize agreements, such as this one, that put the generic in a better position than it would have been in had it won the patent litigation.[83] Had Teva's patent victory been finally upheld, other generics would have entered, dramatically driving down all cinacalcet prices and triggering full-credit returns and shelf-stock adjustments in Teva's customer contracts. DPC ¶¶ 197-204. Windfall settlements like this can and do give rise to reverse-payment claims.[84]

Amgen's payment to Teva is nothing like the hypothetical settlement "blessed" in *Actavis*, nor is it commonplace.[85] In *Actavis*, the Supreme Court described a "commonplace" settlement in which "Company A sues Company B for patent infringement and demands, say,

---

[83] *See* 570 U.S. at 152 ("In reverse payment settlements . . . a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market. That, we think, is something quite different [from a traditional damages-discount settlement]."). Any factual dispute about whether Teva earned more by settling than it would have realized had it continued litigation cannot be resolved on a Rule 12(b)(6) motion. Report, D.I. 123 at 17. That Teva was able to sell months' worth of cinacalcet retain 90% of the supra-competitive revenues indisputably left Teva better off than it would have been had it sustained its non-infringement judgment on appeal. The settlement afforded Teva the advantages it would have gained if it had been awarded a 180-day exclusivity period under 21 U.S.C. § 355(j)(2) and (j)(5) as the first filing generic (it wasn't) and Amgen had agreed not to launch an authorized generic during that 180-day period (it didn't).

[84] *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 253-54 (3d Cir. 2017) (Pfizer's release of substantial damages claim arising from Ranbaxy's at-risk launch sales for a token sum stated reverse payment); *In re Nexium Esomeprazole Antitrust Litig.*, 42 F. Supp. 3d 231, 281 (D. Mass. 2014) ("Teva and AstraZeneca's settlement of a contingent liability . . . amounted to an illegal reverse payment under the *Actavis* standard.").

[85] The defendants insist that Teva's "payment" of $40 million to Amgen (which would have been less had Amgen and Teva not succeeded at keeping other generics off the market) makes this a "commonplace" settlement not subject to antitrust scrutiny. But as this Court has already recognized, "the simple inclusion of 'a token payment by the purportedly infringing generic manufacturer" does not "shield [patent] settlements from antitrust review.'" D.I. 177 at 9 (quoting *F.T.C. v. AbbVie Inc*., 976 F.3d 327, 355 (3d Cir. 2020)). *See also* DPC ¶¶ 190, 197, 199. The plaintiffs here allege that Teva made "a token payment" in exchange for retaining the vast majority of its launch profits—over $350 million that it could not have expected had it remained on the market, with *or without* a settlement. By agreeing to remove itself from the market, Teva protected those profits. This was anything but commonplace.

$100 million in damages."[86] According to the Court, in such circumstances, "it is not uncommon for B (the defendant) to pay A (the plaintiff) some amount less than the full demand as part of the settlement—$40 million, for example."[87] Here, while Amgen chose the same $40 million sum as in the *Actavis* hypothetical, the potential damages liability incurred by Teva is some *four times* the amount in the *Actavis* hypothetical.[88]

Second, the defendants argue that the plaintiffs have not alleged an "unjustified" payment because they have not pleaded that Amgen's release of its at-risk damages claim exceeded the "fair value" of the $40 million payment to Amgen. Amgen Br. at 9. This misconstrues *Actavis*, which makes clear that a "fair value" analysis is relevant only in the context of side deals to an alleged reverse-payment settlement, where a generic firm agrees to provide services to the brand company such as marketing or promotion services as part of, or to camouflage, a pay-for-delay deal.[89] In such situations, courts may consider the "fair value" of such services to assess whether they might justify the payment made by the brand and thereby refute the charge of anticompetitive conduct.[90] But "fair value" has no relevance here, where there was no such side

---

[86] 570 U.S. at 151-52.

[87] *Id.*

[88] Nor does *Actavis* condone all patent settlements that encompass a percentage of alleged damages. As the Third Circuit explained in *In re Lipitor Antitrust Litigation*, "[i]f parties could shield their settlements from antitrust review by simply including a token payment by the purportedly infringing generic manufacturer, then otherwise unlawful reverse payment settlement agreements attempting to eliminate the risk of competition would escape review." 868 F.3d 231, 258 (3d Cir. 2017). Accordingly, the *Lipitor* court found that a $1 million payment in the face of liability of "hundreds of millions of dollars," was "paltry by comparison" and "therefore properly subject to antitrust scrutiny." *Id.*

[89] *See Actavis*, 570 U.S. at 159 (noting that justification for reverse payment may include "fair value for services").

[90] *Id.*; *see also In re Lipitor Antitrust Litig.*, 868 F.3d at 256.

deal.[91] The question is whether there was a large and unjustified payment—*measured against saved litigation expenses only*—and whether the brand paid for delay.[92]

Third, contrary to the defendants' suggestion, reverse payments must be "considered holistically to determine [their] alleged effects on competition."[93] This Court already rejected Amgen's efforts to partition the "acceleration"/grace period provisions from Amgen's agreement to Teva's retention of revenues exceeding $350 million.[94] Order at 11. Amgen's attempts to revive this argument (Amgen Br. at 11) should be rejected.[95]

### b. The Amgen-Teva agreement extended generic delay.

The plaintiffs also adequately allege that the Amgen-Teva agreement extended the delay already achieved by Amgen's monopolistic scheme. Its terms impaired not only Teva's entry (Teva agreeing to come off the market) until mid-2021, but also impaired entry by other generics, which remained mired in legal proceedings for months, while others waited in the wings awaiting the results, before obtaining the assurance needed to launch. Even then, the next market entrant (Cipla) launched at reduced capacity.

---

[91] Despite the defendants' attempts to recast Teva's $40 million payment back to Amgen, there is no side deal here. Teva was not obligated to perform any services to Amgen under the agreement. In such situations, *Actavis* does not countenance any assessment of "fair value."

[92] 570 U.S. at 159 ("the likelihood of a reverse payment bringing about anticompetitive effects depends upon . . . its scale in relation to the payor's anticipated future litigation costs").

[93] *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 322 (D.R.I. 2019) (collecting cases). The value of saved litigation costs is a question of fact that cannot be adjudicated in this motion. In any event, it is difficult to imagine that the saved litigation expenses—post trial—could have exceeded $350 million.

[94] And there is no question that the plaintiffs allege that the "acceleration" clause, together with Teva's retained revenues, constitutes a payment that is "large and unjustified." DPC ¶¶ 15, 190, 197-200, 283, 292, 312, 318.

[95] The defendants' apparent argument that the payment was "justified" —notwithstanding their misapprehension of *Actavis*'s concept of "fair value"—should also be rejected. Amgen Br. at 8-9. The plaintiffs allege the payment to Teva was unjustified. DPC ¶ 312. Indeed, the plaintiffs have continued to allege that the value transfer from Amgen to Teva was large and unjustified—and thus unlawful. *See, e.g.*, DPC ¶¶ 15, 190, 197-200, 283, 292, 312, 318.

The defendants argue their agreement did not cause any delay or impairment to Teva's market re-entry, since Teva was sold out in early January. *See* Amgen Br. at 11-12; Teva Br. at 16. But absent the agreement, Teva would have obtained or produced more cinacalcet, as any rational economic actor would have done. By removing Teva as a competitor until mid-2021, the agreement kept all Teva generic Sensipar out of the market for over two years. During that time, its generic could not serve as a price disciplining force on any other competitor. This impairment of competition, a direct result of the defendants' agreement, is enough to state a claim.[96]

The defendants also claim that other generics were not impaired by the Amgen-Teva agreement. Citing this Court's preliminary injunction ruling in the *Cipla* action, Teva contends that the agreement caused no delay because "Cipla could have launched without liability *the moment* Teva launched at risk on December 28, 2018." Teva Br. at 12. As an initial matter, it still took months after said launch for Cipla to obtain that ruling. And when Cipla did launch, it did so in very limited quantities, citing the litigation threat from Amgen. DPC ¶ 220. Regardless, as courts have repeatedly held, and as discussed above, reverse-payment agreements must be adjudged *as of the time* they were entered; subsequent events are not relevant.[97] So the defendants' insistence that other generics did eventually launch before their agreed entry dates, while true, is misplaced. At minimum, the plaintiffs allege that competition was impaired by the Amgen-Teva agreement. Discovery will show the extent of that delay.

Finally, the defendants argue that permitting the plaintiffs' reverse payment claims to move forward would distort the Hatch-Waxman Act's incentive structure and discourage

---

[96] *See, e.g.*, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104 (3d Cir. 2010) (agreement between dominant healthcare provider and insurer to protect each other from competition violated antitrust law by creating "suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run").

[97] *See, e.g.*, *Impax Labs*, 2021 WL 1376984 at *8 ("[It] is the basic antitrust principle that the impact of an agreement on competition is assessed as of the time it was adopted.").

generics from launching at risk. Amgen Br. at 14; Teva Br. at 19-20. But generics have—and will continue—to evaluate at-risk launch opportunities based on the strengths of their patent positions and the extent of their exposure if they are found to have infringed. Here, the patent strength was so minimal that Teva would still have been economically incentivized to launch at risk and continue to compete. And Teva and Amgen could still have reached a procompetitive agreement—one without a payment and with an earlier entry date.[98]

### D.   The plaintiffs have standing to sue Teva.

The plaintiffs have Article III and antitrust standing to sue Teva because they allege that they were injured by paying and reimbursing more for cinacalcet than they would have absent the Amgen-Teva agreement. DPC ¶¶ 13, 16-17, 158, 203, 248, 276, 307, 319; EPC ¶¶ 14, 19–21, 281, 292. Under controlling Third Circuit law, no more is required at this stage.[99]

Ignoring the Court's determination that the plaintiffs' allegations that Amgen secured Teva's market exit "for the purpose and effect of raising and maintaining the supra-competitive prices Plaintiffs would have to pay for Sensipar" (D.I. 177 at 12) were sufficient, Teva claims the plaintiffs suffered no harm (i.e., paid no supra-competitive prices for brand or generic Sensipar) as a result of the Amgen-Teva agreement, and thus lack standing. Teva Br. at 14.

This argument hinges on the question of impairment of generic entry. There was no delay of either the products of other generics or of the Teva product, so the argument goes, and

---

[98] In support of its contention that permitting liability here would discourage future at-risk launches, Amgen points to recent California legislation on pharmaceutical settlements. Amgen Br. at 14 (citing Cal. Health & Safety Code § 134002(a)(2)(F)). But this legislation explicitly states that it "does not modify, impair, limit, or supersede the applicability of the antitrust laws of California as defined in the Cartwright Act." Cal. Health & Safety Code § 134002(d)(1).

[99] *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (plaintiff need only "allege[] some specific, identifiable trifle of injury"); *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 165 (3d Cir. 2017) (in reverse payment cases, allegations of "increased drug prices for [the brand] (and its generic equivalents)" suffice to plead antitrust standing).

therefore no harm. Teva Br. at 14-17. But as amended and as discussed above (*see supra* §§ V.A.2; V.B.3; V.C.2.b), the plaintiffs have amply alleged that the Amgen-Teva agreement impaired competition.[100] Indeed, while the Court held that the plaintiffs' prior complaints did not adequately allege delay as to other generics, the Court nevertheless observed that "Amgen and Teva structured their agreement so that both make more money the longer the market remains free of other generic competition."[101] One way to view the Amgen-Teva agreement, the Court observed further, is that the two "ceased their ostensible 'competition' before their actions would harm both of them by opening the floodgates to additional generic competition." D.I. 177 at 13.

In any case, the plaintiffs have both Article III and antitrust standing to sue Teva, based on Teva's agreement to suspend cinacalcet sales until mid-2021. The plaintiffs allege that Teva's "acceleration" clauses deterred full-scale launches by other Sensipar generics. DPC ¶ 202. Teva contends that because it sold all its product in its days-long launch, there was no delay. Teva Br. at 15-16. This argument, of course, rests on the presumption that Teva (among the world's largest generic drug manufacturers) would not have continued to make and sell cinacalcet absent its agreement with Amgen, because it had sold its "entire inventory" (thought rationally, it would have made more inventory if it could have sold it profitably). Teva's arguments may not be credited at this stage of the proceedings, where all inferences are drawn in the plaintiffs' favor.[102]

---

[100] *See, e.g.*, DPC ¶¶ 178-81, 182 (but for Amgen's unlawful conduct, Cipla, Aurobindo, Strides, Piramal, and Mylan all would have launched their generic products earlier than they did); DPC ¶¶ 214, 217, 228-30, 232, 243 (showing dates of delayed generic launches).

[101] *Cipla Ltd. v. Amgen Inc.*, 386 F. Supp. 3d 386, 409 n.25 (D. Del. 2019), *aff'd*, 778 Fed. App'x 135 (3d Cir. 2019).

[102] Teva also argues that even if it did have additional product to sell, indirect purchaser plaintiffs do not allege they could have purchased it given that pharmacies purportedly had a six-month supply of Teva generics. Teva Br. at 17. However, EPPs' complaint alleges that Teva shipped a "multi-month" supply, which, while consistent with Mr. Cunard's estimate of six-months' supply, is not synonymous with it. Indeed, Teva's *own* witness in the *Cipla* Action stated that the supply it sold was 3.6 months. *See* EPC ¶ 171 n.42. In any event, even if Teva's

As a rational economic actor, Teva would not have bargained for a re-entry date and an "acceleration" clause had it not been prepared to make and sell additional product. As this Court has already observed, "[n]o one disputes that such a[n acceleration] clause had value to Teva." D.I. 177 at 11.[103] That could not be true if Teva had no plans to sell cinacalcet at a later date.

The extent to which the plaintiffs' alleged overcharges were "minimized" by the ultimate entry of other generic competitors, as Teva argues (Teva Br. at 18-19), is a question of damages. It is premature here and cannot defeat the plaintiffs' standing.[104]

## VI.   CONCLUSION

For these reasons, Amgen's and Teva's motions to dismiss should be denied. To the extent the Court grants any portion of the defendants' motions to dismiss, the plaintiffs respectfully request leave to amend their complaints.


Date: April 27, 2021                              Respectfully submitted,

---

contention were true, the quantity Teva launched would have no bearing on antitrust injury because the Amgen-Teva agreement caused Teva to exit the market, and it has yet to return.

[103] Teva argues that because the direct purchaser plaintiffs have not alleged that they made any purchases from Teva, they have no injury. Teva Br. at 17–18. But this is legally irrelevant. "The fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all for each co-conspirator contributed to the charging of the supra-competitive price paid by the purchaser." *Bogosian v. Gulf Oil Co.*, 561 F.2d 434, 448 (3d Cir. 1977), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). As Teva's own cited authority recognizes, "[o]ne who joins an existing conspiracy is responsible for all prior acts committed in furtherance of the conspiracy." *Marian Bank v. Elec. Payment Srvs. Inc.*, No. 95-cv-614, 1997 WL 367332 at *4 (D. Del. Feb. 5, 1997). Teva's reliance on *Marian Bank* is misplaced; in *Marian Bank*, the court dismissed the plaintiff's claim because that company's participation in the conspiracy post-dated the plaintiff's existence as a going concern.

[104] Teva also asserts, without citation, that "Plaintiffs concede that the presence or absence of Teva product on the market was no longer relevant" after multiple generics launched. Teva Br. at 19. To the contrary, the complaints allege that "although other generic manufacturers have since launched generic versions of Sensipar, competition in the market remains impaired as a result of the Amgen-Teva agreement due to the fact that Teva is no longer selling generic Sensipar." EPC ¶ 13; DPC ¶¶ 190, 302, 313.

**/s/ Ian Connor Bifferato**
Ian Connor Bifferato (Del. Bar No. 3273)
**THE BIFFERATO FIRM, P.A.**
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
cbifferato@tbf.legal

OF COUNSEL:
Karin E. Garvey
Matthew J. Perez
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
kgarvey@labaton.com
mperez@labaton.com

*Interim Lead Counsel for the Indirect
Purchaser Class*

Lee Albert
**GLANCY PRONGAY & MURRAY
LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
lalbert@glancylaw.com

Melinda R. Coolidge
**HAUSFELD LLP**
888 16th Street, N.W.
Suite 300
Washington, DC 20006
Tel: (202) 540-7200
mcoolidge@hausfeld.com

Adam J. Pessin
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
apessin@finekaplan.com

*Additional Counsel for Indirect Purchaser
Plaintiffs*

**/s/ Tiffany J. Cramer**
Tiffany J. Cramer (Del. Bar No. 4998)
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
2711 Centerville Road Suite 201
Wilmington, DE 19808
Tel: (302) 656-2500
tjc@chimicles.com

*Liaison Counsel for the Proposed Direct
Purchaser Class*

OF COUNSEL:
Thomas M. Sobol
Bradley J. Vettraino
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
tom@hbsslaw.com
bradleyv@hbsslaw.com

Linda P. Nussbaum
Bart D. Cohen
Peter Moran
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
Tel: (917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
pmoran@nussbaumpc.com

*Interim Co-Lead Counsel for the
Proposed Direct Purchaser Class
and Counsel for Plaintiff César Castillo,
LLC*

Dianne M. Nast
Michael Tarringer
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
mtarringer@nastlaw.com

Mike Roberts
**ROBERTS LAW FIRM, P.A.**
20 Rahling Cir.
Little Rock, AR 72223
Tel: (501) 821-5575

mikeroberts@robertslawfirm.us

*Counsel for KPH Healthcare Services, Inc.*

John Radice
Daniel Rubenstein
Kenneth Pickle
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com
kpickle@radicelawfirm.com

*Additional Counsel for the Proposed Direct
Purchaser Class*